BARBEE v. CHRISTY-FOLTZ, INC. — Case No. 09-2056

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LAWRENCE C. BARBEE,

                          Docket No. 09-2056

        Plaintiff,

  vs.                      Urbana, Illinois
                              October 18, 2010

CHRISTY-FOLTZ, INC.,

        Defendant.

EXCERPTS FROM JURY TRIAL -- Day 1 of 4

BEFORE THE HONORABLE DAVID G. BERNTHAL
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S :

For the Plaintiff:     MARY LEE LEAHY, ESQUIRE
                       Leahy Law Offices
                       308 East Canedy
                       Springfield, Illinois  62703
                       (217) 522-4411

                       DOUGLAS J. QUIVEY, ESQUIRE
                       Londrigan, Potter & Randle, P.C.
                       1227 South Seventh Street
                       P.O. Box 399
                       Springfield, Illinois  62705
                       (217) 544-9823

For the Defendant:     R. SAMUEL POSTLEWAIT, ESQUIRE
                       Winters, Featherstun,
                       Gaumer, Kenney, Postlewait,
                       Stocks & Flynn
                       225 N. Water St., Suite 200
                       Decatur, Illinois  62525
                       (217) 429-4453

Court Reporter:       LISA KNIGHT COSIMINI, RMR-CRR
                       U.S. District Court
                       201 South Vine, Suite 344
                       Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript produced by computer.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056                    2

I  N  D  E  X

Page

EVIDENCE ON BEHALF OF THE PLAINTIFF:

LAWRENCE C. BARBEE

Direct Examination by Ms. Leahy ................  3

Cross-Examination by Mr. Postlewait ...........  33

Redirect Examination by Ms. Leahy .............  67

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1              (In open court; jury present.)

 2              LAWRENCE C. BARBEE, sworn, 2:08 p.m.,

 3              DIRECT EXAMINATION BY MS. LEAHY:

 4       Q    State your name, please.

 5       A    My name is Lawrence C. Barbee.

 6       Q    And your address, Mr. Barbee?

 7       A    My address is 259 East Garfield Street,

 8  Decatur, Illinois.

 9       Q    When were you born?

10       A    I was born in 1959, July 28.

11       Q    And where were you born?

12       A    I was born in Ripley, Tennessee.

13       Q    Were you raised in Tennessee?

14       A    Yes, ma'am.

15       Q    Are you currently employed?

16       A    Yes, ma'am.

17       Q    And where do you work?

18       A    I work at Chris-- I work for Christy-Foltz

19  through Grohne Concrete.

20       Q    And what position do you hold?

21       A    I am a material hauler, truck driver.

22       Q    And how long have you held that job?

23       A    I've held that for three and a half years.

24       Q    And let's talk a little bit about

25  Christy-Foltz.  What kind of business is it?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Christy-Foltz is a general contracting

2  business.  It has several things that can be done there

3  as general contractor.  They have plumbing, painting,

4  Grohne Concrete.  They do concrete work.  They do on site

5  with other concrete -- other constructions, sidewalks.

6  They do all kind of -- they have elevators, cranes that

7  whatever have you where, or they do bridges and road

8  constructions -- a lot of stuff.

9      Q     And they're located in Decatur, correct?

10     A     Yes, ma'am.

11     Q     And how many different locations does

12  Christy-Foltz have?

13     A     They have the south -- on South Main they have

14  Christy-Foltz, the main office at the 700 block of South

15  Main.  And they also have Grohne Concrete, which is, I

16  imagine, the 2000 block of Water Street.

17     Q     And at that Grohne plant which is owned by

18  Christy-Foltz, can you describe how many buildings there

19  are, the kind of layout?

20     A     At Grohne Concrete, at the Water Street plant,

21  there's two separate buildings; and the main building

22  where Mr. Ron Grigg, supervisor, is, is at the west side

23  of the estate.  So on the east side, there's the batch

24  plant office and the batch plant.

25     Q     Is the batch plant office within the building

1  known as the batch plant?

2      A      Yes, ma'am.  The batch plant office is inside

3  there.

4      Q      And Mr. Grigg's office is a separate building?

5      A      Yes, ma'am.

6      Q      Now, let's talk about a typical workday for

7  you.  What time do you go to work?

8      A      7:00 in the morning I'm normally at Vulcan

9  Material; but before then I am to go, check out my truck,

10 get everything ready to go and I meet at Vulcan Material.

11     Q      And why do you go to Vulcan?

12     A      At the beginning of our day as a material

13 hauler, we go to Vulcan Material to either get sand or

14 rock or whatever have you to take to Grohne Concrete.

15     Q      And when you say you take -- so you take it --

16 you take your truck, pick up a load, and come back to

17 Grohne Concrete?

18     A      Correct.

19     Q      And what do you usually do next?

20     A      Well, what we normally do then is stop in the

21 batch, at Grohne Concrete, in the office where Mr. Ron

22 Grigg is to see what else we may have to do for that day.

23     Q      Now, what days of the week do you work?

24     A      I work Monday through Friday, sometime on

25 Saturdays, from like 7:00 to maybe 3:30 or something like

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    that in the afternoon.

2        Q    Now, we've heard discussion of the, Grohne

3    being in the concrete business, right?

4        A    Yes, ma'am.

5        Q    And sometimes do you work as a ready mix

6    driver?

7        A    Yes, ma'am.

8        Q    And if we look back over the last few years,

9    how often do you work as a ready mix driver?

10       A    Often as needed, really.  Some mornings we come

11   in, we may do a half a day of material hauling; and the

12   rest of the day we may do concrete.  So whenever is

13   needed.

14       Q    Would there be a week where you would do

15   nothing but hauling and then another week where you would

16   do ready mix from time to time?

17       A    Yes, ma'am.

18       Q    And if you're doing the ready mix, are you paid

19   under the terms of the ready mix driver contract with the

20   Teamsters Union?

21       A    Yes, ma'am.

22       Q    And if you work as a hauler, are you paid

23   according to the rate paid pursuant to another contract

24   with the Teamsters?

25       A    That is correct.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     Mr. Barbee, are you involved in activities in

2   the community?

3      A     Yes, ma'am.  I do a lot of community work.  I'm

4   also with the Weed and Seed Program in Decatur where

5   community leaders come together.  We do a lot with kids.

6   We try to deter kids away from guns and drugs, STDs,

7   violence, and stuff like that.

8            Also, I do a walk with the Macon County

9   Sheriff's Department with kids to let them know how

10   either you can look at yourself from this side of the

11   wall or be inside and look out; and it's called "The Look

12   In/Look Out Program" that I do at the Macon County

13   Sheriff's Department.

14            Also --

15      Q     And when you say "look in/look out," what are

16   you looking in at, and what are you looking out at?

17      A     Well, kids can look in and say, "Is this where

18   I want to be?  Or would I rather be out here looking in,

19   or inside looking out?

20      Q     And when they look in, what are they looking

21   into?

22      A     So they don't have no parts to that.  They said

23   they don't want to be in jail, you know.  It's very

24   devastating to a child to see something like that.

25      Q     Now, Mr. Barbee, you've been here throughout

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    the proceedings, right?

2        A    Yes, ma'am.

3        Q    And you heard the judge read a stipulation that

4    the parties agreed that on August 9th of 2007 Gary

5    Roberts called you "nigger"?  You heard that stipulation

6    read?

7        A    Yes, ma'am.

8        Q    Tell us what happened that day.

9        A    On that day -- at the end of my workday, I stop

10   in at Grohne Concrete at the main office where Mr. Ron

11   Grigg be and turn in my paperwork and to get further

12   assignments or whatever have you.

13           On that day, turning in my paperwork, as I

14   entered there, there was -- Gary Roberts and Kurt

15   Schinzler were in the office.

16       Q    Was Mr. Grigg there?

17       A    No, ma'am.  He was not.

18       Q    What happened next?

19       A    What happened next was Gary Roberts said, "I

20   know your ears are burning because here comes my favorite

21   nigger."

22       Q    What did you say or do?

23       A    I didn't say anything.  I was shocked.  I was

24   really hurt, you know, because I hadn't done anything to

25   anybody for that.  So it caught me off guard.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     Now, I think you said someone else was present.
2  Who was that?
3      A     Mr. Kurt Schinzler was there.
4      Q     Did he say anything?
5      A     No, he didn't.
6      Q     What, if anything, did you do about what Mr.
7  Roberts had said?
8      A     At the end of that day, I went and put my
9  paperwork up and dropped my load off; and what I did, I
10 went home, thought about it over and over again and
11 whatever.
12          The next morning, meeting with my union
13 steward, I told him what had happened.
14     Q     And who was your union steward?
15     A     My union steward was Kevin Fowler.
16     Q     What happened next?
17     A     Kevin said that -- he asked me, "Who was there?
18 Was Mr. Ron there?"
19          And I told him no, and I told him Kurt was the
20 only one that was there.
21          And he said, "Kurt didn't say anything?"
22          And I said, "No.  We both didn't say anything."
23          And he said, "Well, I'll tell Ron."
24     Q     And by "Ron," did you think he was referring to
25 Mr. Grigg?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Yes.  Yes, ma'am.

2      Q     On that day, did you have any conversations

3  with Mr. Grigg about what had happened in regard to Mr.

4  Roberts?

5      A     Yes.  I told him what had happened.

6      Q     When was that?

7      A     After I came to the office of Mr. Ron Grigg

8  with my first load, he said he had heard what Mr. Roberts

9  had done, and he think that was a stupid thing and wasn't

10  gonna tolerate that.

11          And I said, "Okay," and proceeded on for the

12  day.

13      Q     Did you have any further conversation -- by the

14  way, let me go back.

15          When you say "proceeded on," you continued to

16  do your work assignment?

17      A     Yes, ma'am.

18      Q     Did you have any further conversation with Mr.

19  Grigg that day?

20      A     On that day, Mr. Ron Grigg called me on the

21  radio and said to come to the batch plant office, that

22  Mr. Robert [sic] would like to speak with me.

23      Q     And did you do that?

24      A     Yes, ma'am.

25      Q     And so you came to -- that would be Grohne?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Yes, ma'am.

2      Q     Where the batch plant's located?

3      A     Correct.

4      Q     And when you got there, what did you do?

5      A     When I got to the batch plant office, I went

6   inside the batch plant office, and there was Scott

7   Spitzer and Mr. Larry Benton inside the batch plant

8   office.  So I went in and waited for Mr. Roberts to come.

9      Q     Now, let's talk a little bit about that batch

10  plant office.  How big is it?

11     A     It's a very small place.  There has been time

12  when probably five or six of us have been inside the

13  batch plant office.

14     Q     And does that make it crowded, or is there lots

15  of space?

16     A     It's crowded.

17     Q     So you were there, and you were waiting for Mr.

18  Roberts.  Did he come?

19     A     Yes, ma'am.  Mr. Robert came in; and when Mr.

20  Robert came inside the office, batch plant office, he

21  said, "I'm sorry," and, "I didn't think you was gonna

22  take it like that," and just kind of nonchalant and

23  really acted like he didn't really care, you know, and

24  just kind of walked out.

25     Q     What happened next?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1       A    What happened next, as I got ready to walk out

 2   the batch plant office, Scott Spitzer said, "You know

 3   what?  When you guys say 'nigger,' it's no problem but

 4   when we say 'nigger,' it's a problem."

 5            So I just kind of looked at him like:  What

 6   have you got to do with this?

 7            At that particular time, Larry Benton said,

 8   "You know what?  I don't allow my kids to listen to that

 9   nigger shit; and when they do, I tell them to cut it

10   off."

11       Q    What happened next?

12       A    What happened next, I left the batch plant

13   office, went immediately to Mr. Ron Grigg and told him

14   that I didn't think that that was appropriate.  I also

15   told him that, what had happened with Scott Spitzer and

16   me and Larry Benton.

17       Q    So let's back up a little bit.  Where was Mr.

18   Grigg when you told him?

19       A    Well, Mr. Grigg was in his office.  It was

20   probably 100 feet away from the other building.  So I

21   walked from there up to his office.

22       Q    So you walked from the batch plant to his

23   office.  Was anyone present besides Mr. Grigg when you

24   talked with him about Roberts and Spitzer and Benton?

25       A    When I walked in the office, Kurt Schinzler was
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   there and Mr. Ron Grigg.

2       Q    And that's when you told him --

3       A    Yes.  That's when I told him; I said, "The

4   apology wasn't appropriate.  It was meaningless.  I

5   didn't think he, he was sincere."  And I also told him

6   about what Scott Spitzer had said and what Larry Benton

7   had said, and I thought it was gonna escalate from there.

8       Q    Did you ever find out that Gary Roberts had

9   been disciplined for the use of the N word?

10      A    Yes.  I received a letter stating that Mr.

11  Roberts was being suspended; and I also heard that Mr.

12  Aldridge, Terry Aldridge, was being suspended also for N

13  word or something that happened.

14      Q    As far as you know, was any action taken

15  against Mr. Spitzer?

16      A    No.  There was not.

17      Q    What about Mr. Benton?

18      A    No.

19      Q    Do you know if anybody even talked to them

20  about what they had said to you?

21      A    No.

22           MS. LEAHY:  May I approach, Your Honor?

23           THE COURT:  You may.

24  BY MS. LEAHY:

25      Q    I'm showing you Plaintiff's Exhibit 1.  Mr.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Barbee, can you identify that document?

2         A    Yes, ma'am.

3         Q    And what is it?

4         A    This is a -- this is to inform me that Mr.

5    Roberts had been suspended.

6         Q    Mr. Barbee, up until August 9th of 2007, how

7    would you describe your relationship with your coworkers?

8         A    Used to be a, like all-for-one work

9    environment.  You know, we all worked to make sure all of

10   us were, you know, getting things done like it's supposed

11   to.  We were basically a team before all of this.

12        Q    Did that relationship change in any way?

13        A    Yes, ma'am, it did.

14        Q    How did it change?

15        A    When this incident happened with Mr. Roberts,

16   my coworkers isolated themselves/stopped communicating,

17   as though I was the one that did something wrong.

18        Q    Explain to me what you meant by "isolating."

19        A    Well, there used to be times when I could walk

20   in the batch plant office and we all would, you know,

21   talk about the big load or the big whatever was gonna go

22   on for that day, and we would all work towards that.  So

23   we were basically a team.

24             But, but when this incident happened, it's like

25   if I walked in that office, they would all walk out.  Or

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

 1  if I spoke, nobody would speak back.

 2      Q    Mr. Barbee, calling your attention to

 3  August 20th of 2007, did you have a meeting on that day

 4  with Mr. Schinzler and Mr. Grigg?

 5      A    Yes, ma'am.

 6      Q    How did that meeting come about?

 7      A    That meeting came about when I couldn't believe

 8  how I was being treated at, at my work environment; and

 9  what had happened was I wrote a letter to the company,

10  letting them know how I was feeling about it, and I

11  thought something needed to be done about it.  I didn't

12  think nobody was sincere about it.

13      Q    And did the meeting come about as a result of

14  your writing that letter?

15      A    Yes, ma'am.

16      Q    Where did the meeting take place?

17      A    The meeting took place at the south building,

18  which is Christy-Foltz.  It's on South Main.

19      Q    And where did it take place in that facility?

20      A    In that facility, it took place within Mr. Hal

21  Schinzler's office.

22      Q    And do you know what relationship Mr. Schinzler

23  has with Christy-Foltz?

24      A    Mr. Hal Schinzler is the president of

25  Christy-Foltz.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     And do you know if he's related to Kurt

2 Schinzler, because I think you've used his name?

3      A     Yes.  That is his son.

4      Q     Kurt is Hal's son?

5      A     Yes, ma'am.

6      Q     And you were present; Mr. Grigg was present;

7 Mr. Schinzler was present?

8      A     Yes, ma'am.

9      Q     And how long did that meeting last?

10      A     Approximately 45 minutes or so.

11      Q     And as best you remember, what did you say?

12 And what did Mr. Grigg say?  And what did Mr. Schinzler

13 say?

14      A     Mr. Hal said what Gary Roberts had done was a

15 very stupid thing, and he wasn't gonna tolerate that, and

16 he was assuring me that I was not working in a hostile

17 environment.

18           And I didn't understand that because no one was

19 talking, whatever have you.  But at this particular time,

20 I asked him; I said, "Well, is there any kind of meeting

21 we can have, counseling or something of that nat-- safety

22 meeting or whatever?"

23           He told me no.

24      Q     Anything else you remember you said or Mr.

25 Schinzler said or Mr. Grigg said during that meeting?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    Well, other than they were saying that they

2  were not going to tolerate that.  That was basically

3  everything that it was.

4      Q    After that meeting on August 20, 2007, did the

5  relationship between you and your coworkers change?

6      A    You mean change -- after that meeting, from

7  working in that environment, hostile environment, and the

8  continuation of the way the coworkers were treating me, I

9  went to the Decatur Memorial Hospital.

10      Q    Okay.  But after this meeting on August 20th --

11  you said your relationship with your fellow employees had

12  been good before August 9th?

13      A    Right.

14      Q    And you described the change.  Was there any

15  improvement in the relationship after August 20th?

16      A    No, ma'am.

17      Q    As far as you know, was there any meeting held

18  with the employees in regard to the situation?

19      A    No, ma'am.

20      Q    Okay.  You said you went to Decatur Memorial

21  Hospital?

22      A    Yes, ma'am.

23      Q    And why did you go there?

24      A    Well, the stress, the anxiety.  I couldn't

25  sleep.  I really couldn't eat.  A lot of times I was just

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    kind of afraid of just being around my coworkers.

2        Q    Did you receive any prescription from Decatur

3    Memorial Hospital?

4        A    I did receive some medication from Decatur

5    Memorial Hospital, Dr. Tabithol [phonetic] or whatever

6    his name.  I'm not for sure.

7        Q    What type of medication was it?

8        A    It was something for depression and anxiety.

9        Q    Did you have any reaction to that medicine?

10       A    Well, taking that medication -- it was a very

11   strong medication.  Taking that medication interfered

12   with my driving and my working ability.

13       Q    What do you mean by that?

14       A    Well, it was so strong.  I'd, I'd take -- I

15   took the medication, and it would -- it gave me a bad

16   reaction.  I couldn't control my handling the vehicle

17   where I worked at.

18       Q    Were you -- did you miss any work?

19       A    Yes, ma'am.

20       Q    And what period of time were you off of work?

21       A    I think it was, like, September the 12th or

22   something like that, through the 17th, I believe.

23       Q    Now, calling your attention to September 21,

24   2007, what happened on that day?

25       A    I'm sorry.  Could you --

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     I'm calling your attention to September 21,

2    2007.  What happened on that day?

3      A     September the 21st, 2007, I believe -- on the

4    21st, I believe that I was told to -- I was recommended a

5    Dr. Karen Lee -- Dr. Karen Lee.

6      Q     Okay.  And did you ever see Dr. Karen Lee?

7      A     Yes.  Several times I seen Dr. Karen Lee.

8      Q     Was there any other time that you were off of

9    work?  We're talking now during the month of September.

10      A     Yes, ma'am.

11      Q     And when was that?

12      A     I believe it was -- I'm not sure right now.

13    There was another time.

14      Q     And why were you off of work that second time

15    in September?

16      A     Well, the second time in September, around the

17    middle of the month or something, taking the medication,

18    I was driving; and I had a bad reaction from my, at my

19    work from driving the truck, and I had to stop on the

20    side of the road and gather myself together.

21            I was very nervous, shaking, and I called for

22    Kevin Fowler, which is the, my union steward, to come

23    where I was; and at that time, Mr. Grigg also came.  I

24    was on the side of the road, my truck.

25      Q     And Mr. Grigg came and Mr. Fowler, I think you

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   said, came.  What happened next?

2        A    What happened next was I became so shaken up

3   from the medication and from the job stress and whatever

4   have you that I couldn't drive anymore.  I didn't feel

5   secure about driving.  It was an unsafe moment for me.

6   So Mr. Ron Grigg allowed Kevin Fowler to take me home.

7        Q    And were you off work after that, too?

8        A    Yes, ma'am.

9        Q    And are you still taking the medication?

10       A    No, ma'am.

11       Q    When did you stop taking the medication?

12       A    Shortly after this medication had affected my

13   job and the way I worked, I stopped taking it.

14       Q    And did the side effects you've described, did

15   they go away?

16       A    No.

17       Q    Okay.  Tell me what you were experiencing after

18   you stopped taking the medication.

19       A    After I stopped taking the medication, I

20   experienced, basically, the same thing:  the, not being

21   secure at my job.  The hostile environment was still

22   going on, so I just kind of coped with it.

23       Q    By "the hostile environment," do you mean the

24   fact that your coworkers were continuing not to talk with

25   you?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    Yes, ma'am.

 2             MS. LEAHY:  May I approach, Your Honor?

 3             THE COURT:  You may.

 4   BY MS. LEAHY:

 5        Q    Mr. Barbee, I'm showing you Plaintiff's

 6   Exhibit 5.  Can you identify that for me?

 7        A    Yes, ma'am.

 8        Q    What is it?

 9        A    It's a picture of the noose in the batch plant

10   office.

11        Q    Who took that picture?

12        A    I did.

13        Q    Tell me what happened the day you took that

14   picture.

15        A    That was at the batch plant office, and I was

16   to work at the batch plant office that day; and I saw

17   that noose, and I took a picture of it.

18        Q    Why did you take a picture of it?

19        A    Basically, to show what was actually going on

20   at my job, to have proof.

21             MS. LEAHY:  May I approach again, Your Honor?

22             THE COURT:  Yes.

23   BY MS. LEAHY:

24        Q    I'm showing you Plaintiff's Exhibit 3 and ask

25   if you can identify that?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     A     Yes.

2     Q     What is that?

3     A     That's a noose.

4     Q     Is that the noose that you took a picture of?

5     A     Yes, ma'am.

6     Q     Did you talk with Mr. Grigg about Plaintiff's

7   Exhibit 3?

8     A     Yes, ma'am.

9     Q     Where were you when you talked with him about

10  it?

11    A     I was at his office.  When that happened, I

12  went to the doctor's office, Dr. Karen Lee, and talked

13  with her about the noose, showed her the picture and

14  everything; and then I went from there to Mr. Ron Grigg's

15  office.

16    Q     And that would be his separate building office

17  at the batch plant?

18    A     Correct.

19    Q     Do you remember when this was, approximately?

20    A     I believe it was October the 17th, or

21  something.

22    Q     Was anyone present when you saw Mr. Grigg?

23    A     In the office when I was showing him the

24  picture, there was Kurt Schinzler and Mr. Ron Grigg and

25  myself.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       Q     What did you say?  What did Mr. Grigg say?  And

2   what, if anything, did Mr. Schinzler say?

3       A     When I came in the office, I went to Mr. Ron

4   Grigg and showed him the picture of this and said, "I

5   can't believe this type of stuff is going on," and

6   showed -- you know, and showed him the picture, and we

7   were talking.

8             He said, "What does this has to do with you?

9   What does this noose has to do with you?"

10            And I said, "For 400 years, my people has been

11  struggling for this type of stuff."  I said, "But you're

12  allowing this to go on where we work at."

13            And I didn't hear Mr. Kurt Schinzler say

14  anything.  I was so upset that I asked Mr. Ron could I go

15  home for the rest of the day, and he said yes.

16            As I was getting ready to leave, a police

17  officer, Mullin, came into the, the office; and I left.

18      Q     Did you talk at all with Officer Mullins?

19      A     I did, but it was at Dr. Karen Lee's office.

20      Q     Did you talk with him -- you'd been to

21  Dr. Karen Lee earlier, and then you went and saw Mr.

22  Grigg; and as you're leaving Mr. Grigg's office, the

23  officer is coming?

24      A     Correct.

25      Q     Did you talk with Officer Mullins at all at

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Mr. Grigg's office?

2         A    No.  I did not.

3         Q    Did you hear Officer Mullins say anything to

4    anybody on that day?

5         A    No.  I didn't get a chance to hear him say

6    anything.

7              MS. LEAHY:  May I approach, Your Honor?

8              THE COURT:  Yes.

9    BY MS. LEAHY:

10        Q    I'm showing you Plaintiff's Exhibit 6.

11        A    Yes, ma'am.

12        Q    Could you identify that?

13        A    Yes.  This is at the batch plant outside the

14   office.  This is at the back entrance of the batch plant.

15        Q    Is that a photograph?

16        A    Yes, ma'am.

17        Q    Who took it?

18        A    I did.

19        Q    Why did you take that photograph?

20        A    To have proof of, of the noose.

21        Q    Is this the same noose that is reflected in

22   Plaintiff's Exhibit 5?

23        A    No.  This is another noose.

24        Q    How soon after you had seen the noose that is

25   Plaintiff's Exhibit 3 -- how soon after you saw the first

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   noose did you see the second one?

2       A    The first noose that I saw, it was only like

3   days later on when I saw this noose.

4       Q    Do you remember how many days, approximately?

5       A    I'm not sure.  Three, probably.

6       Q    I'm showing you Plaintiff's Exhibit 4.  Is this

7   the noose that you saw that you took a photograph of

8   that's reflected in Plaintiff's Exhibit 6?

9       A    Is that the noose?

10      Q    [Nodding head up and down.]

11      A    Yes.

12      Q    Was anyone present when you took this

13  photograph, Plaintiff's Exhibit 6?

14      A    Gary Roberts was there.

15      Q    Anyone else present?

16      A    No, not at the time.

17      Q    Mr. Barbee, did you -- let me back up a little

18  bit.

19           In 2007, were there any other African-American

20  truck drivers at Christy-Foltz?

21      A    No, ma'am.

22      Q    When you took either picture -- the first one,

23  Plaintiff's Exhibit 5; or the second one, Plaintiff's

24  Exhibit 6 -- did anyone see you take either picture?

25      A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1         Q      Which, or both of them?

 2         A      The first picture, Gary Roberts was there that

 3    morning.  The second picture, Scott Spitzer was there.

 4         Q      So when you took the picture of the second

 5    noose, a few days after the first one, Scott Spitzer was

 6    there?

 7         A      Yes, ma'am.

 8         Q      Did he say anything to you or you say anything

 9    to him?

10         A      Well, Scott Spitzer seen me taking pictures of

11    this noose, and he asked me what was I doing.

12                And I said, "I'm taking pictures."

13                He said, "You can't do that."

14                And I said, "Yes I can.  I work here like you

15    do."  And I left to continue my job.

16         Q      Let's go from the time that Mr. Grigg told you

17    you could go home after you showed him the photograph of

18    the first noose and the time you saw the second noose.

19    Did you have any further conversations with Mr. Grigg

20    about the noose?

21         A      From the time that I left from the, Mrs. Karen

22    Lee office, I talked to him then.  I, I'm not sure

23    because the second noose, when I saw it, was the time

24    that I was telling them about the nooses that were there.

25         Q      And did Mr. Schinzler, the president of
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  Christy-Foltz, ever talk with you about either noose?

2      A    No.

3      Q    Mr. Barbee, did you ever make the request to

4  become a ready mix driver?

5      A    Yes, ma'am.

6      Q    And when did you first do that?

7      A    I first asked to be a ready mix driver several

8  months after I first came back; but I was told that the

9  contract was getting ready to be renewed, so I could

10  either vote for the contract or whatever.

11      Q    You mean the contract between Christy-Foltz and

12  the Teamsters Union?

13      A    Yes, ma'am.

14      Q    Okay.  And did you ever put your request to

15  become a ready mix driver in writing?

16      A    Yes.  On about October 11th of 2007, after

17  verbally asking him, I wrote it.

18      Q    And did you understand that if you transferred

19  from a hauler to a ready mix driver you'd lose your

20  seniority as a hauler?

21      A    Yes, ma'am.

22      Q    And that you'd go to the bottom of the list for

23  seniority for a ready mix driver?

24      A    Yes, ma'am.

25      Q    And did you understand that at the bottom of

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   the list for seniority, you wouldn't get as much work as

2   the highest person on the list for seniority?

3       A    Yes, ma'am.

4       Q    Did you realize that in the beginning, working

5   as a ready mix driver, you might not make as much money

6   as you were making as a hauler?

7       A    Yes, ma'am.  I, I understand all that.

8       Q    And did you have any conversation with Mr.

9   Grigg about becoming a ready mix driver?

10      A    Yes, I did.  I had asked him, and he said that

11  I would lose seniority and all of that.

12           And I said it should be my choice, if I want to

13  go there.

14           And he said, "Well, you won't get paid as much.

15  You won't work as much."

16           But I said, "That's my choice, if I want to go

17  there."

18      Q    If you build up seniority as a ready mix

19  driver, eventually would you have made as much or more

20  than a hauler?

21      A    As much or, or more.

22      Q    Was there any difference in pay between being a

23  hauler and being a ready mix driver?

24      A    Well, the material hauler makes 14-something.

25  The ready mix driver makes probably 6 or $7 more.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q     Why did you want to be a ready mix driver?

 2        A     Well, the ready mix drivers are more physical.

 3   You learn more about -- you can advance.  You can start

 4   out as a ready mix driver, and you can pretty soon be a

 5   batch plant operator.

 6        Q     Did Mr. Grigg ever get back to you about your

 7   written request to become a ready mix driver?

 8        A     No.

 9        Q     Since you made that written request in 2007,

10   has Christy-Foltz hired ready mix drivers?

11        A     Yes.

12        Q     And who have they hired?

13        A     They hired Jason Cecil, Tommy Sheets, Larry

14   Benton, Ralph.  There's another young man by the name of

15   Dustin, I believe.  And there was a man before right

16   after Jason that came; he only worked for a short period

17   of time, but he left.

18        Q     What was the race of Mr. Cecil?

19        A     Caucasian.

20        Q     And Tommy Sheets?

21        A     Caucasian.

22        Q     And Ralph?

23        A     Caucasian.

24        Q     And the other man that you mentioned?

25        A     Caucasian.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q      How many times did you see Dr. Lee?

 2        A      I've seen Dr. Lee probably three times.

 3        Q      And why did you stop seeing Dr. Lee?

 4        A      Well, I really couldn't afford to see Dr. Lee.

 5        Q      Have you counseled with anyone else, other than

 6  Dr. Lee, about the way you were feeling?

 7        A      Yes.  At my church, my pastor and several other

 8  spiritual leaders have sat down and talked; and, you

 9  know, and we pretty much pray our way through it.

10        Q      Mr. Barbee, the isolation that you've

11  described, has that continued to today?

12        A      Yes.

13        Q      How did this whole series of events make you

14  feel?

15        A      This has -- less than a man.  This has really

16  taken a toll.

17        Q      And you continue to work at Christy-Foltz?

18        A      Yes.

19        Q      Why?

20        A      Justice.  Because if I quit, then they, they

21  gonna win.

22        Q      Mr. Barbee, did you ever see any written policy

23  of Christy-Foltz about discrimination?

24        A      No.

25        Q      Did you ever see any written policy on racial
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  harassment?

2      A    No.

3      Q    I mean of Christy-Foltz.

4      A    No, ma'am.

5      Q    Have you heard of Decatur Services Construction

6  Corporation?

7      A    No, ma'am.

8      Q    Have you ever at Christy-Foltz had any training

9  on discrimination?

10      A    No, ma'am.

11      Q    Any training on harassment?

12      A    No, ma'am.

13      Q    Apart from the conversations that we've talked

14  about, did anyone, either who worked for Christy-Foltz or

15  who, or who was representing Christy-Foltz -- did they at

16  any time interview you about this whole series of events?

17      A    No, ma'am.

18      Q    Did you ever see anything that indicated an

19  investigation had been done?

20      A    No, ma'am.

21      Q    Ever see anything in writing about what had

22  been done?

23      A    No, ma'am.

24      Q    Did anyone on behalf of Christy-Foltz tell you

25  what, if anything, had been done, other than the

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    conversations you've talked about today?

2         A    No.

3         Q    Were you ever provided any counseling by

4    Christy-Foltz?

5         A    No, ma'am.

6              MS. LEAHY:  I have nothing further, Your Honor.

7              THE COURT:  Thank you.

8              Before we do cross-examination, it's the

9    perfect time to take a midafternoon break.  We'll excuse

10   the jurors to the, to the jury room for a restroom break;

11   and we'll take a break here shortly ourselves.

12              (Jury absent, 2:51 p.m.)

13              THE COURT:  Mr. Barbee, you may step down, sir.

14              MR. BARBEE:  Thank you.

15              THE COURT:  All right.  We'll take our recess

16   as well.

17              (Recess, 2:50 p.m. to 3:09 p.m.)

18              THE COURT:  Anything before we bring in the

19   jury?

20              MS. LEAHY:  Yes, Your Honor.  You know, there

21   was just one thing.  You know you granted the motion to

22   exclude witnesses, and I saw Mr. Grigg in the hallway

23   with Mr. Schinzler; and I just want to be sure that

24   everybody understands that the motion to exclude is so it

25   won't get out of the courtroom.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          THE COURT:  Right, right.  So just, again, I'll

2     solicit the assistance of counsel.  We can't have

3     somebody in the courtroom -- and I'm not suggesting that

4     was what was going on -- but we don't even want to have

5     the appearance of, "Well, here's what's going on in the

6     courtroom," to, you know, coach or convey what's

7     happening.  So just be careful in that regard to avoid

8     even the appearance of coaching a witness.

9          All right.  Thanks.

10          (Jury present, 3:09 p.m.)

11          THE COURT:  We're ready for cross-examination.

12     Mr. Postlewait, you may proceed.

13          MR. POSTLEWAIT:  Thank you.

14          CROSS-EXAMINATION BY MR. POSTLEWAIT:

15     Q    You went to work at Christy-Foltz in 2004, --

16     A    Yes, sir.

17     Q    -- correct?

18          You went to work as a ready mix driver?

19     A    Yes, sir.

20     Q    And then you left in 2005?

21     A    I believe so.

22     Q    Would it be fair to say at or about March 29 of

23     '05, as best you recall?  Would you have any reason to

24     disagree with that date?

25     A    I don't know.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    When you worked there on that first occasion in
2  2004 and into 2005, you had no problems at all with any
3  of your coworkers; is that right?
4      A    Yes.
5      Q    You had no problems of, with any of your
6  coworkers when you worked there on that first occasion,
7  but you left and went to Tennessee and worked at
8  Tennessee Steel Haulers and worked as a material hauler
9  for a year or so there, right?
10     A    Tennessee Steel Haulers?
11     Q    Yes.
12     A    Yes.
13     Q    You stopped doing that to buy your own truck
14 and then lease to a man you referred to, I believe, in
15 your testimony, Jason Cecil, who had his own trucking
16 business, Cecil & Son, right?
17     A    Yes, sir.
18     Q    At Cecil & Son you worked as a material hauler
19 there, hauling sand, rock, other bulk materials?
20     A    Liquid fertilizer.
21     Q    Okay.  And you leased to them for maybe six
22 months, --
23     A    I don't know.
24     Q    -- like that?
25          And you worked for a couple of other trucking

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   companies before going back to work at Christy-Foltz?

2       A    Yes, sir.

3       Q    You worked at a, a number of places in your

4   working career, have you not, Mr. Barbee?

5       A    Yes, sir.

6       Q    Do you have any estimate of the number of

7   places you've worked, say, in the last 20 years?

8       A    No, sir.

9       Q    Do you know anyplace you've worked longer than

10  you've worked at Christy-Foltz?

11      A    Do I know?

12      Q    Anyplace that you've worked for a longer period

13  of time than you've worked at Christy-Foltz?

14      A    Yes, sir.

15      Q    Where?

16      A    I grew up on a farm; and I worked there 20,

17  probably almost 20 years.

18      Q    All right.  And then once you started working

19  in the trucking industry, have you worked anyplace as

20  long as you've worked at Christy-Foltz?

21      A    Farming.

22      Q    Okay.  But that was before you went into the

23  trucking industry, right?

24      A    That's where I learned how to truck at.

25      Q    You've continued to work at Christy-Foltz

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1 through the present time after going to work again there

2 in about October of 2005, right?

3     A   I don't know.  2005?

4     Q   Right.

5     A   Could you repeat the question, please?

6     Q   You returned to work at Christy-Foltz at or

7 about October 3 of '05 as a material hauler?

8     A   '03 --

9     Q   That would be correct?

10     A   '03 of '05?

11     Q   No, October 3 of '05.

12     A   I don't know.

13     Q   In any regard, you've worked there through the

14 present time, correct?

15     A   I have worked there.

16     Q   That's been approximately five years, correct?

17     A   Stating from --

18     Q   October of '05 to the present.

19     A   Probably about three and a half, four years.

20     Q   From the time you returned to work at

21 Christy-Foltz in '05, '06, whatever your recollection

22 is, --

23     A   Yes, sir.

24     Q   -- up to the time of this incident with Gary

25 Roberts, you never had any problems at all with any of

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  your coworkers, did you?

2      A    No, sir.

3      Q    Prior to the August 2007 incident with Gary

4  Roberts, you had been a -- you had not been a subject of

5  any kind of discrimination or harassment at all, had you?

6      A    No, sir.

7      Q    Nobody had done anything to you that you would

8  consider harassing to you in any manner prior to this

9  incident with Gary Roberts, correct?

10      A    Could you repeat that question again, please?

11      Q    I said:  Nobody had done anything toward you

12  that you would consider harassing to you in any manner

13  prior to the incident with Gary Roberts?

14      A    No, sir.

15      Q    Prior to August of 2007, you actually had a

16  positive relationship with Mr. Roberts; did you not?

17      A    All the employees?

18      Q    With Mr. Roberts.

19      A    With Mr. Roberts?

20      Q    Yes.

21      A    Yes.

22      Q    Okay.  In fact, he'd invited you over to his

23  house?

24      A    I went to his house to look at a car.

25      Q    All right.  You didn't have any problems with

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Mr. Roberts before August of 2007, did you?

2       A    Not that I know of.

3       Q    All your experiences and interactions with him

4   had been positive?

5       A    Work-related.

6       Q    Now, when this statement with Roberts occurred

7   which you said was in the presence of Kurt Schinzler, you

8   believe that Kurt stated, words to the effect, that he

9   couldn't believe it?

10      A    I couldn't believe that this had happened.

11      Q    But you said -- is it true that, according to

12  your recollection Mr., or Kurt Schinzler appeared to be

13  in awe?

14      A    That's right.

15      Q    Said words to the effect that he couldn't

16  believe it?

17      A    We were in awe.

18      Q    Both of you?

19      A    Yes, sir.

20      Q    August 9 of 2007 is your best judgment of the

21  day the incident occurred, correct?

22      A    Yes, sir.

23      Q    That was a Thursday?

24      A    I'm not sure what day it was.

25      Q    You were dropping your paperwork off at the

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    office.  Would that suggest it was your last load of the

2    day and close to quitting time?

3         A    Yes, sir.

4         Q    And if you worked eight and a half hours that

5    day, that was a full day; was it not?

6         A    Correct.

7         Q    You didn't miss any work that day, correct?

8         A    Correct.

9         Q    All right.  And you worked all day the next

10   day, August 10 of '07, which was a Friday, correct?

11        A    Yes.

12        Q    And, in fact, you worked six and a half hours

13   as a material hauler and one and a quarter hours as a

14   ready mix driver; is that right?

15        A    I don't know.

16        Q    When you came into Grohne on August 10 of 2007,

17   that Friday, the day after the incident, Ron Grigg did

18   talk with you; did he not?

19        A    Yes, sir.

20        Q    He told you it was a stupid thing for Mr.

21   Roberts to say and that Mr. Grigg was going to talk with

22   Mr. Roberts, correct?

23        A    Correct.

24        Q    This conversation occurred in Mr. Grigg's

25   office?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A     Correct.

 2        Q     And it was that day, August 10 of 2007, that

 3   Mr. Roberts apologized to you, correct?

 4        A     Yes, sir.

 5        Q     Okay.  And he said, "I'm sorry.  I didn't know

 6   you were going to take it like that," right?

 7        A     Yes, sir.

 8        Q     Prior to that, Mr. Grigg had told you you

 9   needed to wait down at the batch plant so, because he

10   thought Gary wanted to talk to you?

11        A     Yes, sir.

12        Q     You mentioned the statement by Larry Benton

13   where he said words to the effect that, "I don't let my

14   kids listen to that nigger stuff."  You remember that

15   testimony?

16        A     Yes, sir.

17        Q     Okay.  Now, Mr. Benton is saying he doesn't

18   allow his kids to engage in that, so to speak, correct?

19        A     Yes, sir.

20        Q     And, yet, you still found that offensive?

21        A     Yes, sir.

22        Q     Mr. Barbee, had you ever used the N word when

23   speaking with any of your coworkers prior to the incident

24   with Mr. Roberts that occurred August 9 of 2007?

25        A     No, sir.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      Had you ever used the word "coon"?

2      A      No, sir.

3      Q      Do you deny ever using any terms that someone

4   might consider as a racial slur toward the

5   African-American race in the presence of any coworkers?

6      A      No, sir.

7      Q      So you acknowledge making some of those

8   statements?

9      A      No.  I do not.

10     Q      Okay.  So you deny it?

11     A      I did not say that.

12     Q      Do you admit or deny ever inquiring to Scott

13  Spitzer when you were asked to go out to Argenta,

14  Illinois, to take a load as to whether or not they liked

15  niggers out there?

16     A      No, sir.  I did not say that.

17     Q      And did you also -- after this incident with

18  Mr. Roberts, did you notify the Teamsters Union of the

19  incident, Mr. Conner?

20     A      Did I notify the Teamsters?

21     Q      Yes.

22     A      The Teamsters notified me also.

23     Q      But did you notify Mr. Conner?

24     A      No, sir.

25     Q      How did he learn about the incident, if you

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  know?

2      A     I believe through my union steward.  That

3  morning when I told my union steward, they would have to

4  tell Mr. Griggs [sic] and the president of the company.

5      Q     Did you meet with Mr. Conner in regards to what

6  the union was doing for you in connection with this

7  incident?

8      A     I met with Mr. Conner several times.

9      Q     What was the purpose of the meetings?

10      A     The purpose of the meeting was the incident

11  that happened and the escalating of it.  I didn't feel

12  like coming back to the union hall with my coworkers

13  under this type -- that was going on.

14      Q     Did you at any time make the claim to

15  Mr. Conner that the union was discriminating against you?

16      A     Well, yes, I did.

17      Q     What was that about?

18      A     Well, no one was taking action.  No one was

19  trying to have a meeting or bringing us together to try

20  to get this out the way.  No one took that initiative.

21      Q     Did you have a meeting with Mr. Conner and a

22  representative of the NAACP?

23      A     I met with Mr. Conner along with Mr. Jeffrey

24  Perkins from the NAACP.

25      Q     What was the purpose of that meeting?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     A    To hear what was going on, to be there with me.

2     Q    I'm not understanding what you're saying.

3     A    What had happened, I had asked Mr. Perkins to

4  come along with me to just hear what was going on.  He

5  just came as a friend.

6     Q    Come along with you to go where?

7     A    With Mr., to Mr. Conner's office.

8     Q    To -- okay.

9          Did you get any matters resolved with Mr.

10  Conners [sic] and Mr. Perkins?

11     A    I got a matter resolved with Mr. Conners.

12     Q    In what way?

13     A    Mr. Conners had said that this incident was

14  between Christy-Foltz and myself, not with him.  So from

15  that point, I said, "Well, okay.  You mean I pay you

16  union dues, and you're not gonna help me get this

17  resolved?"

18          And he said this matter was between

19  Christy-Foltz and myself.

20     Q    You recall sending a letter dated August 15 of

21  '07 to Ron Grigg?

22     A    Yes, sir.

23     Q    Okay.  And in that letter, you claim that there

24  were additional racial slurs or comments being made to

25  you?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Yes, sir.

2      Q     And in that letter, you said you learned of Mr.

3  Roberts' suspension on August 13 of 2007?

4      A     August 14th.

5      Q     Would it refresh your recollection to look at

6  the letter?

7      A     Okay.  Okay.

8            MR. POSTLEWAIT:  May I approach the witness,

9  Your Honor?

10            THE COURT:  You may.

11  BY MR. POSTLEWAIT:

12      Q     Look at the, Exhibit 10, Mr. Barbee.

13      A     10.  I'm not finding 10 in here.

14      Q     Exhibit 10, they're tabbed on the side.

15      A     I see 6L.

16      Q     Keep going.

17      A     I see 11.  Here we go.

18      Q     Do you have Defendant's Exhibit 10?

19      A     Yes, sir.

20      Q     Okay.  Is that a copy of the August 15, 2007,

21  letter to Mr. Grigg?

22      A     Yes, sir.

23      Q     In that letter, you indicate you received a

24  letter on Monday, August 13, 2007, that Mr. Roberts was

25  suspended without pay?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    Okay.  I'm sorry.  I was on the wrong page
 2   there.  Yes.  Yes, sir.
 3        Q    So you knew at the time that you created this
 4   letter that remedial action had been undertaken against
 5   Mr. Roberts?
 6        A    I knew?
 7        Q    Yes.
 8        A    I think this -- yes.
 9        Q    Did you also know about the remedial action
10   as to -- the disciplinary action as to Mr. Aldridge?
11        A    I heard about Mr. Aldridge.
12        Q    And did Mr. Grigg inquire to you that Monday,
13   August 13 of 2007, as to whether everything was resolved?
14        A    Could you --
15        Q    Did Mr. Grigg ask you on Monday, August 13,
16   2007, whether everything was resolved?
17        A    I don't know.
18        Q    Did he ask you whether everything was okay?
19        A    I don't know.
20        Q    No recollection of that?
21        A    [No response.]
22        Q    Do you admit or deny that you told Mr. Grigg on
23   August 13 of 2007 that you thought you could get some
24   money?
25        A    No, sir.  No, sir.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    Do you admit or deny?

2        A    I deny.

3        Q    The letter that you sent to Mr. Grigg

4   August 15, 2007, resulted in the meeting that you've

5   testified about with Mr. Grigg and Mr. Schinzler on

6   August 20 of 2007, correct?

7        A    I met with them on the 20th.

8        Q    And in that, they asked you about the things

9   that were occurring, correct?

10       A    Yes.

11       Q    In that meeting, you used the term "hostile

12  work environment," meaning the coworkers not

13  communicating with you, correct?

14       A    Meaning the attitude of my coworkers.

15       Q    Not communicating, not waving?

16       A    Not communicating.  I was working in a hostile

17  environment.  I walk in; they walk out.

18       Q    Did you at any time tell -- well, let me ask

19  you this.  Were all your coworkers treating you that way?

20       A    The majority.

21       Q    Would you say half of them or more than half?

22       A    More than half.

23       Q    Did you ever tell Dr. Lee that half of them

24  were okay, and half of them were snubbing you?

25       A    I don't know.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      You claim to have found this first noose on

2    October 17 of 2007, correct?

3      A      On or about.

4      Q      When did you first see that noose, Mr. Barbee?

5      A      On or about the 17th of October, somewhere

6    along in there.

7      Q      And the first thing you did was take a picture

8    of it, right?

9      A      First thing I did was looked at it.

10     Q      All right.  And where was it positioned?

11     A      It was in the batch plant office, on the east

12   wall of the batch plant office.

13     Q      Now, Ms. Leahy showed you Photo Exhibit --

14   Plaintiff's Exhibit 5.  Do you still have that there in

15   front of you?

16     A      No, sir.

17            MR. POSTLEWAIT:  May I approach the witness,

18   Your Honor?

19            THE COURT:  You may.

20   BY MR. POSTLEWAIT:

21     Q      Do you recognize that as the same photo except

22   an enlargement of what Ms. Leahy was previously showing

23   you in your direct examination?

24     A      Yes, sir.

25     Q      Okay.  And that shows the noose that was in the

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1   batch office, as you call it a noose, correct?

2        A    Yes, sir.

3        Q    Is that where it was positioned when you first

4   saw it?

5        A    Yes, sir.

6        Q    Do you know how long it had been there?

7        A    No, sir.

8        Q    Did you move it at all to take the photograph?

9        A    No, sir.

10       Q    Do you know what it means that it's hanging

11  upside down?

12       A    No, sir.

13       Q    You don't know who made it?

14       A    No, sir.

15       Q    How long after you took the photograph of it

16  did you tell Mr. Grigg about it?

17       A    Shortly after.  I went to Dr. Karen Lee office.

18       Q    Okay.  What time did you take the photograph?

19       A    I'm not sure.  I'm not sure about the time.

20       Q    If your appointment with Karen Lee was at 10:30

21  in the morning, it would have had to be before that,

22  right?

23       A    Yes, sir.

24       Q    You said that you were supposed to work at the

25  batch plant that day?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Wherever I was assigned.  I wind up there.

2      Q     I think you indicated in your direct

3  testimony -- correct me if I'm wrong; but I believe you

4  said that you were supposed to work at the batch plant

5  that day?

6      A     I believe.

7      Q     And what were you supposed to do there?

8      A     What am I supposed to do there?  Ready mix

9  truck.

10     Q     Okay.  And so for that day of October 17 of

11  2007, your payroll records should show ready mix truck

12  time or material hauler time?

13     A     It should show material hauler.  Sometimes our

14  tickets will show -- if I drove truck 77 and was assigned

15  to it, if another employee came in and drove that same

16  truck it would still have my name on that ticket.

17     Q     Okay.  But if you're in a ready mix truck,

18  you'd get ready mix time, wouldn't you?

19     A     Yes, sir.

20     Q     Okay.  So if you were going to work on a ready

21  mix truck that day on October 17 of 2007, your time

22  records ought to show ready mix time, correct?

23     A     I'm not sure because sometime they'll call us

24  in for ready mix, and we will get in the truck and our

25  order will be canceled.  So we'll go back to material

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   hauler with just saying, you know, that you didn't get in

2   the ready mix; you didn't -- you wasn't used.

3       Q    So if your records show material hauling time

4   that day, you didn't operate ready mix that day?

5       A    It could be either/or.  If you got out to go to

6   be available for ready mix and wasn't used, you'll go

7   back to your truck.

8       Q    What time did you get to the plant that

9   morning?

10      A    We started to work at 7:00 and work -- 3:00,

11  and anything after 3:00 is overtime in ready mix.

12      Q    And how many photos did you take?

13      A    How many photos did I take?  I took this photo

14  here.

15      Q    I'm talking of the -- of the alleged noose in

16  the batch office, how many photos did you take of it?

17      A    I took this one here.

18      Q    Okay.  Any more?

19      A    No, sir.

20      Q    Why not just take the picture up to Mr. Grigg

21  in the, in the main office?

22      A    Why not?

23      Q    Right.

24      A    I don't know what happened after this moment of

25  taking the picture, whether I just passed out or

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    whatever.  After taking this picture, I couldn't retrieve

2    it on my phone.

3        Q    You say you could not?

4        A    Could not retrieve it right then.

5        Q    When did you retrieve it?

6        A    Probably later on after I'd taken it.

7        Q    Were you able to retrieve it at Dr. Lee's

8    office?

9        A    Yes.  I retrieved it later on and got them off

10   my phone.

11       Q    Your inability to retrieve it from your phone,

12   was that why you didn't take it up and show it to Mr.

13   Grigg at that time?

14       A    Yes.

15       Q    Okay.

16       A    Yes.

17       Q    So what did Dr. Lee say about this?

18       A    Well, Dr. Lee, she couldn't believe it also,

19   that this type of -- I was working in this type

20   environment that allowed this type of activity to go on.

21       Q    What did you tell Dr. Lee about it?

22       A    What I told her was this was a picture of a

23   noose in the batch plant office.

24       Q    And were you going there for examination or

25   treatment?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    A    Yes.

2    Q    And did she provide you with any treatment?

3    A    Yes, sir.

4    Q    What did she do for you?

5    A    We talked.  Some type of evaluation of what

6    they normally do, I guess.

7    Q    And the two of you called the Decatur Police,

8    right?

9    A    Yes, sir.

10   Q    And did the two of you also call the FBI?

11   A    I called the FBI.

12   Q    Did the two of you call WCIA --

13   A    I called --

14   Q    -- TV?

15   A    I called WCIA.

16   Q    You did?

17   A    Yes, sir.

18   Q    But you never called Mr. Grigg?

19   A    No, sir.

20   Q    So did Officer Mullins come to Dr. Lee's

21   office?

22   A    Yes, sir.

23   Q    And what did he say?

24   A    I told Officer Mullins that I thought this was

25   a hate crime; and, you know, was there anything he could

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   do about it.
 2            And he said there's nothing he could do about
 3   it, and this was not a hate crime.
 4        Q    Why did he -- did he explain to you why it
 5   wasn't a hate crime?
 6        A    Well, he just said it's, it's not a big deal.
 7        Q    And he'd not even seen the noose at that time,
 8   had he?
 9        A    Yes.  He had seen it.
10        Q    On your phone?
11        A    On the, on this picture here where I retrieved
12   it.
13        Q    On your telephone, right; your cell phone?
14        A    On this, on the picture where I retrieved it.
15        Q    Okay.  All right.  Well, how did you get
16   Officer Mullins to then go down to the Grohne Concrete
17   facility?
18        A    I didn't -- Officer Mullins said he couldn't do
19   anything about it.  So after talking to Dr. Karen Lee, I
20   left and went back to work.
21            Officer Mullins, he came afterward.  I didn't
22   get him to come.  He came on his own.
23        Q    Were you there when Officer Mullins was there
24   at the Grohne Concrete batch plant?
25        A    I was at Grohne's concrete office with Mr. Ron
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Grigg.  I didn't go to the batch plant office.  I went

2   into Mr. Ron Grigg's office and showed him the pictures

3   and asked him why this kind of stuff was going on here.

4          And he said, "What does this has to do with

5   you," and whatever.

6          And I said, "For 400 years, my people have been

7   struggling for this type of thing," and after that I

8   wanted to go home.  I didn't -- I felt upset.  So as I

9   was leaving the batch plant office of Grohne Concrete

10   office with Mr. Ron Grigg, the officer was coming in.

11      Q   Okay.  And the officer went down to the batch

12   plant?

13      A   I don't know.

14      Q   All right.  Did he ever report back to you as

15   to his findings?

16      A   No, sir.

17      Q   Not at all?

18      A   No, sir.

19      Q   Did you ever follow up with Officer Mullins to

20   inquire about his findings?

21      A   No, sir.

22      Q   How did you learn that the noose had been

23   removed?

24      A   At the deposition -- the investigation, I

25   believe.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    Did Ron Grigg tell you that the noose had been

2    taken down?

3    A    That was talked about at the investigator, when

4    the investigator was there.

5    Q    What investigator?

6    A    At the Civic Center.

7    Q    Expand on that.

8    A    The findings, some investigator was there, and

9    they were talking -- we were talking; and Mr. Ron said

10   that the police officer came, and they removed the noose.

11   Q    Okay.  You're talking about the underlying

12   proceedings before you filed your action here, correct?

13   A    Yes, sir.

14   Q    All right.  When were you next in the batch

15   plant office after October 17?

16   A    After October 17th, I don't know.

17   Q    Did you observe that there -- it was gone when

18   you were next in that office?

19   A    Yes.  I noticed it was gone.

20   Q    Did Mr. Grigg or anyone else ever tell you the

21   origin of the, what you considered to be a noose in the

22   batch plant office?

23   A    No, sir.

24   Q    What is it about that -- strike that.

25        Do you claim it was directed at you?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     A     Yes, sir.

2     Q     Why do you say that?

3     A     From the hostile environment.

4     Q     You don't know where it came from; you don't

5     know who made it; you don't know how long it had been

6     there, but it's directed at you is your claim?

7     A     Yes, sir.

8     Q     You've never known who put it there?

9     A     No, sir.

10    Q     Now, you claim to have found a second noose on

11    the east wall of the batch plant a few days later,

12    sometime later, in October?

13    A     Yes, sir.

14    Q     Best date is October 20th of 2007?

15    A     I don't know.

16    Q     Isn't that what you alleged?

17    A     I imagine -- yes.

18    Q     When did you first see that alleged noose in

19    the batch plant, east batch plant wall?

20    A     Could you say that again?

21    Q     When did you first see that one, the second

22    alleged noose?

23    A     The second alleged noose was a few days after.

24    Q     All right.  What did you do when you saw it?

25    A     I looked at it.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      Okay.  Then what did you do?

2      A      Took a picture of it.

3      Q      And what did you do with the photo?

4      A      I retrieved the photo.

5      Q      Off your cell phone?

6      A      Yes, sir.

7      Q      And that's when Mr. Spitzer was present?

8      A      Yes, sir.

9      Q      Did you -- after taking the photo, did you go

10  up to see Mr. Grigg?

11      A      Well, no.  I did not.

12      Q      Any reason why not?

13      A      The, Mike -- I mean, Scott Spitzer interacted.

14  I don't know if Mr. Ron were there or was he gone.  But

15  me and Scott Spitzer was there.  He asked me what I was

16  doing.  I told him what I was doing, and he got the

17  noose.

18      Q      Scott did?

19      A      Scott.

20      Q      Okay.  Did you ask Scott, say, "Hey, Scott, do

21  you know where this thing came from?"

22      A      No, sir.

23      Q      All right.  When you were in the batch plant

24  office, I believe your testimony was that Gary Roberts

25  was in there when you took that picture at the batch

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  plant office?

2      A    The first picture.

3      Q    Did you ask Gary; did you say, "Hey, Gary, do

4  you know where this came from?"

5      A    No, sir.

6      Q    The second noose, was it hanging there with a

7  lot of other tools on the wall, come-alongs, chokers,

8  ropes?

9      A    Yes, sir.

10     Q    Was it kind of weaved in behind and in between

11 some of the things?

12     A    It was on the wall, noticeable where I could

13 see it when I come down the steps.

14     Q    And do you know how long it had been there?

15     A    No, sir.

16     Q    Do you know who put it there?

17     A    No, sir.

18     Q    Do you know who made it?

19     A    No, sir.

20     Q    Did you ever take any more photographs of it?

21     A    Yes, sir.

22     Q    Have you produced those?

23     A    No, sir.

24     Q    How long after you photographed it did you --

25 did you ever tell Mr. Grigg about it?

59

1      A    Well, when I was taking the pictures, right

2   before Scott got to it, I was -- I took a picture.  And

3   then I was taking that, another picture of it; and Scott

4   say, "What are you doing?"

5      Q    But when did you ever tell Mr. Grigg about this

6   second noose that you saw?

7      A    Scott told Mr. Grigg about it.

8      Q    Okay.  So you never reported it to Mr. Grigg,

9   correct?

10     A    I reported the nooses to Mr. Grigg.  Yes, sir.

11     Q    When did you report the second noose to Mr.

12  Grigg?

13     A    When Scott was asking me what was I doing.  We

14  were all there.  I mean, me and Mike -- Scott was there

15  at the place.

16     Q    But did you at any time walk up to Mr. Grigg's

17  office --

18     A    No, sir.

19     Q    -- a hundred yards away and --

20     A    No, sir.

21     Q    -- say, "Where does this come from?"

22     A    No, sir.

23     Q    Or, "Where did that come from?"

24     A    No, sir.  I did not.

25     Q    Was it all dusty?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1        A     I don't know.

2        Q     Did it have, like, a chalky substance on the

3   rope?

4        A     I don't know.

5        Q     Did you touch it?

6        A     No, sir.

7        Q     Do you know if anybody had ever used it for

8   anything?

9        A     No, sir.

10        Q     Even if they had used it for something, would

11   that still be a symbol of, against the African-American

12   race?

13        A     To hang someone?

14        Q     No.  If they used what you have shown in

15   Exhibit 6, what you took a photograph -- if some of the

16   guys in the plant used that in doing maintenance at the

17   plant, would it still be a symbol against the

18   African-American race, in your mind?

19        A     I don't know.

20        Q     If the sash cord that was hanging in the batch

21   office was made many, many years ago, predating your

22   arrival at the Grohne Concrete premises, and was made by

23   a man just passing the time, would that still be a symbol

24   against the African-American race, in your mind?

25        A     I don't know.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1        Q      Your coworkers do communicate with you about
2    business matters as necessary to do the job?
3        A      Yes.
4        Q      Okay.  And when you go to the batch plant and
5    if you happen to be driving a ready mix truck, Scott
6    Spitzer tells you where to take the truck?
7        A      Yes, sir.
8        Q      Or Ron tells you where to take the truck?
9        A      Yes, sir.
10       Q      Or Kevin Fowler maybe tells you where to take a
11   material hauler truck?
12       A      Yes, sir.
13       Q      You spend most of your day in a truck, correct?
14       A      Yes, sir.
15       Q      And there's many days when you're a material
16   hauler that you're not anywhere near, for instance, the
17   batch plant; would that be right?
18       A      Yes, sir.
19       Q      And you'd have no reason to go up to the batch
20   office?
21       A      We have at the batch office, batch plant
22   office -- if we bring a material in and we need water,
23   our cooler sits right in the batch plant office area.  So
24   if you're coming through in your semi and you wanted some
25   water, you could just stop your truck, hop out, go and

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    get you some water, which the water's brought there every

2    day for us.

3        Q    But that's a decision you would make, right?

4        A    Yes.

5        Q    You did observe the

6    antidiscrimination/antiharassment policy that was posted

7    in the break room, correct?

8        A    No, sir.

9        Q    Never observed it?

10       A    In the break room?

11       Q    Right, in the main office building.

12       A    No, sir.

13       Q    Posted on the bulletin board?

14       A    No, sir.

15       Q    All right.  Do you know if there's other --

16   what other posters are posted up there on the bulletin

17   board?  Or do you go in there?

18       A    We have posters of when our union meeting and

19   some old material there that's, talked about the safety

20   yard thing, about trucks, what have you.

21       Q    You remember a labor law poster being up there

22   at or about 2007, Mr. Barbee, that says "5-in-1 Labor Law

23   Poster"?

24       A    No, sir.

25       Q    No?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          Mr. Barbee, today you referred to Ron as

2    Mr. Ron Grigg?

3        A    Yes, sir.

4        Q    There's times when you refer to these people

5    as, like, "Mr. Ron"; isn't that right?

6        A    Mr. Ron.

7        Q    Sometimes you refer to Hal Schinzler as

8    "Mr. Hal"?

9        A    Yes, sir.

10       Q    And they've never asked you to do that, right?

11       A    Correct.

12       Q    Did Dr. Lee restrict your driving any, in any

13   way when she prescribed the medication for you?

14       A    Dr. Lee didn't prescribe the medication for me.

15       Q    Who prescribed that?

16       A    DMH, Dr. Tabitalli [phonetic], or something

17   like that.

18       Q    Did they restrict your driving in any way at

19   the time they prescribed that to you?

20       A    Yes.

21       Q    But you chose to drive anyway?

22       A    No.  There were days when I'd take the

23   medication.  He said take small doses of it as

24   medication.  I was off.  And when I did take the

25   medication and I came on to work, that's when the effect

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  started to happen.

2      Q    Do you recall what the dosage was?

3      A    Three times a day.

4      Q    .5 milligrams of Xanax, right?

5      A    I don't know whether it was Xanax or whatever.

6  I don't -- I'm not for sure.

7      Q    You don't know?

8      A    I don't know.

9      Q    All right.  When you were in the meeting on

10  August 20th of 2007, you said you asked about counseling?

11      A    Yes, sir.

12      Q    Today in your testimony you referred to, "Well,

13  could we have a safety meeting, some kind of counseling."

14  What do you mean by that?

15      A    Well, where all the employees come together and

16  talk and, to see where we are.  What do we need to do to

17  get past this?

18      Q    Is that the kind of meeting you were asking

19  about on August 20th of 2007?

20      A    That along with --

21      Q    A meeting?

22      A    That along with the way I was being treated.

23      Q    But I thought you were seeking medical

24  counseling?

25      A    Uh-huh [nodding head up and down].

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      But now it's safety meeting counseling?

2      A      All of it.  It goes right together.

3      Q      Did you mention safety meeting counseling to

4  Mr. Schinzler or Mr. Grigg?

5      A      I didn't feel secure about what had happened,

6  and I thought that's, went under safety.

7      Q      You requested a transfer to ready mix driver,

8  correct?

9      A      Yes, sir.

10      Q      October 11 of 2007?

11      A      Yes, sir.

12      Q      And you specifically took a piece of paper in,

13  a driver's log piece of paper, making a written request,

14  and specifically requested that Ron Grigg sign it as

15  being received, right?

16      A      Yes, sir.

17      Q      Do you always do that in terms of when you

18  request something, to have him sign it and acknowledge

19  it?

20      A      That is how you pretty much get your requests.

21  You can -- a written request.  That is what that is, a

22  written request.

23      Q      Any reason why you just didn't send a letter?

24      A      I was right there where he was, and we just

25  agreed, you know -- if you want to transfer, I'm gonna

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  put in for it now, you know, written request.

2      Q    And you believe it's your choice as to whether

3  you work as a material hauler or a ready mix driver?

4      A    Yes, sir.

5      Q    Does the employer have any say in that?

6      A    Yes, sir.

7      Q    So what if they desire that you work as a

8  material hauler, just as you were hired?

9      A    That -- a written way of telling me, you know,

10 am I denied or why I can't have the job.  I would like to

11 have something written to me.  That's all.

12     Q    Mr. Grigg talk to you about the fact you would

13 not make as much money in a ready mix position?

14     A    Yes, sir.

15     Q    And that was due to the loss of seniority?

16     A    Yes, sir.

17     Q    You'd be at the very low, bottom of the

18 seniority list, right?

19     A    Yes, sir.

20     Q    You said that if you were to go to work as a

21 ready mix driver that before long you'd be a batch

22 operator?

23     A    Yes, sir.  I believe, I believe we could be.

24     Q    Many, how many batch operators has Grohne had

25 in the last 30 years?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    I don't know.

 2        Q    Did anybody ever tell you that if you become a

 3   ready mix driver that the next step is a batch operator?

 4        A    No, sir.

 5        Q    Ms. Leahy asked you if you knew who Decatur

 6   Services Construction Corporation is.  You ever heard of

 7   that?

 8        A    No, sir.

 9        Q    Have you ever heard of Decatur Construction

10   Services, Inc., d/b/a Grohne Concrete?

11        A    No, sir.

12        Q    You drive a truck that says "Grohne" on the

13   side?

14        A    It say "Christy-Foltz" on the side.

15        Q    How about the cement trucks?

16        A    It say "Grohne Concrete."

17             MR. POSTLEWAIT:  Thank you, Mr. Barbee.

18             Thank you, Your Honor.

19             THE COURT:  Thank you.

20             Redirect.

21             MS. LEAHY:  May I approach, Your Honor?

22             THE COURT:  You may.

23                REDIRECT EXAMINATION BY MS. LEAHY:

24        Q    I believe you have in front of you a blown-up

25   version of Plaintiff's Exhibit 5?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    Yes, ma'am.

2      Q    It's also reflected here.  I think you

3  previously testified that this is the first noose that

4  you saw?

5      A    Yes, ma'am.

6      Q    And where is it in that picture?

7      A    There it is right there, at the east side of

8  the batch plant office, on a plastic bag there.

9      Q    Okay.  So there's a plastic bag with some red

10 lettering, and the noose is on top of that?

11     A    Yes, ma'am.

12     Q    And when did you first see that?

13     A    This was in October, about the middle of

14 October I saw that noose in the batch plant.

15     Q    And you took the picture of the noose at that

16 time?

17     A    Yes, ma'am.

18     Q    And then you had the picture developed?

19     A    Yes, ma'am.

20     Q    Did you have that picture with you when you

21 went to see Dr. Lee?

22     A    Yes, ma'am.

23     Q    And after you saw Dr. Lee, then you immediately

24 came back to the batch plant, to the main office, and

25 talked with Mr. Grigg?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Yes, ma'am.

2      Q     Do you have a blown-up exhibit of Plaintiff's

3  Exhibit 6?

4      A     I'm sorry?  I didn't hear you.

5      Q     I'm showing you Plaintiff's Exhibit 6, which

6  you previously testified was the photograph that you took

7  of the second noose?

8      A     Correct.

9      Q     And when was it that you took that photograph?

10      A     A few days after the first photo.

11      Q     Had you ever seen the first noose before?

12      A     No, ma'am.

13      Q     And you'd been in the batch plant many times?

14      A     Yes, ma'am.

15      Q     And describe where that first noose was.

16      A     The first noose is -- the batch plant office,

17  you enter in from the east side; and as you enter in,

18  come into on the east side of this plant through the

19  door, to your left is where the operator sit, who mixes

20  this concrete or whatever or tell you where to go.

21          Across from that is the west side where we

22  normally stand or something; and you can look right back,

23  facing the door and the mixer man, Scott Spitzer, and

24  that is where that is, on the east side of that wall.

25      Q     And I believe there's other things, such as for

1  coffee and making of coffee, that type of thing in the

2  picture?

3      A    Yes.  Normally, when we coming to the batch

4  plant office with Scott Spitzer or whatever, there's a

5  microwave where you can warm your food, also a small

6  refrigerator that approximately sit to the left of that

7  where they sell pops.  You could put your food in there

8  and keep it cool.  Coffee, the coffee machine is there,

9  and the sugar and everything is right along in front of

10  this in the batch plant office.

11      Q    And it was -- in mid-October was the first time

12  that you had ever seen that first noose?

13      A    Yes, ma'am.

14      Q    And now showing you Plaintiff's Exhibit 6,

15  which you have, and you said you took that photograph a

16  few days later?

17      A    Yes, ma'am.

18      Q    And when you -- did you testify previously, I

19  think, that Mr. Spitzer was present when you took this

20  photograph?

21      A    Yes, ma'am.

22      Q    Had you ever seen that noose before?

23      A    No, ma'am.

24      Q    And that was in the batch plant office?

25      A    That's in the batch plant, plant, itself.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    Okay.  Then describe the relationship -- the
 2   first noose was in the batch plant office?
 3        A    Batch plant office.
 4        Q    And then where was the second noose in
 5   relationship to that batch plant office?
 6        A    This is also the east side wall of the batch
 7   plant.  The batch plant is over the whole mixing
 8   procedure back there.  But the office is inside where the
 9   control.
10             Maybe six feet, five feet away from the batch
11   plant office there's a back door, and this is the outer
12   field of the building.  So when you're going out that
13   door there, there's a light switch; and that noose and
14   stuff is right there.
15             These are two separate buildings, but it -- the
16   office is inside the batch plant.
17        Q    So the first one was in the office inside the
18   batch plant, and the second one was by the door as you
19   would exit the batch plant?
20        A    Correct.
21        Q    And you -- did you ever see any of those
22   noose-- either one of those nooses at any time in your
23   employment before you, the day you took the pictures of
24   them?
25        A    No, ma'am.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     Q   Mr. Barbee, does the noose have a symbolism for

2  you?

3     A   Yes.

4     Q   What is that?

5     A   Hatred.

6     Q   And at that time, when you saw those nooses,

7  you were the only African-American truck driver?

8     A   Yes, ma'am.

9     Q   As far as the ready mix job, you were willing

10  to be put at the bottom of the seniority list, correct?

11     A   Yes, ma'am.

12     Q   And you understood then that you would make

13  initially less money than you were making as a hauler?

14     A   Yes, ma'am.

15     Q   Did you know there was a potential for you to

16  make more money than you would be making as a hauler?

17     A   Yes, ma'am.

18     MS. LEAHY:  May I have just a moment, Your

19  Honor?

20     THE COURT:  You may.

21      (Brief pause in proceedings.)

22  BY MS. LEAHY:

23     Q   Mr. Barbee, as to the first noose, you took the

24  picture and had it developed, right?

25     A   Yes, ma'am.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1        Q      How long did that take?

2        A      How long did it take to develop?  I'm not sure.

3    I don't know.

4        Q      Let me put it another way.  You had the picture

5    when you went to Dr. Lee's office, correct?

6        A      Uh-huh.

7        Q      How far before that did you have it developed?

8        A      Maybe a couple days before that.

9        Q      Okay.  And you did come from Dr. Lee's office

10   to Mr. Grigg?

11       A      Correct.

12              MS. LEAHY:  I have nothing further, Your Honor;

13   but I would move to admit Plaintiff's 1, 3, 4, 5, and 6.

14              THE COURT:  Do you wish to be heard on the

15   tender?  I think that the pretrial order indicates that

16   there's no objection.

17              MR. POSTLEWAIT:  They were admitted without

18   objection.

19              THE COURT:  Very well.  Those will be admitted

20   without objection.

21              Any follow-ups to the redirect?

22              MR. POSTLEWAIT:  No.

23              THE COURT:  All right.  Mr. Barbee, thank you.

24   You may step down.

25                   (Witness Barbee excused, 4:13 p.m.)

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1

2

3

4                    <u>REPORTER'S CERTIFICATE</u>

5

6        I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

7   that the foregoing is a correct transcript from the

8   record of proceedings in the above-entitled matter.

9        Dated this 6th of November, 2010.

10

11

12

13                    s/Lisa Knight Cosimini
                  _____
                  Lisa Knight Cosimini, RMR-CRR
14                Illinois License # 084-002998

15

16

17

18

19

20

21

22

23

24

25