BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LAWRENCE C. BARBEE,

                                        Docket No. 09-2056

                Plaintiff,

    vs.                                 Urbana, Illinois
                                        October 19, 2010

CHRISTY-FOLTZ, INC.,

                Defendant.

        EXCERPTS FROM JURY TRIAL -- Day 2 of 4

        BEFORE THE HONORABLE DAVID G. BERNTHAL
            UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S :

 For the Plaintiff:        MARY LEE LEAHY, ESQUIRE
                           Leahy Law Offices
                           308 East Canedy
                           Springfield, Illinois  62703
                           (217) 522-4411

                           DOUGLAS J. QUIVEY, ESQUIRE
                           Londrigan, Potter & Randle, P.C.
                           1227 South Seventh Street
                           P.O. Box 399
                           Springfield, Illinois  62705
                           (217) 544-9823

 For the Defendant:        R. SAMUEL POSTLEWAIT, ESQUIRE
                           Winters, Featherstun,
                           Gaumer, Kenney, Postlewait,
                           Stocks & Flynn
                           225 N. Water St., Suite 200
                           Decatur, Illinois  62525
                           (217) 429-4453

 Court Reporter:           LISA KNIGHT COSIMINI, RMR-CRR
                           U.S. District Court
                           201 South Vine, Suite 344
                           Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript
produced by computer.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056                    2

I N D E X

                                                              Page


EVIDENCE ON BEHALF OF THE PLAINTIFF:

    HALDON SCHINZLER
    Direct Examination by Ms. Leahy ...............   3
    Cross-Examination by Mr. Postlewait ..........  33
    Redirect Examination by Ms. Leahy ............  44
    Recross-Examination by Mr. Postlewait ........  53

    RONALD GRIGG
    Direct Examination by Mr. Quivey .............  55
    Cross-Examination by Mr. Postlewait .......... 103
    Redirect Examination by Mr. Quivey ........... 127


RULE 50 MOTION ................................... 140


EVIDENCE ON BEHALF OF THE DEFENDANT:

    SCOTT SPITZER
    Direct Examination by Mr. Postlewait ......... 149
    Cross-Examination by Ms. Leahy ............... 189

3

```
 1                    (In open court; jury present.)

 2                    HALDON SCHINZLER, sworn, 9:07 a.m.,

 3                  DIRECT EXAMINATION BY MS. LEAHY:

 4        Q    State your name, please.

 5        A    Haldon Schinzler, Jr.

 6        Q    And your professional or business address, Mr.

 7   Schinzler?

 8        A    740 South Main, Decatur, Illinois.

 9             MS. LEAHY:  Your Honor, I should note I'm

10   calling Mr. Schinzler as an adverse witness.

11        Q    You're the president of Christy-Foltz?

12        A    Correct.

13        Q    And that's a general building contractor

14   business?

15        A    Correct.

16        Q    And it specializes in commercial and industrial

17   buildings?

18        A    Correct.

19        Q    Now, there's been discussion in this case of a

20   company called Decatur Construction Services, Inc.

21        A    Yes.

22        Q    Are you familiar with that business?

23        A    Yes.

24        Q    Tell me what that business is.

25        A    It's a holding company for Grohne Concrete.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    Who owns Decatur Construction Services, Inc.?

2    A    Christy-Foltz, Inc.

3    Q    And when you say it's a holding company, is its

4    only function that it owns Grohne?

5    A    Correct.

6    Q    So Christy-Foltz owns Decatur Construction

7    Services, Inc.; and Decatur Construction Services, Inc.,

8    owns Grohne Concrete?

9    A    Correct.

10   Q    And when was this sort of three-tiered

11   relationship set up?

12   A    1995.

13   Q    Does Decatur Construction Services, Inc., have

14   any employees?

15   A    No.

16   Q    Now, you know Ron Grigg?

17   A    I do.

18   Q    And what is his position with Christy-Foltz?

19   A    He's our plant manager of Grohne Concrete.

20   Q    Is he an employee of Christy-Foltz or of

21   Grohne?

22   A    He is an employee of Christy-Foltz.

23   Q    Does Grohne have any employees?

24   A    No.

25   Q    So that all of the employees whose names will

1   come up in this case, they're employees of Christy-Foltz?

2      A    Correct.

3      Q    Mr. Grigg [sic], I want to call your attention

4   to August of 2007.  At that time, you learned that Gary

5   Roberts had called Lawrence Barbee -- who are both

6   employees of Christy-Foltz -- "nigger"; is that correct?

7      A    That Ron Grigg notified me that.

8      Q    So you learned about that?

9      A    Yes.

10      Q    When did you learn about it?

11      A    When did I learn about it?

12      Q    Yes.

13      A    I'm not sure of the exact date.  Okay?

14      Q    Did you have any discussion with anybody other

15   than Ron Grigg about what Mr. Grigg had told you, that

16   Gary Roberts had called Lawrence Barbee a nigger?

17      A    No.

18      Q    Were you consulted as to what to do about this

19   situation?

20      A    Was I consulted?

21      Q    Yes.

22      A    By Ron Grigg, yes.

23      Q    All right.  And did you advise him as to what

24   to do?

25      A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       Q      What did you tell him to do?

2       A      I asked him who did it and why it was done, and

3  he indicated to me that Gary Roberts had called Lawrence

4  this name in jest, or in joking, and that he had called

5  the parties together and that Gary Roberts had apologized

6  to Lawrence; and he thought everything was okay between

7  the parties.

8       Q      Did Mr. Grigg tell you that he was present for

9  that apology?

10      A      He did not.

11      Q      Did he tell you where the apology that he

12  thought had taken place took place?

13      A      No.

14      Q      Did he tell you anything about the

15  circumstances of the apology?

16      A      No.  He told me -- he just told me that he had

17  gotten the parties together and that Gary had apologized

18  to Lawrence, and he thought everything was okay.

19      Q      Did you ask him how he knew about the apology

20  since he wasn't there?

21      A      No.  I did not.

22      Q      Did he ever tell you that Mr. Barbee had come

23  to him and said that the apology was not sincere?

24      A      Later, he called me after he thought it was

25  taken care of; and a day or two, or a few days later, he

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   called me and thought that it was not taken care of, that

2   it was not adequate, that Lawrence had voiced some

3   concerns about the workplace environment.

4        Q    Mr. Schinzler, can you give me any estimate of

5   the time frame you heard that Gary Roberts had called

6   Lawrence Barbee nigger?  Was it a separate occasion when

7   Ron Grigg told you that Roberts had apologized?

8        A    No.  I think when he called me and told me

9   that, that it had occurred, that he had taken care of it,

10  that he thought everything was okay.

11       Q    So there was just the one conversation up to

12  that point in time; he advised you what had happened, but

13  he also told you that Roberts had apologized?

14       A    Correct.

15       Q    One conversation?

16       A    Right.

17       Q    What happened next, after then the second

18  conversation when he told you Mr. Barbee had come to

19  him -- correct? --

20       A    Yes.

21       Q    -- and had told him that he did not think the

22  apology was sincere?

23       A    I don't know that he told me that.  He -- that

24  he had concerns that the people were not friendly to him.

25       Q    So Ron Grigg told you then that Barbee had come

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  and said that the other employees now were not friendly

2  to him?

3      A    Correct.

4      Q    What, if anything, did you tell Mr. Grigg to

5  do?

6      A    I thought that we should set up a meeting with

7  Lawrence.

8      Q    And did you set up that meeting?

9      A    Yes.

10     Q    When did that take place?

11     A    I think that occurred on April 20th --

12  August 20th.  I'm sorry.

13     Q    Of 2007?

14     A    Correct.

15         MS. LEAHY:  Your Honor, may I approach?

16         THE COURT:  Yes.

17  BY MS. LEAHY:

18     Q    Mr. Schinzler, I'm showing you Plaintiff's

19  Exhibit 2.  Can you identify that document?

20     A    Yes, I can.

21     Q    And what is that document?

22     A    That is some notes that I took during this

23  meeting with Lawrence.

24     Q    Where did that meeting take place on

25  August 20th?

```
 1        A     In my office.

 2        Q     And who was present?

 3        A     Myself, Ron Grigg, and Lawrence Barbee.

 4        Q     And you've -- is this your handwriting on this

 5   document?

 6        A     Yes, it is.

 7        Q     Then you indicate in the upper right-hand

 8   corner, "Present:  Hal Schinzler" -- and that's you --

 9   "Ron Grigg, and Lawrence Barbee," correct?

10        A     Correct.

11        Q     How long did the meeting take?

12        A     Not long, maybe 30 minutes to an hour, maybe.

13        Q     Now, Mr. Schinzler, it's not easy to read your

14   handwriting, so I'm going to ask that you read what you

15   wrote.

16        A     Okay.  "Gary Roberts made comment to Carroll

17   [sic] Sperry.  'Look at Carroll.  He's acting like

18   Terry's'" -- and I used N word.

19              "After apology" --

20        Q     Okay.  Wait.  Let's just stop right there.

21        A     Okay.

22        Q     Who's Carrol Sperry?

23        A     He's another truck driver.

24        Q     And who told you this?

25        A     Who told me --
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    Who said this at the meeting?  Did you say

2  that?

3      A    No.  Lawrence said that.

4      Q    Lawrence Barbee told you about this other

5  comment, correct?

6      A    Correct.

7      Q    Now, you have -- the next line reads, "After

8  apology"?

9      A    Correct.

10     Q    Was this statement that Gary Roberts made after

11  the apology, or does "after the apology" refer to the

12  next paragraph that starts, "Scott Spitzer"?

13     A    "After apology" refers to the next paragraph.

14     Q    What did you say when Mr. Barbee told you that

15  Gary Roberts made the comment to Carrol Sperry, "Look at

16  Carrol.  He's acting like Terry's N"?

17     A    I'm not sure that I said anything.  I was

18  letting Lawrence speak.

19     Q    Did you do anything to investigate the truth of

20  that comment to Carrol Sperry?

21     A    No.  I assumed, I assumed that Lawrence was

22  telling me the truth.  I had no reason to doubt that.

23     Q    All right.  Did you then follow up with either

24  Roberts or Sperry about this comment?

25     A    No.  I did not.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      Do you know if anybody else did?

2      A      No.  I do not know.

3      Q      Did you direct anybody to follow up and talk

4  about that particular nigger comment?

5      A      No.

6      Q      All right.  Then after the apology, can you

7  continue reading, please?

8      A      "After apology.  Scott Spitzer said to

9  Lawrence, 'You call each other names, and it's all right;

10  but when we do it, it's not all right.'

11            "At another time, Scott drove up on end loader

12  and said to Lawrence that, 'I didn't know you were

13  racist.'"

14      Q      All right.  Let's stop there for a moment.

15  Did -- these are things that Mr. Barbee is telling you?

16      A      Correct.

17      Q      All right.  Now, when was it that Scott Spitzer

18  said this comment to Lawrence about "you call each other

19  names"?

20      A      It was after the apology, but, but I don't know

21  what date.

22      Q      Did you do anything -- by the apology, you mean

23  the apology that Mr. Grigg told you Mr. Roberts had made?

24      A      Correct.

25      Q      Did you do anything to investigate that

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1    incident?

 2        A    No.

 3        Q    Did you direct anybody else to do anything?

 4        A    No.

 5        Q    Do you know if anybody did anything about Scott

 6    Spitzer's comment to Lawrence?

 7        A    Well, I told Scott at a later date that, that

 8    he didn't need to be discussing things like that with,

 9    with Scott -- with Lawrence.

10        Q    When was that?

11        A    That was sometime after it was discovered that

12    it was said.

13        Q    Was it in August?

14        A    Can't say.

15        Q    Where did the conversation with Scott Spitzer

16    take place?

17        A    It was just -- would have just been on the work

18    site.

19        Q    Where on the work site?

20        A    Just at the job site.

21        Q    Well, as I understand it, you've got --

22    Christy-Foltz has two locations in Decatur?

23        A    Correct.

24        Q    All right.  But then Christy-Foltz employees go

25    out on job sites, construction sites, right?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    A    Correct.

2    Q    So where did the conversation with Scott

3  Spitzer take place?

4    A    It would have been at the Grohne Concrete site.

5    Q    Do you remember where on that site?

6    A    No.

7    Q    Was anyone else present?

8    A    No.

9    Q    What did you say to Mr. Spitzer?

10    A    Just that he, he couldn't talk like that and

11  use language and et cetera that would upset someone.

12    Q    Are those the words you used?

13    A    Probably not.

14    Q    Do you remember the words you used?

15    A    No.

16    Q    The next paragraph, could you read that,

17  please, then about "at another time"?

18    A    "At another time, Scott, he drove up on an end

19  loader and said to Lawrence that 'I didn't know you were

20  racist.'"

21    Q    So that's Mr. Scott Spitzer, did you take it to

22  be?

23    A    Yes.

24    Q    Telling Mr. Barbee that he was racist?

25    A    That's what, that's what Lawrence stated.  Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      And I think you said before you had no reason
2   to doubt Mr. Barbee, right?
3      A      Correct.
4      Q      Do you know when that comment was made?
5      A      I do not.
6      Q      Did you do anything to investigate that
7   comment?
8      A      I did not.
9      Q      Did you direct anybody to do that?
10     A      No.
11     Q      Did you talk to Mr. Spitzer about it?
12     A      That was afterwards.  That's what I said, told
13  you, that I had told Scott that he couldn't speak and
14  talk like that.
15     Q      When you say "speak and talk like that," how
16  would Scott know what you were talking about if you said
17  just "speak or talk like that"?
18     A      To use words like that were, that had been,
19  we'd been accused of using.
20     Q      Did you say to Mr. Spitzer, "You can't use the
21  nigger word on the work site"?
22     A      No.  I did not.
23     Q      We come to the last, or the next paragraph, and
24  it says what?
25     A      "Lawrence states that work environment is

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  hostile, hostile meaning nonfriendly, no speaking, no

2  waving."

3      Q    Do you remember anything else Mr. Barbee told

4  you about that?

5      A    No.  That's -- was all that I remember on that.

6      Q    Did you say anything in regard to that?

7      A    I probably did, but I don't remember.

8      Q    And the last word on that, on your notes is?

9      A    "Counseling."

10     Q    What does that refer to?

11     A    Lawrence had asked that if we had any

12 counseling or provided any counseling.

13     Q    Did he tell you why he was asking you that?

14     A    I don't remember.

15     Q    Do you remember if he told you that this was

16 having an effect on him, and it was making him upset?

17     A    I think that, I think he probably brought that

18 up during the conversation.

19     Q    And you believe that he was upset when you set

20 up the meeting, didn't you?

21     A    I believe he had concerns.

22     Q    What, if anything, did you do as a result of

23 this meeting on August 20th?

24     A    I think after the meeting of August 20th, we

25 consulted our attorney as --

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    Well, I don't want to go into any
 2   attorney-client conversations.
 3        A    Okay.
 4        Q    Did you do anything else?
 5        A    Well, we talked -- I had Ron and, talk to our
 6   people and tell them that they cannot be nonfriendly, or
 7   they have to conduct business as usual; that there
 8   shouldn't be any exceptions to how they're treating him.
 9        Q    Do you know if Mr. Grigg did meet with the
10   employees?
11        A    I do not know that.  No.
12        Q    Apart from your notes, is there anything else
13   in writing regarding Mr. Barbee's report to you about the
14   use of the N word in the workplace?
15        A    No.
16        Q    Mr. Grigg ever show you any notes of any
17   interviews he conducted?
18        A    No.
19        Q    And I want to be sure about this.  You did not
20   meet with the employees, right?
21        A    I did not.
22        Q    Did you do anything at all after the
23   August 20th meeting in regard to this situation at
24   Christy-Foltz?
25        A    No, other than instructing Ron to speak to our
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   employees and, and tell them that they had to conduct

2   business as usual.

3       Q    On August 20, 2007, Christy-Foltz didn't have

4   any written policy in effect regarding discrimination or

5   harassment, right?

6       A    Correct.

7            MS. LEAHY:  May I approach, Your Honor?

8            THE COURT:  Yes.

9   BY MS. LEAHY:

10      Q    I'm showing you Plaintiff's Exhibit 7.  Can you

11  identify that document?

12      A    Yes.  It's a nondiscrimination/antiharassment

13  policy drawn up by our attorney.

14      Q    This policy indicates that it's the policy of

15  Decatur Construction Services, Inc.?

16      A    Correct.

17      Q    But that company had no employees?

18      A    Correct.

19      Q    So there was nobody that this policy would be

20  covered by, correct?

21      A    Well, maybe technically, but it was posted in

22  our -- at Grohne and at Christy-Foltz on, on the bulletin

23  board that our employees use.

24      Q    But you told me it was in the mid '90s that

25  Decatur Construction Services, Inc., was formed to be a

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   holding company for Grohne?

2       A   Correct.

3       Q   So how would -- would an employee who began to

4   work at Christy-Foltz in 2004, 2005, 2006 -- they

5   wouldn't be aware of that relationship, would they?

6       A   No.  But if they seen this on our bulletin

7   board, they may not even question Decatur Construction

8   Services.  They knew it was, would be our policy.  It's

9   posted on, on the employees' bulletin board.

10      Q   So you think everything that's posted on your

11  bulletin board is part of Christy-Foltz?

12      A   Everything that -- well, yeah, that pertains to

13  Christy-Foltz, yes.

14      Q   Aren't there notices up there for meetings of

15  the union?

16      A   Sometimes, probably.  Yes.  But, again, that's

17  part of Christy-Foltz' business.  It's our employees.

18      Q   Well, it's notice from the union to the

19  employees that there's going to be a union meeting at the

20  union hall, right?

21      A   Uh-huh.

22      Q   And Christy-Foltz does go there, right?

23      A   No.

24      Q   Okay.  I mean, that's correct?

25      A   That's correct.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    When was this Decatur Construction Services,
2  Inc., policy posted?
3    A    I'm not sure of the date.
4    Q    Can you even give me a month?
5    A    Yeah, by September of '07.
6    Q    This policy wasn't given to each employee, was
7  it?
8    A    It was not.
9    Q    And no employee had to sign that they read
10  this, this policy and understood it?
11    A    That's correct.
12    Q    There was no announcement it was up on the
13  bulletin board, was there?
14    A    No, not that I'm aware of.
15    Q    Mr. Schinzler, did you become aware that Mr.
16  Barbee said that he had found a noose on the grounds of
17  Grohne Concrete, which is really Christy-Foltz?
18    A    Yes.
19    Q    When did you become aware of that?
20    A    As soon as he notified Ron Grigg that, that
21  there was one there.
22    Q    Do you know when that was?
23    A    No.  I do not.
24    Q    Can you even give me a month?
25    A    August or September.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     And did Mr. Grigg notify you of this by phone?

2      A     Yes, he did.

3      Q     Did you tell Mr. Grigg what, if anything, to

4  do?

5      A     Yes.  I told him to take it down immediately

6  and then to find out who put it there, how it got there,

7  who made it, and et cetera.

8      Q     Did Mr. Grigg ever give you a written report of

9  what he had done?

10     A     No.  He did not.

11     Q     Now, you knew that a noose would be probably

12  offensive to African-Americans, didn't you?

13     A     Yes.

14     Q     Did you talk with Mr. Barbee about this?

15     A     No.

16     Q     Did you ever talk with Mr. Barbee about the

17  noose incident?

18     A     No.

19     Q     Did you become aware that Mr. Barbee claimed

20  there was a second noose on the premises of Grohne

21  Concrete?

22     A     Yes.

23     Q     When was that?

24     A     It was soon afterwards, probably -- it seems

25  like a week, maybe, afterward, after the first incident.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      All right.  And how did you learn about that?

2      A      Mr. Grigg phoned me.

3      Q      And what did you tell him to do about that, if

4    anything?

5      A      I told him to get -- likewise, of the first

6    one, told him to take it down immediately and get rid of

7    it -- or to, you know, hold it -- and told him to find

8    out, if he can find out who made that one and why it was

9    there, where it was at, exactly where it was at and --

10     Q      Okay.  Did Mr. Grigg ever show you any pictures

11   that Lawrence Barbee had taken of the noose?

12     A      I have seen pictures of the noose.

13     Q      Had you seen those pictures before the

14   litigation?

15     A      I think I did.

16     Q      How did you come to see those pictures?

17     A      I think Ron Grigg showed me the pictures.

18     Q      Mr. Schinzler, did you do anything other than

19   what you've just testified to about the second noose?

20     A      No.

21     Q      Since that meeting on August 20, 2007, have you

22   ever talked with Mr. Barbee about what happened to him?

23     A      No.

24     Q      Have you ever made any inquiry as to how he was

25   doing?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A      Probably in casual conversation between

2    Lawrence and myself.

3      Q      You mean just like you would with any other

4    employee?

5      A      Yes.

6      Q      Did you ever hear of an incident in September

7    whereby Mr. Barbee had a problem continuing to drive his

8    truck?

9      A      I did hear that.

10      Q      Well, you heard that.

11             And when was that that you heard it?

12      A      Well, I don't remember the date at all.

13      Q      And, again, was this from Mr. Grigg?

14      A      Yes.

15      Q      And what did he tell you about that incident?

16      A      He told me that Lawrence had to pull his truck

17    over to the roadside, that he couldn't continue driving,

18    and that we had to make arrangements to get a driver out

19    there to replace him and, and complete the, the hauling.

20      Q      Did he say anything about Mr. Barbee's physical

21    condition?

22      A      No.

23      Q      Did he say anything about Mr. Barbee at all,

24    other than that he had to pull his truck over?

25      A      No.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    Did he indicate any concern for Mr. Barbee?
 2        A    Well, he was concerned, yeah, that, that he
 3   couldn't continue driving, you know; so he --
 4        Q    Did he tell you why Mr. Barbee couldn't
 5   continue driving?
 6        A    That he was, I think, stressed out.
 7        Q    And anything else he told you?
 8        A    No.
 9        Q    Did you ever learn prior to the litigation that
10   this, Mr. Barbee was taking any type of medication?
11        A    No.  I did not.
12        Q    Mr. Schinzler, if we'd go to Exhibit 2, it
13   deals with nondiscrimination and antiharassment, correct?
14        A    Exhibit 2?
15        Q    Plaintiff's Exhibit 2, the policy?
16        A    No.
17        Q    I'm sorry, Plaintiff's Exhibit 7, --
18        A    Okay, yes.
19        Q    -- the policy.
20        A    Yes.
21        Q    And then it talks about equal employment
22   opportunity, right?
23        A    Yes.
24        Q    And it defines "sexual harassment," correct?
25        A    Correct.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q     And then it talks about "Other Forms of
2   Harassment," right?
3        A     Yes.
4        Q     And that includes "verbal or physical conduct
5   that denigrates or shows hostility or aversion toward an
6   individual because of his or her race," et cetera?
7        A     Correct.
8        Q     So, in your opinion, does this policy cover
9   what had happened to Mr. Barbee?
10       A     I would think so.
11       Q     And then it goes on to cover -- to define
12  harassing conduct; slurs, negative stereotyping;
13  threatening, intimidating, hostile acts; right?
14       A     Correct.
15       Q     And then there's -- on the second page, there's
16  a paragraph that prohibits retaliation; is that correct?
17       A     Correct.
18       Q     And the policy strongly urges employees to
19  report what Mr. Barbee had reported to you, right?  And
20  by "you," I mean Christy-Foltz.
21       A     [No response.]
22       Q     Go to the last paragraph on page 2.
23       A     Uh-huh.
24       Q     "The employer strongly urges the reporting of
25  all incidents of discrimination, harassment, or
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   retaliation."

2       A    Yes.

3       Q    And if we go to the third page, this policy

4   indicates that, "Early reporting and intervention have

5   proven to be the most effective methods of resolving

6   actual or perceived incidents of harassment."  Do you

7   agree with that?

8       A    Yes.

9       Q    All right.  What was the intervention that

10  Christy-Foltz did in regard to what Mr. Barbee had

11  reported?

12      A    I'm not, I'm not sure.  Of intervention, okay.

13  I don't know that -- I'm not sure I understand.

14      Q    Are you saying you don't understand the policy

15  that Christy-Foltz issued?

16      A    No.  I'm, I'm -- what I'm, I don't know -- if I

17  understand your question -- of what intervention we did.

18      Q    That's exactly my question.  Your policy

19  indicates that, "Early reporting and intervention have

20  proven to be the most effective methods of resolving

21  actual or perceived incidents of harassment."

22           And I'm asking you what Christy-Foltz did by

23  way of intervention.

24      A    Nothing.

25      Q    Then you go down to the middle of this third

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    page, and it talks about, "Any allegations will be

2    investigated promptly, thoroughly, and impartially."  It

3    talks about individual interviews and that the parties

4    will be advised of the results of the investigation.

5             Did Christy-Foltz follow that in this case?

6        A    We did, we did our investigation.  Yes.

7        Q    What's the investigation?

8        A    My speaking with Ron Grigg, the manager, and

9    Ron investigating the incidents with the employees.

10       Q    What did he do to investigate with the

11   employees?

12       A    I assume that he --

13       Q    No, no.  I don't want you to assume, Mr.

14   Schinzler.  I only want you to tell me what you know that

15   Ron Grigg did.

16       A    He spoke with several of our employees.

17       Q    Do you know who he spoke to?

18       A    I know some of them.  Yes.

19       Q    Who do you know that he spoke to?

20       A    He spoke to Robert Stewart and Scott Spitzer.

21   Those two I know.

22       Q    All right.  Did you see any notes of his

23   interviews with them?

24       A    No.

25       Q    Do you know if he made any notes?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A    No.  I do not.

2       Q    Do you know if he did any report at all on any

3   of these incidents?

4       A    Not that -- no.  I do not know.

5       Q    Did you ask him for a written report?

6       A    No.  I did not.

7       Q    Why not?

8       A    Because we had ongoing discussion as to what he

9   was finding.

10       Q    But at some point, that ended, right?

11       A    Well, yes.

12       Q    And at the end of it, did you ask him for a

13   written report?

14       A    No.

15       Q    If we go then to the paragraph a third of the

16   way down on page 3 of Exhibit 7, it talks about

17   "responsive action."  Do you see that paragraph?

18       A    I do.

19       Q    And it says, "Responsive action may include,

20   for example, training."  Was any training done by

21   Christy-Foltz?

22       A    No.

23       Q    Has any training ever been done on

24   Christy-Foltz about harassment, racial harassment, sexual

25   harassment, or discrimination?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1       A    No.

2       Q    Why not?

3       A    We've -- it's never been a problem, never been

4    an issue.  It just -- we don't feel it happens in our

5    company.

6       Q    Well, you certainly -- did you ever see the two

7    nooses?

8       A    Yes, I did.

9       Q    Well, that would be a problem, wouldn't it?

10   You've already talked about what you thought it, how it

11   would affect African-Americans.

12      A    It could be a problem if, in how they're

13   presented or where they're located.  Yes.

14      Q    You've admitted that that presence would be a

15   problem for African-Americans?

16      A    Yes.

17      Q    Did it occur to you to bring in somebody who

18   did this kind of work, get all the employees together,

19   and try and flush this issue out, and put it to rest?

20      A    It did not.

21      Q    The next thing that your policy suggests is

22   referral to counseling, and that's what Mr. Barbee had

23   asked for, correct?

24      A    Correct.

25      Q    Did you ever provide any counseling for him?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    A    Did not.

2    Q    After August 20, 2007, did you ever go back to

3  him and say, "Hey, how you doing?  This may have been

4  rough for you.  Can we help you in any way?  Would you

5  like to go to counseling now?"

6    A    We did not ask him if he would like to go to

7  counseling.  No.

8    Q    The next thing the policy suggests is

9  monitoring of the offender.  Was that done?

10   A    Pardon?

11   Q    The monitoring of the offender, was that done?

12   A    No.

13   Q    All right.  And then it goes on to talk about

14 disciplinary action.  Apart from the suspensions given to

15 Mr. Aldridge and Mr. Roberts, there was no other

16 disciplinary action, right?

17   A    Correct.

18   Q    When Mr. Barbee was conveying to you a hostile

19 environment on August 20th, did it occur to you that the

20 white employees might be very resentful that Roberts and

21 Aldridge had gotten those suspensions?

22   A    Did it -- yes.  That occurred to me.

23   Q    Did you do anything to investigate, or tell Mr.

24 Grigg to investigate, to see if that were true; that the

25 white employees were angry about the suspensions?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A    Did not ask him to investigate if they were

2   angry.

3       Q    But it occurred to you that they could be?

4       A    Yes.

5       Q    And the other thing that the policy suggests is

6   that the employer will advise the complaining employee of

7   action taken.  Did Christy-Foltz do that in regard to Mr.

8   Barbee?

9       A    We didn't advise him directly.  No.

10      Q    Did you advise him indirectly?

11      A    He, he knew of the discipline action.  Yes.

12      Q    How did he know that?

13      A    He works with these people.  He's direct -- he

14  works directly alongside them.

15      Q    So you thought that the other employees would

16  tell Mr. Barbee that Roberts and Aldridge had been

17  suspended?

18      A    I think he would know that.

19      Q    But how?

20      A    Because he works right there at the same

21  location as they are, and they would just talk.  I

22  mean --

23      Q    Did you advise Mr. Barbee as to the

24  investigation, what you've called the investigation?

25      A    No.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    Didn't call Mr. Barbee in and say, "Hey,
2    Lawrence, this is what we're doing.  This is what we've
3    done.  You got any suggestions?"
4      A    I did not.
5      Q    Do you know if anybody else did?
6      A    No.  No one -- no one did.
7      Q    If you'd turn to the fourth page of the
8    policy -- by the way, you think this policy is a pretty
9    good one, don't you?
10     A    Yes.
11     Q    On the fourth page of the policy it says,
12   "These policies should not and may not be used as a basis
13   for excluding or separating individuals of a particular
14   gender, or any other protected characteristic, from
15   participating in business or work-related social
16   activities or discussions."
17          Isn't that directly related to the isolation
18   that Mr. Barbee reported to you?
19     A    Well, I, I don't know that he was isolated.
20     Q    I thought you said that in, in your notes he
21   had told you that on August 20th?
22     A    He, he told me that he thought he was isolated.
23     Q    And you told me that you had no reason to doubt
24   Mr. Barbee on August 20th, right?
25     A    On what he thought.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    I mean, he told you "hostile" means not

2    friendly, no speaking, no waving?

3    A    Correct.

4    Q    Mr. Schinzler, can you explain why you put that

5    policy up on the bulletin board if you did not intend to

6    follow it?

7    A    I think we do intend to follow it.

8    Q    What about back then in September of '07, or

9    August of '07, when it was posted?  Did you intend to

10   follow it then?

11   A    Yes.

12   Q    But you didn't, did you?

13   A    I think we were -- I think we were following it

14   to the best of our intent and, and what we believed

15   during the investigation to what was turned up.  Yes.

16   Q    You thought it was a good policy?

17   A    Uh-huh.

18   Q    But you've admitted to me that you didn't do

19   any of the things, the practical things -- like training,

20   like counseling -- that this policy calls for?

21   A    Correct.

22        MS. LEAHY:  No further questions.

23        THE COURT:  Thank you.

24        Do you wish to --

25        MS. LEAHY:  Your Honor, I would move the

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    admission of Plaintiff's Exhibits 2 and 7.

2            THE COURT:  Any objection to 2 and 7?

3            MR. POSTLEWAIT:  7 is the policy.

4            THE COURT:  Policy.

5            MR. POSTLEWAIT:  And 2 is the --

6            THE COURT:  The notes.

7            MR. POSTLEWAIT:  No.  No objection.

8            THE COURT:  They can be admitted without

9    objection.

10               CROSS-EXAMINATION BY MR. POSTLEWAIT:

11       Q    Good morning, Mr. Schinzler.

12       A    Good morning.

13       Q    Is the correct name of the corporation Decatur

14   Construction Services, Inc., d/b/a Grohne Concrete

15   Products?

16       A    Correct.

17       Q    At the Grohne Concrete Products, on one of the

18   bulletin boards, is there a notice of registration for,

19   for instance, your IBT number, Illinois business tax

20   number, that specifically indicates Decatur Construction

21   Services and Grohne Concrete Products?

22       A    On our bulletin board?

23       Q    Yes.

24       A    I'm not sure.

25       Q    If there is one on the bulletin board, it would

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  be there for all employees to see, correct?

2          MS. LEAHY:  Your Honor, I'm going to object to

3  that because we don't know if there is one there.

4          THE COURT:  Sustained.

5  BY MR. POSTLEWAIT:

6      Q    When you first talked to Ron Grigg, he told you

7  about the incident involving Gary Roberts and Lawrence

8  Barbee and that the apology had already been made; is

9  that your testimony?

10     A    Correct.

11     Q    Would you agree that that is early reporting

12 and intervention?

13     A    Correct.

14     Q    Was it your understanding that that occurred

15 within a day of the event?

16     A    Yes.

17     Q    Did -- your meeting on August 20 of 2007, do

18 you recall whether that was precipitated by a letter that

19 Mr. Barbee had sent to Mr. Grigg?

20     A    It probably was.  Yes.

21     Q    Do you remember in that letter that he claimed

22 that there was other racial slurs or racial comments that

23 had been made to him?

24     A    Yes.  I remember that.

25     Q    And when you took notes in the meeting, were

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1    you attempting to define what those were?

2         A    I called the meeting for Lawrence to state his

3    concerns.

4         Q    Okay.  With regard to this statement by Gary

5    Roberts that Lawrence reported about, "Look at Carroll.

6    He's acting like Terry's N," --

7         A    Correct.

8         Q    -- at the time of this meeting, Gary Roberts,

9    was he on suspension at that time?

10        A    I'm not sure of the dates on that.

11        Q    The next two items that you had listed on your

12   notes, Exhibit 2, are things that Lawrence was claiming

13   occurred after the apology, right?

14        A    Correct.

15        Q    And this, this statement by Gary Roberts was

16   something that occurred before the apology?

17        A    Correct.

18        Q    Do you recall whether or not Ron Grigg

19   indicated to you or reported to you prior to that meeting

20   on August 20th of 2007 that Mr. Barbee had indicated to

21   Ron that he thought he could get some money?

22        A    Ron had conveyed that to me.  Yes.

23        Q    Did that cause you some concern or suspicion in

24   terms of Lawrence's motives?

25        A    Yes, it did.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    Did you take that into consideration when you
2  were making decisions as to the extent of any responsive
3  actions to what he was saying?
4    A    Yes.
5    Q    With respect to the subject of counseling in
6  that meeting, did Lawrence Barbee specifically ask for
7  any group meeting of the employees?
8    A    No.
9    Q    Do you know whether he was receiving, or did
10 you receive any indication that he was receiving
11 counseling at the time?
12   A    I do not know.
13   Q    Did he bring up Christy-Foltz paying for
14 counseling?
15   A    I can't recall that.
16   Q    When you were in this meeting with Lawrence
17 Barbee, you had a chance to observe his demeanor?
18   A    Yes.
19   Q    Did he appear in any way upset?
20   A    No.
21   Q    Following that meeting, you understood Ron was
22 going to talk with the employees but did not specifically
23 direct him as to how to do that?
24   A    Correct.
25   Q    Is that because Ron's around those employees

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    every day and, and has been for the last 37 years and

2    knows well how to do those things?

3        A    Yes, he does.  And our, our managers and

4    superintendents are in charge of their employees and

5    hiring and et cetera.

6        Q    Did the incident with Gary Roberts and this

7    follow-up meeting with Lawrence Barbee that occurred on

8    August 2, 2007 -- is that, that series of events what

9    precipitated the adoption of the antiharassment policy?

10       A    Yes, it is.

11       Q    And, particularly, when the other statements

12   were conveyed to you about Scott Spitzer saying, "You

13   guys call each other names, but when we do it it's a

14   problem," and Scott Spitzer suggesting to Lawrence, at

15   least according to Lawrence, "I didn't know you were

16   racist," did you find that those statements are -- did

17   you consider them ambiguous as to whether they are

18   derogatory or not derogatory, or whether they might be

19   unintentionally offensive to someone?

20       A    I don't think they were meant to be offensive

21   to anyone.

22       Q    So the policy, to the extent it defines what is

23   and isn't, tends to give some definition to what conduct

24   Christy-Foltz is, is attempting to prohibit?

25       A    Correct.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    Mr. Schinzler, prior to this incident with Gary
 2   Roberts, had, in your experience with Christy-Foltz --
 3   which you've been there since 1963; is that correct?
 4        A    Correct.
 5        Q    And in your experience, have they ever had any
 6   other incidents of racially discriminatory conduct or
 7   harassment, anything of the kind that can be construed as
 8   such?
 9        A    None.
10        Q    And has Christy-Foltz in the past employed
11   African-American employees?
12        A    Yes, we have.
13        Q    Other races?
14        A    Yes.
15        Q    Okay.  And did you consider this incident with
16   Gary Roberts and the events that followed to be an
17   isolated event?
18        A    Yes, I did.
19        Q    Once you did adopt the policy, was there any
20   further events other than the two alleged noose
21   incidents?
22        A    None.
23        Q    Once you adopted the policy, posted the policy,
24   and other than the two alleged noose incidents, has
25   Lawrence Barbee to your knowledge ever reported any
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  further harassing conduct or discriminatory conduct of

2  any kind?

3      A    Not to my knowledge.

4      Q    You have had occasion to see Lawrence Barbee

5  subsequent to, at least, the second alleged noose

6  incident?

7      A    Yes.

8      Q    Has Mr. Barbee ever mentioned anything to you

9  that things are still uncomfortable for him in the

10  workplace, anything of the kind?

11      A    No.

12      Q    Okay.  Have you made observations of Mr. Barbee

13  that would indicate otherwise?

14      A    No.

15      Q    Am I correct that Mr. Barbee spends the vast

16  majority of his time behind the wheel in his truck?

17      A    That's correct.

18      Q    Is he working in a collective environment where

19  he's communicating with other employees on a frequent

20  basis?

21      A    Not on a frequent basis.

22      Q    Did you consider that as well in the, in the

23  course of these events?

24      A    Yes, I did.

25      Q    Do you recall with respect to the first alleged

1   noose whether the police came to the Grohne Concrete

2   premises?

3        A    Yes.  The police did come.

4        Q    Did you find that unusual?

5        A    I did.

6        Q    And did you talk with Ron and follow up as to

7   what was occurring?

8        A    Yes.  Ron kept me advised on, on what was

9   happening.

10       Q    Plaintiff's counsel asked you much about

11  written reports, written documents.  Is that the way you

12  and Ron communicate?

13       A    No.

14       Q    In terms of managers at Christy-Foltz, how many

15  of you are there?

16       A    How many managers?

17       Q    Yes.

18       A    12, 14.

19       Q    All right.  In terms of the concrete plant, is

20  Ron the only manager there?

21       A    Yes, he is.

22       Q    So, do you find it necessary in the conduct of

23  your daily business, or even in investigations of this

24  sort, that everything be documented?

25       A    I do not.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      Q    Did Ron report to you the source of the first

 2 alleged noose?

 3      A    Yes, he did.

 4      Q    And what did he tell you?

 5      A    He told me that, that it was made years ago by

 6 a Grohne employee, which was prior to the time of our

 7 purchasing them, made, made nooses; and this was one of

 8 them.

 9      Q    Did you consider that to be a satisfactory

10 conclusion to the concerns that Mr. Barbee had about that

11 alleged noose?

12      A    It, it led me to believe that it, it was not

13 put there for harassment of any certain individual; that

14 it was something that this employee apparently did in his

15 spare time or whatever; and, and where it was located and

16 how it was hanging upside down by the, the noose on a, on

17 a coat rack, it just did not seem like it was a focal

18 point of intimidation or harassment.

19      Q    Although you specifically did not speak with

20 Lawrence about what had, what had been learned about that

21 first alleged noose, do you know whether or not Ron did?

22      A    I do not know.

23      Q    In regards to the second alleged noose, you

24 indicated, I believe, that you were notified about that

25 claim?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        A     Yes, I was.

2        Q     And you directed Ron to investigate again?

3        A     Yes.

4        Q     And did Ron report back to you as to his

5  findings?

6        A     Yes.

7        Q     And what did he tell you?

8        A     He said that it was what he determined to be an

9  old rope that had hung above the tool bench in the batch

10  house, that it didn't appear to be anything, and had

11  indicated at some times they thought that it even had

12  been used as a rigging or hoisting device or tool.

13        Q     Did you ever receive any reports that that

14  second alleged noose was placed or positioned for any

15  discriminatory or racially harassing purpose?

16        A     No.

17        Q     When you did see it, did you even consider it a

18  noose?

19        A     No.

20        Q     Lawrence Barbee, has he continued to work

21  consistently through the present time?

22        A     Yes, he has.

23        Q     Do you know, has he -- to your knowledge, has

24  he ever refused work because he was unable to work, other

25  than possibly in September of '07?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    A    No.  I think he was involved in a little
2  accident where he wasn't able to work for a few days.
3    Q    That's something totally unrelated to this
4  lawsuit?
5    A    Correct.
6    Q    Other than that, he's not missed any work to
7  your knowledge?
8    A    Not to my knowledge.
9    Q    Given the findings with respect to each of the
10  two alleged nooses, once you understood the, the source
11  of them, given that, would you have expected them to be a
12  problem for Mr. Barbee?
13    A    No.
14    Q    Okay.  Now, even without that knowledge, would
15  you have expected them to be a problem for Mr. Barbee
16  once you saw them?
17    A    No.
18    Q    You were asked about whether the offender was
19  monitored; and with respect to each of the alleged
20  nooses, was there any offender?
21    A    No.
22    Q    And if we take into consideration the incident
23  with Gary Roberts, do you know whether Ron undertook any
24  kind of a heightened monitoring of the employees
25  thereafter?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    A     No.  I do not know.

2    Q     Do you -- or strike that.

3          MR. POSTLEWAIT:  No further questions.

4          THE COURT:  Thank you.

5             REDIRECT EXAMINATION BY MS. LEAHY:

6    Q     Mr. Schinzler, you said that after the apology

7  and suspensions, there was a letter from Mr. Barbee.  Did

8  you see that letter?

9    A     I did.

10    Q     And that as a result of that letter, you

11  convened the August 20, 2007, meeting?

12    A     It was after that.  Yes.

13    Q     And then you indicated that the letter had

14  raised something about other racial slurs, and you made

15  notes about those, correct?

16    A     Yes.

17    Q     Now, when was it that Mr. Grigg told you that

18  the plaintiff had said he could get some money?

19    A     Early on.

20    Q     When?

21    A     When Lawrence come in and, and said that he

22  thought that the work environment was unfriendly.

23    Q     Did you know that by the time that you had the

24  August 20th meeting?

25    A     Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     Q    Did you ask Mr. Barbee during the August 20th

2 meeting if he had ever said that?

3     A    No.  I did not.

4     Q    And you had every reason, you told me before,

5 to believe what Mr. Barbee told you in that meeting?

6     A    Sure.  Yes.

7     Q    You didn't ask him about that comment?

8     A    No.  I did not.

9     Q    Did you do any investigation into that comment?

10    A    No.  I did not.

11    Q    Now, you indicated that Mr. Barbee was not

12 upset during the meeting.  He was very factual with you,

13 right?

14    A    Yes.

15    Q    But you convened the meeting because you

16 thought he was upset?

17    A    Because he had concerns.

18    Q    Now, you indicated to Mr. Postlewait that

19 Christy-Foltz hired African-Americans, correct?

20    A    Yes.

21    Q    Now, your trades employees -- carpenters,

22 electricians, machinists, whatever you have -- those

23 employees are sent out by the union hall, right?

24    A    Correct.

25    Q    So the union hall has a list of those people

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   who have been out of work in order of how long they've

2   been out of work?

3        A    I do not know how they compile their list.

4        Q    But they, they send a specific person to you,

5   and you have to accept that person?

6        A    They can send a specific person, but we do not

7   have to accept them.

8        Q    You have to accept them for a day, don't you?

9        A    For two hours.

10       Q    All right.  And if they're not -- if they don't

11  work right, you can send them back?

12       A    Yes.

13       Q    You've got to be able to prove they're not

14  working right, right?

15       A    Yes.

16       Q    Okay.  But the truck drivers are different,

17  right?  The Teamsters and you have reached an agreement

18  when you can hire anybody off the street to be a truck

19  driver?

20       A    We can.

21       Q    And there's no hiring hall.  The Teamsters

22  don't send that person out that you have to accept for at

23  least two hours?

24       A    Correct.

25       Q    And isn't it true that in 2007 Mr. Barbee was

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   the only African-American truck driver?

2       A    I think that's correct in 2007.  Yes.

3       Q    Now, you indicated that the nooses were after

4   the policy was posted?

5       A    Did I indicate that?

6       Q    Yes.  Is that true?  The policy went up, and

7   then Mr. Barbee reported the nooses?

8       A    Okay.

9       Q    So Christy-Foltz was bound by the policy when

10  you got the reports of the nooses?

11      A    Correct.

12      Q    Now, you said something about Mr. Barbee's in a

13  truck, and he doesn't see employees.  Doesn't he go to a

14  Christy-Foltz site to pick up his truck in the morning?

15      A    Yes, he does.

16      Q    And aren't the other truck drivers there doing

17  the same thing?

18      A    Yes.

19      Q    And doesn't he have to go into the office to

20  get and drop off paperwork?

21      A    Yes.

22      Q    And that would be the office out at Grohne, the

23  main office building where Mr. Grigg is, as well as the

24  batch plant office?

25      A    He would report to Ron Grigg's office.  Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    And if he were assigned ready mix, he'd have to

2  go to the batch plant office to get that work, right?

3    A    Not necessarily, no.

4    Q    He doesn't get a ticket in the batch plant

5  office, about a load he's picking up?

6    A    But he may not go in the batch office.  I'm

7  not, I'm not sure of all of the logistics and how that,

8  all that transpires; but the batch office has a batch

9  operator in it, and basically that's the only person that

10  needs to be in there.

11    Q    And other truck drivers are turning in their

12  paperwork to Mr. Grigg, right?

13    A    Yes, they are.

14    Q    And other truck drivers are going in to get

15  their daily assignments, right?

16    A    Yes, they are.

17    Q    And that would include Mr. Barbee?

18    A    Pardon?

19    Q    That would include Mr. Barbee?

20    A    Yes, it would.

21    Q    And the same thing would be true with the ready

22  mix drivers; they go to the batch plant if they're going

23  to be ready mix drivers that day?

24    A    They go to the ready mix truck.

25    Q    All right.  But don't they go to the office or

1    in the batch plant building?

2         A    Not -- they, they back their truck up to the

3    batch hopper in the batch plant, yes; but they don't have

4    to get out of the truck.

5         Q    How do they get the paperwork as to where

6    they're going and how much load they've got?

7         A    The batch operator may hand it, bring it out

8    and hand it to them.  I'm not sure.

9         Q    Isn't there a microwave and a coffee pot and a

10   refrigerator in the batch plant office?

11        A    I do not know.

12        Q    Have you ever been in the batch plant office?

13        A    I have been.

14        Q    When's the last time?

15        A    Probably a year and a half, two years ago.

16        Q    When you were there the last time, --

17        A    Yes.

18        Q    -- did you see a little refrigerator and a

19   coffee pot and a microwave?

20        A    Did not pay any attention.

21        Q    So there would be times during the day -- oh,

22   and then, then they drop the truck off at the end of the

23   day, right, the truck drivers?

24        A    Correct.

25        Q    So they'd all be doing that around the same

50

```
 1   time, too, right?
 2        A    Not -- they'd all be dropping it off when
 3   they're done, but they don't all finish at the same time.
 4   No.
 5        Q    So there is occasion on every day when Mr.
 6   Barbee would probably see other truck drivers, right?
 7        A    Yes.  See them, yes, yes.
 8        Q    Did you find out how the atmosphere was before
 9   Gary Roberts called Barbee a nigger, between the
10   employees?
11        A    Did I what?
12        Q    Did you ask Mr. Barbee:  How was the
13   relationship with the other employees before the
14   discipline?
15        A    No.  I did not.  No.
16        Q    Now, you said the police came.  You weren't
17   there, were you?
18        A    I was not.
19        Q    So you have no first-hand knowledge of what
20   happened with that?
21        A    I do not.
22        Q    Now, did I understand you correctly that Mr.
23   Grigg told you that the first noose had been made years
24   ago, that there was an employee who made nooses?
25        A    Yes.
```

1     Q     When did Mr. Grigg tell you that?

2     A     After he investigated it.

3     Q     Did you order anyone or you yourself do an

4   inspection of the batch plant to see if the other nooses

5   the man had made were still there?

6     A     No.

7     Q     Have you seen the nooses?

8     A     Yes, I have.

9     Q     Oh, the second noose, you said Mr. Grigg told

10  you that the second noose was used for hoisting things up

11  on the roof --

12    A     Correct.

13    Q     -- of the batch plant?

14          Did he tell you who had tied that noose?

15    A     No.

16    Q     Did he ever tell you any employee had told him

17  who had tied that noose?

18    A     I, not as far as tying the knot, I'm not -- no.

19    Q     Did he tell you who was involved in hoisting

20  whatever it was they were hoisting up to the roof?

21    A     Yes.

22    Q     Who was that?

23    A     Mike Spitzer.

24    Q     Mike Spitzer?

25    A     Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    Did he ever advise you that Mike Spitzer had

2  said the second noose wasn't what he used to hoist

3  equipment up to the roof?

4      A    Yeah.  I had heard that.  Yes.

5      Q    How did you hear that?

6      A    I, just in the conversation probably with Ron.

7      Q    Well, do you remember if it was with Ron?

8      A    I think it was with Ron.

9           MS. LEAHY:  May I approach, Your Honor?

10          THE COURT:  Yes.

11 BY MS. LEAHY:

12     Q    I'm showing you Plaintiff's Exhibits 3 and 4.

13 Have you seen those doc-- those exhibits before?

14     A    I have.

15     Q    Which is the first noose, and which is the

16 second one?

17     A    This is the first noose, and this would be the

18 second noose.

19     Q    Second?

20     A    Yes.

21     Q    You were asked by Mr. Postlewait about Mr.

22 Barbee's absences?

23     A    Yes.

24     Q    Did you pull his records to see if he'd been

25 absent from work in August or September?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1         A    No.  I did not.

2         Q    So you have no idea whether or not he was

3    absent during that time period?

4         A    In August or September of 2007?

5         Q    Or October.  Let's take it three months.

6         A    No.  I do not.

7         Q    Did you ever ask Mr. Barbee if he was absent

8    from work?

9         A    No.  I did not.

10        Q    Now, your answers that you gave today to Mr.

11   Postlewait's questions about what was done or not done,

12   did you call Mr. Barbee in and explain that to him?

13        A    No.

14        Q    Did you call him in and explain why you thought

15   these two nooses were not offensive?

16        A    No.

17             MS. LEAHY:  Nothing further.

18             THE COURT:  The Court has no questions.  Thank

19   you, sir.  You may -- oh did you have follow-up?

20             MR. POSTLEWAIT:  Just a few.

21             RECROSS-EXAMINATION BY MR. POSTLEWAIT:

22        Q    In the course of Mr. Barbee's workday, how long

23   would it take him to check in in the morning to get his

24   instructions?

25        A    Just a few minutes.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    And how long would he be at the office at the

 2   end of the day after he'd finished?

 3        A    Not long.

 4        Q    And if he happens to be on a ready mix truck,

 5   how long would he be at the batch plant to pick up a

 6   load?

 7        A    I'm probably not a -- five, five to

 8   eight minutes, maybe.

 9        Q    Other than those instances, do you know of any

10   other occasions that he would be required or expected in

11   the course of his work to be at the office or interacting

12   with other drivers?

13        A    No.

14        Q    Did you ever have any other complaints from

15   Lawrence Barbee before the incident with Mr. Roberts?

16        A    No.

17        Q    In terms of the second alleged noose, do you

18   know whether or not Scott Spitzer was also involved with

19   having some knowledge and understanding of the source?

20        A    No, not really.

21        Q    Would Ron typically be the person that is

22   monitoring any employee absences of the ready mix drivers

23   and the, the truck drivers?

24        A    Yes, he is.

25             MR. POSTLEWAIT:  Thank you.  That's all.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1              MS. LEAHY:  Nothing further, Your Honor.

 2              THE COURT:  Very well.

 3              Thank you.  You may step down.

 4                   (Witness Schinzler excused, 10:17 a.m.)

 5                     *  *  *  *  *  *  *  *  *  *  *

 6                   (In open court; jury present.)

 7                RONALD L. GRIGG, sworn, 11:20 a.m.,

 8                DIRECT EXAMINATION BY MR. QUIVEY:

 9         Q    Sir, please state your name.

10         A    Ronald L. Grigg.

11         Q    And you're the plant manager for the defendant,

12    Christy-Foltz?

13         A    Yes.

14         Q    And that's the plant manager of the concrete

15    plant?

16         A    Yes.

17         Q    Okay.  Sir, were you the manager and employee

18    responsible for investigating the racial and retaliation

19    complaints made by Lawrence Barbee?

20         A    I was.

21         Q    Have you had any training regarding

22    retaliation?

23         A    No.

24         Q    Have you had any training regarding race

25    discrimination?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1     A    No.

 2     Q    Have you had any training regarding racial

 3  harassment?

 4     A    No.

 5     Q    You haven't had any training regarding how to

 6  conduct an investigation, correct?

 7     A    Correct.

 8     Q    Sir, would you agree with me that you did not

 9  take notes regarding any conversations you had with

10  anybody while you were investigating the incident in

11  which Gary Roberts called Mr. Barbee a dumb nigger?

12     A    I don't remember that comment.

13     Q    Well, you investigated that allegation,

14  correct?

15     A    Well, that's not the comment that I was told

16  was made.

17     Q    Okay.  Well, Mr. Roberts admitted calling Mr.

18  Barbee a nigger, correct?

19     A    Yes.

20     Q    And you investigated that, correct?

21     A    Yes.

22     Q    But you didn't make any notes --

23     A    No.

24     Q    -- regarding any conversation you had with

25  anybody regarding that, correct?
```

```
 1        A    Correct.
 2        Q    Sir, in regard to the nooses, other than to
 3   tell Mr. Barbee that they were not directed at him, you
 4   never interviewed Mr. Barbee concerning the nooses,
 5   right?
 6        A    I did.
 7        Q    You did interview him?
 8        A    Yes.
 9        Q    Anything more than telling him that they
10   weren't directed at him?
11        A    After I, after Mr. Barbee told me that there
12   was a noose down there, I went down immediately, took
13   them down.  The police officer was there.  I called
14   Barbee -- well, and at that time, there after that fact,
15   I started asking, inquiring of other people that worked
16   there, the batch man, the --
17        Q    I'm asking you about what you asked Mr. Barbee.
18        A    He showed me the picture, and I was surprised
19   to see it.  And at that time, I said, "I'll take care of
20   it," and I went down to do that.
21        Q    So you never asked Mr. Barbee when he first saw
22   the noose, correct?
23        A    I don't recall that I asked him that.  No.
24        Q    And you also never asked him about when he took
25   the pictures of the first noose, right?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      A    Not, not at that time, no.

 2      Q    At any time, did you ask him when he took the

 3  pictures?

 4      A    No.

 5      Q    But you talked to other people about the

 6  nooses, correct?

 7      A    After I found them, yes.

 8      Q    But you didn't talk to Mr. Barbee about it,

 9  right?

10      A    I told Mr. Barbee what I had found out in my

11  investigation, that they had been there for 15 years.

12      Q    But --

13      A    That the one had been there for 15 years.

14      Q    But you didn't ask him about when he first saw

15  it, what he did, et cetera, right?

16      A    I may have, but I don't remember that.  I knew

17  that he had taken the picture; so he had to have time to

18  see them, take the picture, get them developed -- you

19  know, I was surprised that he hadn't came to me as soon

20  as he saw them, rather than waiting to take a picture and

21  getting it developed and going and talking to other

22  people about it.

23      Q    Sir, would you agree with me that prior to the

24  incident with Gary Roberts referring to Mr. Barbee as a

25  nigger that your company did not have a written
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1   antidiscrimination policy?

2       A    The company did not; but we have posters, have

3   for years, on the state law, Labor Act, and it has

4   antidiscrimination policies on that poster.

5       Q    So, it's your opinion that that poster was your

6   company's written policy?

7       A    At -- prior to the incident, yes.

8       Q    Well, after the incident, your company thought

9   it was important to have a written policy, correct?

10      A    We were advised to that effect.  Yes.

11      Q    Well, if the poster that you mentioned

12  previously was your written policy, why did you have to

13  create a new one?

14      A    I would ask the same question.  I think it was

15  pretty self-explanatory on the poster that discrimination

16  is against the law, and we try to follow the law.

17      Q    Sir, I'm handing you what has been introduced

18  into evidence as Exhibit 7.  Sir, have you seen Exhibit 7

19  before today?

20      A    Yes.

21      Q    And it's your company's antidiscrimination

22  policy, correct?

23      A    Correct.

24      Q    Do you know when that policy was adopted?

25      A    Within a few days after the incident with Gary
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Roberts.

2       Q    So, sir, it's your, your testimony that it was

3   a few days after the incident that the policy was

4   adopted?

5       A    Yes.

6       Q    So sometime in the middle of August?

7       A    Yes.

8       Q    Sir, you would agree with me that that policy

9   was not in place when Mr. Roberts called Mr. Barbee a

10  nigger, correct?

11      A    I would.  Yes, I agree.

12      Q    And it also was not in place when Mr. Denton

13  [sic] told Mr. Barbee that he did not allow his kids to,

14  to listen to that nigger stuff?

15      A    Not -- I never was aware of that comment.

16      Q    So it's your testimony you were never aware of

17  that comment?

18      A    That's true.

19      Q    So you don't know if it was said or not said?

20      A    I do not know.

21      Q    And so you never did any investigation into

22  that, correct?

23      A    That's correct.

24      Q    Would you agree with me that that policy was

25  not in effect when Mr. Spitzer discussed with Mr. Barbee

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    immediately after this so-called apology and made

2    references to, "Why is it okay for blacks to refer to

3    blacks as niggers, but it's not okay for whites?"

4         A    It was not up at that point.

5         Q    Did you investigate the comment that Mr.

6    Spitzer made?

7         A    I didn't know that comment was made at that

8    time.

9         Q    When, when did you become aware of it?

10        A    At our meeting with Mr. Barbee and Hal

11   Schinzler.

12        Q    But you knew Mr. Spitzer was present during Mr.

13   Roberts' apology, correct?

14        A    Correct.

15        Q    And you knew Mr. Denton was present, corr--

16   also present, correct?

17        A    I did not know that Mr. Benton was present.

18   No.

19        Q    You directed Mr. Roberts to make the apology,

20   correct?

21        A    Yes.

22        Q    So it wasn't his idea; it was your idea, right?

23        A    Well, I'm not sure that he knew he had made

24   such a blunder.

25        Q    My question to you, sir:  Was it your idea or

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   his idea?

 2        A    I said it was my idea.

 3        Q    Sir, with regard to Exhibit 7, that was never

 4   given to all your employees, correct?

 5        A    Correct.

 6        Q    All you did was post it on a bulletin board,

 7   correct?

 8        A    Correct.

 9        Q    And you never told everybody that, "Hey, well,

10   I just posted this," right?

11        A    I think I told everybody.

12        Q    Did you tell Mr. Barbee?

13        A    I believe I did.

14        Q    Where was he when you told him?

15        A    Well, I don't remember where he was.

16        Q    How many employees work at the plant?

17        A    It varies.  Ten to twelve.

18        Q    So it's your testimony that you told all ten or

19   twelve of those that that policy's posted?

20        A    Yeah.  Not all at the same time.  I mean,

21   they're rarely all in one place at one time.

22        Q    You didn't have any employee acknowledge that

23   they had read the policy, correct?

24        A    No.

25        Q    Or that, for that matter, that they'd seen the
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    policy, right?

2         A    I believe they all saw it.  Yes.

3         Q    But you never had them acknowledging, saying

4    they saw it, right?

5         A    I didn't have them sign off on it.  No.

6         Q    And all you really said is, "It's posted on the

7    bulletin board," right?

8         A    More or less, yes.

9         Q    You don't know if they read it or not, even if

10   they knew it was on the bulletin board, correct?

11        A    I do not know that.  No.

12        Q    Sir, look at page 2 of that policy.  Does

13   page 2 address retaliation?

14        A    Yes, it does.

15        Q    Would you agree with me that according to the

16   policy it says retaliation is prohibited and will be

17   subject to disciplinary action?

18        A    Absolutely.

19        Q    Sir, now look at page 3 of the policy.  Does on

20   page 3 it say, "Any reported allegations of harassment,

21   discrimination, or retaliation will be investigated

22   properly -- promptly, thoroughly, and impartially"?

23        A    Yes.

24        Q    You're the only person that investigated the

25   allegations made by Mr. Barbee, correct?

1      A    Yes.

2      Q    And you never talked to him about the nooses,

3  correct?

4      A    After they were, after I was aware of them?  Is

5  that what you're asking?

6      Q    Yes.

7      A    Yes.  I talked to him about the nooses.

8      Q    But all you did was say that they were -- at

9  least in regard to the first one, that it was tied a long

10  time ago, correct?

11      A    I told him that it had been there for a long

12  time and that it was no direction at him -- it wasn't

13  directed to him at all.

14      Q    But you didn't ask him what he felt about it,

15  right?

16      A    He, he pretty much let me know that what I had

17  to say to him didn't -- he said nothing.

18      Q    Okay.  So you didn't ask him about it, right?

19      A    Well, I expected a response when I told him,

20  you know, "Lawrence, these nooses have been here for

21  15 years.  How can you, how can you think that they were

22  directed at you?"  And he just shook it off and, as I

23  recall, left.

24      Q    Sir, you've worked for Christy-Foltz for

25  37 years, correct?

1       A    Correct.

2       Q    And during that time, you went in the batch

3  office about once a month, correct?

4       A    Approximately.

5       Q    Sometimes more, sometimes less, right?

6       A    Yeah.

7       Q    And that would be for all 37 years, right?

8       A    Well, not this particular batch office.  We'd

9  only been there for ten years, but --

10      Q    Okay.  So --

11      A    Ten years.

12      Q    -- once a month for ten years, right?

13      A    Right.

14      Q    And you had never seen that noose, had you?

15      A    No.

16      Q    According to the policy, it says, "The

17  investigation may include individual interviews with the

18  parties involved and, where necessary, with individuals

19  who may have observed the alleged conduct or may have

20  other relevant knowledge."

21           Did I read that correct?

22      A    I'm assuming you did.  I didn't have my glasses

23  on.

24      Q    Fair enough.

25           Would you agree with me that Mr. Barbee was a

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   party involved as it relates to the nooses?

2       A    Yes.

3       Q    Does the policy also state under

4   "Investigation" that, "Confidentiality will be maintained

5   throughout the investigatory process to the extent

6   consistent with adequate investigation and appropriate

7   corrective action"?

8       A    Yes.

9       Q    Would you agree with me that as it relates to

10  Gary Roberts and him calling Mr. Barbee a nigger that you

11  made absolutely no attempt to maintain confidentiality?

12      A    Well, given the regard that Mr. Barbee told

13  Kevin Fowler and a number of other people what was done,

14  I, I had no control over confidentiality.

15      Q    So it's, it's your testimony that Mr. Barbee

16  told people other than Mr. Fowler about the noose before

17  you talked to Mr. Roberts?

18      A    I know he talked to Mr. Fowler.  I -- and if he

19  talked to Mr. Fowler and Mr. Fowler talked to, probably,

20  whoever.

21      Q    So you know Mr. Fowler talked to other people

22  about it before you talked to Mr. Roberts?

23      A    I'm assuming that he did.

24      Q    So you don't know; you're assuming?

25      A    I'm assuming.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    And Mr. Fowler was Mr. Barbee's union steward,
 2   correct?
 3        A    Correct.
 4        Q    Do you think it would be inappropriate for Mr.
 5   Barbee to report an incident like that to his union
 6   steward?
 7        A    Yes, I do.  I think he should have told me
 8   first.
 9        Q    So you think that was a breach of
10   confidentiality?
11        A    I believe I didn't breach any confidentiality.
12   I mean, I think Mr. Barbee should have told me about the
13   noose before he told Kevin Fowler.
14        Q    And because of that, you saw no reason to, to
15   keep anything confidential, right?
16        A    Well, I go back to:  He should have told me
17   about Gary Roberts.  I said noose, but Gary Roberts.
18        Q    You never told Mr. Roberts that he should
19   apologize to Mr. Barbee in private, correct?
20        A    I told Mr. Roberts that he should apologize to
21   Mr. Barbee in private.  Yes, I did.
22        Q    So it's your testimony you told Mr. Roberts
23   that this apology should be made in private?
24        A    No.  I told -- no.  I did not tell that Mr.
25   Roberts and Mr. Barbee ought to be in private.  I was in
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  a private conversation with Mr. Roberts when I told him

2  he needed to make the apology.

3      Q    Okay.  But my question is not that.

4          My question:  Did you tell Mr. Roberts that

5  when he apologizes to Mr. Barbee he should do that in

6  private?

7      A    No.  I did not.

8      Q    Would you agree with me that Terry Aldridge

9  knew Roberts called Mr. Barbee a nigger before Roberts

10  was suspended?

11      A    Yes.

12      Q    Did Mr. Aldridge have any reason to know what

13  Mr. Roberts had done regarding Mr. Barbee?

14      A    Like I said, it, we don't keep any secrets in a

15  workplace and Mr. Fowler knew about it before I did, and

16  I don't take any responsibility in everybody else

17  knowing.

18      Q    Was it essential for an adequate investigation

19  for Mr. Aldridge to know about it?

20      A    I'm not following your question there.

21      Q    Was it essential for an adequate investigation,

22  according to your policy, for Mr. Aldridge to know about

23  what had occurred between Mr. Barbee and Mr. Roberts?

24      A    No.  I didn't feel like it was essential.

25      Q    Okay.  And, also, Mr. Aldridge was aware that

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  Mr. Roberts was suspended even before he was suspended,

2  right?

3      A    You're asking if Mr. Aldridge knew that Mr.

4  Roberts was suspended before he was suspended?

5      Q    Yes.

6      A    I don't believe so.

7      Q    Well, why did Mr. Aldridge get suspended?

8      A    Well, Mr. Roberts and Mr. Aldridge are, at that

9  time, not really friends.  I mean, I'd say they didn't

10  really like each other that much.  And I think Mr.

11  Aldridge thought -- I mean, I thought he was fairly happy

12  that Mr. Roberts was getting suspended; and he made the

13  cute comment to Mr. Roberts and, and called him the N

14  word.

15      Q    Yeah, but he was also -- one of the reasons Mr.

16  Aldridge was suspended was because he was making fun of

17  Mr. Roberts being suspended, correct?

18      A    He got suspended because he used the N word.

19      Q    But he knew before he used the N word that Mr.

20  Roberts was being suspended, correct?

21      A    He knew he was in trouble.  I don't know that

22  he knew he was suspended.

23      Q    Is it your understanding that Mr. Aldridge

24  called Mr. Roberts a nigger?

25      A    That's my understanding.  Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      And that's why he was suspended, correct?

2      A      Correct.

3      Q      And he got the exact identical punishment that

4   Mr. Roberts got, correct?

5      A      Correct.

6      Q      So you equated the two incidents as being the

7   same?

8      A      Well, we're not going to tolerate any use of

9   that language; and, and we determined that was an

10  appropriate punishment for Roberts and felt like it was

11  appropriate for Aldridge also.

12     Q      Mr. Roberts is Caucasian, right?

13     A      Yes.

14     Q      At any time you were investigating the, the

15  incidents regarding the use of the word "nigger," did you

16  tell anybody that they should not talk about this to

17  anybody, or keep it confidential?

18     A      No.  No.

19     Q      Okay.  Is it your testimony today that the only

20  reason Terry Aldridge was suspended was because he called

21  Gary Roberts a nigger?

22     A      Yes.

23     Q      Page 68 of his deposition.

24            Sir, do you recall being deposed on or about

25  March 31, 2010?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A    Yes.

2       Q    And there was a court reporter present,

3  correct?

4       A    Correct.

5       Q    And you were under oath, correct?

6       A    Yes.

7       Q    And during that deposition, do you recall being

8  asked this question and giving this answer?

9           "Question:  It's my understanding that an

10  employee by the name of Terry Aldridge was also suspended

11  for the use of the N word?

12          "Answer:  Yes.

13          "What do you know about that?

14          "Answer:  This came from Gary Roberts, that

15  Terry Aldridge was making fun of Gary because he was

16  getting suspended and because he made the N word remark

17  to Gary."

18          Did you -- do you recall giving, being asked

19  that question and giving that answer?

20      A    Yes.

21      Q    And so it's your testimony that the fact he was

22  making fun of Mr. Roberts because Mr. Roberts was being

23  suspended had nothing to do with him being -- with Mr.

24  Aldridge being suspended?

25      A    I'm not following your question.

1      Q    Is it your testimony that the only reason that

2  you decided to send -- suspend Mr. Aldridge is because he

3  used the N word?

4      A    Yes.

5      Q    So the fact that he was making fun of Mr.

6  Roberts for Mr. Roberts being suspended had absolutely

7  nothing to do with it?

8      A    That -- I mean the process of Mr. Roberts being

9  suspended, that was probably the cause of, of him using

10  the N word.  But the result, he did use the N word, and

11  he was suspended for using the N word.

12      Q    Okay.  Mr. Barbee was the only African-American

13  truck driver you employed at the time, correct?

14      A    Correct.

15      Q    And to confirm, truck drivers, Christy-Foltz

16  has discretion who you want to hire, correct?

17      A    Correct.

18      Q    It's your decision, right?

19      A    Yes.

20      Q    And that's for all types of truck drivers,

21  right?

22      A    Yes.

23      Q    That's not true for the other employees,

24  correct?

25      A    That's correct.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     You get who the union hall sends, right?

2      A     Right.

3      Q     And you don't have any say-so of who you, who

4   they send to include what race of employee they send,

5   correct?

6      A     True.

7      Q     Sir, did you ever consider that suspending both

8   Roberts and Aldridge would cause anger or resentment

9   among other employees towards Mr. Barbee?

10      A     No.  I thought it would be more a positive

11   thing to let them all know what our position was and that

12   we don't tolerate that type stuff.

13      Q     But you knew it was possible that the

14   suspensions would cause resentment, right?

15      A     I was sure that probably Mr. Roberts would not

16   like losing $1,000, no.   I mean, yes, I'm sure he would

17   resent it.

18      Q     How about Aldridge?

19      A     Well, he was probably more resentful of Gary

20   Roberts than of Mr. Barbee.

21      Q     But it never occurred to you that employees

22   would blame Mr. Barbee for this situation?

23      A     No.

24      Q     Never occurred to you?

25      A     Other than -- like I say, Mr. Roberts, I'm sure

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  he was resentful, but --

2      Q    You, you would agree with me that other

3  employees became afraid to talk to Mr. Barbee, right?

4      A    I don't think "afraid" is the right

5  terminology.  I think -- and maybe afraid is correct.

6  They probably were more careful of what they would say,

7  where nothing could be misconstrued.

8      Q    Sir, does, does your policy say that misconduct

9  constituting harassment, discrimination, and retaliation

10  will be dealt with promptly and appropriately?

11      A    Well, I don't think of people not talking to

12  other people is classified as harassment.

13      Q    But that's what your policy says, right?

14      A    Well, harassment, yes.

15      Q    Okay.  Sir, Gary Roberts was given a five-day

16  suspension because he committed misconduct that

17  constituted harassment or discrimination, right?

18      A    Yes.

19      Q    Was Terry Aldridge suspended because he

20  committed misconduct that constituted harassment or

21  discrimination?

22      A    It fell in the same category.

23      Q    So it was harassment or discrimination?

24      A    In our opinion.

25      Q    Okay.  But Mr. Barbee didn't even know about

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   what Mr. Aldridge allegedly said to Mr. Roberts, correct?

2       A    That's correct.

3       Q    And he was the only African-American driver,

4   correct?

5       A    Correct.

6       Q    Sir, would you agree with me that the reason

7   you decided to suspend Gary Roberts was not because of

8   what he said to Mr. Barbee, but because you thought Mr.

9   Barbee did not consider the apology satisfactory?

10      A    Knowing the two individuals and had for several

11  years, and knowing what was, what I was told was said to

12  Mr. Barbee from Mr. Roberts -- you know, I think it was a

13  completely stupid thing for Mr. Roberts to say and do,

14  and a wrong thing for him to do.

15          But it wasn't in a provocative -- I didn't feel

16  like it was a provocative statement.  I mean, and --

17      Q    So was it --

18      A    My, my, my simplest -- my thought initially

19  was, you know, let's try to get through this and see if

20  this can be resolved simply; and I thought if Mr. Roberts

21  would apologize, if Mr. Barbee would accept the apology,

22  it would all be over and done with.

23      Q    All right.  So, in other words, you were not

24  going to suspend him until after the apology, correct?

25      A    I, I hadn't -- we hadn't made a decision on

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   what to do with him punishment-wise until after we

 2   realized that Mr. Barbee did not accept the apology.

 3        Q    Mr. Barbee never told you he did not accept the

 4   apology, did he?

 5        A    When he told me that -- on the next day after

 6   the apology, I asked him; I said, "Are you and Gary okay

 7   now with, you know, with him apologizing?"

 8             And he said, "Well, I don't know.  I think I

 9   can get me some money."

10        Q    But he never said he didn't accept the apology

11   one way or the other, right?

12        A    Well, I think he said, "I don't know," when I

13   asked him if things were okay between him and Gary.

14        Q    So, in other words, it was Mr. Barbee's fault

15   that Mr. Roberts was suspended, correct?

16        A    No.  It was Mr. Roberts' fault for making the

17   statement that he did.

18        Q    But if you thought Mr. Barbee had accepted his

19   apology, you wouldn't have suspended him, right?

20        A    It turned into a more serious offense than what

21   we thought it could have been.

22        Q    Sir, you didn't ask -- answer my question.

23             You would not have suspended Mr. Roberts if you

24   thought Mr. Barbee had accepted his apology, correct?

25        A    Probably not.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     Q    So, in other words, it was Mr. Barbee's fault

2   that he was suspended?

3     A    No.  I go back to:  It was Mr. Roberts' fault

4   for having said it.

5     Q    And, again, just so it's clear, you ordered Mr.

6   Roberts to apologize, right?

7     A    I strongly suggested it.  Yes.

8     Q    And you were his boss, right?

9     A    [No response.]

10     Q    Sir, would you agree with me that at no time as

11   part of your investigation into the, what I'll call the

12   Roberts incident, for his statement, did you talk to Mr.

13   Barbee about whether or not there was racial tension in

14   the workplace?

15     A    I didn't talk to him, and I wasn't aware of

16   any.

17     Q    But you were aware that he sent a letter

18   suggesting that there was racial tension, correct?

19     A    This was after the fact.  He sent the letter

20   after the Roberts incident.

21     Q    But at no time as part of your investigation

22   into the Roberts incident did you ask him if he thought

23   there was racial tension?

24     A    I think I would have known about it prior to

25   the Roberts incident because of the different -- I mean,

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   I interact with all of my employees on a daily basis, and

2   I would have -- I would have picked up on any racial

3   problems if we would have had any.

4        Q    But you're not African-American, correct?

5        A    Not the last time I looked in the mirror.

6        Q    So you don't -- you didn't think it was

7   relevant when you were trying to determine what Roberts

8   meant whether or not Mr. Barbee thought there was racial

9   tension?

10       A    Well, we're talking about one individual.

11  Was -- he could think there was racial tension between

12  him and Mr. Roberts, but I'm not aware of any with

13  anybody else.

14       Q    And this one individual is your only

15  African-American employee that's a truck driver, right?

16       A    Yes.

17       Q    Sir, was the first time you talked to Mr.

18  Barbee about the Roberts incident in your office the day

19  after the alleged apology?

20       A    The first time I talked to him in the office, I

21  believe it was the day after the incident that I first

22  found out about it, and I think I had him come in and

23  tell me what happened; and then I talked to Mr. Roberts

24  after that.

25       Q    So it's your testimony that you talked to Mr.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Barbee before you told Mr. Roberts to apologize?

2        A    I think that's the way it happened.  I can't be

3    100 percent just who I talked to first, probably whoever

4    I saw first.

5        Q    So it's your testimony now that whoever you saw

6    first, that's who you talked to first as it relates to

7    Roberts and Barbee?

8        A    I believe that's probably the way it happened.

9        Q    Sir, again, you recall your prior deposition,

10   right?

11       A    Yeah.

12            MR. POSTLEWAIT:  Page?

13            MR. QUIVEY:  47.

14       Q    And do you recall being asked this question and

15   giving this answer?

16            "So it was the day after the apology that you

17   talked to Mr. Barbee?

18            "Answer:  Yes."

19       A    Yes.

20       Q    So that --

21       A    That's just what I said.

22       Q    So in other words, you talked -- you did not

23   talk to Mr. Barbee until after Mr. Roberts had

24   apologized, correct?

25       A    No.  That's not what I said.  I said I talked

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    to both of them the day after the incident.  That was the

2    day that I learned of the incident; and, and Mr. Roberts

3    apologized to Mr. Barbee on that same day.

4        Q    But in your deposition, you testified you

5    didn't talk to Mr. Barbee until after the apology, right?

6        A    Well, like I say, I talked to both of them, and

7    I don't remember which one I talked to first, and it

8    could have been, could have been either way.

9        Q    Okay.  And I believe you testified that when

10   you first talked to Mr. Barbee about it he indicated that

11   he could get some money for this?

12       A    This was a couple days after the apology.

13       Q    So you're saying that that statement was a

14   couple days after the apology?

15       A    The apology took place on Friday.  On Monday

16   morning when he came in, I asked Lawrence if everything

17   was okay between him and Gary; and he indicated, "Well, I

18   don't know.  I think I can get me some money."

19       Q    And he didn't say anything more, correct?

20       A    Well, I said -- after he told me that, I said,

21   "Well, you know, I don't think Gary Roberts has got any

22   money.  So, you know, it's probably not a good plan."

23       Q    And after that, those two statements, you

24   separated company from each other, correct?

25       A    As I recall, yes.

81

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    So now go back.  What's the first thing that

2   Mr. Barbee told you about the Roberts incident?

3      A    Well, I don't recall just how and when on the

4   day that I came back that I heard about it.  I think

5   probably I heard it first from Kevin Fowler, what was

6   said.  And, and then I started investigating it from

7   there as far as I talked to Lawrence and Gary after that

8   fact.

9      Q    Sir, was it your opinion that Mr. Barbee was,

10   was going to make up racial tension in the workplace that

11   didn't actually exist?

12     A    At the time did I -- no.  I didn't think he

13   would stir up trouble, if that's what you're asking.

14     Q    Well, sir, in your deposition -- this is

15   page 51 -- do you recall being asked:  "Okay.  At any

16   time after that, did you talk with Mr. Barbee, saying

17   something to the effect, 'Do you believe there's any

18   racial tension at the workplace?'"  That's the question.

19         "Answer:  He indicated to me without -- well,

20   when he told me he could get some money, to me that was

21   telling me that he was going to make sure there was."

22         Do you recall that question and that answer?

23     A    Well, once Mr. Barbee told me that he thought

24   he could get some money and, and -- I mean, I had in, in

25   my mind that he was going to try to get some money out of

1   it.

2       Q    Well, did you also have in, in your mind at

3   that time that he was going to, going to make up racial

4   tension that didn't exist?

5       A    Well, with the company about not being

6   responsible for what Gary said -- I mean, we're not

7   liable for an employee, what they say.  And if he was

8   getting money from us, then there would have to be some

9   other reasons for him to, to bring up.

10      Q    So my question is:  When he made that

11  statement, be it right after the apology or a couple days

12  after the apology, whenever that was, it was your belief

13  at that time that he was going to make up racial tension?

14      A    I didn't think about him making up racial

15  tension.  When he started asking for counseling a couple

16  days later, I, I figured there was a pattern that was, we

17  were going to be following.

18      Q    Okay.

19      A    So --

20      Q    And that was right after this first incident,

21  right?

22      A    Within a few days.

23      Q    So you didn't believe him from the beginning,

24  did you?

25      A    Believe him about what?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    Any of this.

2        A    I, I believed -- after he told me he was in it

3   for the money that, or that he thought he could get some

4   money, that it was going to be a process.

5        Q    And you investigated it accordingly, correct?

6        A    I investigated everything thoroughly.

7        Q    But you didn't believe anything Mr. Barbee said

8   about racial tension, did you?

9        A    I don't -- well, you know, in one, one letter

10  that he wrote to us that prompted the meeting with Hal

11  and I and Barbee, he mentioned that other racial slurs

12  had taken place after the Roberts incident.  I asked him

13  what they were, who said them; and he couldn't tell me.

14       Q    You don't consider what Schinzler said a racial

15  slur, do you?

16       A    What was that again?

17       Q    You don't consider what Schinzler said --

18       A    Schinzler [correcting pronunciation].

19       Q    Schinzler.

20            -- a racial slur, do you?

21       A    Spitzer.

22       Q    Spitzer, I'm sorry.

23            You didn't consider that a racial slur, did

24  you?

25       A    As far as him being a racist, as far as
```

1   Lawrence being a racist?

2       Q    I'm not asking if he's a racist.  You can make

3   a racial slur without being a racist.  Did you consider

4   that a racial slur?

5       A    No.

6       Q    And it's your testimony you never even heard

7   about the Denton comment, correct?

8       A    Correct.

9       Q    But if you had heard, would you consider that a

10  racial slur?

11      A    I -- yeah.  I don't believe that the word

12  "nigger" should have been used anywhere in the workplace.

13      Q    Well, if he would have said, "I don't want my

14  kids listening to that black music," would you consider

15  that a racial slur?

16           MR. POSTLEWAIT:  Object, Your Honor, --

17           THE COURT:  We're beyond --

18           MR. POSTLEWAIT:  -- the music.

19           THE COURT:  We're beyond the subject matter.

20  Sustained.

21  BY MR. QUIVEY:

22      Q    Sir, on this August 20th meeting, you were

23  present, correct?

24      A    Correct.

25      Q    And that was you, your boss, and Mr. Barbee,

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   correct?

2       A    Correct.

3       Q    And you would agree that in that meeting Mr.

4   Barbee said he believed there was a hostile environment?

5       A    He said that.

6       Q    And that it was racially hostile?

7       A    He said that.

8       Q    And he also asked during that meeting about

9   counseling, correct?

10      A    He asked if the company provided any

11  counseling.

12      Q    And that was actually the second time he had

13  asked for counseling, correct?

14      A    He asked me in my office prior to that if, if

15  we provided counseling.

16      Q    You'd agree with me that the policy provides

17  for counseling, correct?

18      A    I think in certain circumstances it would.

19  Maybe not in every, every instance.

20      Q    But you didn't think that it was warranted for

21  the company to pay for counseling for Mr. Barbee?

22      A    It's something that hadn't came up before, and

23  at that time we didn't think so.  No.

24      Q    And you didn't think he needed counseling

25  because you didn't think he was telling the truth, right?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A      Well, I had my doubts.

2      Q      You agree with me that Mr. Barbee complained to

3  you about other employees avoiding him?

4      A      Yes.

5      Q      Did you ever call the employees together and

6  say, "Let's discuss this, this matter"?

7      A      I remember talking to a few individuals about

8  they should not ostracize Lawrence and -- but it wasn't a

9  mandated thing.

10      Q      So you didn't have a collective meeting with

11  everybody?

12      A      No.

13      Q      You didn't think it was necessary to bring

14  everybody together to try to resolve the situation?

15      A      I thought the situation was resolved.  I, I

16  didn't see a hostile environment.

17      Q      You didn't think there would be any resentment

18  towards Mr. Barbee either, did you?

19      A      Like I say, other than resentment from Mr.

20  Roberts, I don't think any of the other guys cared enough

21  to resent it.

22      Q      Some of them told you that they were

23  uncomfortable around Mr. Barbee, though, right?

24      A      No.  I don't recall that.

25      Q      So nobody ever said they're afraid to say

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   anything because they don't know how it would be

2   construed by Mr. Barbee?

3       A    Well, I've heard those comments.  Nobody told

4   that directly to me, but I've heard those comments.

5       Q    Sir, this is the last page of the policy,

6   correct?

7            And does it say, "Finally, these policies

8   should not, and may not, be used as a basis for excluding

9   or separating individuals of a particular gender, or any

10  other protected characteristic, from participating in

11  business or work-related social activities or discussions

12  in order to avoid allegations of harassment"?

13           Did I read that correctly?

14      A    Yeah.

15      Q    And you've read this policy before, right?

16      A    Yes.

17      Q    And you're the one that either put it on the

18  bulletin board or directed that it be put on the bulletin

19  board, correct?

20      A    Right.

21      Q    All right.  But it's your testimony that nobody

22  was avoiding Mr. Barbee to avoid allegations of

23  harassment?

24      A    No.  I don't think so.

25      Q    But you'd heard something to that effect,

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  right, but not directly to you?

2      A    Correct.

3      Q    But you didn't do anything to investigate that,

4  did you?

5      A    I told the, my employees that they ought to

6  talk to him whenever they were in contact with him.

7      Q    But you never had a meeting; you never talked

8  to all of them, did you?

9      A    No.

10     Q    You didn't think training regarding diversity

11 was required or needed, did you?

12     A    No.

13     Q    You still don't, do you?

14     A    Not in, not in this case.

15     Q    Do you think it would have caused your company

16 any harm to have diversity training after this incident?

17     A    Well, you know, I think -- we're a small

18 company.  I mean, it's not like we're a big corporation

19 and we've got thousands of people.  Everybody knows

20 what's going on all the time, no matter whether it's a

21 private issue with an individual or a company issue.  I

22 mean, I'm surprised of the different things everybody

23 knows about other people.

24          But, you know, the law is the law, and right

25 and wrong is right and wrong.  Gary Roberts made a stupid

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   mistake.  All of our employees recognize that, and he was

2   punished for it.  And that's pretty good training, I

3   think.

4        Q    So because all 130 of your employees know right

5   from wrong, you don't need any diversity training?

6        A    I don't think any specialized training was

7   necessary.  No.

8        Q    Sir, at some point in time, you became aware of

9   rumors that Mr. Barbee had allegedly made comments that

10  referenced "coons" and "niggers," right?

11       A    I was made aware of that comment, right.

12       Q    You would agree with me you considered these

13  allegations rumors, right?

14       A    Yes.

15       Q    And because they were rumors, you didn't do any

16  investigation into the matter, right?

17       A    No, I didn't.

18       Q    You never talked to Mr. Barbee about the

19  allegations, did you?

20       A    I'm sure they would have been denied if I'd

21  asked him.

22       Q    And why do you, why do you think that?

23       A    Well, he probably would have got suspended,

24  too, if I'd have known that he'd made those comments.

25       Q    Sir, during the course of his employment with

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  Christy-Foltz, Christy-Foltz has loaned Mr. Barbee money,

2  correct?

3      A    Correct.

4      Q    And he paid it back, right?

5      A    Yes.

6      Q    And there's also occasions where Christy-Foltz

7  has loaned white employees money, right?

8      A    Not that I can recall.

9      Q    So it's your, your testimony that Mr. Roberts

10  has never been loaned money by Christy-Foltz?

11      A    That's true.

12      Q    Who keeps the personnel files?

13      A    One of our secretaries.  I mean, probably Vicky

14  Fitzpatrick [phonetic], in particular.

15           MR. QUIVEY:  May I approach, Your Honor?

16           THE COURT:  In fact, maybe this is a good time

17  to take our noon break, and we'll resume with that

18  question after.

19           We'll take our noon break at this time.  I'll

20  just remind you:  Please do not discuss the case among

21  yourselves or with any outside folks and don't do any

22  reading or investigation.

23           Enjoy your lunch.  Since we're getting you

24  probably at the end of the line at the, at the

25  restaurant, we'll give you a little extra time, and that

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   will allow me to take care of a piece of business.  So

2   let's be back at 1:30 today; and, again, just return to

3   the deliberation room.  Thank you.

4                    (Jury absent, 12:06 p.m.)

5                    THE COURT:  You may step down.

6                    All right.  We'll resume at 1:30.

7                    (Recess, 12:06 p.m. to 1:31 p.m.)

8                    THE COURT:  Anything we need to do on the

9   record before the jurors are brought back?

10                   MS. LEAHY:  No, Your Honor.

11                   THE COURT:  Okay.  They're here, I trust?

12                   COURT SECURITY OFFICER:  Yes, sir.

13                   THE COURT:  Okay.  We'll roll.

14                   (Jury present, 1:33 p.m.)

15                   THE COURT:  You may be seated.

16                   We're again in session.  I'll ask quickly if

17  the jury -- did anyone experience any difficulties during

18  the noon hour related to the case?  Thank you.

19                   Ready to proceed, Mr. Quivey?

20                   MR. QUIVEY:  Yes, Your Honor.

21  BY MR. QUIVEY:

22      Q    Sir, I'll now show you Exhibit 3.  And, sir,

23  would you agree with me that Exhibit 3 is the, the first

24  noose that Mr. Barbee complained about?

25      A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     Q    And was the first time you ever saw it after he
2   had complained about it?
3     A    Yes.
4     Q    And, sir, do you assert that Exhibit 3 was ever
5   used for a work-related purpose?
6     A    I don't believe so.
7     Q    Now, let me hand you Exhibit 4.  And, sir, is
8   it your understanding that Exhibit 4 is the second noose
9   that Mr. Barbee complained about?
10    A    Yes.
11    Q    And is it my -- am I correct that you assert
12  that Exhibit 4 is a choker or a lifting device?
13    A    Yes.
14    Q    Okay.  What, what is a choker?  What do you
15  mean by "choker"?
16    A    A choker is any device that you can put a slip
17  knot on and use a loop and tighten it up to secure
18  whatever you're, have the rope around.
19    Q    So is it my understanding that you believe that
20  Exhibit 4 is a slip knot?
21    A    Of some type, yeah.
22    Q    Sir, would you agree with me that the, that
23  after those two nooses were brought to your attention
24  that you kept them in a safe for a period of time?
25    A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     Q    And, sir, do those two nooses look the same
2  today as when you put them in the safe?
3     A    No.
4     Q    How are they different?
5     A    The first noose looks very similar to that, to
6  that.  The second noose, this one, when I took it down,
7  it was completely covered with cement dust.  I mean, I
8  had to hold it out here just to keep from getting it on
9  my clothes.  So over the three years, the cement dust has
10  been knocked off of it.
11     Q    Well, after they were in your safe, whom did
12  you give them to?
13     A    My attorneys.
14     Q    Sir, I hand you what has been previously marked
15  as Plaintiff's Exhibit 13.  Sir, is Exhibit 13 a copy of
16  the Christy-Foltz, Inc., Hauling and Stockpiling
17  Agreement and then also a copy of the Ready Mix Agreement
18  between Christy-Foltz and the Teamsters Union?
19     A    Yes.
20     Q    So it includes both agreements, correct?
21     A    Both agreements, yes.
22     Q    And would you agree with me that in Exhibit 13
23  it states -- and I'll refer you specifically to Appendix
24  A, or Appendage A to the first contract that has the
25  hourly rates for what hauler drivers are paid by

1    Christy-Foltz, correct?

2         A    Correct.

3         Q    And that's 14.40 an hour, correct?

4         A    Correct.

5         Q    And at least -- you know, it starts June 4,

6    2007, and then it has the same rate of pay as of June 24,

7    2009, correct?

8         A    Correct.

9         Q    All right.  And then at the end of the, the

10   Ready Mix Agreement, it has a similar appendix, or

11   Appendage A, correct?

12        A    Correct.

13        Q    And that lists the rate of pay for mixer

14   drivers, mechanics, and plant workers, correct?

15        A    Correct.

16        Q    And those are the rates of pay during the

17   applicable periods that Christy-Foltz paid, correct?

18        A    Correct.

19        Q    And you would agree with me that effective

20   June 24, 2009, mixer drivers were paid $20.70 per hour?

21        A    That's right.

22        Q    And so there's a difference between $20.70 and

23   14.40 an hour, correct?

24        A    Correct.

25             MR. QUIVEY:  Your Honor, move to admit

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Plaintiff's Exhibit 13.

2              MR. POSTLEWAIT:  No objection.

3              THE COURT:  Be admitted without objection.

4    BY MR. QUIVEY:

5         Q    And just so it's clear, Teamster drivers -- or

6    the drivers -- they're all Teamsters -- but Teamster

7    drivers are the only employees that Christy-Foltz has a

8    say-so over who to hire, correct?

9         A    Correct.

10        Q    Sir, I'll hand you what has been previously

11   marked as Plaintiff's Exhibit 12.  Sir, is Plaintiff's

12   Exhibit 12 an earnings register for Christy-Foltz truck

13   drivers for the period January 1, 2007, through

14   October 12, 2009?

15        A    It appears so.

16        Q    And is the earnings register maintained in the

17   normal course of business?

18        A    Yes.

19        Q    And does Exhibit 12 accurately show the

20   payments made to the drivers during that time period?

21        A    I would say that it does.

22             MR. QUIVEY:  Move to admit Exhibit 12.

23             MR. POSTLEWAIT:  Objection, Your Honor.

24             THE COURT:  I think we'll deal with the

25   objection later.  We'll note that it's been tendered, and

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   we'll hear your objection outside the presence of the

2   jury.

3   BY MR. QUIVEY:

4       Q    Sir, would you agree with me that Exhibit 12

5   shows payments made to haulers and ready mix drivers

6   during the time frame?

7       A    Yes.

8       Q    Sir, is it your understanding that, that one of

9   your customers -- and by your, I mean your Christy-Foltz

10  customers -- does not want Mr. Barbee delivering ready

11  mix to his job site?

12      A    Yes.

13      Q    And who is that?

14      A    Mike Pinkston.

15      Q    And would you agree with me that Terry Aldridge

16  is a ready mix driver?

17      A    Yes.

18      Q    And would you agree with me that since 2003,

19  two of your customers have banned Mr. Aldridge from

20  delivering ready mix to them?

21      A    One at the present time, yes.

22      Q    There were two, and now there's one, correct?

23      A    Yes.

24      Q    Sir, I'm handing you what has been previously

25  marked as Plaintiff's Exhibit 9.  And, sir, is

1  Plaintiff's Exhibit 9 a letter that you wrote to Mr.

2  Aldridge on or about August 1, 2003?

3      A    Yes.

4      Q    And in that letter, does it say, "You had a

5  problem with G & G Concrete, and they have banned you

6  from any of their future jobs"?

7      A    Yes.

8      Q    And, "Carl Clark is another customer that we

9  can't send you to"?

10     A    Yes.

11     Q    And so those are the two customers, at least as

12 of that time, that wouldn't allow him to deliver ready

13 mix, correct?

14     A    Correct.

15     Q    And Mr. Aldridge has been a ready mix driver

16 for a long period of time, correct?

17     A    Yes.

18     Q    And he continues to be a ready mix driver,

19 correct?

20     A    Yes.

21          MR. QUIVEY:  Your Honor, move to admit

22 Exhibit 9.

23          MR. POSTLEWAIT:  No objection.

24          THE COURT:  It will be admitted without

25 objection.

```
 1   BY MR. QUIVEY:
 2        Q    Sir, did you write Mr. Barbee a similar letter
 3   that you wrote to Mr. Aldridge?
 4        A    No.  I did not.
 5        Q    Sir, on or about October 11, 2007, did Mr.
 6   Barbee request a job change from hauler to ready mix?
 7        A    He did.
 8        Q    And did he make that, that request in writing?
 9        A    He did.
10        Q    Sir, I'm handing you what's been previously
11   marked as Plaintiff's Exhibit 8.  Sir, could you tell us
12   what Plaintiff's Exhibit 8 is?
13        A    It's Lawrence Barbee's request to change from
14   material hauler to ready mix driver.
15        Q    And at the bottom of the Exhibit 8, it calls
16   drivers -- it's entitled "Driver's Log," and then it has
17   his written request, correct?
18        A    Yes.
19        Q    And then there's writing above that on the top,
20   correct?
21        A    Yes.
22        Q    And is that your writing above that?
23        A    It is.
24             MR. QUIVEY:  Your Honor, I'd move to admit
25   Plaintiff's Exhibit Number 8.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1              MR. POSTLEWAIT:  No objection.

2              THE COURT:  Be admitted.

3    BY MR. QUIVEY:

4         Q    Okay.  At any time, did you give a copy of

5    Plaintiff's Exhibit 8 to Mr. Barbee?

6         A    No.

7         Q    After you wrote what's stated on top, what did

8    you do with Plaintiff's Exhibit Number 8?

9         A    I filed it.

10        Q    Where did you file it?

11        A    Well, within my paperwork regarding -- well,

12   any paperwork I had regarding this case.

13        Q    You received his written request on October 11,

14   2007, correct?

15        A    Yes.

16        Q    And when did you make the notation at the top?

17        A    Well, the notation at the top, I -- when he

18   gave me this request, I said basically the same thing to,

19   to Mr. Barbee, that I didn't understand why he was asking

20   for a change because he's working 40, 50 hours a week as

21   a hauler; and if he changed to ready mix driver, he'd be

22   working eight hours or less.  And at that time, that's

23   what the lower guys on the seniority list were working.

24        Q    Okay.  My question to that:  When did you tell

25   him that, approximately?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      A    Whenever he gave me that sheet, the request.

 2      Q    Did you tell him that his request appeared to

 3 be a ploy to show the company is working him less or to

 4 show a higher wage for settlement purposes?

 5      A    No.  I didn't tell him that part.

 6      Q    But you wrote that on this form after you

 7 received his request, correct?

 8      A    Yes.

 9      Q    And that was the reason why you denied his

10 request, correct?

11      A    No.  That -- there's several reasons I denied

12 his request.  And the main one is he had been out to

13 Pinkston's job, and he was banned from that job; and I

14 would not hire anybody as a ready mix driver and put them

15 on a seniority list that I couldn't send to all my

16 customers.

17      Q    Aldridge was on this seniority list, correct?

18      A    He is on the seniority list.

19      Q    Fairly high up on the seniority list, correct?

20      A    And it's not -- if I could have fired him for

21 not being able to go to a customer, I would have done

22 that --

23      Q    Sir, you --

24      A    -- several years ago.

25      Q    Sir, you agree with me that one of the reasons
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

 1   is because you thought his request was a ploy for

 2   settlement purposes, correct?

 3       A    Well, I couldn't understand the fact that he

 4   would give up making 5 or $600 a week to $100 a week;

 5   and, and when I asked him how come he wanted to do it, he

 6   said to make more money.  But giving -- you know, giving

 7   up 5 or $600 a week to make $100 a week and make more

 8   money, it didn't make sense to me.

 9       Q    But that was one of the reasons why you denied

10   it, correct?

11       A    What was one of the reasons?

12       Q    That you thought it was a ploy to show higher

13   wages for settlement purposes?

14       A    Well, that was just my opinion at the point.

15   It didn't really have any -- it really didn't have

16   anything to do with why I didn't transfer him.

17       Q    But it was your opinion?

18       A    It was my opinion; but my main opinion, I

19   wouldn't hire Lawrence or anybody else that I couldn't

20   send to all my customers.

21       Q    You never told Mr. Barbee that, though, did

22   you?

23       A    Eventually.  But I didn't have to.  I mean, it

24   was -- it's not his right to just come in and say, "Well,

25   I want this job over here.  Give it to me."

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       Q    So you would agree with me that the only way to

2   work your way up on the seniority list is to be on the

3   list?

4       A    Through attrition, yeah.

5       Q    And that eventually, after you get seniority,

6   you'll make significantly more as a ready mix driver than

7   you will as a hauler?

8       A    Well, if you can last that long, but he -- we

9   hired him as a ready mix driver back in '04; and he

10  couldn't make enough, and he quit.

11      Q    But --

12      A    He was on the seniority list then.

13      Q    But if you look at the exhibit that I showed

14  you that has all the earnings of all the drivers during

15  that time period, you would agree with me that the ready

16  mix drivers with seniority make significantly more than

17  the hauler drivers?

18      A    Yeah.  And if he's, was on the seniority list

19  for 20 years, he would make more than probably what

20  haulers would make.

21      Q    And you'd also agree with me that you've hired

22  at least four white drivers to be ready mix drivers since

23  Mr. Barbee made this request, correct?

24      A    Two or three, I think.  I'm not sure just

25  exactly when the date was for McConnell and Benton.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     But they're all white, correct?

2      A     They're all white.

3      Q     Did you believe if you gave Mr. Barbee the --

4   or reassigned him to the ready mix position that that

5   somehow would trigger a union grievance by somebody else?

6      A     Well, I did have requests from a white hauler

7   named Kevin Fowler, and I told him the same thing as far

8   as:  Why would you want to go to ready mix and work eight

9   hours a week when you're making, working 40 or 50 hours

10  on hauling?

11     Q     But did you think that would somehow trigger a

12  union grievance?

13     A     No.  That wasn't my concern.

14           MR. QUIVEY:  No more questions.

15           THE COURT:  Thank you.

16           Mr. Postlewait, do you wish to inquire?

17           MR. POSTLEWAIT:  Yes.

18            CROSS-EXAMINATION BY MR. POSTLEWAIT:

19     Q     Mr. Grigg, if you had granted Mr. Barbee's

20  transfer request at the time he made the request after

21  you had denied Kevin Fowler's request, which Mr. Fowler

22  was number one on the seniority list of the haulers,

23  would Mr. Fowler have had the right to file a grievance

24  under the collective bargaining agreement, if you know?

25     A     He probably could have filed a grievance.  I

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  don't know whether it would have stood up because he had

2  no more right to be, to make that switch than Mr. Barbee

3  did.  I mean, as far as those two drivers are concerned

4  and me hiring another ready mix driver, it's -- and

5  somebody off the street -- none of them would have any

6  more right to, to, for me to hire them than, than the

7  other one.

8      Q    You're looking for the, the person that you

9  think will be the most stable and the best ready mix

10 driver that you can find?

11     A    That, and when I know I've -- you know, there's

12 one of the candidates that I can't send to my, one of my

13 best customers, it, it's a no-brainer not -- he's not the

14 one I want.

15     Q    And the distinction that you're making there is

16 that when Mr. Aldridge got banned or a customer

17 requested -- I guess two customers requested that he not

18 come to their job sites -- he was already a ready mix

19 driver; he was already on the seniority list; and in

20 order to cure the problem if you didn't want to keep him,

21 you would have had to discharge him?

22     A    Yes.  It's a much harder process to get rid of

23 a Teamster that's on a seniority list.  It goes through

24 the grievance procedures; and, like I say, if, if there

25 had been ample justification, or if I thought I could

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   have fired Mr. Aldridge, I would have done so.  It's a

2   very big inconvenience not to, not be able to use your

3   people where you need them.

4        Q    Are there experiences that you've had that

5   would cause you to believe that if you had discharged Mr.

6   Aldridge that you may have lost on a grievance, or at

7   least you were definitely headed for a grievance process?

8        A    Well, it would have definitely, 100 percent,

9   been headed for a grievance procedure, and I wasn't sure

10  I could win.

11       Q    All right.  And since that time, one of the

12  customers has allowed Mr. Aldridge back on his job sites?

13       A    Correct.

14       Q    And with respect to Mr. Barbee, it's your

15  recollection that the request as to him -- well,

16  obviously, it was made before he became on the seniority

17  list for ready mix drivers, right?

18       A    Yes.  He wasn't -- he was a ready mix -- or he

19  was a hauling driver; and him and both, Kevin Fowler are

20  both hauling drivers I use kind of on a part-time basis

21  on ready mix.

22       Q    All right.  Why is it important that you be

23  able to send all your drivers to any customer?

24       A    Well, it's a, it's a scheduling ordeal every

25  day, and I never know what time trucks are coming back

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    off of jobs.  So, you know, they may be -- they need --

2    they may be the first one for timing to send to the, to

3    the next customer; and if that customer is, I can't send

4    him there, then I've got a problem.

5         Q    And when you have customers that are making

6    concrete pours, is concrete a perishable?

7         A    It's perishable, and it has to be there on

8    time.

9         Q    All right.  And when you have a driver that

10   comes in but you can't send him to that job and they need

11   concrete, then that also jeopardizes the potential

12   customer's process --

13        A    Exactly.

14        Q    -- in his business?

15        A    Yes.

16        Q    In your 37 years experience as the plant

17   manager for the Christy-Foltz concrete plant, now known

18   as the Grohne Concrete Products plant, have you ever had

19   any other claims, other than this Roberts incident,

20   claims of racial discrimination, racial harassment, or

21   racial harassment retaliation?

22        A    No, none.  And I've had, I've had

23   African-American drivers before that I've hired.  So -- I

24   mean, Lawrence is not the first.

25        Q    All right.  And in the recent past, have you

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   had any African-Americans apply to be a driver?

2       A    Not recently, no.

3       Q    All right.

4       A    I mean, I can't, I can't remember how far back

5   it's, it's been.

6       Q    So when opposing counsel suggests that Mr.

7   Barbee is the only African-American driver that you have,

8   part of the reason for that is you haven't had any apply

9   recently?

10      A    True.

11      Q    Do you have any estimate as to how long it's

12  been -- and if you can give a range -- since you've had

13  an African-American driver apply, or do you even

14  recognize that in your memory?

15      A    Well, I, I don't remember having any apply

16  since we took over Grohne, so that's been twelve years

17  ago.

18      Q    Okay.  You mentioned a Labor Law poster that's

19  posted at the Grohne office, correct?

20      A    Yes.

21      Q    Is that called a 5-in-1 poster?

22      A    Yes.

23      Q    And that's supposed to give your employees all

24  the, the notices they're required to have under the labor

25  laws?

1     A     Yes, it does.

2     Q     Is there a section on that poster, Mr. Grigg,

3  that reads:  "Race, color, religion, sex, national

4  origin.  Title VII of the Civil Rights Act 1964 prohibits

5  discrimination in hiring, promotion, discharge, pay,

6  fringe benefits, job training, classification, referral,

7  and other aspects of employment on the basis of race,

8  color, religion, sex, or national origin"?

9     A     Yes.

10     Q     Is there also a section on that poster in

11  regards to, for instance, OSHA?

12     A     Yes.

13     Q     Is there a section on it about Family Medical

14  Leave Act of 1993?

15     A     Yes.

16     Q     What other types of things are posted on the

17  bulletin board that are notices to employees?

18     A     We have safety reports, accident time loss data

19  sheets.  We've got union, union hall messages to the

20  drivers.  We have any notices that I post.  For example,

21  I've got one posted up there where everybody's required

22  to wear a hard hat, safety glasses, earplugs when they're

23  going into Caterpillar.  But any notices that I get that

24  the drivers are, or any employee needs to be made aware

25  of.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    Is there also a notice up there about standard
 2   operating procedures on ready mix trucks?
 3        A    Yes.
 4        Q    Is there in the -- there's another bulletin
 5   board in the hallway?
 6        A    Yes.
 7        Q    That's between your office and the break room?
 8        A    Yes.
 9        Q    On that bulletin board, is there an Illinois
10   Department of Revenue certificate of registration that
11   references Decatur Construction Services, Inc., and
12   Grohne Concrete Products?
13        A    Yes.
14        Q    And that has an Illinois business tax number on
15   it?
16        A    Yes, it does.
17        Q    And you're required to post that?
18        A    Yes, we are.
19        Q    Is there also notices about unemployment
20   benefits or the unemployment benefit process?
21        A    Yes.
22        Q    In your experience, has posting always worked
23   when you post notices to employees that they seem to, to
24   gather the information that is in what's posted?
25        A    I think, you know, there's some that pay
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   attention to it more than others.  You know, a lot of it

2   is by law that, you know, we're obligated to post it; and

3   I'm, I'm sure some pay more attention to it than others.

4        Q    But you didn't have any concern that they would

5   not recognize that an antiharassment policy posted on the

6   bulletin board was applicable to them?

7        A    I had no doubt that.  No.

8        Q    Particularly given the recent events?

9        A    Exactly.

10        Q    Might that antiharassment policy have been

11   posted after the August 20th of 2007 meeting that you had

12   between yourself and Mr. Barbee and Mr. Schinzler where

13   you raised these other instances that were offensive to

14   him that were a bit ambiguous?

15        A    Say that again.

16        Q    I said:  Might that antiharassment policy have

17   been posted after the August 20, 2007, meeting, where Mr.

18   Barbee raised some additional statements of coworkers

19   that were offensive to him, such as Mr. Spitzer

20   indicating, "I didn't know you were a racist," and Mr.

21   Spitzer also saying you, "You guys call each other names,

22   but when we do it it's a problem"?

23        A    Yeah.  It was, it was posted after that.

24        Q    Okay.  Was that when you started thinking in

25   your mind what is and what isn't harassing, when these

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   different statements start to come up?

2       A    Yeah.  I started thinking about it.

3       Q    And you did talk to Scott Spitzer soon after

4   that meeting in terms of, "Watch what you say to

5   Lawrence"?

6       A    Yes.

7       Q    And the purpose of that was not to limit his

8   communication with Lawrence, but to restrict any

9   discussion that has to do anything with race?

10      A    Exactly.  Some subjects ought to be off limits.

11      Q    Okay.  When the apology was made, the

12  antiharassment policy had not yet been posted at that

13  time, correct?

14      A    Correct.

15      Q    And it was not yet posted when Mr. Aldridge was

16  suspended as well?

17      A    That's correct.

18      Q    After your August 20, 2007, meeting, you did

19  not detect any other employee acting adversely to Mr.

20  Barbee because of his race, did you?

21      A    I did not.

22      Q    But you did make inquiries to certain employees

23  as to whether they were treating him any differently

24  after the, the chain of events that had occurred up to

25  that time?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    I think I had a -- well, like I say, telling

2   Scott, you know, watch what he says; and Gary Roberts,

3   just wanted to make sure he was clear on what was

4   appropriate and what was unacceptable.

5      Q    Okay.  You work around these guys every day.

6   They check in with you.  Some of them you've worked with

7   for many years.

8      A    Yes.

9      Q    Are there some employees that you just know are

10  not engaged in anything that would border on --

11     A    Yeah.

12     Q    -- harassment or discrimination or retaliation,

13  anything of that nature?

14     A    I don't have one employee that I would, that

15  would do that.

16     Q    After your August 20, 2007, meeting with Mr.

17  Barbee, he never reported to you any more racial slurs,

18  racial statements, anything of that nature, did he?

19     A    No.  He did not.

20     Q    And you didn't hear any such statements?

21     A    No.

22     Q    The only two things that occurred that would

23  even remotely have the possibility of being considered

24  harassing would be the two noose instances; is that --

25     A    Correct.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     -- your understanding?

2            And you determined that both of those were not

3      directed to Mr. Barbee?

4      A     True.

5      Q     Do you know if Mr. Barbee -- or strike that.

6            Did you receive any communication from the

7      union as a consequence of Mr. Barbee reporting the

8      incident involving Mr. Roberts to the union?

9      A     No.

10     Q     Okay.  Did Jerry Conner, the business agent for

11     the union, ever call you?

12     A     I think I talked to him at one time.  I don't

13     remember a lot of the conversation, other than he thought

14     Lawrence was gonna sue them.

15     Q     Now, after you got the August 15, 2007, letter

16     where Mr. Barbee indicated that there was some additional

17     racial slurs and comments -- and you got that, I think,

18     on August 17 -- isn't it true that you very promptly

19     asked him what he was referring to, and he could not give

20     you specifics?

21     A     Yeah.  He stated that other racial slurs had

22     been done and harassment, and I asked him:  Well, who did

23     what?  You know, what did they say?  Who said what?  And

24     he couldn't tell me anything about it.

25     Q     And then when you did pull him together with

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    your meeting with Mr. Schinzler is when you got the

2    report on these other comments that he referenced in that

3    meeting?

4         A    Yes.

5         Q    You indicated that Mr. Roberts had not been

6    loaned money?

7         A    Correct.

8         Q    And why do you say that?

9         A    Well, I would have been probably the one that

10   would have initiated the loan, and I didn't do that.  He

11   may, he may have purchased some concrete at one time and

12   we sent him a bill, and he may have paid for it in

13   payments.  That's possible.  But as far as loaning him

14   any money, I never did.

15        Q    Okay.  And that would definitely go through you

16   if there was to be a loan?

17        A    I would know about it.  Yes.

18        Q    What types of things have you done for Mr.

19   Barbee?

20        A    Well, given him a job to begin with, back in

21   '04.  That didn't, that didn't work out too well for him.

22   He left.

23             During the time that he had left, I think he

24   bought a junk semitractor that -- it wasn't running.  I

25   don't want to call it junk; it was a semitractor that

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   wasn't running.  And he asked to park it on our property,

2   which I let him do for, oh, a couple months at least,

3   while he wasn't working for us.

4           And he came back by the office in '05, '06,

5   somewhere in there.  I had an opening for a material

6   hauler driver.  I asked him if he wanted that and told

7   him what the pay was and the hours that he would work,

8   and he seemed tickled to get it; and so he's been driving

9   that ever since.

10          In the meantime, three or four years ago, he

11  came to me one day; and his, he was about to lose his

12  house or rent -- I'm not sure which, but needed $600.

13  And I ended up with, getting the money from the company

14  and loaning him the money, which he paid back over, like,

15  I believe, twelve weeks, $50 a week, if I'm not mistaken.

16  I hadn't done that for any other employee, but I had a

17  sense of wanting to help Lawrence out as much as I could.

18          A year or so later, he lost his license for

19  failure to pay child support down in another state.  They

20  pulled his driver's license.  At that time, he basically

21  was out of a job again.  I mean, I, I couldn't work him.

22  And he asked for 5 or $600 -- 600, I think, to pay his

23  back child support to where he could get his license

24  back.  So I loaned him that money from the company, which

25  he paid back.  He got his license, came back to work,

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    paid it back over a twelve-week period or so.

2                  And, and then -- well, just prior, probably, a

3    couple weeks prior to the Roberts incident, he came to me

4    needing some money; and I, I really figured, well, you

5    know, I kind of went out on a limb here with

6    Christy-Foltz using their money to, to loan out to him.

7    I didn't really want to do that again.  And I told him

8    that.

9                  And he said, "Well, what about, what about you

10   loaning me the money?"

11                 And, you know, I think I'm -- well, I, I just

12   felt like I ought to do it.  So I loaned him 500 bucks.

13   And I ended up getting that back in a ten-week, ten weeks

14   or so.

15        Q    Okay.  Have you -- did you recently send some

16   concrete to a location that he wanted some, some --

17        A    A church he goes to needed some concrete, and I

18   sent some left-over concrete on several different

19   occasions over to his church with no charge.

20        Q    Have you allowed him to use the shop at the

21   Grohne plant without charge?

22        A    Yeah, that, and he's used our equipment and

23   trucks on his own time at various times.  You know, he's

24   used a backhoe, end loader, dump truck, Bobcat.

25        Q    Mr. Grigg, you were asked some questions about

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    the first noose, Exhibit 3.  Back to October 17 of 2007,

2    can you tell me what events occurred that day?

3        A    Well, I think Lawrence came to work that

4    morning, worked a few hours.  I think he had a, an

5    appointment that he left at 10:30 or so; and I expected

6    him back to work whenever he got done with his

7    appointment.

8             And when he came back early afternoon, he came

9    in my office fairly belligerent.  He had a couple

10   pictures he more or less threw on my desk that had

11   pictures of the noose and started in about, you know, "My

12   people have been oppressed for 400 years, and, you know,

13   this is" -- blah, blah, blah.  I don't remember exactly

14   what he said.

15            And I was -- I mean, I was shocked.  I mean, I

16   really didn't have a whole lot to say, I mean, until I

17   found out what was going on about the noose; and I wanted

18   to find out what it was that he was talking about.

19            And, you know, he testified that I said, "Well,

20   what does that have to do with you," which I did not.  I

21   mean, like I say, I -- till I found out what noose he was

22   talking about, I thought it could have been a legitimate

23   issue.

24            And, and about the time the police officer

25   showed up, and, and I said, "Well, let's go down and see

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    what's, what we're talking about here."

2            And the police officer and I went down.  I

3    don't -- I think Lawrence left -- and went down and found

4    the noose hanging on a rain coat, which I took down; and

5    I talked to the officer.

6            Well, and I think Scott Spitzer was probably in

7    the batch office then; and I asked him, you know, "What

8    do you know about this?"

9            And he indicated it's been in the batch office

10   for years, as long as he could remember.

11           And the police officer, as I recall, didn't

12   think there was anything to it; and, and during the

13   course of the afternoon, too, you know, I started finding

14   out what other information I could find out about the

15   noose and found out that Bob Stewart, one of our other

16   employees, watched the guy make it about 15, 18 years

17   ago, Calvin Campbell.  He had a -- he knew the guy.

18           And he was just sitting there one afternoon, or

19   on a break or whatever, tied it up and hung it up on the

20   nail, and that was it.

21           And I think -- I think I called Lawrence that

22   afternoon after I found out this information about it

23   being there for umpteen years and told him what I'd found

24   out, you know, that it wasn't directed at him.  It had

25   been up there for, forever.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          And I don't, I don't remember exactly whether

2    I -- I think I called him that afternoon.  But if, if

3    not, it was the very next morning.  And I know the next

4    morning I did tell him that same thing in my office, that

5    it wasn't directed at him, and it's been there forever.

6          Q    What was his reaction?

7          A    He didn't -- he just -- I don't remember him

8    saying anything other than I got the, the opinion that,

9    well, it was gonna matter.

10          MR. POSTLEWAIT:  May I approach the witness,

11    Your Honor?

12          THE COURT:  Yes.

13    BY MR. POSTLEWAIT:

14          Q    Mr. Grigg, I've handed you what's marked

15    Plaintiff's Exhibit 5, and is that the picture of the

16    noose that you've just testified about that was in the

17    batch office, or the --

18          A    Yes.

19          Q    -- sash cord, whatever you want to call it?

20          A    Yes, it is.

21          Q    And is that the location that it was when you

22    found it?

23          A    To be honest, I think it was hanging on this

24    yellow raincoat when I found it.  I mean, this is on a

25    white bag here; but I think when I found it, it was

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   probably hanging over on this next nail, on the raincoat.

2       Q    Do you know who would have put it on the next

3   nail?

4       A    Probably whoever wanted the bag.  They probably

5   moved -- I mean, you know, just a possibility.  I have no

6   idea, but --

7       Q    Okay.

8       A    Maybe there was something in this bag somebody

9   wanted and --

10      Q    All right.

11      A    I have no idea.  I really don't know when

12  Lawrence took the picture, how long ago -- I mean, you

13  know, how long between when he took the picture and when

14  I knew that the noose was there.

15      Q    You didn't find that significant, understanding

16  Mr. Barbee apparently took the picture that morning; and

17  it was that afternoon when you went out, observed it,

18  took it down?

19      A    I have no idea when he took the picture.

20      Q    All right.

21      A    I would have thought if it was a troubling

22  aspect for him that he should have just came and got me,

23  and we'd have both taken a picture.

24      Q    And taking you to the second alleged noose,

25  describe the circumstances of how you learned about that

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  and, and what you learned about the alleged noose?

2     A     Well, the way I found out about that noose was

3  Lawrence came to the office sometime during the course of

4  the day.  It might have been first thing; I don't know.

5  He was in the office.  He said, "There's another noose

6  down there," just that cas-- I mean, kind of a casual

7  statement.

8            And I have intercom phone service with my batch

9  plant.  I called Scott, and I said -- I think Scott -- I

10  think I asked Lawrence, "Well, where is it?"

11            And he probably told me it was on the east

12  wall.

13            And I called Scott and told him to, if there's

14  a noose there on that wall, get it down and bring it up

15  to me.  I was probably busy with the phone or something;

16  I couldn't just take off, get out of the office right

17  that minute and go down there myself.

18            So I had Scott find it, and I think Lawrence

19  told me it was hanging over the chokers and come-alongs

20  and that type of stuff or -- anyway, Scott brought it up

21  to me.

22     Q     Did you learn at some time that Mr. Barbee was

23  also taking photographs of that alleged noose?

24     A     Well, I think probably at that time Scott told

25  me -- well, he said, "I saw Lawrence taking pictures over

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    there.  I wondered what he was taking pictures of."

2              And probably the time frame between the two

3    nooses was two to four weeks.  I mean, it wasn't within

4    days.  It was a two- to four-week time period.

5        Q    All right.  So you think it was more like

6    sometime in November, or the end of October or --

7        A    Yeah.

8        Q    -- early November --

9        A    Yeah.

10       Q    -- when that alleged noose was, became an

11   issue?

12             Did you then investigate the, the source or

13   origin of that?

14       A    Yeah.  I mean, I immediately asked Scott what

15   he knew about it.  And, like I say, it was covered so

16   heavily with cement dust that -- I mean, if you'd touch

17   it, you're gonna have to go wash your hands off because

18   it was just, looked twice this size with all the cement

19   dust caked on it.

20             And, you know, Scott indicated that he used it

21   for lifting pumps out of pits; and he thought originally

22   Mike Spitzer, his brother, had used it probably ten or

23   twelve years ago when we were cleaning the roof off,

24   cleaning cement off the roof, putting buckets down off

25   the roof using it.

123

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       Q    So did, did that indicate or satisfy you that

2   this was a, another object that was not directed at

3   Lawrence?

4       A    Exactly.  And where it was, where it was

5   hanging, I mean, you'd have to kind of move things around

6   to even get to it or get it off of a hook.  You know, on

7   the same hook, there was probably a come-along or a

8   choker, and it wouldn't have -- it couldn't have been

9   moved in probably years, let alone days.  But, I mean, it

10  wouldn't be something you could, somebody would put up.

11      Q    If you were to tap that noose on the ledge

12  there where it's sitting, would it leave dust on the --

13      A    Yeah.  It already has.

14          MR. POSTLEWAIT:  May I approach the witness,

15  Your Honor?

16          THE COURT:  Yes.

17          THE WITNESS:  In fact, you can see it right

18  now.

19  BY MR. POSTLEWAIT:

20      Q    Mr. Grigg, I've handed you what's marked as

21  Plaintiff's Exhibit 6.  Do you recognize that photo?

22      A    Yes.  That's --

23      Q    Do you rec--

24      A    -- the location of the second noose.

25      Q    Is that where the alleged second noose was

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    found, according to what Mr. Spitzer told you?

2        A    Yes.

3        Q    What are the other things that are on the wall?

4        A    Well, there's two come-alongs.  There's steel

5    chokers, cables, other peeps -- pieces of rope, it looks

6    like.

7        Q    And if you're to -- strike that.

8             Was the, the noose laid out on the front of

9    those objects, or was it positioned such that it was kind

10   of in between some of them or behind them or what?

11       A    Well, I, I think it was between or behind.  I,

12   I can't really tell.  But it -- if you were gonna put a

13   noose out for, for observation, you'd put it in a whole

14   lot different place than that.  I mean, if you wanted it

15   to be seen, that -- I mean, you look at that, you don't

16   pay attention to anything that's there.

17       Q    You mentioned that you don't recall the start

18   date of Mr. McConnell and Mr. Benton; is that right?

19       A    That's correct.

20       Q    Would it refresh your recollection to look at a

21   record that would indicate whether or not they were

22   working before October 11 of 2007?

23       A    Yeah.

24            MR. POSTLEWAIT:  May I approach the witness,

25   Your Honor?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1              THE COURT:  Yes.

 2                  (Brief pause in proceedings.)

 3   BY MR. POSTLEWAIT:

 4       Q    It's not going to be on those.  We're going to

 5   have to look at the other exhibit.

 6       A    I've got one over here.

 7       Q    Oh.  I believe these are in alphabetical order.

 8   Could you find Mr. Benton and Mr. McConnell on that list?

 9       A    Well, I see Mr. Benton was working on 8/7 of

10   '07.

11       Q    What page is that on?

12       A    22.

13       Q    All right.  And how about Mr. McConnell?

14       A    I show him working on 10/16/07, be

15   October 16th.

16       Q    All right.  You see any record of him working

17   there before that?

18       A    No.

19       Q    Okay.

20       A    Wait a second.  He's back in June.  He worked

21   back in June.  Let's see, that's --

22       Q    Are you having trouble reading it without your

23   glasses?

24       A    Yeah.  That's --

25       Q    Sorry.  I forgot about that.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          Okay.  If you'd go to page 47 -- are you on
2   that page?  Can you see it?
3        A    Yeah.
4        Q    All right.  Doesn't it indicate a first pay
5   period for Mr. McConnell of June 5 of 2007?
6        A    Yes.
7        Q    Okay.  So both McConnell and Benton predated --
8        A    Right.
9        Q    -- Mr. Barbee's request to transfer --
10       A    Yeah.
11       Q    -- to ready mix?
12       A    Correct.
13       Q    And the only ones that would have been hired
14  after Mr. Barbee were Jason Cecil, Justin Beaman --
15       A    And Tom Sheets.
16       Q    -- and Tom Sheets?
17            Do you know, Mr. Grigg -- you heard Dr. Lee
18  talk about how Mr. Barbee feared for his life, feared
19  that he was going to be jumped, was pacing about her
20  office, afraid he was going to be harmed.
21            Did you on October 17 of 2007 observe any such
22  conduct out of Mr. Barbee?
23       A    No.
24       Q    Had you at any time, either before or after
25  that date, observed any such conduct that would indicate

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   to you that Mr. Barbee was particularly stressed or

2   afraid for his --

3        A    No.

4        Q    -- physical being?

5        A    No.  And there's no reason for him to be.  I

6   mean, I don't have any employees that are aggressive or

7   would do anything like that.  Those -- and, and he knew

8   everybody as well as I do.  So he knew that he did not

9   have to worry about that.

10       Q    If he had taken the picture of the noose down

11  at the batch office on October 17 of 2007 and walked up

12  to your office and showed it to you on his cell phone, or

13  even just told you that it was there, what would you have

14  done?

15       A    I'd have went down and got it and went through

16  the same investigation process that I did, find out why

17  it was there, how it got there, and where it came from.

18            MR. POSTLEWAIT:  Nothing further.  Thank you.

19            THE COURT:  Thank you.

20            Mr. Quivey.

21            REDIRECT EXAMINATION BY MR. QUIVEY:

22       Q    Sir, you just testified that the first noose

23  had been there forever, correct, meaning it had been

24  there for a long time, right?

25       A    Correct.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    But you hadn't seen it for over 35 years that

2    you'd worked there, right?

3      A    I've only been there at that location since

4    ninety -- '96, '97.

5      Q    Okay.  But so you hadn't seen it since 1996 on

6    any occasion, correct?

7      A    Correct.

8      Q    Sir, is it your belief that a noose had to be

9    directed at Lawrence, Mr. Barbee, for him to find it

10   offensive?

11     A    Yes.

12     Q    Sir, I believe you testified that, that nothing

13   happened after August 20th, when you had the meeting,

14   until the first noose.  Was that your testimony?

15     A    I believe it was.  Yeah.

16     Q    You agree with me that during that time frame

17   Mr. Barbee complained to you about being isolated by his

18   coworkers?

19     A    Well, he mentioned that they weren't talking to

20   him.  But, but in the same --

21     Q    Just answer my question.

22     A    Okay.

23     Q    Had -- he complained to you during that time

24   frame, right?

25     A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    Okay.  You also agree with me that on or about

2  September 21, 2007, you went to him when he had pulled

3  off the side of the road because he couldn't drive

4  anymore, correct?

5      A    Correct.

6      Q    And he was stressed out at that time, right?

7      A    He said he was.

8      Q    So when you testified that at no time you saw

9  him to be particularly stressed, that wasn't true, was

10  it?

11      A    Yes, it was.

12      Q    Well, you saw him particularly stressed on

13  September 21st, didn't you?

14      A    I saw him on the side of the road, and he was

15  sitting on the bank.  He said he was stressed.

16      Q    You knew he was on medication, right?

17      A    He mentioned that he was.

18      Q    At some point in time during that time frame,

19  you knew he'd been seeing a counselor, correct?

20      A    Yes.

21      Q    He hadn't, to your knowledge, hadn't seen a

22  counselor before the Roberts incident, had he?

23      A    Not to my knowledge, no.

24      Q    Sir, I'm handing you what's previously been

25  marked as Plaintiff's Exhibit 10.  Sir, could you tell us

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  what Plaintiff's Exhibit 10 is?

2      A    Looks like the employee record on Gary Roberts,

3  $50 a week, and it looks like a total amount of 1460 --

4  $1,460.63.

5      Q    So he had some sort of debt of 14-- $1,460.63,

6  correct?

7      A    Yes.

8      Q    And that was -- and then he made $50 payments

9  to pay off that debt, correct?

10      A    Correct.

11      Q    And that started -- his first payment was

12  sometime in February of '08?

13      A    I don't see the date, but I'd assume you're

14  right.

15      Q    Yeah, I mean, you can't really tell -- it's cut

16  off -- but I think it says February 26, '08, is the first

17  payment?

18      A    Yeah.

19      Q    So it would appear that he was loaned either

20  materials or money, and he paid that off in $50

21  installments, correct?

22      A    It looks like it.  I mean, I'm sure it was a

23  purchase.  He probably bought some concrete and didn't

24  pay for it, and somebody decided that they'd let him pay

25  it off.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      Q    So it was a loan to him, correct?

 2      A    Same as, yeah.

 3      Q    And it's also true that you let white employees

 4  use Christy-Foltz equipment on their off-time as well,

 5  correct?

 6      A    Other people have used Christy-Foltz equipment.

 7  Yes.

 8      Q    And, again, whenever Mr. Barbee was loaned

 9  money, he paid you back, right?

10      A    He did.

11      Q    You or Christy-Foltz, correct?

12      A    Yes.

13      Q    So you thought he was reliable to be able to

14  pay it back, correct?

15      A    Yes.

16      Q    Sir, I believe it was your testimony that you

17  don't have any employees that, that would do that,

18  meaning any sort of racial hostility, correct?

19      A    Talking about a violent, anything violent, yes.

20      Q    Okay.  No.  I understand that.

21           But you also don't believe any of them would

22  engage in any sort of racial harassment, correct?

23      A    No.  I believe that.  Yes.

24      Q    But, yet, when you were first confronted with

25  the noose, you thought that it, it may have been directed
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   at Mr. Barbee, correct?

2       A    Well, without knowing anything, I had to

3   assume -- I had to find out what was going on.

4       Q    So it's at least possible that one of your

5   employees that never did anything wrong might have done

6   it, right?

7       A    Well, anything's possible.  I'm just giving you

8   my, my opinion of what I know of my employees.

9       Q    Sir, you knew that Mr. Barbee was upset or

10  dissatisfied with the way the Roberts incident was

11  handled, correct?

12      A    Yeah.  The, the Monday after the apology, he

13  indicated that.

14      Q    And you're the one who had handled that

15  incident, correct?

16      A    Yes.

17      Q    So did it ever occur to you that maybe he

18  wouldn't be too eager to come to you first when he found

19  the noose?

20      A    No.  That didn't, that didn't occur to me.

21      Q    Sir, in regards to the white employees that

22  were hired as, as ready mix drivers -- first of all, you

23  would agree with me that Mr. Barbee, before he put in the

24  request in writing, he made an oral request to be a ready

25  mix driver, correct?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A     Probably.

2       Q     And that was before, some time before October

3   11th of 2007, right, his verbal request?

4       A     It wouldn't have been very much before.

5       Q     And you also said that no African-Americans had

6   applied to be a driver, correct?

7       A     In the recent past, correct.

8       Q     You would agree with me that you primarily rely

9   on word of mouth to hire drivers, correct?

10      A     Correct.

11      Q     In fact, one of these three employees that you

12  hired is related to another one of your drivers, right?

13      A     Correct.

14      Q     So you don't -- you didn't put an advertisement

15  in the newspaper or anything like that, right?

16      A     That's right.

17      Q     So how would an African-American know to apply?

18      A     Word of mouth, same way anybody else would

19  know.  And that's, that's been -- that's worked so far.

20  You know, if I wanted to hire somebody right now --

21      Q     Sir, you answered my question.

22      A     Okay.

23            MR. POSTLEWAIT:  Object, Your Honor.

24            THE COURT:  I think the witness is volunteering

25  additional nonresponsive material.  Overruled.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  BY MR. QUIVEY:

2      Q    Sir, going back to this possible grievance that

3  Mr. Fowler could have filed, it's your testimony -- and

4  you correct me if I'm wrong -- that he could file a

5  grievance if the job was given to Mr. Barbee, but he

6  could not file a grievance if you hired someone off the

7  street?

8      A    No.  I was saying that he, he probably would

9  file a grievance, but it wouldn't matt-- I mean, it

10 wouldn't bother me if he filed a grievance because he had

11 no right to file a grievance.

12     Q    All right.  I mean, under the contract, you had

13 the right to hire who you wanted to hire as a ready mix,

14 correct?

15     A    Right.

16     Q    Sir, you were asked some questions about the

17 relationship between the three companies.  Please take a

18 look at Exhibit 7, please, which is that discrimination

19 policy.

20     A    Okay.

21     Q    Sir, anywhere in that does it mention

22 "Christy-Foltz"?

23     A    No.

24     Q    And would you also agree with me that you made

25 no attempt to make sure employees actually read that

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   policy?

2        A    I didn't sit down with them and make sure they

3   read it.  No.

4        Q    Sir, did I, I understand your testimony a

5   little bit ago when you were being questioned by Mr.

6   Postlewait that you did not start thinking about

7   harassment until after August 20th of 2007?

8        A    We, we never had any occasion to -- we have

9   never had occasion to think about harassment.  It never

10  has happened in my 37 years.  So, you know, it's slow to

11  maybe see that is this actually harassment or something

12  else.

13       Q    Okay.  So you admit you may have been slow to

14  recognize that there was a problem?

15       A    True.

16       Q    Sir, am I correct that you told Scott Spitzer

17  to "watch what you say to Mr. Barbee"?

18       A    Well, after a meeting with, with Mr. Barbee

19  and, and Hal, where Scott indicated there, asked Mr.

20  Barbee if he was a racist, or he didn't know if he was a

21  racist, you know, I thought that the -- any discussion

22  about race at all should not be used.

23       Q    But you told him to watch what he said to Mr.

24  Barbee, correct?

25       A    Yeah.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q     Did you tell any other employees that?

 2        A     Not that I can recall.

 3        Q     Are you aware whether Mr. Spitzer told other

 4   employees to do the same?

 5        A     I'm not aware of that.

 6              MR. QUIVEY:  No more questions.

 7              THE COURT:  I think this will be a good time to

 8   take our afternoon break.

 9              I think that noise has been ceased, and I

10   apologize to the jury.  I apologize to counsel and the

11   litigants.  You've prepared for these trials, and you

12   give up your time, and you're entitled to have an

13   environment where you can hear the questions and the

14   answers; and I don't know why that happened, but I think

15   it's been remedied.  So I appreciate your patience.

16              We'll take a 15-minute break.  Thank you.

17                   (Jury absent, 2:45 p.m.)

18              THE COURT:  All right.  Just so we have an idea

19   for planning purposes, we need to resolve the objection

20   to Plaintiff's 12; but other than that, then, are you

21   resting --

22              MS. LEAHY:  Yes, Your Honor.

23              THE COURT:  -- subject to resolution of that?

24   I'll let you do that in their presence.

25              And then what will we use the remaining time
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  for today?

2          MR. POSTLEWAIT:  I'd like to make a Rule 50

3  motion and, for judgment as a matter of law on certain --

4  on the entire case, and then I have witnesses waiting in

5  the hallway, or the witness room.

6          THE COURT:  Okay.  All right.  Well, let's --

7  while the jury is out, let's, let's hear your objection

8  to Exhibit 12, records regarding pay.

9          MR. POSTLEWAIT:  Your Honor, on the plaintiff's

10  exhibit list that's been filed with the -- I guess the

11  most recent one, it does show that my objection to that

12  was limited to those drivers other than Mr. Cecil,

13  Mr. Beaman, and Mr. Sheets.

14          And now that I've used the exhibit for

15  Mr. Benton and Mr. McConnell to establish their, their

16  beginning date, I would not object to those pages going

17  along with it so the jury could see that they were

18  actually working as ready mix drivers before Mr. Barbee's

19  October 11, 2007, request.

20          But what the plaintiffs are attempting to do

21  with this exhibit is to allow the jury to see all the

22  ready mix drivers' wages, even those who have many, many

23  years of seniority; and the only issue here in this case

24  is with respect to Mr. Barbee's claim.

25          He claims he was denied his request to, to be

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    hired as a ready mix driver, and the only wages that

2    would be relevant to that are the Caucasian employees

3    that he claims he was -- that he claims got beneficial

4    treatment, essentially, which were the Beaman, the

5    Sheets, and the, the -- the third one that I mentioned.

6    Okay?

7            And, obviously, the people who are higher on

8    the seniority list, work more often, have a higher annual

9    wage -- that's going to be shown by those records.  If

10   you're going to compare apples to apples, he would have

11   been making no more than would Mr. Sheets, Mr. Beaman, or

12   Jason Cecil, those that were hired after him, so -- in

13   terms of his seniority.  So those are the records that

14   are relevant, and I also have exhibits of the same thing

15   to be able to show those.

16           But I don't think they should be able to argue

17   to the jury that somehow Mr. Barbee from the date of his

18   request to the present time would have been making what

19   those much higher on the seniority list are shown by that

20   record to make.  It just -- he wouldn't have had that

21   opportunity.

22           Thank you.

23           THE COURT:  Thank you.

24           Mr. Quivey.

25           MR. QUIVEY:  Your Honor, I believe counsel's

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  argument goes to the weight but not to the admissibility

2  of the document.

3          First of all, he used it, the document, to

4  refresh recollection.  There's testimony that it was kept

5  in the ordinary course of business, and it is -- it is

6  relevant what the other drivers were making.  He can

7  argue to the jury about seniority and how quickly you

8  would move up the ladder.

9          But it's not just the damages since then.  It's

10 what the damage was, could be in the future based on, as

11 you gain seniority, how much you could make.

12         So the document is relevant.  He's free to

13 argue to the jury at the present time that Mr. Barbee

14 would never make as much as these people.  That's an

15 argument.  But it doesn't mean that the exhibit is not

16 admissible.

17         THE COURT:  Any response?

18         MR. POSTLEWAIT:  I say:  Future lost wages is

19 speculation.

20         THE COURT:  I'll overrule the objection and

21 admit Plaintiff's 12.  We'll, of course, be determining

22 whether any of the exhibits will actually go to the jury

23 room, but this will be admitted over that objection.

24         Shall we proceed to your motion?

25         MR. POSTLEWAIT:  Yes, Your Honor.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

 1          May I approach the bench, Your Honor?

 2          THE COURT:  Sure.

 3          MR. POSTLEWAIT:  Your Honor, I've handed up to

 4  the Court a trial brief and also a copy of the case, a

 5  recent case, of <u>Porter v. Erie Foods International, Inc.</u>

 6  It's a Seventh Circuit decision and, from 2009.  I

 7  believe the copy you have has the, the more recent

 8  citation; but I have 2009 WL 2431991, Seventh Circuit of

 9  2009.  That cites the relevant law.

10          And given the, the evidence that has been

11  submitted, I don't believe that a jury could rule in the

12  plaintiff's favor as a matter of law, given what the, the

13  burden is that the plaintiff must show.

14          The facts of the alleged harassment include Mr.

15  Roberts' remark where he referenced Mr. Barbee as a

16  nigger.

17          You have a remark that's made out of the

18  presence of Mr. Barbee by Mr. Aldridge.

19          You have a remark reported to Mr. Schinzler and

20  Mr. Grigg that Mr. Roberts supposedly made in regards to,

21  "Look at Carrol.  He's acting like Terry's nigger."

22          You have the remark where Scott Spitzer

23  supposedly said, "When you call each other names, or when

24  you call each other 'nigger,' it's not a problem; but

25  when we do it, it is a problem."

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          And then you've got Scott Spitzer's statement,

2     "I didn't know you were racist," according to the

3     plaintiff.

4          Only the statement by Mr. Roberts directed to

5     Mr. Barbee, calling him a nigger, is the one -- and only

6     the statement by Mr. Spitzer, the two statements by Mr.

7     Spitzer, were in the presence of Mr. Barbee.  The two

8     statements by Mr. Spitzer are ambiguous as to whether

9     they would be considered harassing.  But even if you give

10    it the benefit of the doubt and say that they are, that

11    it's not the severe and pervasive degree that's required

12    to impose liability on the employer.

13         If you look at page 5 of the brief, the

14    elements are that he was subject to unwelcome harassment;

15    the harassment was based on his race; the harassment was

16    severe or pervasive so as to alter the condition of his

17    work environment by creating a hostile or abusive

18    situation, and there is a basis for employer liability.

19    The basis for employer liability is whether the employer

20    took reasonable steps to correct the situation or to

21    prevent it from recurring.

22         In this case, you've got -- Christy-Foltz has

23    arranged the apology from Mr. Roberts, which was made the

24    day after the incident.  They further suspended Mr.

25    Roberts for a week.  They further suspended Mr. Aldridge

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    for a week for his use of the word "nigger."

2            You have the evidence that they adopted an

3    antiharassment policy that was posted in this chain of

4    events sometime after this August 20, 2007, meeting, or

5    soon after that.

6            And you've got the evidence of the, the nooses

7    which, pursuant to prompt investigation, were both

8    determined to have been in existence for a long period of

9    time under circumstances that would indicate that they

10   were in no way related to race, no way intended to

11   intimidate anyone of the African-American race, and no

12   way directed at Mr. Barbee and that the first one,

13   according to Mr. Grigg's investigation, was made many

14   years ago by a former employee of Grohne and had been

15   there ever since.  The second one was used at the batch

16   plant to conduct maintenance, according to Mr. Grigg's

17   investigation.

18           Mr. Barbee hasn't offered a scintilla of

19   evidence that would contradict that.  He doesn't know

20   where they came from.  He doesn't know how long they were

21   there.  He doesn't know who put them there.  And he

22   just -- it's just the mere existence that somehow these

23   are symbols against the African-American race, despite

24   the overwhelming indication from the photos and, and from

25   the testimony that they were not in any way directed at

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   him and not in any way racially related.

2           Secondly -- so I'd move for judgment as a

3   matter of law on the issue of harassment.

4           Secondly, the issue of the denial of transfer,

5   which they claim is based on race or is based on his

6   complaints about the harassment retaliatory claim, in

7   this instance, you've got legitimate business reasons

8   that have been testified to by Mr. Grigg.  And Mr. Fowler

9   previously requested a transfer and was denied, a man

10  with more seniority than Mr. Barbee.  You've got his

11  testimony that a customer would not allow Mr. Barbee on

12  his job site, and you've got his testimony that he had no

13  obligation to hire Mr. Barbee.  And you've got his

14  testimony that when Mr. Barbee was previously a ready mix

15  driver he quit.

16          And, furthermore, when Mr. Barbee asked for the

17  transfer, he said he wanted to make more money, which

18  made no sense at all, given that he would lose all

19  seniority when he did move over to the ready mix driver

20  list and be at the bottom of the list, which would assure

21  him that he would be making less money.  According to Mr.

22  Grigg, he couldn't understand why someone would go from

23  making $600 a week down to $100 a week.

24          But the point is, regardless of his race, the

25  same would have occurred.  Mr. Fowler's a Caucasian.

1    Okay?  Same thing occurred.

2           Thirdly, I'd move for judgment as a matter of

3    law on the issue of punitive damages.  In that case, the

4    plaintiff is required to show that the defendant acted

5    with reckless disregard to the plaintiff's rights.  I

6    submit that they must show that that was done by a

7    managerial employee in order to impute liability to the

8    corporation.

9           And in this case, the evidence is overwhelming

10   that there was no reckless disregard for Mr. Barbee's

11   rights on the part of the defendant.  They acted most

12   reasonably under the circumstances by immediately

13   bringing them together for an apology, promptly

14   disciplining Mr. Roberts and Mr. Aldridge, posting the

15   antiharassment policy, promptly investigating both of the

16   alleged noose incidents.

17          And the evidence is not to the contrary; or to

18   the extent that it is, the overwhelming weight of the

19   evidence favors the defendant such that this case should

20   not go to the jury, and judgment should be rendered in

21   favor of the defendant as a matter of law.

22          Thank you.

23          THE COURT:  Thank you.

24          Who will respond?  Mr. Quivey.

25          MR. QUIVEY:  I will, Your Honor.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1          THE COURT:  Very well.

2          MR. QUIVEY:  First of all, under Rule 50, the

3    sole issue before the Court is whether there's legally

4    sufficient evidence construed in the most favor to the

5    plaintiff for the jury to be able to award a verdict for

6    plaintiff.  So any sort of dispute of what the evidence

7    is gets resolved in favor of the plaintiff.

8              As it relates -- first of all, I can dispense

9    with the case that was presented, Porter v. Erie Foods,

10   rather quickly.  Even from the head note, it notes:

11   "Employer responded promptly and effectively to

12   incident."  There's ample evidence for the jury here that

13   the defendant's response to these incidents was not

14   prompt, was not effective, that there wasn't a real

15   investigation, that it was predetermined that Mr. Grigg

16   thought that Mr. Barbee was making this up and trying to

17   create a hostile environment, and that they did not

18   respond appropriately to the incident.

19             So the case, Porter v. Erie Food, is just a

20   different situation.  In Porter, there were two separate

21   HR investigations by a disinterested party that

22   investigated this.  The plaintiff didn't cooperate with

23   this, in the investigation in Porter.  It's just not the

24   same situation.

25             There's ample testimony, the most direct from
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Mr. Barbee, that a hostile environment was created.  It

2   was not just the, the incident from Mr. Spitzer -- I

3   mean, excuse me, from Mr. Roberts.  But it was what Mr.

4   Spitzer said afterwards, what Mr. Denton said afterwards,

5   what the employees, some of which were directed by

6   defendant to isolate him, to freeze him out, that that

7   created a hostile environment.  So there's more than

8   sufficient evidence for the jury to find in Plaintiff's

9   favor as it relates to hostile environment.

10          As it relates to retaliation, I submit

11  Exhibit 8 by itself is enough for that to go to the jury

12  where, in Mr. Grigg's own writing, he states one of the

13  reasons why Mr. Barbee was not given the ready mix

14  position was because it was a ploy for settlement, which

15  is directly related to his claims of retaliation and

16  race.

17          Yes.  There's conflicting evidence of what was

18  meant, what reasons why.  There almost always is in a

19  retaliation case.  But construed most favorably to Mr.

20  Barbee, there's ample evidence of retaliation.

21          As it relates to punitive damages, I submit

22  there's ample evidence from the jury that Mr. Grigg, who

23  predetermined his investigation and thought that Mr.

24  Barbee was making this up, that was the "willful."  There

25  wasn't an investigation.  There wasn't any training, and

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1    there was no attempt to address this situation because
2    they simply didn't think there was a situation to
3    address.
4             So under the standards of Rule 50, it's
5    Plaintiff's position that there's more than sufficient
6    evidence for all three issues to go to the jury.
7             Thank you.
8             THE COURT:  Thank you.
9             Rebuttal?
10            MR. POSTLEWAIT:  Briefly respond.
11            THE COURT:  Sure.
12            MR. POSTLEWAIT:  With regard to Exhibit 8, Your
13   Honor, you heard Mr. Grigg testify that the portion of
14   this exhibit that says, "This appears to be a ploy to
15   show the company is working him less or to show a higher
16   wage for settlement purposes," Mr. Grigg said that was
17   not a reason for a transfer.  He said that was his
18   opinion of what was occurring, but it was not a reason to
19   deny it.  He had ample reasons to deny this transfer
20   based on the things I've previously described to the
21   Court.
22            And the last comment that counsel made about a
23   predetermined investigation, that's not supported by the
24   evidence at all.  An incident occurred with Roberts on
25   Thursday.  Friday, Mr. Grigg has talked to both Mr.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Barbee and Mr. Roberts, undisputed; arranged for an

2   apology; was checking in with Mr. Barbee on Monday to see

3   if everything was okay, at which point Mr. Barbee --

4   which is disputed -- said, "I think I can get some

5   money."

6          But, regardless of that, what the defendant has

7   done is reasonable.  When you look at what the elements

8   are that they are required to prove -- set aside for a

9   moment that Mr. Grigg believes that this is motivated by

10  monetary gain.  And the fact is:  Whatever investigation

11  they did make, which the evidence does show disciplinary

12  action, the posting of the antiharassment policy, the

13  prompt investigation of the nooses, prompt removal of the

14  nooses, I'm not sure what more they could have done other

15  than what Plaintiff wants to say, is they should have

16  done the best.  All they're required to do is what's

17  reasonable.

18          Thank you.

19          THE COURT:  Thank you.

20          Granting a motion under Rule 50, of course, is

21  an extreme thing and wouldn't be undertaken lightly.

22          Mr. Quivey is correct.  There's sufficient

23  evidence here that needs to go to the jury.  It's not a

24  bench trial, and so we don't make credibility

25  determinations.  We don't weigh the evidence and decide

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   what we might do as judges if we were called upon to rule

2   on the ultimate question.

3          "Is there enough evidence for the jury to

4   consider?" is our real question, and the answer is yes;

5   and the motion is denied.

6                    * * * * * * * * * * *

7          (In open court; jury present.)

8          SCOTT SPITZER, sworn, 3:25 p.m.,

9          DIRECT EXAMINATION BY MR. POSTLEWAIT:

10     Q    Good afternoon.

11     A    Good afternoon.

12     Q    Would you state your name, please?

13     A    Scott Spitzer.

14     Q    And where do you live?

15     A    Mt. Zion, Illinois.

16     Q    And are you married?

17     A    Yes, I am.

18     Q    Have children?

19     A    Yes.

20     Q    And are you employed?

21     A    Yes, I am.

22     Q    And where are you employed?

23     A    Christy-Foltz.

24     Q    And for how long?

25     A    Since '93, so 17 years.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    And what positions have you held at
2   Christy-Foltz?
3        A    I started off as a material hauler, driving a
4   semi, hauling rock and sand; and then I went to ready
5   mix, hauled concrete; and now I'm a batch man, and I make
6   the concrete.
7        Q    All right.  How long were you a material hauler
8   hauling sand?
9        A    One year.
10        Q    Okay.  And then how long were you a ready mix
11   driver?
12        A    Roughly, what, eight years -- six or
13   eight years, something like that.  Well, no.  I, I
14   started batching concrete down at the south plant at
15   Christy-Foltz in, it was probably early '96, so -- and
16   then after -- I batched down there for, well, till we
17   bought Grohne.  And then I drove for the log-in until
18   probably '01 or '02, something like that.
19        Q    All right.  And then for a year or two after
20   they bought Grohne, then you became the batch man at the
21   Grohne premises?
22        A    Correct.
23        Q    And as a batch man, what do you do?
24        A    I make the concrete.  I run the plant, make the
25   concrete, load the trucks; and then I -- we got a loader
```

1   we got to load the bins with.  I run the loader, load the

2   bins.

3       Q    What do you mean to "load the bins"?

4       A    You got to put rock and sand up in the -- the

5   plan, the rock and sand goes in the top; and then it

6   mixes it and puts it in the truck, and then the truck

7   mixes the concrete.

8       Q    And within the -- at the Grohne premises, is it

9   correct that there's a, a main office building, Mr.

10  Spitzer?

11      A    Yes, there is.

12      Q    And is that located closest to the, to Water

13  Street?

14      A    Yes, it is.

15      Q    All right.  And then as you go further east,

16  Water Street runs north and south, right?

17      A    Correct.

18      Q    Okay.  You turn east into the premises?

19      A    Yes.

20      Q    And you would pass first the main office?

21      A    Correct.

22      Q    And would you then, if you continued to go

23  east, eventually be back at the area of the batch plant?

24      A    Right.  It's about 5, 600 feet east of the main

25  office.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     All right.  And can you give the jury any sense

2   of the size of the batch plant?

3      A     The, the batch plant has a building that's

4   probably 40 by 60 and about 25 feet tall; and then right

5   next to it, on the west side of it, there's a new plant

6   we put up two years ago, and it probably takes an area of

7   land probably about the same size as the building, 40 by

8   60.

9      Q     And the, the -- when you say a new plant that

10  you put up two years ago, what does that consist of?

11     A     It's a whole new batch plant.  It's a -- it was

12  a newer style, quicker.

13     Q     And is that -- what does that consist of?

14     A     You got your aggregate bins; and then there's a

15  cement silo about 60 feet tall, and that's where the

16  trucks back in to load the concrete.

17     Q     And these are steel bins?

18     A     Yes, they are.

19     Q     And within the batch plant, we've -- is there

20  what we call a batch office?

21     A     Yes.  The batch office is on the west side of

22  the, of the building --

23     Q     Okay.

24     A     -- now.

25     Q     Is it located currently at the same location

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    where it was in 2007?

2        A    No.

3        Q    All right.  And where was it located in 2007?

4        A    In 2007, it was -- there was a little 8 by 12

5    batch office inside the building.  The old plant was --

6    it was enclosed in the building, and the batch office was

7    inside the building also.

8        Q    All right.  And what was the size of the batch

9    office in 2007?

10       A    It's 8 by 12 -- 8 foot by 12 foot.

11       Q    And what, what types of things were in the

12   batch office?

13       A    The batch computer and -- oh, there's a little

14   table that had the key-plexing parts on and what have

15   you.

16       Q    And when was the old batch office moved to the

17   new batch office?

18       A    Oh, when we finished getting, putting the new

19   plant up, and it's been up for two years.  So that would

20   be like '08.  We moved -- we didn't move -- we didn't

21   move the old office.  We just basically abandoned the old

22   office.

23       Q    Can you just describe what else is in the, was

24   in the batch office back in 2007?

25       A    Well, when you walked in the door, there was a,

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   to the left was a desk with -- the batch computer sat on

2   it.  Just past it was a printer that printed out the

3   tickets.  And then behind it there was a, like I said, a

4   bench that had a -- there was a refrigerator and a coffee

5   maker on it.  Then, like I said, I kept some parts on

6   there, some extra valves and stuff, kept them inside

7   there so they wouldn't get in the dust.  There was the

8   chair I sat in, and there was two other chairs for the

9   drivers to, when they come in to get their tickets, they

10  can sit in when I explain to them where they were going.

11       Q    All right.  Do you know Lawrence Barbee?

12       A    Yes, I do.

13       Q    How long have you known him?

14       A    Since he started working there.  I don't

15  remember the exact date he started working, but --

16       Q    All right.  And he's a material hauler?

17       A    Yes.

18       Q    Given his position as a material hauler and

19  your position as the batch man, does your job require you

20  to interact with him frequently?

21       A    No, not frequently.

22       Q    Now, Lawrence has on occasion worked as a ready

23  mix driver as well?

24       A    Yes, he has.

25       Q    Okay.  And when he works as a ready mix driver,

1  does that involve any frequent interaction with you as

2  the batch man?

3      A    Yeah.  When he comes in to load, he comes into

4  the batch office to get his ticket, and I give him

5  directions to the job he's going to.

6      Q    And how long does that process take when a

7  driver comes into the batch office to get his ticket and

8  you give him his directions?

9      A    If the directions are easy, usually just a

10  minute.  I mean, if it's a, complicated directions, it

11  could take a couple minutes.

12     Q    And do they typically wait in the truck, or do

13  they come in while they're -- and I assume this is all

14  while their truck is being loaded; is that right?

15     A    Yeah.  They back the truck in, and I start

16  loading it.  And they got to -- they got to fill the

17  water tank with water; and after they do that, they come

18  in and get their directions.  And usually by the time

19  that's done, the truck's done loading.  So they go back

20  out.

21     Q    All right.  When they're out at the, working on

22  their truck or sitting in their truck after they backed

23  in to be loaded, can they see into the batch office or

24  not?

25     A    Yeah.  You talking about the old plant or the

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   new plant?

2        Q    The old plant.

3        A    The old plant.  Yeah, if they look over their

4   left shoulder, they -- I mean, they'd have to bend back

5   over and look over their left shoulder in order to see

6   actually in the office.

7        Q    All right.  But if they want to have any

8   significant communication with you, they come into the

9   batch, the old batch office, the 2007 batch office?

10       A    Correct.

11       Q    And now for purposes of my questioning here,

12  Mr. Spitzer, I want to talk to you about the 2007 batch

13  office, the way it used to be before you moved to the new

14  batch office.

15       A    Okay.  That's what I thought, but I wanted to

16  clarify.

17       Q    Have you understood all my questions --

18       A    Yes.

19       Q    -- have pertained to the old batch office?

20       A    Yes, I do.

21       Q    All right.  To the extent you do on occasion

22  interact with Mr. Barbee, how would you describe your

23  relationship with him?

24       A    In the beginning, it was good.  Then it got a

25  little rocky there through the middle, and it's been

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   getting pretty good now.

2       Q    Okay.  Now, when you say "got a little rocky in

3   the middle," what do you mean by that?

4       A    Well, when the deal with the, the noose started

5   up, he, there was -- I said a few things to him, and he

6   took them the wrong way; and so I just basically quit

7   talking to him because I was afraid I'd say something

8   that he mistook the wrong way.

9       Q    All right.  What did -- strike that.

10           Are you aware of an incident on or about

11  August 9 of 2007 involving Gary Roberts and Lawrence

12  Barbee when Mr. Roberts made a derogatory remark to Mr.

13  Barbee?

14      A    Yes.

15      Q    And were you present, or do you have any

16  personal knowledge of the remark being made to Mr.

17  Barbee?

18      A    I wasn't present when the remark was made, no;

19  but I know about it.  I mean, I heard about it.

20      Q    And what was your first knowledge of, of that

21  remark?

22      A    After the fact, after it was said, Mr. Roberts

23  come down -- I think he had to load -- for a load of

24  concrete, and he said he thinks he just screwed up.  He

25  said he just said something he thinks that Lawrence

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  didn't like.

2       Q    And did you discuss with him what was said?

3       A    He told me what he said, and I just said that

4  probably wasn't the right thing to say.

5       Q    And what was the next thing that happened that

6  relates to this remark being made?

7       A    Within a day or two, Lawrence came down to the

8  batch plant one time when Gary was loading, and Gary

9  apologized to him for saying it.

10      Q    Do you know whether or not that was the day

11  after the remark was made?

12      A    I don't remember if it was the exact day after,

13  but it was within the day or two after.

14      Q    And did you actually hear the conversation

15  between Lawrence and, and Mr. Roberts?

16      A    Yes, I did.

17      Q    And what was said?

18      A    Gary apologized to Lawrence, said he was sorry

19  for saying it.  He didn't think it would offend him; but

20  if it did, he was sorry.  And then they stood up and

21  shook hands.

22      Q    And did that occur in the batch office --

23      A    Yes, --

24      Q    -- in your presence?

25      A    -- in the batch office.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1       Q    And are you aware that Mr. Roberts was
2  disciplined?
3       A    Yes, I was.
4       Q    And how did you find out about that?
5       A    I don't remember exactly how I found out about
6  it, but when he wasn't at work and -- I asked where he
7  was at, and they said he got suspended for seven days.
8       Q    And did anyone tell you why he was suspended?
9       A    I assumed why, because of what he said.
10      Q    When Mr. Barbee made the apology to -- I'm
11 sorry.
12           When Mr. Roberts made the apology to Mr.
13 Barbee, was there any further conversation between the
14 three of you after that that day?
15      A    Yes, there was.
16      Q    And what was said?
17      A    I asked Lawrence why it was so -- why that two
18 black people could call each other that, but they get so
19 offended when somebody else did.
20      Q    And did you consider there, anything to be
21 wrong with that inquiry?
22      A    No.  I was just asking as one friend to
23 another.
24      Q    And what did Mr. Barbee say?
25      A    He said it just wasn't right, and he didn't
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  like it.  And I said, "Okay.  We -- then it will never

2  happen again."

3      Q    And what was the next thing that happened in

4  this chain of events, according to your recollection, Mr.

5  Spitzer?

6      A    I don't remember.  There's a little more

7  conversation was said.  And then Lawrence -- I don't

8  remember if Lawrence was even working that day.  I think

9  he got up and walked out; and Gary was loaded by then,

10  and he got up and walked out.

11      Q    Did you at any time learn that Mr. Barbee had

12  reported what you said to Mr. Grigg?

13      A    Yeah.  Ron called me.  We got -- I got a phone

14  in the batch office that I can talk to, back and forth to

15  Ron; and he called me and said that Lawrence didn't think

16  this apology was sincere because we made fun of him over

17  it.

18      Q    And did you make any fun of him over it?

19      A    No.  I wasn't making fun of him.  I was just,

20  like I said, one friend to another, just asking him.

21      Q    What happened next?

22      A    Then the -- I don't remember if it was the next

23  day or one day when Lawrence was in dumping a load of

24  sand, I went out and tried to talk to him, you know, to

25  tell him I wasn't trying to make fun of him and that the

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   apology was sincere and everything.  And he took that the

2   wrong way and said Ron -- told Ron that I jumped, chewed

3   him out for going to Ron and saying that.

4           Q    And did you chew him out?

5           A    No.  Like I said, I just went to him and told

6   him the apology was sincere.  I was just asking a

7   question.  And so that -- at that point, that's when I

8   quit talking to him.

9           Q    Okay.  Did you quit talking to him for any

10  reason related to his race?

11          A    No.

12          Q    Did you quit talking to him because he in any

13  way complained about Mr. Roberts making the nigger

14  statement to him?

15          A    No.

16          Q    Did you in any way limit your communication

17  with him in retaliation for him making complaints about

18  Mr. Roberts' --

19          A    No.

20          Q    -- statement?

21          A    No.

22          Q    Was your concern in talking with him that he

23  was twisting what you said in his reports to Mr. Grigg?

24          A    Yes.

25               MS. LEAHY:  Your Honor, I'm going to object to

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    that.  I believe it's leading.

2              THE COURT:  It is.  Sustained.

3    BY MR. POSTLEWAIT:

4         Q    Why did you decide to limit your conversation

5    with, with Mr. Barbee?

6         A    As I said, I was afraid if I said something to

7    him, he would twist it around into something it wasn't;

8    and I didn't want to take a chance of offending him any

9    more.

10        Q    With respect to the disciplinary action that

11   Mr. Roberts received, did you understand from that action

12   that such conduct was not tolerated by Christy-Foltz?

13        A    Correct, yeah.

14        Q    Do you know whether anyone else was suspended?

15        A    Yes.

16        Q    And who was that?

17        A    Terry Aldridge.

18        Q    And do you know, or were you a witness to any

19   events that led to his suspension?

20        A    Yes, I was.

21        Q    Tell me about that.

22        A    He -- Gary was in the batch office waiting to

23   load -- it was before he was suspended.  It might have

24   been the next day -- I don't remember -- the next day or

25   within a couple days there; and Terry walked in and

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   looked at Bone and said, "Hey, you stupid nigger."

2          And I says, "You can't say that."

3          He said, "Why?"

4          I said, "'Cause Gary's gonna get in trouble for

5   saying that.  You can't say that."

6          And then --

7     Q    Go ahead.

8     A    And then I reported it to Ron that it was said.

9     Q    And what did Ron say?

10    A    He said, "That's not right.  You can't say

11   that."

12    Q    Did the fact then that Mr. Roberts and also Mr.

13   Aldridge got suspended send a strong message to you that

14   as an employee of Christy-Foltz you're not to engage in

15   conduct in derogation of the race of anyone else?

16    A    Yeah.  It sent a message to me.  I knew it

17   already.  But, yeah.

18    Q    Other than this incident with Mr. Roberts

19   making a derogatory comment to Mr. Barbee, in your

20   experience at Christy-Foltz -- at either workplace,

21   whether the south plant or the Grohne plant -- are you

22   aware of anyone else or any other instances of racially

23   derogatory remarks being made from one coworker to

24   another?

25    A    Not that I can recollect.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    Are you aware of any other racially derogatory

2  remarks being made to Mr. Barbee?

3      A    Not that I know of, other than statements he

4  made himself.

5      Q    Okay.  And when you say statements he made

6  himself, what are you referring to?

7      A    Oh, every once in a while when he's hauling

8  ready mix, he would like -- there's outlying towns around

9  Decatur, Warrensburg, Argenta, small towns; and on

10  several occasions, he'd come in -- one time I was going

11  there, he'd say, "Well, do they let niggers out there?"

12          And I'm like, "You're not a nigger.  You're a

13  black man.  It's fine for you to go out there."

14          And then he'd laugh and chuckle, you know, and

15  that was the end of the conversation.

16      Q    All right.  Any other instances that you're

17  aware of where Mr. Barbee himself may have made a

18  derogatory remark toward the African-American race?

19      A    No.

20      Q    Do you consider the incident involving Mr.

21  Roberts' remark to Mr. Barbee to be an isolated instance?

22      A    Probably.

23      Q    Are you aware of anyone who has referenced --

24  or who has refused to communicate with Mr. Barbee

25  following the incident involving Mr. Roberts?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    I don't know specific people that don't.  I
2  know his conver-- you know, people limited their
3  conversation with him because he always twisted mine,
4  what I said around.
5      Q    Is there any -- strike that.
6           Do you still, still speak to him?
7      A    Yes, I do.  I do now.
8      Q    But even when you were in the rocky time
9  period, did you speak to him as necessary to perform your
10 job?
11     A    Oh, yeah.  I still told him -- you know, he'd
12 come and get directions or something; I'll tell him where
13 he was going, get his ticket, and stuff like that.  If it
14 was work-related, yes, I spoke to him.
15     Q    Was there any difference in your relationship
16 with Mr. Barbee before and after the incident with Gary
17 Roberts as a consequence of that incident with Gary
18 Roberts?
19     A    No.
20     Q    The difference in your relationship was as a
21 consequence of what you said to him and then the manner
22 in which he reported it; would that be a correct
23 understanding?
24     A    Yeah.  My reasoning for not talking to him was
25 because the way he turned around what I said and reported

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   it wrong.

2          MR. POSTLEWAIT:  Your Honor, I need to use an

3   exhibit.  I believe counsel's got an objection to

4   Defendant's Exhibit 1.

5          THE COURT:  Defendant's 1.

6          MS. LEAHY:  If I can have just one moment, Your

7   Honor.

8          THE COURT:  Sure.

9              (Brief pause in proceedings.)

10          MS. LEAHY:  Your Honor, I believe we had an

11   objection on the basis of relevancy.  I believe this was

12   not taken in any relevant time period.

13          THE COURT:  Well, I haven't heard any

14   evidence --

15          MS. LEAHY:  Okay.

16          THE COURT:  -- about it, so it's a little hard

17   to rule.

18          But why don't you proceed, and we'll resolve

19   it.  And just to cover the possibility, we won't publish

20   it with equipment.  You can show the exhibit to the

21   witness; and then we won't publish it via the electronic

22   display until, until we've resolved the dispute.

23          MR. POSTLEWAIT:  Okay.  I'm going to talk about

24   one other thing before I speak with the witness on that.

25          May I approach the witness, Your Honor?

167

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1              THE COURT:  You may.

 2   BY MR. POSTLEWAIT:

 3        Q    Mr. Spitzer, I've handed you what's been marked

 4   as Defendant's Exhibit 2.

 5        A    Uh-huh.

 6        Q    Do you recognize that document?

 7        A    Yes, I do.

 8        Q    And have you seen it before?

 9        A    Yes, I have.

10        Q    And where have you seen it?

11        A    It hangs on the bulletin board in the break

12   room.

13        Q    And is that what's known as a nondiscrimination

14   and antiharassment policy?

15        A    Yes, it is.

16        Q    And do you know whether or not that applied to

17   the employees at the Grohne Concrete premises, the

18   Christy-Foltz employees that are working there?

19        A    I would assume it does.  Yes.

20        Q    Do you know approximately when that document

21   was posted at the premises?

22        A    Not exactly, no.

23        Q    Do you have a recollection as to whether it was

24   within the chain of events that, following the Mr.

25   Roberts incident that you previously described?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    I believe it was.  Yes.

 2        Q    Are there other notices on the bulletin board

 3   at the same location where that is posted?

 4        A    Yes, there is.

 5        Q    What types of other notices are posted there?

 6        A    There's a, a federal guidelines, big poster

 7   that's got, like, similar discrimination things,

 8   harassment messages on it.  It's got a minimum wage deal,

 9   other job-related things on it.

10             Then there's some union notices as far as union

11   meetings, dues going up.

12             There's a thing for Caterpillar.  You got to

13   wear your hard hat and safety glasses when you're out

14   there.

15             Miscellaneous postings for the employees.

16        Q    If you need to know about a policy or a written

17   policy that, that applies to the premises or the

18   employees at the premises, do you know from your

19   experience as an employee there to go to that board?

20        A    I look at that board often to make sure there's

21   nothing new up there.  Yes.

22        Q    Is there also another bulletin board that's,

23   that's more up towards Mr. Grigg's office from the break

24   room in the hallway?

25        A    Yeah.  There's a hallway between the break room
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  and Ron's office; and, yeah, there's another bulletin

2  board on there.

3      Q    Is that, is that an alternate location where

4  notices may be posted?

5      A    Yes.

6      Q    Are you aware of a Department of Revenue notice

7  that's posted on the hallway bulletin board?  Have you

8  ever looked at that?

9      A    I, I don't remember exactly what's up there,

10  but there probably is.  There could be.  I know there's

11  an accident -- for work-related accidents; there's a

12  notice about that up there.  I'm not exactly sure what,

13  everything's up there.

14      Q    On that policy, it refers to Decatur

15  Construction Services parenthetically under the title of

16  the document?

17      A    Yes, it does.

18      Q    And given that -- or I'm sorry.  It is at the

19  top of the document.

20          Given that, did you understand that to apply to

21  you as an employee at the, at the Grohne Concrete

22  premises?

23      A    Yes, I do.

24      Q    Are you aware, Mr. Spitzer, of an incident that

25  occurred at or about October 17, 2007, when Mr. Barbee

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   claimed to find a noose in the batch office at the batch

2   plant?

3        A    Yes.

4        Q    How are you aware of that incident?

5        A    I was in the batch office when the police came

6   down.

7             MR. POSTLEWAIT:  May I approach the witness?

8             THE COURT:  You may.

9   BY MR. POSTLEWAIT:

10        Q    I'm going to show you what's been marked as

11   Plaintiff's Exhibit 5 and the larger version of it, 5A.

12   Do you recognize that photo?

13        A    Yes, I do.

14        Q    And you recognize what's shown in the photo?

15        A    Yes, I do.

16        Q    And what is the area?

17        A    Pardon?

18        Q    What is the area?

19        A    The area?

20        Q    Yes.

21        A    That's -- when you walk in the batch office

22   door, that's off to your right over your shoulder, right

23   behind the door.

24        Q    And what is shown in the photo?

25        A    Coat racks, some shelves, got a hat, raincoat,

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   some respirators, fire extinguisher.

2       Q    Do you know who took that photo?

3       A    I believe Lawrence did, Barbee.

4       Q    And were you present when he took the photo?

5       A    No.

6       Q    Do you recognize in the photograph what he

7   claimed to be a noose?

8       A    Yes, I do.

9       Q    And is it the -- how would you describe what,

10  what he claims to be a noose?

11      A    I mean, it looks like a noose.  It's a short

12  piece of rope with a knot in it, in each end.

13      Q    And is it a rope, or would you describe it as

14  something smaller than that?

15      A    Yeah.  It's smaller.  I mean, it's like a, a

16  small cord like you'd use on a sash or a clothes line or

17  something like that.

18           MR. POSTLEWAIT:  May I approach the witness,

19  Your Honor?

20           THE COURT:  Yes.

21  BY MR. POSTLEWAIT:

22      Q    I show you what's been marked as Plaintiff's

23  Exhibit 3.  Do you recognize that?

24      A    Yes, I do.

25      Q    Is that the object that's shown in the photo?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

 1      A    Yes, it is.

 2      Q    Do you, Mr. Spitzer, know the history of that

 3  object?

 4      A    Close to the whole history, yeah.

 5      Q    All right.  What do you know about it?

 6      A    It's -- a man named Calvin Campbell made it

 7  like 30, 40 years ago.  It's been hanging in the batch

 8  office ever since.  When we bought Grohne in

 9  November '96, it was hanging there; and it's just always

10  hung on a loop on the hook.

11      Q    All right.  Now, that predated your existence

12  at Christy--

13      A    Right.

14      Q    --Foltz?

15      A    Yes.

16      Q    So did somebody tell you that?

17      A    Yeah.  The batch man, the man that was batch

18  man before me, Bob Stewart, he told me that, who made it

19  and --

20      Q    All right.  Well, from the time you worked in

21  the batch office there, which was, as I understand it,

22  soon after 1996, or maybe about 1998?

23      A    Yeah, probably.  Around -- I started working as

24  a batch man probably in '01, '02, somewhere along in

25  there.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    All right.  Well, let's just talk about the

2  time frame you have been in the batch office --

3      A    Okay.

4      Q    -- from 2001 to, to the time that this was,

5  was, issue was raised about this, this Exhibit 3 in

6  October of 2007.

7      A    Uh-huh.

8      Q    During that period of time -- say, the six

9  years prior -- did you observe that within the batch

10 office?

11     A    Yeah.  It's always hung there.

12     Q    Okay.  Where did it -- did it always hang in

13 that same location that's shown in --

14     A    No, it didn't.

15     Q    -- that photograph exhibit?

16     A    No, it didn't.

17     Q    Okay.  Where did it hang?

18     A    Right above -- as I would sit at the computer,

19 it was right -- it used to hang right above my shoulder,

20 which was to the left of the door.

21     Q    So the door is on the east side of the room?

22     A    Yes, it is.

23     Q    Okay.  And if you would walk in the door, it

24 would be located on the wall immediately to your left,

25 correct?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A      Correct.

2      Q      Okay.  And it hung on a nail there?

3      A      Yeah.  It was a little brass hook it would hang

4  on, along with a feather duster that used to hang up

5  there.

6      Q      And in the photo, it's actually -- it would be

7  to your right as you walk in the door, right?

8      A      Correct.

9      Q      And do you know how it got from the wall to

10 your left to the rack on the right?

11     A      Not too long after I started, become batch man

12 and starting batching, I hung a paper towel holder up

13 there.  So I took that hook down, took it down, put it

14 over on the coat rack.  And the feather duster, I think

15 it laid, just laid on the desk.

16     Q      Okay.  And did it remain in that location?

17     A      Yeah.  Yes.

18     Q      Okay.  Did it remain in that location at all

19 times up to the time that Mr. Barbee on October 17 of

20 2007 raised an issue about it?

21     A      It was always on the hook, but usually the

22 respirators and stuff were hanging in front of it.  It

23 never was out in the open like that.

24     Q      Do you know how it happened to get out in the

25 open like that?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    No, I don't.  Because it -- you know, like I

2  said, everything hung in front of it.  Because it had

3  been hanging there for so long, it was the first thing on

4  the hook; and everything else was hanging in front of it.

5      Q    What's all the other stuff that's, that's shown

6  in the, in the photo?

7      A    Raincoat.  The, the plastic bag that you can

8  see there -- that's a True Value bag -- it's got a

9  respirator in it, to keep it from getting dusty.  And

10  then there's another respirator.

11           There's a belt; it's an extra belt for the

12  baghouse on top of the silo.  And then a hat, fire

13  extinguisher.  There's an empty coffee can with some

14  silicone tubes in it, and you can see the microwave to

15  the left of the picture.

16      Q    And these are things that are, have accumulated

17  over the years --

18      A    Yeah.

19      Q    -- in position --

20      A    Yes.

21      Q    -- within the batch office, correct?

22      A    Yes.

23      Q    Do you remember the events of October 17 of

24  2007?

25      A    Somewhat.  I mean, I don't remember the -- I

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  couldn't tell you the exact date, other than you just

2  said it.  But I remember the, when the police officer

3  showed up and said, said that he was there because there

4  was a noose hanging there.

5      Q    All right.  And prior to that time, had Mr.

6  Barbee ever said anything to you about the noose?

7      A    I can't say for sure that he did.  But just

8  about everybody that came in eventually sometime or

9  another noticed it hanging up there and asked about it.

10     Q    Did anybody ask about it in terms of it having

11 some kind of racial meaning or symbolism or any kind of

12 adversity towards the African-American race?

13     A    Nobody that I know of considered it racial.

14     Q    All right.

15     A    It had nothing to do with that.

16     Q    Why would they ask about it?

17     A    Just because -- you know, "Who tied it?"  And,

18 you know, whatever, where it come from.

19     Q    Do you know anyone who would have positioned

20 the sash cord so as to harass Mr. Barbee or any other

21 person of the African-American race?

22     A    No, I don't.

23     Q    Do you know anybody who would have positioned

24 the alleged noose in the batch office there so as to

25 intimidate or threaten Mr. Barbee or any other

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

 1   African-American?

 2        A    No, I don't.

 3        Q    Did you at any time have any conversation with

 4   Mr. Barbee about it?

 5        A    Like I said, I, I don't remember for sure if he

 6   ever noticed it and said anything to him about it -- to

 7   me about it or not.  I, I mean, I could say I think I do;

 8   but, I mean, as far as just -- you know:  What's that?

 9   Where did it come from?  Told him what it was, and then

10   that was the end; it was dropped.

11        Q    Do you know whether that was before or after

12   the police officer came?

13        A    That was before.

14        Q    Do you know how long before?

15        A    No.  Quite some time.  It wasn't immediately

16   before or nothing.  No.

17        Q    And do you remember when the police officer did

18   come to the premises?

19        A    Yes, I do.

20        Q    And prior to that time, did Mr. Barbee voice

21   any concerns or objections to the existence of the noose?

22        A    No.  Nobody's ever objected to it, and there's

23   been several black people come in there delivering

24   cement.  There used to be a couple black guys done that,

25   and nobody's ever voiced any kind of an objection to it.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q     All right.  And do you remember the names of
2   these individuals that you --
3        A     The first name.  I don't know their last name.
4   One's Levi, and the other one's Nolan.
5        Q     Do you know approximately how long before the
6   police officer came that, that they would have seen it?
7        A     They hauled cement to us off and on for several
8   years.  So, I mean, there's -- they were in there
9   probably two or three times a month for several years.
10  And they worked for Leopold Arnett [phonetic], and they
11  hauled our cement for probably ten years.
12       Q     Did they ever even inquire to you as to what it
13  was?
14       A     No.
15       Q     What happened when the police officer arrived?
16       A     He told me that he was here on a complaint
17  against a noose hanging in the office, and I showed it to
18  him and, and explained to him that it had been there for
19  a long time.
20       Q     And then what happened?
21       A     He left.
22       Q     Okay.  And did he instruct you to take it down?
23       A     I don't remember if he told me to take it down
24  or Ron told me to take it down.  But I took it down.  I
25  mean, if somebody's offended by it, I took it down.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    And what did you do with it?

2    A    I give it to Ron.  I think I put it in the

3  drawer for a little while and then eventually took it up

4  to Ron.

5    Q    Did -- following that, following the taking it

6  down, did Mr. Grigg inquire to you as to what you knew

7  about the noose?

8    A    I'm sure he probably did, asked me where it

9  come from.  I told him it'd been there for a long time,

10  and Bob had told me that Calvin Campbell had made it.

11    Q    All right.  Did you think anything more of it

12  after that?

13    A    No.  I mean, to me it's not -- I don't think of

14  it of as racial anyway.  I mean, so it don't -- it just

15  wasn't relevant to me.

16    Q    Are you aware of an incident that occurred at

17  some point later where Mr. Barbee claimed to observe a

18  second noose at the batch plant?

19    A    Yes.

20    Q    And do you know approximately when that was?

21    A    I don't remember when it was.  No.

22    Q    Do you remember where it was allegedly located?

23    A    It was hanging on a hook outside the batch

24  office but inside the batch building.

25         MR. POSTLEWAIT:  Approach the witness, Your

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  Honor?

2          THE COURT:  Yes.

3  BY MR. POSTLEWAIT:

4      Q    Mr. Spitzer, I've shown you what's been marked

5  as Exhibit 6 and 6A.  You recognize the areas shown in

6  those two photographs?

7      A    Yes, I do.

8      Q    And what is the area?

9      A    It's -- when you walk in the door, you can see

10 it in the pictures.  You walk in the door on the east

11 side of the building.

12     Q    And is the second alleged noose shown in that

13 photograph?

14     A    I assume the picture's supposed to be of it,

15 but I can't see it in the picture.

16     Q    All right.

17     A    There's so much other stuff hanging there, I

18 can't really tell which is it or not.

19          MR. POSTLEWAIT:  May I approach the witness?

20          THE COURT:  Yes.

21 BY MR. POSTLEWAIT:

22     Q    I hand you what's been marked as Defendant's

23 Exhibit 13.  Do you recognize the area shown in that

24 photo?

25     A    Yes, I do.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    And does that show a noose?

2      A    Yes, it does.

3      Q    And is that the position that the noose was in

4 when Mr. Barbee complained about it?

5      A    Now that I've looked at this picture I can see

6 where it's at in the first one; so, yes, it was.

7      Q    What other types of things are hanging there on

8 that wall with Exhibit 13, or in the Exhibit 13?

9      A    There's other tools.  There's two cable

10 come-alongs, extension cord.  There's a couple cables

11 that used, are used to hang, hold the chutes on trucks.

12      Q    Is there anything different hanging in

13 Exhibit 6 that I showed you?

14      A    As far as the same hooks, no.  It looks like

15 about the same stuff.  The extension cord's not there in

16 Exhibit 6.

17      Q    Okay.  Are those other things that are hanging

18 on the wall, do they have any utility there at the plant?

19      A    They're all tools that I use.  Yes.

20      Q    And had you ever used the noose that's shown in

21 Exhibit -- Plaintiff's Exhibit 6 or Defendant's

22 Exhibit 13?

23      A    I don't call it a noose.  It was a slip knot we

24 used when we was working on the, the baghouse on top of

25 the cement silo.

1       Q     And what did you use it for?

2       A     I was working up on top of the cement silo, and

3   it's about 60 feet tall; and rather than climb down the

4   ladder and get tools, I would have somebody -- I had a

5   five gallon bucket tied on the rope.  And I'd lower the

6   bucket down, and somebody would hand me tools.  And one

7   time I needed a shovel; and my brother was down there,

8   and he tied the shovel on the end of the rope, and then I

9   brought it up to me.

10      Q     All right.  And so it's, it's -- you have

11  knowledge that, that your brother tied the slip knot

12  that's in --

13      A     Yes, he did.

14      Q     -- Exhibit 6?

15      A     Yes, he did.

16            MR. POSTLEWAIT:  Approach the witness, Your

17  Honor?

18            THE COURT:  Yes.

19  BY MR. POSTLEWAIT:

20      Q     Mr. Spitzer, I'm handing you Plaintiff's

21  Exhibit 4.  Do you recognize that?

22      A     Yes, I do.  That's what's hanging in the

23  Exhibit 6.

24      Q     And now that's -- you refer to the knot that's

25  shown in that as a slip knot?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    Correct.

2      Q    And what is the loop at the, what I would say

3  is above the slip knot, for?  The small loop?

4      A    The only thing I can think of is that's where

5  the five-gallon bucket was tied to.

6      Q    Okay.  And you would slide the knot to tightly

7  grip whatever object you were attempting to hoist?

8      A    Correct.  He -- we lifted a, a sledgehammer up

9  and a shovel, and you can put them through the loop and

10  then slide them down to tighten them up so they wouldn't

11  fall off.

12      Q    Okay.  When was this that you used that

13  exhibit, that, that rope with the slip knot in it?

14      A    I -- it was a long time before the previous of

15  that.  We was working on the baghouse.

16      Q    What's your best judgment?

17      A    Oh, probably a couple years.  It had been

18  hanging there for a long time.

19      Q    All right.  And is it in the same condition

20  today as it was then?

21      A    It's deteriorated from age.  When we used it,

22  it was a brand new rope.

23      Q    All right.  And was there at any time a longer

24  rope also attached to it?

25      A    Yes, there was.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    And what -- is that -- what was that for, the
 2   longer rope?
 3        A    It was 60 foot to the top of the silo, so there
 4   was a lot of rope hanging on it.
 5        Q    And at some point, was the longer rope removed
 6   from that?
 7        A    Well, part of the longer rope is still hanging
 8   on the cement silo, but the -- what was left of it, I cut
 9   off of it and used -- we have a, there's a pit on each
10   side of the batch plant where the water, drainage water
11   goes.  And we got a sump pump that hangs in there; it
12   hangs on a rope.  And the rope on the sump pump had
13   rotted out, so I cut a piece off of there to tie onto it.
14        Q    And when did you do that?
15        A    Probably a couple years before that.
16        Q    All right.  Referring to a couple years before
17   Mr. Barbee complained about it?
18        A    Right, yeah.
19        Q    Had that rope with the slip knot been hanging
20   in that same location, to your knowledge, prior to Mr.
21   Barbee complaining about it?
22        A    As far as I knew, it had been hanging there
23   ever since we took it off -- got done working on the silo
24   that day.
25        Q    Did you at some point observe Mr. Barbee
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  photographing the rope with the slip knot?

2      A    Yeah.  I was present when he took that picture.

3      Q    And did you find that to be unusual?

4      A    Yes, I did.

5      Q    And what did you do?

6      A    I asked him what he was taking a picture of,

7  and he said, "Don't worry about it."

8          And I said, "This is a private business.  You

9  can't just take pictures."

10          And he said, "Yes, I can."

11      Q    Do you remember approximately when this was?

12      A    No, not for sure.

13      Q    Would you have any reason to disagree with late

14  October/early November of 2007?

15      A    No.  I wouldn't have no reason to disagree with

16  that.

17      Q    The -- did you tell Mr. Grigg about it then?

18      A    Yes, I did.  I told him Lawrence was taking

19  pictures of something.

20      Q    And what did Mr. Grigg say?

21      A    He asked if I knew what he was taking pictures

22  of, and it took me a few minutes before I realized it was

23  probably that rope hanging there.

24      Q    All right.  And then what happened?

25      A    I took it down and took it up to him so he

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   could see what it was, took it up to Ron.

2        Q    And did it remain down?

3        A    Yeah.

4        Q    Did Mr. Barbee, did he ever mention that rope

5   with the slip knot in it to you prior to the time that

6   you observed him taking pictures of it?

7        A    No, he didn't.

8        Q    Do you know anybody that he discussed it with?

9        A    Nobody that I know of ever said anything about

10  it.

11       Q    Did you or anyone else to your knowledge assign

12  any racially discriminatory meaning or racial symbolism

13  to that rope with the slip knot?

14       A    No.

15       Q    Did you or anyone else to your knowledge

16  position the rope so as to harass Mr. Barbee or any other

17  person of the African-American race?

18       A    No.

19            MS. LEAHY:  Objection, Your Honor.  I don't

20  believe he's laid the foundation as to how he could know

21  about anybody else.

22            THE COURT:  Sustained.

23            MR. POSTLEWAIT:  I said to his knowledge.

24            THE COURT:  Well, I think you need to limit the

25  question to this gentleman.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1    BY MR. POSTLEWAIT:
2        Q    Mr. Spitzer, did you position the rope so as to
3    intimidate or threaten Mr. Barbee or anyone else of the
4    African-American race?
5        A    No, I didn't.
6        Q    Given Mr. Barbee's position as a material
7    hauler, would he have any reason to be at the batch
8    plant?
9        A    As a material hauler, no, he would have no
10   reason to be in there.
11       Q    And the only time he would have reason to be
12   there was if he was working as a ready mix driver?
13       A    Correct.
14       Q    And then would his visits to the batch plant be
15   short in duration?
16       A    Yes, they would.
17       Q    Mr. Spitzer, are you aware -- strike that.
18            Okay.  Mr. Spitzer -- may I approach the
19   witness, Your Honor?
20            THE COURT:  Sure.
21   BY MR. POSTLEWAIT:
22       Q    I handed you what's been marked as Defendant's
23   Exhibit 1.  Do you recognize that photo?
24       A    Yes, I do.
25       Q    Okay.  Do you know who took the photo?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    I did.

2      Q    When did you take that photo?

3      A    It was in, like, 1997.

4      Q    And what is the area that's shown by the photo?

5      A    That's standing in the batch office looking out

6  to the east.

7      Q    There's a person shown in the photo.  Who is

8  that?

9      A    That's Donny Kuhle.

10     Q    And is he still an employee?

11     A    No.  He's retired.

12     Q    And is there anything shown in the photo also

13  in the picture with Mr. Kuhle?

14     A    Yeah.  The, the feather duster and the noose

15  tied on the, or hanging on the hook like I said it was.

16     Q    And is that the same noose as what's been --

17  the sash cord, the smaller --

18     A    Yeah, Exhibit 3, yes.

19     Q    Now, you were an employee, if we go back prior

20  to the 2001 time period that we talked about before, but

21  you were an employee up there at the Grohne premises

22  driving a ready mix truck at that time?

23     A    Correct.  I'd drive a ready mix truck, and

24  sometimes I'd run the loader.

25     Q    At that time, are you aware of anyone who

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   assigned any racially derogatory meaning to that --

2       A    No.

3       Q    -- rope?

4       A    No, not that I know of.

5       Q    The sash cord.

6            You know anyone who assigned any intimidating

7   or threatening meaning to the African-American race back

8   at that time in 1997?

9       A    No.

10      Q    Do you know any African-American that it was

11  directed to at that time?

12      A    No.

13      Q    And that would have predated Mr. Barbee's

14  employment at the premises?

15      A    Yes.

16           MR. POSTLEWAIT:  Nothing else.

17           THE COURT:  Thank you.

18              CROSS-EXAMINATION BY MS. LEAHY:

19      Q    Mr. Spitzer, are you telling me that you had

20  never heard anything about the meaning or symbolism of a

21  noose prior to, let's say, September 1st of 2007?

22      A    Nothing racial, no.

23      Q    Never heard anything about that?

24      A    I don't -- I, to tell you the truth, I don't

25  understand what's racial about a noose anyway.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    Oh, you don't?

2    A    No.

3    Q    You said it was there when Christy-Foltz bought

4    out Grohne?

5    A    Yes.

6    Q    Why did you keep it?

7    A    It's not mine.  I mean, what would I do

8    anything with it for?

9    Q    Who did it belong to?

10    A    I assume Calvin Campbell.

11    Q    Pardon me?

12    A    Calvin Campbell, the man who tied it, I would

13    assume it belonged to him.

14    Q    Well, did you call him up and say, "Do you want

15    this back?  Otherwise I'm going to get rid of it"?

16    A    I don't know him.

17    Q    Did you turn it over to Ron Grigg and say, "I

18    think this is Mr. Campbell's property.  What should I do

19    with it"?

20    A    There's other people's property hanging there.

21    The raincoat belonged to one of the other drivers.  If

22    it's not mine, I'm not going to bother it.  It didn't

23    mean nothing to me.  It just hung on a hook.

24    Q    After the police came to you and told you that

25    he was there because of a complaint regarding a noose --

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   right?

2        A      Right.

3        Q      Was Mr. Grigg with him when he came?

4        A      I believe he came down also.  Yes.

5        Q      And you said you took it down?

6        A      Right.

7        Q      Did the police direct you to take it down?

8        A      I don't remember if the officer directed me to

9   or if Ron told me to take it down.

10       Q      All right.  And then you said you put it in a

11  drawer?

12       A      I put it in the drawer.  Yes.

13       Q      You didn't give it to Mr. Grigg?

14       A      Not for probably a week, maybe.

15       Q      Was there some reason why you didn't give it to

16  Mr. Grigg right away and he take it away?

17       A      I took it down, put it in the drawer just so --

18  I mean, it offended somebody.  So I took it down and got

19  it out of there.  And then I think Ron asked me to bring

20  it up to him -- asked if I still had it, and I said yes.

21  He said, "Well, go ahead and bring it up here."

22       Q      Now, am I correct -- if I can approach, Your

23  Honor.

24              THE COURT:  Yes.

25       Q      As to Plaintiff's Exhibit 3, which is the first

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   noose that you think a Mr. Campbell made?

2       A    Right.

3       Q    You never talked to Campbell about that, --

4       A    No.

5       Q    -- did you?

6            You had heard it from a Bob Stewart?

7       A    Correct, correct.

8       Q    This wasn't used for anything, was it?

9       A    No, not that I knew of.

10      Q    Let's go back a little bit, and then we'll come

11  forward in your testimony.

12           You indicated that you were a material hauler,

13  which is the job that Mr. Barbee now has?

14      A    Correct.

15      Q    And then you went to ready mix?

16      A    Correct.

17      Q    And isn't it true that Mr. Grigg asked you to

18  come to ready mix?

19      A    Yes, he did.

20      Q    And you had to take a pay cut in the beginning

21  in regard to that, right?

22      A    Basically, yes.

23      Q    But you went, and you worked there for eight

24  years?

25      A    Correct.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1         Q     And at the end of the eight years, were you
 2    making more than you made in the first year?
 3         A     Yes.
 4         Q     And that's because as you worked up seniority,
 5    you got paid more?
 6         A     No.  You don't get paid more; you just work
 7    more hours, so you --
 8         Q     Okay.
 9         A     -- just make more money.
10         Q     I'm sorry.  But your actual salary is more?
11         A     Your, your gross wages are more.  Your hourly
12    salary is the same, whether you're at the top of the list
13    or the bottom of the list.
14         Q     But your hourly salary as a ready mix driver is
15    more than as a hauler?
16         A     Yes, it is.
17         Q     Okay.  So then as you would work your way up
18    seniority, not only were you making more per hour, you
19    also would get hours, more hours?
20         A     As you work your way up in seniority, you work
21    more hours.  Yes.
22         Q     And I think then you said you went to become
23    the batch man?
24         A     Yes.
25         Q     You said the batch office was small.  I'm
```

1    talking now about 2007, not the new office.

2         A    Right.

3         Q    Wasn't there a coffee maker in there?

4         A    Yes.  I said there was.

5         Q    And there was -- was there an icebox?

6         A    Yes, there was.

7         Q    And anything else?

8         A    The batch computer and a couple chairs.

9         Q    Would employees put their food in the icebox

10   and come in and have a cup of coffee?

11        A    They didn't put their food in the icebox.  No.

12   That was my icebox that I used.

13        Q    Okay.  For your food?

14        A    For my food, right.

15        Q    And did employees come in and have a cup of

16   coffee?

17        A    Yes.  Occasionally, when they'd load, they'd

18   get a cup of coffee.

19        Q    And they'd shoot the breeze?

20        A    Just to get their instructions on where they

21   was going.

22        Q    And you're still employed by Christy-Foltz,

23   right?

24        A    Yes, I am.

25        Q    So there would be occasion, since you were a

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  hauler, when employees would see each other when they

2  were picking up their trucks as haulers, right?

3      A    Not really.  The trucks are parked in a

4  different location.  The material hauler trucks are

5  parked in a different location than the concrete trucks.

6      Q    I know that, but if you -- the material haulers

7  would see each other when they went to pick up their

8  trucks?

9      A    Yes, yes.

10     Q    And at the end of the day when they were

11  dropping them off?

12     A    Yes.

13     Q    And when they were dropping off their

14  paperwork?

15     A    Paperwork went to the office.  Yeah.

16     Q    In Mr. Grigg's office?

17     A    Correct.

18     Q    And then if they were assigned to ready mix,

19  they'd be at the batch plant?

20     A    When they're loading, yes.

21     Q    Now, you said that in the beginning the

22  relationship was good, the relationship with Mr. Barbee,

23  but then it got rocky?

24     A    Yes.

25     Q    And you made the decision not to talk to him

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  unless absolutely necessary, right?

2      A    Not to talk to him unless it pertained to work.

3      Q    Okay.  Other employees did the same, didn't

4  they?

5      A    I think they did.  I can't --

6      Q    Who?

7      A    I can't say who exactly did, but I just noticed

8  that other people weren't talking to him as much either.

9      Q    Did anyone talk with you about that, like, for

10  example, Mr. Schinzler, the president of Christy-Foltz,

11  or Mr. Grigg?

12      A    I don't remember exactly.  Somebody might have

13  said something to me about, along the lines of Lawrence

14  felt alienated because nobody was talking to him.

15      Q    Do you remember who told you that?

16      A    Not exactly, no, I don't.

17      Q    Did you suggest anything that could be done to

18  resolve that problem?

19      A    No.  Because I didn't feel he was being

20  alienated.  I just wasn't taking a chance of him

21  misconstruing something I said.

22      Q    Did anyone at Christy-Foltz convene a meeting

23  for all the truck drivers so you could sort out these

24  issues?

25      A    Not that I knew of.

197

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    You never attended such a meeting?

2        A    I never attended one.  No.

3        Q    Now, about this policy, when did you first read

4   it?

5        A    When I noticed it hanging up there, I kind of

6   went over it and glanced at the topics and read a little

7   bit about it.  I didn't actually read the whole thing,

8   but --

9             MS. LEAHY:  If I may approach, Your Honor.

10            THE COURT:  Yes.

11            MS. LEAHY:  Your Honor, I had thought that Mr.

12  Postlewait had used our exhibit of the policy, but I

13  believe he used a defendant's exhibit for it.  Can we

14  agree that they're identical, or do you want me to use --

15            MR. POSTLEWAIT:  They are identical.  It's fine

16  if you want to make it a joint --

17            THE COURT:  You certainly may if, in fact,

18  that's the case.

19            MS. LEAHY:  Then we would make Plaintiff's

20  Exhibit -- I believe 7 -- a joint exhibit.

21            THE COURT:  All right.  I can double-check the

22  plaintiff's list, but if you're confident -- 7, yes.

23  BY MS. LEAHY:

24       Q    Okay.  Mr. Spitzer, I'm now showing you Joint

25  Exhibit 7, which is the policy.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Okay.

2      Q     You said you read a little bit of it.  When did

3  you first read a little bit of it?

4      A     When I noticed it hanging there, I, I just kind

5  of glanced through it and looked at the topics of it and

6  what it was about.

7      Q     When was that?

8      A     I don't remember exactly when it got hang up,

9  but I noticed it hanging there.  It was -- I'm sure it

10 was after the fact.

11     Q     Can you give me -- after the fact of what?

12     A     After Lawrence found the first noose.  I'm not

13 sure.  That's when I noticed it up, hanging up there.

14           I can't tell you exactly what date --

15     Q     Do you remember --

16     A     -- it was handing up there.  That's just when I

17 noticed it.

18     Q     Had you read it by January 29, 2010?

19     A     Oh, yeah.

20     Q     Do you remember my taking your deposition on

21 that day?

22     A     Yes, I do.

23           MR. POSTLEWAIT:  What page?

24           MS. LEAHY:  41.

25

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1    BY MS. LEAHY:

2        Q    Do you remember my asking you this question?

3             "I'm showing you Exhibit 2.  Have you seen that

4    document before?"

5             And your answer:  "I'm not sure."

6             Do you remember that?

7        A    Yes.

8        Q    And I was referring to this policy, right?

9        A    Correct.

10       Q    Then I asked you:  Is the firm Decatur

11   Construction Services, Inc. -- are you familiar with that

12   business?"

13            Remember that question?

14       A    Yes.

15       Q    You remember your answer?  "Yeah.  They

16   bought -- when I say -- when Christy-Foltz bought Grohne,

17   when Grohne was acquired they formed Decatur Construction

18   Service, and Decatur Construction Service actually owns

19   Grohne Concrete.  I believe that's how it works."

20            Do you remember that answer?

21       A    Yes, I do.

22       Q    And then I asked:  "And you're not sure you

23   have seen Plaintiff's Exhibit 2?"

24            Remember that question?

25       A    Vaguely, yes.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    And your answer:  "Well, there's a board

2   hanging up in the office, or up in the break room that's

3   got stuff posted on it.  It could be up there.  We got it

4   years ago.  When I started working for Christy-Foltz, we

5   had a little book.  This stuff might be in it.  I mean,

6   I've seen stuff about sexual harassment and stuff like

7   that; but this thing here, no, I don't remember."

8             So as of January 29, 2010, you didn't remember

9   having seen Joint Exhibit 7, right?

10      A    At that time, I didn't remember; but I went

11   back and looked.  And, yes, it was hanging on the

12   bulletin board.

13      Q    So after your deposition, you went back there

14   and looked at that policy?

15      A    Yes, just to refresh my memory that it was

16   there.

17      Q    But you hadn't read the whole thing?

18      A    No.  Like I said, when it -- when I seen it

19   hanging up there, I just glanced over it and looked at

20   the topics.  I didn't read it word for word.  No.

21      Q    Have you ever read it word for word?

22      A    Yes, I have.

23      Q    When was that?

24      A    After that deposition, I read it.

25      Q    Now, I believe you told me in your deposition

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  that when Mr. Grigg would hand out the paychecks, or when

2  someone would hand out the paychecks, there might be a

3  note with it advising you about something, or to read

4  this?

5      A    I'm not sure I understand the question.

6      Q    Did you ever, when you got your paycheck, ever

7  get a slip of paper from Christy-Foltz advising you about

8  something?

9      A    Occasionally, there would be a slip of paper

10 attached to it, your check.

11     Q    Did you ever get a slip of paper attached to

12 your check about discrimination?

13     A    I don't recall.

14     Q    About harassment based on race?

15     A    I don't, don't remember getting one.  No.

16     Q    About retaliation?

17     A    No.

18     Q    And I gather that you've never had any training

19 on any of those subjects while you were an employee of

20 Christy-Foltz?

21     A    To me it's common sense.  You shouldn't need

22 training; but, no, not that I know of.

23     Q    What's the common sense?

24     A    It's common sense you don't harass somebody

25 sexually or racially.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    Do you know what that means?

 2        A    What's that?

 3        Q    Do you know what that means, harassing them on

 4   the basis of race?

 5        A    Yes.  I know what it means.

 6        Q    Okay.  What is it?

 7        A    You don't make comments, racial comments to

 8   anybody or sexually harass anybody, making sexual

 9   comments to other people.

10        Q    Anything else that it means to you besides

11   comments?

12        A    Well, I'm sure gestures or something like that

13   could be considered harassment, too.

14        Q    Okay.  You then said -- after you indicated

15   your relationship with Mr. Barbee was rocky and that you

16   quit talking to him unless it was related to business,

17   then you said it got better.  When?

18        A    Oh, just -- I mean, after time.

19        Q    But when, Mr. Spitzer?

20        A    I don't remember an exact date.

21        Q    Well, let's go back from today.

22        A    Uh-huh.

23        Q    If you think in your mind, today it's

24   mid-October 2010.

25        A    Right.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    You stopped talking to him except business back

2    in the fall of 2007.  That's three years ago.

3    A    Correct.

4    Q    When did it start to get better?

5    A    Oh, I'd say probably within the last six

6    months, if I was to guess.

7    Q    Any reason why it got better in the last six

8    months?

9    A    No, no reason.

10    Q    Anyone suggest to you that you ought to start

11    talking with Mr. Barbee again?

12    A    No.

13    Q    What exactly was your comment to Mr. Barbee

14    right after you witnessed Mr. Roberts apologizing to Mr.

15    Barbee?

16    A    I asked him how come it was all right for two

17    black people to call each other that, and they get -- he

18    gets offended when a white person calls him that.

19    Q    Did you use the word "nigger"?

20    A    I don't remember if I did or not.  I might

21    have.  I don't remember.  I probably didn't, being as

22    Gary was getting in trouble for it.

23    Q    And I gather from what you said, Ron Grigg

24    called you and told you that Mr. Barbee had said that he

25    did not think that Gary Roberts was sincere in the

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  apology?

2      A    Correct.

3      Q    Why would he be telling you that?

4      A    I don't know.

5      Q    Now, Mr. Spitzer, weren't some of the employees

6  not just stopping talking to Mr. Barbee; but weren't some

7  of them angry that Gary Roberts and Terry Aldridge had

8  gotten suspensions?

9      A    I don't know of anybody angry other than Terry

10  was angry because he didn't think he should have got

11  suspended.

12     Q    So Terry was angry?

13     A    Yeah.

14     Q    What about Gary Roberts?  Wasn't he angry?

15     A    He really didn't act like, any emotion at all,

16  if he was mad about it or not.

17     Q    But you said Terry Aldridge was?

18     A    Yeah.

19     Q    Now, Mr. Spitzer, you said that Mr. Barbee had

20  used the word "nigger" in regard to being sent to

21  outlying towns?

22     A    Correct.

23     Q    And I believe you said here it was on several

24  occasions?

25     A    Right.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    And do you remember in your deposition telling

 2   me it was a couple of times?

 3        A    I don't remember how many times I said:  a

 4   couple, several.  I don't think I put a specific number

 5   on it.

 6        Q    Go to page 55.

 7             "How many times did you hear him say that?

 8             "Answer:  I don't remember for sure.  Two,

 9   three, ten -- I don't remember."

10        A    Right.

11        Q    Remember that answer?

12        A    Yeah.

13        Q    When was it that that occurred?

14        A    When as far as date and time, --

15        Q    Yeah.

16        A    -- I don't remember.

17        Q    Year even?

18        A    Pardon?

19        Q    Year.

20        A    Year?  It was probably earlier in, in '07,

21   during the busy part when he was hauling concrete.

22        Q    But you don't know?

23        A    I don't remember exact dates, time.  No.

24        Q    Did you report that --

25        A    No.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    -- to Mr. Grigg?

 2             Now, you said that Plaintiff's Exhibit 3, the

 3   first noose, had been there for years; is that correct?

 4        A    Correct.

 5        Q    And that you didn't do anything about it

 6   because you thought it belonged to Mr. Campbell?

 7        A    I said it didn't belong to me.

 8        Q    Did you ask Ron Grigg who it belonged to?

 9        A    No.

10        Q    When that policeman came in and took down, or

11   told you to take down or Mr. Grigg told you to take down

12   the first noose, did anyone suggest an inspection of the

13   batch plant to see if there was anything else that

14   resembled a noose?

15        A    I don't remember exactly.  Ron might have told

16   me to make sure there wasn't nothing else, and I didn't

17   see anything else.  I don't remember for sure if I did or

18   not.

19        Q    You don't remember if he told you to do it, and

20   you don't remember if you did?

21        A    I don't, I don't -- I don't remember if

22   anything was said like that or not.

23        Q    Okay.  Now, you indicated that you did think

24   Plaintiff's Exhibit 3 looked like a noose, right?

25        A    Correct.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1        Q    But you're familiar with Plaintiff's Exhibit 4,

2   right?

3        A    Right.

4        Q    But when you thought of Plaintiff's Exhibit 1,

5   didn't -- I mean, pardon me, Plaintiff's Exhibit 3,

6   didn't you think of Plaintiff's Exhibit 4?

7        A    No.  Because it was just a slip knot we used on

8   the plant.  I didn't, didn't even think nothing about it

9   looking like a noose, and it was hanging behind

10  everything.  I probably didn't even see it.

11       Q    And you said your brother tied that?

12       A    Yes.

13            MS. LEAHY:  May I approach again, Your Honor?

14            THE COURT:  Sure.

15  BY MS. LEAHY:

16       Q    Mr. Spitzer, I think if you look you can see on

17  that video the picture that is being shown?

18       A    Yes, I can.

19       Q    All right.  And if you look at that picture, to

20  the right is Plaintiff's Exhibit 4, correct?

21       A    Correct.

22       Q    And it's sort of by a pipe, right?  Or a piece

23  that's going up to the ceiling?

24       A    It's what now?

25       Q    It's by a piece of pipe that's going up to the

1    ceiling?

2         A    Yeah.  It's a piece of conduit going down to

3    the light switch.

4         Q    Now, if you go to your left, --

5         A    Uh-huh.

6         Q    -- are you sure the rope on the left isn't the

7    one you used to hoist things up to the roof?

8         A    I know it's not.

9         Q    Okay.  Do you know who tied the rope on the

10   left?

11        A    The rope on the left is not tied.  It's just

12   kind of wadded up there.

13        Q    Not in any of the top part of that, right?

14        A    No.

15        Q    And I gather from what you said, after you

16   began to work in the batch plant, you moved Plaintiff's

17   Exhibit 3 around?

18        A    Which one's 3?  This one?

19        Q    Yes.

20        A    Yes.

21        Q    Now, Mr. Spitzer, as to the second noose, you

22   said you saw Mr. Barbee taking pictures?

23        A    Right.

24        Q    And you told him he couldn't do that?

25        A    Right.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q     Why did you say that to him?

2        A     It's a private business.  I just assumed you're

3   not supposed to take pictures there.  We go to

4   Caterpillar quite often; and, and it's posted, "No

5   cameras; no pictures."  So I just assumed it's a private

6   business thing.

7        Q     There were no such things posted at

8   Christy-Foltz, were there?

9        A     Not that I know of, no.

10       Q     And after you saw him taking those pictures,

11  then you got on the phone with Ron Grigg and told him

12  about it?

13       A     I told him Lawrence was taking pictures of

14  something.  Yes.

15       Q     And what did he say to you?

16       A     He said to see if I could figure out what he

17  took a picture of.

18       Q     And how did you know what he took a picture of?

19       A     The direction the camera was aimed.

20       Q     All right.  So you then went over to the wall,

21  and you saw Plaintiff's Exhibit 4?

22       A     Right.

23       Q     And you then took it to Mr. Grigg?

24       A     Correct.

25       Q     I believe -- I believe it's Defendant's
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Exhibit 1, that photograph?

2       A    Yeah.

3       Q    If I may look at that, please.  You said that

4   was taken in 1997?

5       A    Yes.

6       Q    Why did you take it?

7       A    We were -- the EPA had got on us about the dust

8   coming out of the baghouse.  We worked on the baghouse,

9   and they said we had to take pictures to document that

10  the work was done -- you know, that the old bags, what

11  they looked like, that they were removed, new bags were

12  put in.

13          And at the time, Bruce Croney [phonetic] worked

14  there, and he'd bought a 24-exposure disposable camera;

15  and we just had to waste the rest of the pictures to, so

16  we could take the camera and get it developed.

17      Q    Did you make any suggestion to anybody at

18  Christy-Foltz about how to solve this problem of not

19  speaking to Mr. Barbee?

20      A    No.

21      Q    And I gather nobody talked with you about it,

22  either anyone in authority, Mr. Grigg or Mr. Schinzler?

23      A    No.  I mean, it's -- me not talking to Mr.

24  Barbee, to me, had nothing to do with Christy-Foltz.  I

25  talked to him at work.  I talked to him when I needed to

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   at work.  So it was a personal thing, me not talking to

2   him.

3        Q    You think it was personal on behalf of the

4   other employees?

5        A    I can't answer for them.

6        Q    Did Mr. Grigg ever tell you anything to the

7   effect of something like, "Be careful what you say to Mr.

8   Barbee"?

9        A    No.

10       Q    So this was your idea to cut back on your

11  talking to Mr. Barbee?

12       A    Correct.

13       Q    Why did you change your mind?

14       A    Just time -- as time goes by, I started talking

15  to him a little bit.  I still watch what I say to him.

16       Q    Because you shouldn't be saying anything

17  inappropriate?

18       A    I don't say anything inappropriate.

19       Q    So "Hi," "Good morning," "How are you," "How's

20  your" -- you know, "Did you see a movie last night?"

21  None of that, right?

22       A    I don't -- no, not usually.  I mean, I say "hi"

23  when he walks in, might make a joke or something, but --

24       Q    Okay.  And that was as it was before, and now

25  you've begun to do it again?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     Yeah.  Not like it was before.  Before we was

2   real -- I mean, we talked a lot, and we talked about

3   personal lives.  We talked about a lot of stuff.  But

4   it's still not like that, no.  But I talk to him.  I

5   don't, I don't ignore him or nothing like that anymore.

6      Q     But you did ignore him for a time, didn't you?

7      A     I didn't ignore him.  I didn't talk to him

8   other than business stuff.  Yeah.

9           MS. LEAHY:  Nothing further.

10          THE COURT:  Do you have extensive redirect?

11   I'm mindful of the time.

12          MR. POSTLEWAIT:  I don't have any further

13   questions.

14          THE COURT:  All right.  Then you may step down,

15   sir.  Thank you.

16          (Witness Scott Spitzer excused, 4:40 p.m.)

17               * * * * * * * * * *

18               REPORTER'S CERTIFICATE

19        I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

20   that the foregoing is a correct transcript from the

21   record of proceedings in the above-entitled matter.

22        Dated this 7th of November, 2010.

23

24               s/Lisa Knight Cosimini
        _____
                 Lisa Knight Cosimini, RMR-CRR
25               Illinois License # 084-002998