BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

E-FILED
Friday, 12 November, 2010  02:31:28 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LAWRENCE C. BARBEE,

                Plaintiff,

    vs.

CHRISTY-FOLTZ, INC.,

                Defendant.

Docket No. 09-2056

Urbana, Illinois
October 20, 2010
8:55 a.m.

EXCERPTS FROM JURY TRIAL -- Day 3 of 4

BEFORE THE HONORABLE DAVID G. BERNTHAL
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S :

For the Plaintiff:      MARY LEE LEAHY, ESQUIRE
Leahy Law Offices
308 East Canedy
Springfield, Illinois  62703
(217) 522-4411

DOUGLAS J. QUIVEY, ESQUIRE
Londrigan, Potter & Randle, P.C.
1227 South Seventh Street
P.O. Box 399
Springfield, Illinois  62705
(217) 544-9823

For the Defendant:      R. SAMUEL POSTLEWAIT, ESQUIRE
Winters, Featherstun,
Gaumer, Kenney, Postlewait,
Stocks & Flynn
225 N. Water St., Suite 200
Decatur, Illinois  62525
(217) 429-4453

Court Reporter:        LISA KNIGHT COSIMINI, RMR-CRR
U.S. District Court
201 South Vine, Suite 344
Urbana, Illinois 61802

Proceedings recorded by mechanical stenography; transcript
produced by computer.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

I N D E X

Page

EVIDENCE ON BEHALF OF THE DEFENDANT:

GARY ROBERTS
Direct Examination by Mr. Postlewait .......... 3
Cross-Examination by Mr. Quivey ............... 23
Redirect Examination by Mr. Postlewait ........ 31

TERRY ALDRIDGE
Direct Examination by Mr. Postlewait .......... 32
Cross-Examination by Mr. Quivey ............... 47
Redirect Examination by Mr. Postlewait ........ 54

KEITH MULLINS
Direct Examination by Mr. Postlewait .......... 54
Cross-Examination by Mr. Quivey ............... 66
Redirect Examination by Mr. Postlewait ........ 67

ROBERT STEWART
Direct Examination by Mr. Postlewait .......... 69
Cross-Examination by Ms. Leahy ................ 88
Redirect Examination by Mr. Postlewait ........ 101
Recross-Examination by Ms. Leahy .............. 102

RONALD L. GRIGG
Direct Examination by Mr. Postlewait .......... 103
Cross-Examination by Mr. Quivey ............... 122

RONALD L. GRIGG
Direct Examination by Mr. Postlewait .......... 127

REBUTTAL EVIDENCE ON BEHALF OF THE PLAINTIFF:

MICHAEL SPITZER
Direct Examination by Ms. Leahy ............... 128
Cross-Examination by Mr. Postlewait .......... 146

LAWRENCE C. BARBEE
Direct Examination by Ms. Leahy ............... 148

3

```
 1                  (In open court; jury present.)

 2                  GARY ROBERTS, sworn, 9:07 a.m.,

 3            DIRECT EXAMINATION BY MR. POSTLEWAIT:

 4       Q    Would you state your name, please?

 5       A    Gary Roberts.

 6       Q    And where do you live?

 7       A    Decatur.

 8       Q    And where are you employed?

 9       A    Christy-Foltz.

10       Q    Are you married?

11       A    Yes.

12       Q    How long have you been married?

13       A    Two years.

14       Q    And how long have you been employed at

15   Christy-Foltz?

16       A    About 17 years.

17       Q    And what is your position at Christy-Foltz?

18       A    Driver, --

19       Q    And --

20       A    -- Teamster.

21       Q    I'm sorry.

22       A    Teamster.

23       Q    All right.  And are you a member of the

24   Teamsters' Local Union 279?

25       A    Yes.
```

1        Q     Okay.  And you would have gone to work for

2   Christy-Foltz in about 1993?

3        A     No.  It was '91.

4        Q     All right.  And what is your seniority in terms

5   of the ready mix drivers?

6        A     Well, that's a good question.  I'd say one --

7        Q     All right.

8        A     -- because there's two ahead of me, and they're

9   usually in construction.

10       Q     Okay.  And have you always driven a ready mix

11  truck?

12       A     Yes.

13       Q     All right.  Have you ever been a material

14  hauler?

15       A     No.

16       Q     Okay.  And what are your duties in the position

17  as a ready mix driver?

18       A     Deliver concrete.

19       Q     All right.  And do you work out of the Grohne

20  Concrete Products premises?

21       A     Yes.

22       Q     And where is that located?

23       A     Over off Water Street.

24       Q     All right.  And there at the Grohne premises,

25  is there a main office building?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A      Yes.

2      Q      And then is there a batch plant?

3      A      Yes.

4      Q      And then is there a batch office within the

5   batch plant?

6      A      Yes.

7      Q      And is the batch office where it's located

8   today the same place where it was located in 2007?

9      A      Yes.  Except for the batch office, they built a

10   new little one outside.

11      Q      Okay.  So the batch office within the batch

12   plant has moved locations since 2007?

13      A      Yes.

14      Q      Okay.  When I refer to the batch office with

15   respect to my questioning of you, Mr. Roberts, I'm

16   referring to the old batch office, where it was located

17   in 2007.  Do you understand that?

18      A      Yes.

19      Q      Okay.  Do you know Lawrence Barbee?

20      A      Yes.

21      Q      And how long have you known him?

22      A      Five, six years.

23      Q      All right.  How did you happen to meet him?

24      A      When he got hired in there.

25      Q      All right.  So you met him at work?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A    Yes.

2       Q    All right.  And does -- what is Mr. Barbee's

3  position at work?

4       A    Material hauler.

5       Q    All right.  And given his position as a

6  material hauler and your position, does your job require

7  you to interact with him frequently?

8       A    Very seldom.

9       Q    All right.  To the extent you do have occasion

10 to interact with him, how would you describe your

11 relationship with Mr. Barbee?

12      A    Employees.

13      Q    Okay.  And you were involved in an incident

14 with Mr. -- or were you involved in an incident with Mr.

15 Barbee back on August 9th of 2007?

16      A    Yes.

17      Q    And what occurred on that incident?

18      A    Joking around, I called him a name.

19      Q    All right.  And you called him the N word?

20      A    Yes.

21      Q    And in joking around with him, had you done

22 that before?

23      A    Yes.

24      Q    Had you ever used the N word with him before,

25 joking around?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1     A   Yes.

2     Q   Had Mr. Barbee ever expressed any resentment on

3 any prior occasion?

4     A   No.

5     Q   All right.  And did you consider him a friend

6 back at the time prior to this incident that you've just

7 described?

8     A   Yes.

9     Q   All right.  And did Mr. Barbee in his

10 interaction with you ever use any language that was in

11 derogation of any race himself?

12     A   Jokingly, yes.

13     Q   And can you describe any instances?

14     A   Honky, cracker.  He's talked before about

15 raccoons.

16     Q   Referred to you as a honky or a cracker?

17     A   Yes.

18     Q   Now, on any of those occasions when you

19 referred to Mr. Barbee as the N word, he referred to you

20 as a honky or cracker, was that off the premises of

21 Grohne?

22     MR. QUIVEY:  I'll object to the form of the

23 question.  He just assumed something that wasn't in

24 evidence, in that they were --

25     THE COURT:  He can answer that.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   BY MR. POSTLEWAIT:

2        Q    You may answer.

3        A    Yes.

4        Q    It was off the premises?

5        A    Oh, no.  No, it wasn't.

6        Q    Did any of those comments ever occur in the

7   presence of Ron Grigg?

8        A    No.

9        Q    Where would they occur?

10       A    In the batch office.

11       Q    All right.  Following this incident on

12  August 9, 2007, did you make an apology to Mr. Barbee?

13       A    Yes.

14       Q    How did that happen?

15       A    Ron Grigg suggested that I ought to go and

16  apologize to him.  So at first I didn't remember doing

17  it, but then I -- after I thought about it, it came back

18  to me.  But, yes, I went down to the batch office; and me

19  and Lawrence and Scott Spitzer was sitting in there.  I

20  apologized to him, and we shook hands.

21       Q    What did you say to him?

22       A    I told him I was sorry if I offended him.

23       Q    When you came to work -- or following this

24  incident with Mr. Roberts on August 9 of 2007, how did

25  you happen to talk with Ron Grigg wherein he suggested

1  you should apologize?

2      A    In the batch office -- I mean, in the office,

3  front office.

4      Q    And did he call you up to the front office?

5      A    No.  I don't think so.  I just -- I went in,

6  walked in there.

7      Q    All right.  And then did he inquire to you

8  about it when you walked in?

9      A    Yes.

10      Q    All right.  And following your apology to Mr.

11  Barbee, you say you shook hands with him?

12      A    Yes.

13      Q    All right.  Did you think the matter was

14  resolved?

15      A    Yes.

16      Q    Were you sincere in your apology?

17      A    Oh, yeah.  I didn't mean to hurt his feelings.

18      Q    Okay.  Now, did you receive any disciplinary

19  action as an employee of Christy-Foltz as a result of

20  this incident?

21      A    Yes.

22      Q    And what disciplinary action did you receive?

23      A    I got five days off without pay.

24      Q    Did you consider that appropriate?

25      A    Oh, yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    Did you understand from the disciplinary action

2  you received that such conduct was not tolerated by your

3  employer, Christy-Foltz?

4    A    Yes.

5    Q    Have you ever known of them to tolerate any,

6  any such conduct that would be in derogation of, of any

7  race or religion or sex or gender or --

8    A    Never happened before.

9    Q    Did the disciplinary action send a strong

10  message to you, Mr. Roberts, that as an employee of

11  Christy-Foltz you're not to engage in conduct in

12  derogation of the race of anyone else?

13    A    Yes.

14    Q    Have you, since you received the disciplinary

15  action, ever used the N word in the course of your work?

16    A    No.

17    Q    Other than the incident involving yourself, are

18  you aware of anyone before or after the incident making

19  any other racially derogatory remarks to Mr. Barbee?

20    A    No.

21    Q    Do you consider the incident involving Mr.

22  Barbee to be an isolated incident?

23    A    Yes.

24    Q    Is there any difference in your relationship

25  today with Mr. Barbee than before that incident?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A     No.

 2        Q     Do you speak with Mr. Barbee as necessary to

 3   perform the duties of your job?

 4        A     Yes.

 5        Q     Do you have occasion to interact with him very

 6   often?

 7        A     No.  We hardly ever see each other.

 8        Q     Okay.  And why is that?

 9        A     We drive different trucks, and we're on the

10   road all the time.

11        Q     All right.  If you do see him, where do you see

12   him?

13        A     Passing on the, on the street.

14        Q     All right.  Do you wave to him?

15        A     Yes.

16        Q     Are you aware of anyone who has refused to

17   communicate with Mr. Barbee as a result of the

18   disciplinary action that you received?

19        A     Yes.

20        Q     And who would that be?

21        A     I don't recall.  I just remember hearing it.

22        Q     All right.  And do you know -- well, I guess

23   you can't say why someone else would not --

24        A     They're just scared to say anything to him.

25        Q     All right.  Let me show you what's been marked
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

12

```
 1    as Joint Exhibit 7.

 2              MR. POSTLEWAIT:  May I approach, Your Honor?

 3              THE COURT:  Yes.

 4                  (Brief pause in proceedings.)

 5    BY MR. POSTLEWAIT:

 6        Q    Have you seen that document before, Mr.

 7    Roberts?

 8        A    Yes.

 9        Q    And, and where have you seen it?

10        A    In our break room --

11              MS. LEAHY:  Objection, Your Honor.  I don't

12    think it's been identified.

13              THE COURT:  I think we haven't identified it,

14    so --

15              MR. POSTLEWAIT:  I'm sorry.

16    BY MR. POSTLEWAIT:

17        Q    Mr. Roberts, can you identify the document?

18        A    Discrimination policy.

19        Q    All right.  And --

20              MS. LEAHY:  Your Honor, --

21              THE COURT:  Is there a sticker on there, sir,

22    that has a number?

23              THE WITNESS:  Exhibit 7.

24              THE COURT:  Okay.  That's the Joint Exhibit 7?

25              MR. POSTLEWAIT:  That's correct.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1    BY MR. POSTLEWAIT:

2         Q    And is that a nondiscrimination and

3    antiharassment policy, Mr. Bar-- or Mr. Roberts?

4         A    Yes.

5         Q    And you said you'd seen that before, but where

6    have you seen it?

7         A    In our break area.

8         Q    And whereabouts in the break area?

9         A    Oh, we've got a bulletin board above our tables

10   they put fliers on.

11        Q    And are there other notices posted on the

12   bulletin board along with that policy?

13        A    Yes, several.

14        Q    And what types of notices are posted there?

15        A    Union meetings and numerous things.

16        Q    All right.  If you need information as an

17   employee of Christy-Foltz in regards to the, to the

18   business in which you're engaged there at Grohne

19   Concrete, is the bulletin board where these notices are

20   posted a place that you typically go to get information?

21        A    Every morning.

22        Q    All right.  And why do you go to the board

23   every morning?

24        A    It's in our break area.

25        Q    All right.  And you check the board every
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  morning?

2      A    We -- I glance at it once in a while.

3      Q    All right.  Do you recall approximately when

4  this policy was posted?

5      A    As far as I know, it's been up there every day.

6      Q    All right.  Do you know whether it was posted

7  before or after your incident with Mr. Barbee?

8      A    Before.  And after.

9      Q    The -- are you aware, Mr. Roberts, of an

10 incident at or about October 17, 2007, wherein Mr. Barbee

11 claimed to find a noose in the batch office of the batch

12 plant?

13     A    I heard about it.

14     Q    How did you hear about it?

15     A    Through the guys, the other drivers.

16     Q    All right.

17          MR. POSTLEWAIT:  And -- may I approach the

18 witness?

19          THE COURT:  Yes.

20 BY MR. POSTLEWAIT:

21     Q    Mr. Roberts, I've handed you what's marked as

22 Plaintiff's Exhibit 5.  Do you recognize that photograph?

23     A    Yes.

24     Q    You can, you can hold it to look at it.  What

25 area does the photograph show?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    The old batch office.

2      Q    All right.  And do you see what appears to look

3  like a, a noose or a sash cord in that photo?

4      A    Yes.

5      Q    And had you ever seen that before in the batch

6  office?

7      A    Yes.

8      Q    Do you know who put it there?

9      A    That's been there ever since we bought

10 Grohne's.

11     Q    All right.  And what year would that have been?

12     A    Whenever we bought Grohne's.  I can't remember.

13     Q    All right.  If that was --

14     A    It's been 15 years ago.

15     Q    All right.  When you say it's been there ever

16 since you bought Grohne's, is that when you noticed it,

17 when you first went to that premises?

18     A    I never pay any attention to all that stuff on

19 the walls, but I do remember seeing it up there.

20     Q    All right.  Do you know if it was ever moved

21 from one location to another or ever know of any orderly

22 movement of the, of the alleged noose around the batch

23 office?

24     A    Not that I know of.

25     Q    Okay.  What other things are in the, the

1  photograph?

2      A    Aerosol cans, fire extinguisher, air masks,

3  earplugs, microwave.

4      Q    Okay.  Do you have any personal knowledge as to

5  the origin of that sash cord?

6      A    I never paid any attention to it.

7      Q    All right.  Did you ever assign any racially

8  discriminatory meaning or racial symbolism to that sash

9  cord or alleged noose?

10      A    No.

11      Q    Did you, to your knowledge, ever position the

12  sash cord so as to harass Mr. Barbee or any other person

13  of the African-American race?

14      A    No.

15      Q    Did you or anyone else -- or strike that.

16          Did you, to your knowledge, position the sash

17  cord so as to intimidate or threaten Mr. Barbee?

18      A    No.

19      Q    Is there anything about that that would, in

20  your opinion, be intimidating or threatening to anyone of

21  the African-American race, to your knowledge?

22      A    No.

23      Q    That would have long predated -- or did that

24  long predate Mr. Barbee's employment at the premises?

25      A    I don't understand.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      Did that sash cord exist long before Mr. Barbee

2  was employed at the premises?

3      A      Oh, yes.

4      Q      Do you know any circumstances as to whether the

5  sash cord was removed?

6      A      It used to hang over on the other side of the

7  door.  That's where I used to see it.

8      Q      All right.

9             MR. POSTLEWAIT:  May I approach the witness,

10  Your Honor?

11             THE COURT:  Yes.

12  BY MR. POSTLEWAIT:

13      Q      Mr. Roberts, I've handed you what's marked as

14  Defendant's Exhibit 1.  Do you recognize what's shown in

15  that photograph?

16      A      Yes.

17      Q      And what is -- what does the photograph show?

18      A      It shows a guy retired from Grohne's.

19      Q      What is his name?

20      A      Don Kuhle.

21      Q      All right.  And where is he positioned?

22      A      Right in the doorway.

23      Q      Of the batch office?

24      A      Of the batch office.

25      Q      Okay.  And if you look to the right of where

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   he's standing, --

 2        A     Yes.

 3        Q     -- do you see anything on that wall?

 4        A     I see the noose.

 5        Q     All right.

 6        A     That's where it's always been hanging, since we

 7   bought Grohne's.

 8        Q     All right.  Was there any purpose for it to be

 9   hanging there?

10        A     I have no idea.  It's been there ever since we

11   bought the place.

12        Q     All right.

13        A     There's a lot of junk hanging in there.

14        Q     Did you ever ask anybody about it or --

15        A     I really didn't care.

16        Q     All right.  Given Mr. Barbee's position as a

17   material hauler, would you expect him to be in the batch

18   office?

19        A     The only time he'd really need to be in there

20   is to ask Scott, our batch man, where to dump his load.

21        Q     Okay.  And how long would that take?

22        A     A few seconds.

23        Q     All right.

24              MR. POSTLEWAIT:  May I approach the witness,

25   Your Honor?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1                THE COURT:  Yes.

2    BY MR. POSTLEWAIT:

3         Q    Mr. Barbee [sic], let -- I just laid in front

4    of you Plaintiff's Exhibit 3, and do you recognize that?

5         A    Looks like the noose.

6         Q    And that's the -- does it appear to be the

7    noose that you've just been discussing?

8         A    I can't be for sure because I never paid that

9    much attention to it.

10        Q    Okay.

11        A    Similar to it, or could be the same one.

12        Q    All right.  Mr. Roberts, are you aware of an

13   incident later in 2007 where Mr. Barbee claimed to find a

14   second noose hanging on a wall at the batch plant?

15        A    Yes, from hearsay.

16             MR. POSTLEWAIT:  May I approach the witness,

17   Your Honor?

18             THE COURT:  Yes.

19   BY MR. POSTLEWAIT:

20        Q    Mr. Roberts, I've just handed you what's been

21   marked as Plaintiff's Exhibit 6 and ask you if you

22   recognize the area shown in that photo?

23        A    Yes, I do.

24        Q    And what do you recognize it as?

25        A    Right outside the batch office.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    All right.  And would that be near the entrance
2   of the batch plant?
3        A    Yes.
4        Q    And if you were to enter on -- which side of
5   the batch plant?
6        A    It would be on your right.
7        Q    And would that be on the east side of the batch
8   plant?
9        A    Be on the north.  The door's on the east side;
10  but when you walk in and turn to your right, you'd be
11  facing north.
12       Q    And do you see anything there on the wall that
13  appears to be a noose?
14       A    No.
15       Q    All right.  What do you see on the wall, Mr.
16  Roberts?
17       A    A bunch of ropes and come-alongs.
18       Q    All right.  Do you know what those things are
19  used for?
20       A    Doing work around the batch plant.
21       Q    Have you ever used any of those tools?
22       A    Oh, I've used the come-alongs before.
23       Q    All right.
24            MR. POSTLEWAIT:  Approach the witness, Your
25  Honor?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          THE COURT:  Yes.

2    BY MR. POSTLEWAIT:

3          Q    Mr. Roberts, I've handed you what's been marked

4    as Defendant's Exhibit 13.  Do you recognize the area

5    shown in that photo?

6          A    Yes.

7          Q    And do you see a piece of rope in the photo?

8          A    Yes.

9          Q    And it appears to have a slip knot?

10         A    Yes.

11         Q    With a -- it appears to have a loop on one end

12   and, that it's hanging from?

13         A    Yes.

14         Q    Have you ever used that before?

15         A    I've never seen it before.

16         Q    All right.  Do you have any knowledge as to the

17   origin of that rope?

18         A    No.

19              MR. QUIVEY:  Objection, Your Honor.  He just

20   said he never saw it before.

21              THE COURT:  We'll let the answer, "no," stand.

22   BY MR. POSTLEWAIT:

23         Q    Do you know -- strike that.

24              Understanding you've not seen it before, but as

25   you see it in the photo there, and given the other items

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  that are on the wall along with it, do you assign any

2  racially discriminatory meaning or racial symbolism to

3  that rope?

4      A    No.

5      Q    Does it appear to be consistent with the other

6  things that are hanging on the wall?

7      A    I'd say so.

8      Q    Do you consider that rope to be harassing to

9  Mr. Barbee in any way?

10     A    No.

11     Q    Do you consider that rope to be threatening or

12 intimidating to Mr. Barbee in any way?

13     A    No.

14     Q    Given Mr. Barbee's position as a material

15 hauler, would he be expected to go in and out that door

16 with any frequency?

17     A    Yes.

18     Q    And for what purpose?

19     A    To check with Scott, our batch man.

20     Q    All right.  And how many -- in a typical day,

21 do you have any estimate of the number of times that he

22 would be expected to go in and out that door?

23     A    Not very often, because usually you'd just call

24 him on the radio.

25     Q    All right.  So sometimes he wouldn't even need

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    to -- he would just use the radio?

2        A    Yes, most of the time.

3        Q    All right.

4             (Brief pause in proceedings.)

5             MR. POSTLEWAIT:  Thank you, Mr. Roberts.

6    That's all I have.

7             THE COURT:  Mr. Quivey.

8             CROSS-EXAMINATION BY MR. QUIVEY:

9        Q    Sir, would you agree with me that your

10   deposition was taken on or about March 18, 2010?

11       A    Yes.

12       Q    And you were under oath at that time, correct?

13       A    Yes.

14       Q    After your deposition, have you talked to Mr.

15   Postlewait about your deposition?

16       A    Not really.

17       Q    Have you talked to Mr. Grigg about it?

18       A    No.

19       Q    So you haven't -- have you talked to anybody at

20   Christy-Foltz about your deposition and what you said in

21   your deposition?

22       A    No.

23       Q    Is it your testimony today that you apologized

24   to Mr. Barbee following you calling him a dumb nigger?

25       A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     You do recall your deposition, though, on

2    March 19, 2010, --

3      A     Oh, yes.

4      Q     -- correct?

5      A     Yep.

6      Q     And you were asked a series of questions about

7    that alleged apology, correct?

8      A     Yes.

9      Q     All right.  Start with page 39.

10           Sir, do you recall being asked this question

11   and giving this answer?

12           "Did anyone ever suggest to you that you should

13   apologize to Mr. Barbee?

14           "Answer:  No."

15     A     Yes.

16     Q     Do you remember that question and that answer?

17     A     Yes.

18     Q     "Question:  Did you ever apologize for having

19   made that comment?

20           "Answer:  I haven't talked to him since that

21   happened."

22     A     Yes.

23     Q     Do you recall that question --

24     A     Yes.

25     Q     -- and that answer?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    Yes.

2      Q    So at that time, you said you hadn't talked to

3  Mr. Barbee since you calling him a dumb nigger, correct?

4      A    Yes.

5      Q    All right.  Later in the deposition, "Question:

6  I'm sorry if I've asked you this before.  But I think you

7  said you did not apologize to Mr. Barbee about calling

8  him a dumb nigger.  Did anyone ever suggest to you that

9  you, that you do that?

10         "Answer:  No, never really talked about it."

11         Do you recall that question and that answer?

12      A    Yes.

13      Q    Again, later, "Question:  And you don't have

14  any recollection of apologizing to Mr. Barbee in the

15  batch office or anything?

16         "Answer:  No.  I have never seen him really

17  after that, just once in a while driving his truck.  I

18  took it on myself not to say anything to Lawrence because

19  I don't want him to use that against me again.  That's

20  why I said I haven't talked to him since then."

21         Do you recall that question and that answer?

22      A    Yes.

23      Q    So, in March of 2010, you had no recollection

24  of ever apologizing to him, --

25      A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    -- correct?

2    A    Yes.

3    Q    And you said in March at your deposition under

4    oath that you hadn't talked to Mr. Barbee since calling

5    him a dumb nigger, correct?

6    A    Yes.

7    Q    But now, October, a few months later, all of a

8    sudden your, your memory is better?

9    A    I remember it now.  Yes.

10    Q    And you talked to Mr. Postlewait after your

11    deposition, right?

12    A    [No response.]

13    Q    Yes or no?

14    A    Yes.

15    Q    Sir, in regard to the antidiscrimination

16    policy, Exhibit 7, you've never read that policy, have

17    you?

18    A    No.

19    Q    So, at no time have you ever read it?

20    A    No.

21    Q    So my question is correct:  You have not read

22    it, right?

23    A    Yes.

24    Q    Sir, when you called -- well, first of all, is

25    it your testimony today that you've called Mr. Barbee a

1    nigger on more than one occasion?

2        A    Yes.

3        Q    Sir, when you called him a dumb nigger in

4    August of 2007, he didn't laugh after you called him

5    that, did he?

6        A    No.

7        Q    And Mr. Kurt Schinzler was also present during

8    that conversation, right?

9        A    Yes.

10       Q    And is he the son of Hal Schinzler?

11       A    Yes.

12       Q    He didn't laugh when you made the comment

13    either, did he?

14       A    No.

15       Q    Matter of fact, neither one said anything, did

16    they?

17       A    No.

18       Q    Sir, you -- after you were suspended, you

19    didn't tell anybody you were suspended; you immediately

20    walked out of the building, correct?

21       A    Yes.

22       Q    So you didn't tell any of your coworkers that

23    you were suspended until you got back from your

24    suspension, right?

25       A    Yes.

1      Q     You were mad that you were suspended, weren't

2   you?

3      A     No, not really.

4      Q     Okay.  So now you think it was appropriate that

5   you were suspended?

6      A     Yes.

7      Q     So if a coworker learned about your suspension

8   prior to you coming back from suspension, somebody else

9   had to tell them about it, right?

10      A     I guess.

11      Q     Would you agree with me that all the drivers

12   were mad about you being suspended?

13      A     I don't know if all of them were.

14      Q     But you --

15      A     I heard some of them were.

16      Q     But you testified in your deposition that they

17   were all mad about it, right?

18      A     I didn't say all of them.  I just said some of

19   them.

20      Q     Okay.  Do you recall this question and this

21   answer?

22            "All the drivers were mad about what happened?

23            "Answer:  Yes."

24            Do you recall that question and that answer?

25      A     Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      Q    Sir, did you -- you also think that everybody,
 2  meaning all the drivers, were afraid to say anything to
 3  Lawrence?
 4      A    Yes.
 5      Q    And because of that, you wouldn't talk to him,
 6  right?
 7      A    Yes.  I was never around him.
 8      Q    Well, let's talk about that a little bit.  In
 9  your deposition, didn't you say that you saw him, or see
10  him once or twice a day?
11      A    Sometimes.
12      Q    And that up to 20 times a month at the Grohne
13  plant?
14      A    That's just a guess.
15      Q    Right.  But that's -- and that's both before
16  and after you called him a dumb nigger, right?
17      A    Yes.
18      Q    In regards to you saying that he, he used the
19  word "honky," you don't recall when he said that, do you?
20      A    No, I don't.  It's a long time ago.
21      Q    In regards to the, the nooses, nobody ever
22  asked you anything about them at the time, correct?
23      A    No.
24      Q    So there's -- nobody said, "Hey, when did you
25  see this, not see this?"  You didn't have anything to do
```

```
 1   with that, did you?

 2       A    No.

 3       Q    To include nobody asked you:  Did you put it

 4   there?  Had you seen it?  Or anything like that, right?

 5       A    No.

 6       Q    Sir, you were asked about whether you thought

 7   Mr. Barbee would find those nooses offensive.  You would

 8   agree that a black man could be offended by a noose at

 9   the workplace, right?

10       A    I guess.

11       Q    And you testified to that in your deposition,

12   right?

13       A    I don't remember.

14       Q    Do you recall this question and giving this

15   answer?

16            MR. POSTLEWAIT:  Page?

17            MR. QUIVEY:  38, line 11.

18   BY MR. QUIVEY:

19       Q    "Did anyone -- do you understand that a black

20   man could be offended by a noose at the workplace?

21            "Answer:  Yes."

22            Do you recall that question and you giving that

23   answer?

24       A    Yes.

25            MR. QUIVEY:  No more questions.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1              THE COURT:  Thank you.

2              Redirect.

3         REDIRECT EXAMINATION BY MR. POSTLEWAIT:

4         Q    Mr. Roberts, when you gave your deposition

5    earlier in the year, did you have any occasion to think

6    about the facts; and did you even know what the lawsuit

7    was about when you came to give your deposition?

8         A    No.

9         Q    Do you know what the lawsuit is about today?

10        A    Vaguely.

11        Q    And prior to your deposition, had you thought

12   back on the events of August 9 of 2007?

13        A    Tried to.  It's been a long time.

14        Q    And do you have any explanation as to why you

15   didn't remember your apology at that time but you do

16   today?

17        A    Yes, I do.  I -- at the time, I didn't think it

18   was that big a thing.

19        Q    And when you did apologize, am I understanding

20   your testimony correct that Mr. Barbee was present, and

21   Mr. Spitzer was present?

22        A    Yes.

23        Q    Okay.  When you have seen Mr. Barbee before and

24   after the incident -- and I think Plaintiff's counsel

25   referred to 20 times a month -- at the Grohne plant, are
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1    you in your truck; or are you out, outside the truck?

 2        A    Both.

 3        Q    All right.  So sometimes you might meet him in

 4    your truck; he's in his truck?

 5        A    Yes.

 6             MR. POSTLEWAIT:  That's all I have.  Thank you.

 7             THE COURT:  Thank you.  I have none.

 8             Thank you.  You may step down.

 9                 (Witness Roberts excused, 9:43 a.m.)

10                   * * * * * * * * * * *

11                 (In open court; jury present.)

12                 TERRY ALDRIDGE, sworn, 9:44 a.m.,

13             DIRECT EXAMINATION BY MR. POSTLEWAIT:

14        Q    State your name for the record, please.

15        A    Terry Lynn Aldridge.

16        Q    Where do you live, Mr. Aldridge?

17        A    Decatur, Illinois.

18        Q    And how long have you lived in Decatur,

19    Illinois?

20        A    My whole life.

21        Q    All right.  Are you employed?

22        A    Yes.

23        Q    And where are you employed?

24        A    Christy-Foltz, Incorporated.

25        Q    How long have you been employed at
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Christy-Foltz?

2        A     About 14 years.

3        Q     And what position are you employed in at

4    Christy-Foltz?

5        A     Truck driver.

6        Q     What type of truck driver?

7        A     I drive mixer trucks, dump trucks, straight

8    trucks.

9        Q     Do you do any material hauling?

10       A     No, sir.

11       Q     All right.  And when you talk about driving

12   dump trucks, is that to construction sites?

13       A     Yes.

14       Q     Okay.  You're a member of the Union Local 279,

15   Teamsters?

16       A     Yes.

17       Q     All right.  And what contracts govern your work

18   at Christy-Foltz?

19       A     Under the mixer contract and the construction

20   contract.

21       Q     Have you held any other positions at

22   Christy-Foltz while you're, during the time you've been

23   employed there?

24       A     No.

25       Q     And what is your seniority in terms of the

1  mixer drivers?

2      A    I'm number six.

3      Q    Do you know Lawrence Barbee?

4      A    Yes.

5      Q    And at the Grohne premises, Mr. Aldridge, are

6  you familiar with the batch plant?

7      A    Yes.

8      Q    Are you familiar with the current office of the

9  batch plant?

10     A    Yes.

11     Q    And has that office been changed from where the

12 batch office used to be?

13     A    Yes.

14     Q    And when did that change occur, to the best of

15 your recollection?

16     A    I think 2008.

17     Q    When I refer to the batch office in my

18 questioning to you, Mr. Aldridge, I'm referring to the

19 old batch office, where it was in 2007.  Do you

20 understand that?

21     A    Okay.  Yes.

22     Q    How long have you known Mr. Barbee?

23     A    Since he hired in, and I, I can't give the

24 accurate date of when he hired in.

25     Q    All right.  And what -- you knew him as a --

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   what position?

 2        A    Material hauler, truck driver.

 3        Q    And given his position as a material hauler and

 4   your position as a ready mix driver, does your job

 5   require you to interact with him with any frequency?

 6        A    No.

 7        Q    All right.  To the extent you do have occasion

 8   to interact with Mr. Barbee, how would you describe your

 9   relationship with him?

10        A    Just say "hi" or wave in passing.

11        Q    All right.  Are you aware of an incident that

12   occurred back in August of 2007 where Mr. Roberts made a

13   derogatory remark to Mr. Barbee?

14        A    Yes.

15        Q    And how did you learn about that incident?

16        A    I guess through a conversation, but I don't

17   know with who.

18        Q    Were you present for that, at the time of that

19   incident or any --

20        A    No, sir.

21        Q    Are you aware that Mr. Roberts was disciplined?

22        A    Yes.

23        Q    And how are you aware of that?

24        A    I was disciplined over the same, at the same

25   time.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1        Q    And tell me the circumstances of what occurred

2   that resulted in that.

3        A    I had heard through a conversation that Mr.

4   Roberts had said the N word to Lawrence Barbee; and when

5   I saw Gary Roberts, I said the N word to Gary Roberts.

6   So --

7        Q    And then what happened?

8        A    Well, I was called into the office and said

9   that Gary was disciplined and that I had to be

10  disciplined, too.

11       Q    And what was the extent of your discipline?

12       A    Seven days off.

13       Q    Without pay?

14       A    Without pay.

15       Q    Did you understand from the disciplinary action

16  that you received that such conduct was not tolerated by

17  your employer, Christy-Foltz?

18       A    Yes.

19       Q    Have you ever known of Christy-Foltz to

20  tolerate any conduct that would be considered

21  discriminatory racially, sexually, from the standpoint of

22  religion or gender or any other basis?

23       A    No.

24       Q    Did the disciplinary action send a strong

25  message to you that as an employee of Christy-Foltz you

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    are not to engage in such conduct in derogation of the

2    race of anyone else?

3         A    Yes.

4         Q    Other than the incident involving Mr. Roberts,

5    are you aware of anyone before or after that incident

6    making any racially derogatory remarks to Mr. Barbee?

7         A    No.

8         Q    Do you consider the incident involving Mr.

9    Barbee's remark to -- I'm sorry, Mr. Roberts' remark to

10   Mr. Barbee to be an isolated incident?

11        A    Yes.

12        Q    Is there any difference in your relationship

13   with Mr. Barbee today as it was before the series of

14   events that you just described?

15        A    No.

16        Q    Do you speak with Mr. Barbee as may be

17   necessary to perform the duties of your job?

18        A    Yes.

19        Q    And do you speak with him in addition to that?

20        A    If we see each other -- if we see each other of

21   a morning, greet -- you know, say "hi."

22             MR. POSTLEWAIT:  May I approach the witness,

23   Your Honor?

24             THE COURT:  Yes.

25

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   BY MR. POSTLEWAIT:

 2       Q    Mr. Aldridge, I've just handed you what's been

 3   marked as Joint Exhibit 7.  Do you recognize that

 4   document?

 5       A    Yes.

 6       Q    And what is it?

 7       A    It's a nondiscrimination and antiharassment

 8   policy.

 9       Q    Have you ever seen the document before?

10       A    Yes.

11       Q    And where have you seen it?

12       A    The document is posted in our lunchroom, and

13   it's also -- well, that's the main place that I've seen

14   it.

15       Q    All right.  How did you learn that the document

16   was posted there?

17       A    We just happened to see it on the, on the

18   board.  It's been there for years.

19       Q    And did you ever review the document?

20       A    Yes.

21       Q    All right.  And what other types of notices are

22   posted on the board?

23       A    Well, there's union notices.  There's safety

24   notices.  There's government and state labor laws.

25   That's about it.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    All right.  Now, are you familiar with the

2   labor law poster that -- is that what you're referring

3   to?

4        A    Yes.

5        Q    All right.  Do you know whether or not that

6   labor law poster has a section on it that indicates that

7   discrimination is not allowed?

8        A    Yes.

9        Q    Did you understand that to be the policy of

10  Christy-Foltz at all times before this incident --

11       A    Yes.

12       Q    -- with Mr. Roberts?

13       A    Yes.

14       Q    Mr. Aldridge, would you take a look at the,

15  what appears to be a sash cord or small noose in front of

16  you on the counter there, Defendant's -- or Plaintiff's

17  Exhibit 3?

18       A    Okay.

19       Q    Have you ever seen that before?

20       A    Is that the same one that was hanging in the

21  batch --

22       Q    I can't answer questions to you, but --

23       A    If that's the same one that was hanging in the

24  batch, yes.

25       Q    All right.  Take a look, please.  There's some
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  photos there on the stand next to you.  There's a photo,

2  Plaintiff's Exhibit 5.  They're marked on the back.  Do

3  you recognize what's shown in that photo?

4      A    Yes.

5      Q    What area is shown?

6      A    Well, this is a picture of the old batch plant

7  in, or the old batch office, inside the old batch office.

8      Q    And is that the way the, the batch office

9  appeared back in 2007?

10      A    Yes.

11      Q    All right.  And do you see what's been marked

12  as Plaintiff's Exhibit 3 in that photo?

13      A    [No response.]

14      Q    I'm referring to the small noose in front of

15  you.

16      A    Yes.

17      Q    All right.  Do you know the origin of that?

18      A    Yes.

19      Q    How do you know that?

20      A    I hired in at Grohne Concrete in 1989, which

21  is -- now Christy-Foltz owns us.  But in 1989, when I

22  hired in, this particular noose was hanging on the wall;

23  and I remember asking the, the batch operator -- which

24  his name was Buck Howe [phonetic]; and my brother-in-law,

25  Bob Stewart, was in there at the same time -- and I just

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   asked; I said, "Who made that, who made that rope into a

2   noose?"

3           And they said a man by the name of Calvin

4   Campbell, which was an employee, was sitting there one

5   day; and there was a piece of rope laying there, and he

6   just made a noose out of it, and he hung it up on the

7   wall.

8       Q    And was there any meaning ascribed to that, to

9   your knowledge?

10      A    Nobody said anything.

11      Q    Did you assign any racially discriminatory

12  meaning or racial symbolism to that alleged noose?

13      A    No.

14      Q    Did you, to your knowledge, position that noose

15  in the batch office to harass Mr. Barbee?

16      A    No.

17      Q    Did you, to your knowledge, position the sash

18  cord so as to intimidate or threaten Mr. Barbee?

19      A    No.

20      Q    Do you know any reason why that small noose

21  that had hung in the batch office for so long would be

22  intimidating or threatening to Mr. Barbee in any way?

23      A    No.

24      Q    Take a look at Defendant's Exhibit 1.  It's a

25  small photo.  You see it?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    Yes.

2      Q    Okay.  Do you recognize what's shown in that

3  photo?

4      A    Yes.

5      Q    Is there a person in the photo?

6      A    Yes.

7      Q    Do you know who that person is?

8      A    Don Kuhle.

9      Q    All right.  And who is he?

10      A    Don Kuhle was a driver for Christy-Foltz for

11  quite a number of years.  He's retired.

12      Q    All right.  And do you recognize the area where

13  he's standing?

14      A    Yes, the old batch office.

15      Q    All right.  And do you see to the right of the

16  photo what is on the wall there?

17      A    Well, I see a duster; and it's very faint, but

18  I think there's a rope hanging there.

19      Q    Had you seen what's marked as Plaintiff's

20  Exhibit 3, the sash cord or small noose, hanging in that

21  position at the batch office?

22      A    Yes.

23      Q    In the course of your employment at Grohne?

24      A    Yes.

25      Q    All right.  That's consistent with the fact

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    that you've testified that it had been there for many

2    years?

3         A    Yes.  Matter of fact, the way I understood it,

4    it was made in about 1973.

5         Q    Do you know that of your own knowledge, or did

6    someone tell you that?

7         A    Someone told me.

8         Q    Do you know whether or not it was removed from

9    the batch office?

10        A    No.  I do not.

11        Q    Are you aware of an incident later in 2007

12   where Mr. Barbee claimed to find a second noose hanging

13   on a wall at the batch plant?

14        A    No, sir.

15        Q    All right.  Take a look at what's been marked

16   as Photo Exhibit 6.

17        A    Okay.

18        Q    And, Mr. Aldridge, do you recognize the area

19   shown in Photo Exhibit 6?

20        A    Yes.

21        Q    And what is that area?

22        A    That is an area of the old batch plant.

23        Q    Do you see a rope hanging in the photo?

24        A    I see, I see cables and cords.

25        Q    All right.  Would you also take a look at

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    what's been marked as Defendant's Exhibit 13.  It's a

2    small photo.  Do you have that photo?

3        A    Yes.

4        Q    Do you see a rope hanging in that photo?

5        A    Yes.

6        Q    What other things are on the wall with it?

7        A    There's a come-along with cables, and there's

8    an electrical cord; and there's also some metal, metal

9    rebar hooks.

10       Q    Do you know the origin of the rope that's,

11   that's shown in that photo?

12       A    No.

13       Q    Had you ever seen it before hanging there on

14   the wall?

15       A    If I did, I didn't pay any attention to it.

16       Q    All right.  Is it what you would expect to find

17   on that wall?

18       A    Well, that particular wall, that's where they

19   hung a lot of the materials that they needed for

20   different operations in the batch plant.

21       Q    All right.  Does it appear consistent with you

22   to other things that are hanging on the wall there?

23       A    Yes.

24       Q    Do you assign any racially discriminatory

25   meaning or racial symbolism to that rope?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A    No.

2       Q    Do you know anyone who put it there that

3   intended it to be a noose?

4       A    No.

5       Q    Did you position the rope in that location?

6       A    No.

7       Q    Is there anything about that rope that would

8   appear to you to be harassing to Mr. Barbee or any other

9   member of the African-American race?

10      A    No.

11      Q    Is there anything about that rope shown in

12  Plaintiff's Exhibit 6 that would appear to be

13  intimidating or threatening, or that you would expect to

14  be intimidating or threatening, to Mr. Barbee or any

15  other person of the African-American race?

16      A    No.

17      Q    Given Mr. Barbee's position as a material

18  hauler, in your experience, would Mr. Barbee be expected

19  to be in the batch plant?

20      A    No.

21      Q    All right.  And why is that?

22      A    Well, the actual batch plant, I don't know why

23  he would be in there.  Now, years ago, the old batch

24  office, you had to go in the batch plant to get in the

25  batch office.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    All right.  When you say "years ago," how far

2  are you -- or how long ago are you referring to?

3      A    Well, back up until 2008, you had to walk in

4  the old batch plant to get to the batch office.

5      Q    Right.

6      A    The new batch office is on the outside.

7      Q    I'm referring back in 2007, though, Mr.

8  Aldridge.  At that time, would Mr. Barbee as a material

9  hauler have had any reason to go in either the batch

10  office or the batch plant?

11      A    Yes.

12      Q    For what purpose?

13      A    To turn in his tickets --

14      Q    All right.

15      A    -- for the loads of material that he would be

16  hauling in.

17      Q    Do you know whether those tickets would be

18  turned in to the main office or the batch office?

19      A    That I can't swear to.  I've just seen the

20  truckers bring them into the batch office.

21      Q    Okay.  Do you know whether or not there's ever

22  been other members of the African-American race up in the

23  batch office, other than Mr. Barbee?

24      A    No.

25      Q    All right.

```
 1        A    I, I do not know.

 2        Q    All right.  Are you aware, or do you recall any

 3   circumstances before the incident involving Mr. Roberts,

 4   or before the incident that you were involved in, wherein

 5   Mr. Barbee himself made any remarks that would be

 6   considered in derogation of the African-American race?

 7        A    Would you repeat that question?

 8        Q    Are you aware or do you recall of any

 9   circumstances before the incident involving Mr. Roberts

10   in August of 2007, or the incident in which you were

11   involved, wherein Mr. Barbee himself made any remarks in

12   derogation of the African-American race?

13        A    No.

14        Q    All right.  Are you aware of him making any

15   racial slurs toward the Caucasian race?

16        A    No.

17             MR. POSTLEWAIT:  All right.  No further

18   questions.  Thank you.

19             THE COURT:  Thank you.

20             Mr. Quivey.

21              CROSS-EXAMINATION BY MR. QUIVEY:

22        Q    Sir, you've worked for, for Grohne for a long

23   time and then for Christy-Foltz, correct?

24        A    Yes.

25        Q    Since, like, 1989?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A     May 15, 1989.
 2        Q     How many African-Americans have worked as truck
 3   drivers during the time of your employment?
 4        A     I think there was another man that came to work
 5   for Grohne's, but I don't remember his name; and I
 6   wouldn't swear 100 percent, but I'm almost sure there was
 7   a young man that came to work for Grohne.
 8        Q     Do you recall giving a deposition on March 19,
 9   2010?
10        A     Yes.
11        Q     And you were under oath at that time?
12        A     Yes.
13        Q     And since your deposition, have you talked to
14   Mr. Postlewait?
15        A     No.
16        Q     Have you talked to anybody about -- Grigg --
17   about this lawsuit, about you testifying?
18        A     No, sir.
19        Q     Okay.  You would agree with me that in the
20   deposition you said, "Lawrence was the first one, I
21   think"?  So you think there may have been another one,
22   now?
23        A     Yes, I do.
24        Q     Okay.  Let's go back.  What exactly did you say
25   to Mr. Roberts in August of 2007?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    I heard through conversation that Mr. Roberts
2   called Lawrence Barbee the N word.  I, I don't know how
3   many hours later I heard it.  But I walked into the batch
4   office; and Gary Roberts was in there and Scott Spitzer,
5   and I, I made a statement.  I said -- do you want to know
6   what I said?

7      Q    Yes, sir.

8      A    I said, "Hey," N word.  I said, "That's a
9   mighty strong statement to be making.  You're liable to
10  be getting in trouble."

11          And it was construed that I said the N word to
12  him, or called Gary Roberts the N word.

13     Q    But in your mind, you were telling him that his
14  statement was a very strong statement, and you didn't
15  call him the N word, correct?

16     A    No, I didn't.  But I was --

17     Q    It was your word against Roberts and Spitzer,
18  correct?

19     A    Yes.

20     Q    And you're not real friendly with Mr. Roberts
21  or Mr. Spitzer, are you?

22     A    I work with them.  We're not social friends,
23  but we work together.  We're working -- we get along.

24     Q    But you're not very friendly with Mr. Roberts,
25  correct?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A    I wouldn't, I wouldn't say that.  I said we

2  work together.  We don't socialize together.

3       Q    How does your vacation work at Christy-Foltz?

4       A    On the anniversary date that you hired in,

5  every year you are given a vacation check for the number

6  of weeks of vacation that you have coming.

7       Q    Right.  So you get a check on your anniversary

8  date for how many weeks you get, and you get that check,

9  correct?

10      A    Yes.

11      Q    And then -- so if you take a vacation, you

12  don't get paid for that, the week you actually take; but

13  if you want to just keep the vacation money, you just

14  work throughout the year, correct?

15      A    Yes.

16           MR. POSTLEWAIT:  Your Honor, I --

17      A    Yes.

18      Q    So in other --

19           MR. POSTLEWAIT:  Objection, out of the scope of

20  direct.

21           THE COURT:  It's not clear.  But we'll let you

22  have a standing objection, and -- I think I can see where

23  we're going, and we'll see how it develops.

24  BY MR. QUIVEY:

25      Q    So, sir, when you got suspended, that was not a

1  big deal to you, was it?

2      A    It was a big deal as far as being off work.

3  But like I made in the statement, it was hot, so I just

4  considered it a week's vacation.

5      Q    So you just took your week of vacation at that

6  time, correct?

7      A    Yes.

8           THE COURT:  For the record, I'll overrule the

9  objection.

10     Q    Sir, I believe in your, your direct

11  examination, you said you had to be suspended.  Did you

12  think you had to be suspended?

13     A    I didn't think I deserved to be suspended.  No.

14     Q    In fact, it was Mr. Grigg who said you had to

15  be suspended, right?

16     A    Yes.

17     Q    Sir, in regard to Exhibit 7, which is the

18  discrimination policy, sir, you knew that it had been

19  hanging on the bulletin board at Christy-Foltz, correct?

20     A    Yes.

21     Q    But it's also true that you hadn't read it; or

22  if you had read it, it had been a long time ago, correct?

23     A    Yes.

24     Q    So it wasn't something that you looked at

25  frequently?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     No.

2      Q     And you don't even really remember reading it,

3  do you?

4      A     Not the particular day.  In 21 years, I've read

5  everything on that bulletin board.

6      Q     Sir, did Mr. Grigg tell you you had to

7  apologize to Mr. Roberts?

8      A     No.

9      Q     And Mr. Barbee wasn't present when you had this

10  conversation with Mr. Roberts and Mr. Spitzer, correct?

11      A     No.

12      Q     Sir, in regard to the noose, you don't know

13  when the last time you saw it, correct?

14      A     We saw it every day in the old batch plant up

15  to the time it moved in 2008.

16      Q     So your testimony:  Every day you walked in

17  there, and you saw it?

18      A     Well, it was hanging on the wall.

19      Q     And you noticed it every day?

20      A     I'm not gonna say I looked at the wall and

21  looked for it.  But, you know, if you walked in there

22  every day, everything that was on the wall -- maybe you

23  only noticed it once a week.

24      Q     Is it your understanding it was on the wall

25  when the, when the new batch office was built, still on

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1   the old wall -- still in the old office, I should say?

2       A    That I won't swear to.  No.

3       Q    So if it was taken down, you don't know when it

4   was taken down, correct?

5       A    No.  I wouldn't know when it was taken down.

6   Correct.

7       Q    And you don't even know if it was taken down,

8   correct?

9       A    No.

10      Q    I mean, my answer is correct; you don't know,

11  right?

12      A    I do not know when it was taken down.  No.

13      Q    Sir, in all, all your years with Grohne or

14  Christy-Foltz combined, has there -- have you ever

15  received any training on discrimination?

16      A    No.

17      Q    After you were suspended and Mr. Roberts was

18  suspended, did anybody call a meeting to discuss the

19  situation?

20      A    No.

21      Q    In 2007, did anybody ask you any questions

22  about the noose?

23      A    No.

24           MR. QUIVEY:  Thank you, sir.

25           THE COURT:  Redirect?
```

1        REDIRECT EXAMINATION BY MR. POSTLEWAIT:

2        Q    Mr. Aldridge, when you were suspended for a

3   week, that still cost you a week's pay; is that --

4        A    Yes.

5        Q    -- right?

6        A    Yes.

7        Q    Was that significant to you?

8        A    Yes.

9             MR. POSTLEWAIT:  Thank you.

10            THE COURT:  Thank you.  You may step down.

11                 (Witness Aldridge excused, 10:15 a.m.)

12                     * * * * * * * * * *

13                 (In open court; jury present.)

14             KEITH MULLINS, sworn, 10:35 a.m.,

15            DIRECT EXAMINATION BY MR. POSTLEWAIT:

16        Q    Good morning.

17        A    Good morning.

18        Q    Will you state your name for the record,

19   please?

20        A    Keith Mullins.

21        Q    And your occupation?

22        A    I'm a police officer for the City of Decatur.

23        Q    How long have you held that position?

24        A    22 years.

25        Q    And have you held other positions with the City

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   of Decatur?

2        A     I was an auxiliary police officer before that.

3        Q     All right.  And you're with the Decatur Police

4   Department?

5        A     Yes.

6        Q     All right.  Officer Mullins, what is the extent

7   of your education?

8        A     Attended regular school through high school in

9   Decatur schools and then some courses at Richland

10  Community College.

11       Q     And have you had further training after the

12  courses at Richland Community College?

13       A     The, had the State Police Academy over in

14  Springfield for basic training for law enforcement and

15  then extended education for law enforcement after getting

16  on the department.

17       Q     All right.  And can you just briefly describe

18  the, the education that you had?

19       A     I have -- I'm a breathalyzer operator for the

20  State.  I am a field training officer for officers on the

21  department.  I am a firearms instructor for the

22  department.  Bicycle officer for the department.  I can't

23  think of anything else right offhand.

24       Q     All right.  Officer, do you recall an occasion

25  at or about October of 2007 when you visited the Grohne

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Concrete Products premises on North Water Street --

2        A    Yes.

3        Q    -- in Decatur in the course of your duties?

4        A    Yes.

5        Q    Do you remember this incident involving a man

6   by the name of Lawrence Barbee?

7        A    Yes, I do.

8        Q    Would you, starting at the beginning, tell me

9   how you were notified, how you happened to go to that

10  premises?

11       A    On October 17th of 2007, I was called to a

12  doctor's office at -- I think it's 102 West Kenwood in

13  Decatur to meet with Lawrence Barbee, reference to a

14  complaint that he had had.  Went there and spoke to him.

15  The complaint that he had gave Dispatch was that he was

16  being discriminated against at work -- and he worked at

17  Christy-Foltz -- and that he was the only black male

18  employee at the, Christy-Foltz and that he was passed up

19  for promotions.  He was being harassed by other fellow

20  employees at work and being called names and that there

21  was some type of hangman's noose at the place of work.

22       Q    And was it Dr. Lee that called the police

23  department, or was it Mr. Barbee?

24       A    Mr. Barbee called.  He had happened to be at

25  the doctor's office when he had called the police.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    So when you went to the doctor's office, did

2    you meet with both Mr. Barbee and Dr. Lee?

3      A    No.  I just -- Mr. Barbee himself.

4      Q    All right.  And what conversation beyond what

5    you've indicated occurred?

6      A    He had spoke that he had some type of

7    altercation with a fellow employee for Christy-Foltz and

8    that he was called a derogatory name -- I think it was

9    from him -- and then the company -- that I learned that

10   that employee had been suspended for his actions.

11         And Mr. Barbee, once I went through the whole

12   investigation, Mr. Barbee didn't want anything done with

13   that employee.  He didn't want to have any further

14   problems by having any criminal charges placed against

15   him.

16     Q    And would there have been any criminal charges

17   to place against that employee?

18     A    Possibly disorderly conduct.

19     Q    Okay.  And when you say you went through your

20   investigation, what did that entail?

21     A    My -- all the things that were, he had told

22   Dispatch, the only things I was concerned of for the

23   criminal part were possibly the names and, secondly, the

24   rope that he had said that was tied in the noose.

25     Q    And what further conversation did you have with

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   Mr. Barbee there at the doctor's office?

2       A    That was pretty much it.

3       Q    All right.  And do you recall what time of day

4   that was?

5       A    I was -- he called in at 10:15 -- or 11:15, I

6   believe it was, and I went there to speak to him at 12--

7   I take that back.  It's 10:15 he had called in.  I was

8   sent there about 11:15 in the morning.

9       Q    Did he have photos that he was showing you of

10  this alleged noose?

11      A    No.

12      Q    Did -- what did you do next?

13      A    I went to the place that he said it was, the

14  rope or the noose was at, and, which is Grohne Concrete,

15  2500 block of North Water Street in Decatur.  I went

16  there.

17           I spoke to one of the persons in charge there,

18  and they took me to -- that person took me to his office,

19  which is considered a batch office, and immediately

20  showed me the rope.  From his action and everything, he

21  had no expectation that I was going to be there and was

22  cooperative to me and took me immediately to what he

23  perceived to be the item or, or noose that Mr. Barbee was

24  talking about.

25      Q    All right.  Did you check in at the, at the

1  main office at the Grohne premises when you first got on

2  the premises?

3      A    I believe it to be the main office.  I don't

4  know -- I kind of searched around for somebody, honestly,

5  to begin with because I didn't know where exactly I was

6  going to be going to on the property of Grohne Concrete.

7      Q    Did someone take you from the main office back

8  to the plant where this batch office was?

9      A    I found someone there that did, was the

10  supervisor, and they took me to that spot.

11      Q    Is that man sitting at this table?

12      A    I don't recall if that's him or not.

13      Q    All right.  Do you have any record of who, who

14  you talked to?

15      A    That day, whenever -- I would have taken down

16  all the notes and everything that day.  I have since

17  discarded all of them for the fact that, when my

18  investigation was complete, there was nothing being done.

19      Q    All right.  So you went back to the, to the

20  batch plant, and where did you go in the batch plant?

21      A    Went inside -- it's like a pole shed, pretty

22  much, and went inside this metal building.  Inside the

23  metal building is an office.  I guess it would be an

24  office.  It's kind of an older building, went to this

25  closed room in the back or the corner of this building;

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   and he immediately showed me where the rope was at that

2   was tied in the noose form.

3        Q    And where was it at?

4        A    As soon as you walk in the door to the office,

5   as soon as you cleared the doorway, it would be on the

6   right-hand side on the same wall as the door.

7             MR. POSTLEWAIT:  May I approach the witness,

8   Your Honor?

9             THE COURT:  Yes.

10  BY MR. POSTLEWAIT:

11       Q    Officer, I've handed you what's been marked as

12  Plaintiff's Exhibit 5.  Do you recognize the area shown

13  in that photo?

14       A    It looks like the interior of the office area.

15       Q    And do you see what would appear to be a small

16  noose or sash cord in the photo?

17       A    Yes.

18       Q    And is that where you found, or where it was

19  pointed out to you that it was located?

20       A    I believe so.  Yes.

21       Q    And what did you -- what conversation occurred,

22  if any, when you went to the batch office?

23       A    I -- the person that was in charge that this

24  office belonged to, I spoke to that person; and that

25  person explained that -- he was kind of surprised about

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   me being there, for one, and, secondly, that, he

2   immediately took me to this rope or noose and explained

3   that he -- this item has been there since he had been

4   employed and given this office to work at.

5       Q    All right.  Looking at -- you see the sash cord

6   or a small noose in front of you there on the stand, --

7       A    Yes.

8       Q    -- on the witness stand?

9            Does that appear to be what you observed that

10  day, Plaintiff's Exhibit 3?

11      A    Yes.  But this part was all the way down,

12  making it very small at the end to where it was only a

13  portion showing like this.

14      Q    All right.  And so since that time, from the

15  time you observed it, it's been -- apparently, the, the

16  knot has been pulled upward?

17      A    That I recall, yes.

18      Q    Okay.  Do you know who, who may have done that

19  at all?

20      A    No, I don't.

21      Q    All right.

22      A    This rope --

23      Q    You did not?

24      A    This rope was left there.  I viewed it while I

25  was there, and I left it there.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      Q    All right.  Did you assign any racially
 2  discriminatory meaning to that rope under the
 3  circumstances?
 4      A    No.  I did not.  Whenever I first picked it up,
 5  it was kind of like on a nail; and you could see a little
 6  bit of a, like a rust formation on the rope to where this
 7  had been sitting on the nail for quite some time; and
 8  whenever you picked it up, it had stayed in that form
 9  when taking it off it.  When I also, it was also taken
10  off, a lot of dirt and dust had come off of it also,
11  indicating to me that it had been there for quite some
12  time.
13      Q    All right.  What further conversation occurred,
14  if any?
15      A    I had left there -- I don't recall of, any
16  other further conversation.  The ends were frayed.  It's
17  an older type of rope.  The guy had told me it had been
18  there since he was employed there for at least -- from
19  what I remember, two years or more, and that it had been
20  sitting there, or hanging there like it was.
21           And I got done talking with him.  I went up
22  there to the main office of Christy-Foltz in the 900
23  block of South Main Street and talked to, I believe, the
24  owner that, or some of the other persons that worked
25  there in the office.  And he expl-- they explained that
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   the, about the employee being suspended or his form of

2   discipline that had been taking place with him.  And that

3   was pretty much it.

4           I think I then went back to and spoke to Mr.

5   Barbee, explaining of my observations and finding and

6   that, you know, without the complaint of, you know, maybe

7   disorderly conduct with the employee that had already

8   been disciplined, I, I was not able to assist him in any

9   criminal activity.

10      Q    And when you say you informed him of your, your

11  findings, what, what did you inform him?

12      A    Well, I told him it was my observations of the

13  rope -- we had agreed that it was the same rope in the

14  same location.  And with that in mind, with the age and

15  what I'd been told -- with the age of the rope and what

16  I'd been told by the person that, you know, just -- this

17  is his office -- that there was nothing that I was able

18  to do for him as far as any actions criminally.

19      Q    From what you observed of the, of the rope in

20  the batch office, would you expect that to be harassing

21  in any way to any member of the African-American race?

22      A    I was -- whenever I had first heard from Barbee

23  about the noose or the rope, I wanted to go see the type

24  of rope, how it was tied, where it was at, to where it

25  would be alarming to him.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1              When I went there and spoke to the person and

2      that the rope had been there for some time and that --

3      the age of the rope and it not being displayed out for

4      him for his observations of it, I didn't see how at that

5      time that he would have seen it be alarming for him.

6          Q     Given your observations of the, of the rope as

7      you've described, would you have expected that rope to be

8      intimidating or threatening to Mr. Barbee in any way?

9          A     No.

10         Q     Did Barbee -- did Mr. Barbee display any

11     unusual behavior in your presence that day?

12         A     Not that I can remember.  All I know is he did

13     not want to go back to work.  He did not want to go in

14     the environment for fear of what other drivers might do.

15     When I asked him what the drivers had done, or any of the

16     drivers there had done, he explained that they hadn't

17     done anything to him except for the one altercation with

18     the one subject.  He just felt that something may occur.

19         Q     And I believe in your testimony earlier, you

20     said that, that he indicated to you that the employees

21     were calling him names?

22         A     That's what it said in the dispatcher -- what

23     he had told Dispatch; but he had never claimed any of

24     that when I had questioned him about anybody else that

25     had given him problems, any of the other drivers or

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    anything.

2        Q    But did you ask him:  Has anybody -- who was

3    calling you names, and what are they saying?

4        A    All he had told me was the one subject that had

5    been disciplined by the employer.

6        Q    Did you get into the subject -- I think you've

7    indicated he told you he'd been passed up on a promotion.

8    Did you get into that subject with him?

9        A    Not really, because that was nothing criminal

10   that I could deal with.

11       Q    And you said that he indicated that he had been

12   harassed; and as I understand your testimony, it's just

13   the one name-calling incident that you're referring to?

14       A    Yes.

15       Q    All right.  And did you report back to Dr. Lee

16   at all?

17       A    It's -- Dr. Smith is what the detail had said,

18   that the office that I was, went to to speak to him.

19       Q    All right.  Do you remember meeting or seeing a

20   doctor there at the office where Mr. Barbee was?

21       A    There's several doctors in that office.  I was

22   just sent to that one particular lobby, I guess, where I

23   spoke to him.

24       Q    Okay.  But did you meet with a doctor at all?

25       A    No.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    Okay.  Did Mr. Barbee indicate any reaction to

2  your findings, Officer?

3      A    No.  He, he understood from what -- when

4  speaking with him, he was pleasant to me, understanding;

5  and then, you know, I had explained that, you know, this

6  would be a civil situation, that it wouldn't be a

7  criminal one.

8          MR. POSTLEWAIT:  Okay.  Thank you very much.

9          THE COURT:  Mr. Quivey.

10          CROSS-EXAMINATION BY MR. QUIVEY:

11      Q    Officer, during your testimony, you mentioned

12  to "that guy," "that person," "the person in the office."

13  You were referring to Scott Spitzer, correct?

14      A    No.  I know Scott Spitzer.  It wasn't him that

15  I had spoke to there.

16      Q    So the person in the office where the noose was

17  was not Scott Spitzer?

18      A    No.

19      Q    And did you ever talk to Scott Spitzer while

20  you were there?

21      A    I didn't even know he was employed there.

22      Q    All right.  But you went to high school with

23  him, right?

24      A    Yes.

25      Q    And grade school, right?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1       A    Yes.

2       Q    But he was not the person you talked to in

3  the -- not the main office but in the little office?

4       A    No.  It was not until yesterday that I even

5  realized where he worked.

6       Q    And, and just so I understand, you never saw

7  any photographs of the noose?

8       A    No.

9       Q    And you never spoke to a female psychologist

10  when you were called out to, via Dispatch?

11       A    No.

12       Q    You would agree with me that when you talked to

13  Mr. Barbee, he expressed fear to you about what his

14  coworkers might do to him?

15       A    He expressed his fears.  Yes.

16            MR. QUIVEY:  No more questions.

17            THE COURT:  Thank you.

18            Any redirect?

19            REDIRECT EXAMINATION BY MR. POSTLEWAIT:

20       Q    Officer, when you did spend some moments or

21  some time with Mr. Barbee, was he pacing about at all?

22       A    At the house, maybe, a little bit where I went

23  and met him after I had been to Grohne Concrete and

24  Christy-Foltz.

25       Q    Did you notice anything unusual about his
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  demeanor?

2      A     He was calm.  He was polite.  He didn't -- he

3  didn't want to go back to his job where he was working;

4  and I had spoke to him about that, you know, trying to

5  figure out why it is that he didn't want to go there.

6          But he didn't, you know -- other than the fact

7  of the argument with, and this noose that he had observed

8  and the argument that he had had with the person that was

9  disciplined and then his belief that others, he would

10  have other problems with other employees there, he --

11     Q    Did you make any observations while you were at

12  the Grohne premises that would in any way indicate to you

13  that Mr. Barbee was in, in danger of being harmed in any

14  way if he went to work there?

15     A    Other than the person I spoke to, that's the

16  only one that was there even around the surroundings, you

17  know, on the property.  So I didn't know -- but that

18  doesn't mean much of anything.

19          MR. POSTLEWAIT:  Thank you.

20          THE COURT:  Thank you.

21          You may step down.

22          (Witness Mullins excused, 10:55 a.m.)

23

24              *  *  *  *  *  *  *  *  *  *  *

25

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1                  (In open court; jury present).

 2                  ROBERT STEWART, sworn, 10:56 a.m.,

 3              DIRECT EXAMINATION BY MR. POSTLEWAIT:

 4       Q    Would you state your name, please?

 5       A    Robert Stewart.

 6       Q    And where do you live?

 7       A    I live in Mt. Zion, Illinois.

 8       Q    Are you married?

 9       A    Yes.

10       Q    Do you have children?

11       A    Three.

12       Q    And are they all adults?

13       A    Yes.

14       Q    All right.  And are you employed?

15       A    Yes.  I'm employed at Grohne Concrete.

16       Q    And how long have you been employed there?

17       A    44 years.

18       Q    And who do you get your paycheck from?

19       A    Christy-Foltz.

20       Q    Does Christy-Foltz, to your knowledge, own

21   Grohne Concrete?

22       A    Yes.

23       Q    And you say you've been there for 44 years?

24       A    Yes.

25       Q    That would date you to about 1966?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        A       August 15, 1966.

2        Q       And what position did you start in?

3        A       Truck driver.

4        Q       And what types of trucks did you drive?

5        A       Drove some snub-nose International, two-speed

6    axle, three-yarders, and I went to six-yarders, then up

7    to eight.

8        Q       All right.  Always driving a ready mix, like a

9    concrete truck?

10       A       Yes.

11       Q       All right.  Have you ever been a material

12   hauler?

13       A       No.

14       Q       Have you ever been a construction driver?

15       A       Well, since Christy, once in a while I drive a

16   truck for them.

17       Q       All right.  But primarily, and the vast

18   majority of your time, you've always been a --

19       A       Ready mix.

20       Q       -- ready mix?

21               Have there been any other positions that you

22   held either at Grohne or at Christy-Foltz other than

23   either ready mix driver or after you went to work at

24   Christy-Foltz when they bought Grohne that sometimes you

25   drove a construction truck?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A     Well, I was a batch man for ten years.

 2        Q     All right.  What period of time were you a

 3   batch man, Mr. Stewart?

 4        A     From '92 to 2005, I think.

 5        Q     Was that at the Grohne --

 6        A     Grohne.

 7        Q     That's the North Water Street premises?

 8        A     Yes, North Water Street.

 9        Q     And on that premises, is there a main office?

10        A     A main office.

11        Q     All right.

12        A     Up, front gate.

13        Q     All right.  Is there a batch plant?

14        A     Batch plant's at the east end.

15        Q     And then a batch office within the batch plant?

16        A     Yes.  It was -- the old plant, it was a batch

17   office inside the batch plant.  Yes.

18        Q     All right.  And when did that change?

19        A     I'm not really sure when it changed, --

20        Q     All right.

21        A     -- when they switched over.

22        Q     What I'm interested in here today, Mr. Stewart,

23   is to talk to you about the way the batch plant and the

24   batch office was back in 2007.  Would that, would that be

25   called the old batch office?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1        A     Old batch office.

2        Q     All right.  And is that where you worked from

3   1992 to 2005?

4        A     Yes.  That's where I worked.  Yes.

5        Q     As a ready mix driver, do you have any

6   particular seniority position?

7        A     Well, I follow Gary Roberts in seniority.

8        Q     So are you --

9        A     I'm about the fourth or fifth driver.

10       Q     All right.  Do you know Lawrence Barbee?

11       A     Yes, I do.

12       Q     How do you know him?

13       A     By working there.  He drives a sand haul truck,

14   dump truck.

15       Q     Did you ever meet him or know him before he

16   went to work at Christy-Foltz?

17       A     No, I didn't.

18       Q     And what position does Mr. Barbee work?

19       A     I'm not really sure what position he would be

20   in.

21       Q     All right.  Am I -- is it correct that there

22   are material haulers --

23       A     Material hauler, ready mix haulers,

24   construction.

25       Q     All right.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    He works in the material haulers.

 2        Q    Okay.  And all of those -- all of those drivers

 3   are members of the --

 4        A    Teamsters.

 5        Q    -- union?

 6        A    Yes.

 7        Q    Teamsters Local --

 8        A    279.

 9        Q    -- 279?

10             Given Mr. Barbee's position as a material

11   hauler and your position as a ready mix driver, does your

12   job require you to interact with him frequently?

13        A    I see him when he comes in the yard off and on.

14   You know, I don't really have time to talk.  I'm taking

15   care of business.

16        Q    Can you be any more descriptive in terms of how

17   frequently you would see him?

18        A    Well, I'll just see him drive through the

19   drive.  I'll nod or wave, and that's about all the time

20   I've got time to do.

21        Q    Your job doesn't require -- does it require you

22   to communicate with him at all in the course of your

23   duties?

24        A    Well, if he walks up or stops to talk to me, I

25   could talk to him.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       Q    Sure.  But would that be for any purposes
2  related to your job?
3       A    Yeah, yes.
4       Q    Okay.  What types of things would he come and
5  talk to you about?
6       A    If he has a union problem or --
7       Q    Do you hold a position within the union?
8       A    I'm a union steward.
9       Q    Has Mr. Barbee ever lodged any complaints with
10 you as a union steward?
11      A    They have their own union steward.
12      Q    All right.  So you're the union --
13      A    I'm union steward at ready mix.
14      Q    All right.
15      A    And Kevin Fowler, I think, is union steward for
16 the sand haulers.
17      Q    For the material haulers?
18      A    Material haulers, yes.
19      Q    To the extent you do have occasion to interact
20 with Mr. Barbee, how would you describe your relationship
21 with him?
22      A    I'll speak, talk to him when he wants something
23 to talk about.  Other than that, I, I just go on doing my
24 own work.
25      Q    I understand.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1            Your relationship with Barbee -- or Mr. Barbee
 2    the same as any other --
 3        A    Any other driver.
 4        Q    -- coworkers?
 5            Are you aware of an incident back in August
 6    of 2007 between Mr. Barbee and Mr. Roberts wherein Mr.
 7    Roberts made a derogatory remark to Mr. Barbee?
 8        A    I heard about it.  That's all I -- I heard
 9    about.
10        Q    Are you aware that Mr. Roberts received
11    disciplinary action in connection with that event?
12        A    Yes, I was.
13        Q    And did you understand from the disciplinary
14    action received by Mr. Roberts that conduct in derogation
15    of any race would not be tolerated by Christy-Foltz?
16        A    Yes.
17        Q    Did that send a strong message to you that as
18    an employee of Christy-Foltz you are not to engage in
19    conduct in derogation of the race of anyone else?
20        A    Yep.
21        Q    Other than that incident with Mr. Roberts and
22    Mr. Barbee, are you aware of anyone else prior to that
23    time making any remarks in derogation of another's race
24    there at the work premises?
25        A    I haven't.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1       Q    Did you consider this event to have been an
 2   isolated event?
 3       A    Isolated event.
 4       Q    Something that doesn't occur very often?
 5       A    Doesn't occur very often.
 6       Q    Do you still -- you've not -- has your
 7   relationship with Mr. Barbee before and after this event
 8   changed in any way?
 9       A    No.
10       Q    Mr. Stewart -- may I approach the witness?
11            THE COURT:  Yes.
12       Q    Mr. Stewart, I've handed you what's been marked
13   as Joint Exhibit 7.  Do you recognize that document?
14       A    Yes.
15       Q    And what is that document?
16       A    It's a Construction Service, for employees.
17       Q    What is the title of the document?
18       A    "Decatur Construction Service" and
19   "Nondiscrimination" and -- I can't pronounce the other
20   word.
21       Q    All right.  Antiharassment policy?
22       A    And "Antiharassment Policy."
23       Q    Have you seen that document before?
24       A    Yes.  They had it hanging on the bulletin
25   board.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q     And do you recall when it was hanging on the --
 2   or when it was first hanging on the bulletin board?
 3        A     Not right, right at, I can't.
 4        Q     Now, do you recall when you first noticed it on
 5   the bulletin board?
 6        A     I'm not really sure what time when I did see
 7   it.
 8        Q     All right.  In your mind, do you associate it
 9   with the events that occurred with Mr. Roberts in terms
10   of the time period that it appeared on the board?
11        A     Yeah.  I talked to Gary.
12        Q     No.  I'm talking about the policy.
13        A     The policy?  No.
14        Q     Can't be any more specific as to when you first
15   saw it?
16        A     No, I can't.  I, I -- it's on the bulletin
17   board, and we got two of them on there.  It's been up
18   there.
19        Q     Do you know whether it was posted, for
20   instance, in 2007?
21        A     It might have.
22        Q     All right.  Do you check the board frequently?
23        A     Once in a while.
24        Q     I understand you've been there for 44 years;
25   but if there is something that you need to know, do you
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   check the board?

 2        A     I'll go back and look.

 3        Q     What types of notices are posted on that board?

 4        A     Union meetings or things in these -- like

 5   Caterpillar, you got to wear hard hats and glasses and

 6   earplugs.  That would be posted on there.  It's

 7   qualified; you got to wear them when you go in the plant.

 8        Q     Was there a big labor law poster?

 9        A     Big labor law poster, been up there for years.

10        Q     Do you know whether any part of that labor law

11   poster --

12        A     Very top.

13        Q     -- pertains to discrimination?

14        A     Discrimination.

15        Q     And does it prohib-- give you notice that

16   discrimination is --

17        A     Yes.

18        Q     -- prohibited?

19        A     Yes.

20        Q     Have you read the policy?

21        A     I scanned through it.

22        Q     All right.  Prior to this incident with Mr.

23   Roberts, did you understand as an employee of

24   Christy-Foltz that any conduct in derogation of, of the

25   African-American race, or any other race, is not
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    tolerated?

2         A    Yes.

3         Q    Mr. Stewart, would you please -- there's a

4    photograph, Plaintiff's Exhibit 5, that's to your right.

5         A    Okay.

6         Q    And do you recognize the area shown in that

7    photo?

8         A    Yes.

9         Q    And what area is it?

10        A    See that rope's a hanging.

11        Q    What's the -- in terms of the physical area

12   shown within the photo, do you recognize that area?

13        A    Yeah.  It's where the refrigerator is, the fire

14   hydrant.

15        Q    Are those things in the batch office?

16        A    In the batch office, yes.

17        Q    All right.  And you mentioned a rope that you

18   see there?

19        A    Uh-huh.

20        Q    Do you know the origin of that rope?

21        A    Yeah.

22        Q    What is the origin of the rope?

23        A    I know the man that made it.

24        Q    And who made it?

25        A    Calvin Campbell.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    And when did Mr. Campbell make it?

2    A    In the late '70s.

3    Q    And were you present when he made it?

4    A    Yes, I was.

5    Q    Tell us about Mr. Campbell.

6    A    He's a minister.  We was sitting there on our

7    lunch hour; and he was done, just piddling, found a rope

8    and made it.  Didn't think nothing of it.

9    Q    Did he have to go get a piece of rope, or was

10   it just laying --

11   A    No.  It was just laying there on the counter.

12   It was a scrap piece of rope.

13   Q    And was Mr. Campbell an employee at the

14   premises?

15   A    Yes.

16   Q    And do you have any knowledge as to why he made

17   the --

18   A    No, I don't.

19   Q    -- rope?

20   A    He was piddling, I guess, picked it up and just

21   started messing with it.

22   Q    And has the rope, then, continued to be

23   positioned within the batch office?

24   A    Been hanging in the batch plant for 35 years.

25   Q    Was there any particular meaning assigned to

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   the rope?

2        A    No.  Nobody thought nothing of it.

3        Q    You were the batch operator, you indicated, for

4   a ten-year period of time?

5        A    Uh-huh.

6        Q    During the time you were the batch operator,

7   did it hang there in the batch office?

8        A    It hang right in the same, on the west wall.

9        Q    While you were batch operator, did you have

10  occasions when someone of the African-American race would

11  come into the batch office?

12       A    Yes.  Lawrence Barbee come in there.

13       Q    All right.  But how about prior to that?

14       A    No.

15       Q    Okay.  Do you know of any other circumstances

16  under which the, the rope was made by Mr. Campbell?

17       A    No.

18       Q    Anything else that you have not told us?

19       A    He was just piddling and made it and showed it

20  to me.

21       Q    Would it be fair to say he was just passing the

22  time?

23       A    Just passing the time.

24       Q    Did he hang it up someplace, or did someone

25  else hang it up, to your knowledge, if you know?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1       A    I don't know on that part.  I don't know.  It

2  was just laying on the counter then.

3       Q    All right.  There's a small photo there in

4  front of you labeled Defendant's Exhibit 1.

5            MR. POSTLEWAIT:  May I approach, Your Honor?

6       A    The small one?

7            THE COURT:  Yes.

8       Q    You recognize what's shown in Defendant's

9  Exhibit 1?

10      A    Yeah.  I see the rope hanging on the side of

11  the doorway there.

12      Q    Do you know the man standing in the door?

13      A    Danny Kuhle, Kuhle [different pronunciation].

14      Q    And who is he?

15      A    He was a truck driver.

16      Q    All right.  Worked at Grohne?

17      A    Worked for Christy, Grohne.

18      Q    And you see the rope hanging to the right of

19  the doorway?

20      A    Uh-huh.

21      Q    Is that the way it was positioned when you

22  worked as a batch operator?

23      A    No.  It was hanging on the wall on the north

24  side.

25      Q    Okay.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1      A    By the calendar.  It was hanging up by the

2 calendar that used to be over there.

3      Q    All right.  Calendar on the wall?

4      A    Uh-huh.

5      Q    All right.  Do you know; did it get moved

6 around from time to time?

7      A    Not very often.  It just hung there.

8      Q    All right.  Did you assign any racially

9 discriminatory meaning or racial symbolism to that rope?

10      A    No.

11      Q    Did you know anybody who did?

12      A    No.

13      Q    Do you know anybody who positioned the rope

14 within the office to harass Mr. Barbee or any other

15 person of the African-American race?

16      A    No.

17      Q    Do you know of any reason, given your

18 experience in working there at the site, as to whether or

19 how -- I guess as to whether that would be intimidating

20 to anyone of the African-American race?

21      A    No.

22      Q    Is Mr. Campbell still alive?

23      A    He has passed away.

24      Q    Did anyone prior to me asking you here today,

25 Mr. Stewart, inquire to you about the origin of that
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  rope?

2       A     No.

3       Q     Did Mr. Grigg ever inquire to you in terms of

4  where it came from?

5       A     He called me to the office and asked me.

6       Q     All right.  Do you recall approximately when

7  that was?

8       A     Last summer, or a couple summers ago or -- it's

9  been quite a while.

10      Q     Were you aware of an incident at or about

11 October of 2007 when Mr. Barbee claimed to find a noose

12 there in the batch office?  Did anybody tell you that?

13      A     Scott told me he found it in there.

14      Q     All right.  And what did you tell Mr. Grigg

15 when he inquired to you about it?

16      A     He asked me where it come from, who made it;

17 and I told him.

18      Q     Did you tell him the same thing --

19      A     Uh-huh.

20      Q     -- you've told us here today?

21      A     Yes, I did.

22      Q     Do you know whether or not it was removed from

23 the office?

24      A     It has never been tooken out of that office.

25      Q     Do you know whether it's there today?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A     It's sitting right here in front of me.

 2        Q     I understand.

 3              But do you know when you last saw it within

 4   that office?

 5        A     When it was took up to the front office.

 6        Q     All right.  Was that following this incident --

 7        A     Uh-huh.

 8        Q     -- with Mr. Barbee?

 9        A     Yes, it was.

10        Q     Are you aware of an incident later in 2007

11   where Mr. Barbee claimed to find another noose on the

12   premises there at the batch plant?

13        A     No.  I wasn't too aware of that.

14        Q     All right.

15              MR. POSTLEWAIT:  May I approach the witness?

16              THE COURT:  Yes.

17   BY MR. POSTLEWAIT:

18        Q     Mr. Stewart, the, the large photo that I just

19   sat in front of you, Plaintiff's Exhibit 6, --

20        A     Okay.

21        Q     -- do you recognize the area shown in, in that

22   photo?

23        A     Yes, I do.

24        Q     And what area is it?

25        A     It's the east wall of the batch plant, batch
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  building.

2       Q    And what's shown on the wall?

3       A    Cloyvis [phonetic], rope hanging up there for

4  the batch house.

5       Q    All right.  Do you see anything that would be

6  in the nature of a noose on that wall?

7       A    No, not really.

8       Q    All right.  Do you see a rope with a slip knot

9  on the wall?

10      A    A little one, looks like.

11      Q    Would you pick up the smaller photograph,

12  Defendant's Exhibit 13, that I laid in front of you?

13      A    Okay.

14      Q    Have you seen the rope shown in that photo

15  before?

16      A    No.

17      Q    All right.  Does it appear to be anything

18  unusual hanging in the wall -- on the wall there in terms

19  of the other types of things that are hanging there?

20           MS. LEAHY:  Objection, Your Honor.  He's

21  testified he has not seen this before.

22           THE COURT:  Are you asking about the picture

23  now?

24           MR. POSTLEWAIT:  No.  I'm talking about the

25  rope.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          THE WITNESS:  Rope.

2          THE COURT:  Sustained.

3    BY MR. POSTLEWAIT:

4      Q    What types of things hang on that wall there?

5      A    They got a rope.  They got extension light,

6    cord.  They got a, like a ratchet for tool feeding,

7    cranks to -- rope on top of the building.

8      Q    In looking at that photo, does the rope appear

9    to be consistent with the other things that are hanging

10   on the wall?

11     A    No.  Just -- it's there when they need it.

12     Q    If you were to look at that, what would you

13   think it was?

14     A    Something to do with work.  I wouldn't think

15   nothing of it.

16     Q    Given Mr. Barbee's position as a material

17   hauler, Mr. Stewart, would you expect him to be in the

18   batch office or the batch plant with any frequency?

19     A    He should be -- just walk in the batch office

20   to get his ticket and leave.

21     Q    How long would that take?

22     A    About three minutes.

23     Q    In looking at Defendant's Exhibit 13 and

24   Plaintiff's Exhibit 6, would you assign any racially

25   discriminatory meaning or racial symbolism to the rope

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   that's shown in that photo?

2       A    No, I wouldn't.

3       Q    Would you know any reason that would be

4   intimidating to anyone of the African-American race?

5       A    No.

6       Q    Do you know anyone who positioned it there so

7   as to be harassing to Mr. Barbee or any other person of

8   the African-American race?

9       A    No.  I don't know who -- the only way I can,

10  position it would be Scott.  He put it there to hang

11  there when he needed it.

12      Q    Are you aware of any employees who have changed

13  their behavior with Mr. Barbee since the incident

14  involving Mr. Roberts?

15      A    No.

16          MR. POSTLEWAIT:  Thank you, Mr. Stewart.

17              CROSS-EXAMINATION BY MS. LEAHY:

18      Q    Now, Mr. Stewart, I want to be sure I

19  understand.  You've been at Grohne -- you began in 1966?

20      A    Yes, I have.

21      Q    And then at one point Christy-Foltz bought,

22  bought out --

23      A    Yes.

24      Q    -- Grohne, but you continued to work there?

25      A    Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    Now, did I understand you that at one point in

2   time you were the batch office operator?

3        A    Yes, I was.

4        Q    What period of time?

5        A    '92 to two thousand -- well, ten years I was

6   the batch office man, operator.

7        Q    So that would have been from 1992 to 2002?

8        A    Something like that.

9        Q    Now, am I correct that there are at least two

10  contracts with the Teamsters Union, one that covers the

11  ready mix drivers and one that covers the material

12  haulers?

13       A    It's three, three contracts.  It's

14  construction, ready mix, and material hauler.

15       Q    And you're the union steward over ready mix,

16  correct?

17       A    Over ready mix, yes.

18       Q    And when did you become the union steward over

19  the ready mix employees?

20       A    About ten years.

21       Q    And Kevin Fowler in 2007, he was the union

22  steward for the haulers?

23       A    For the haulers.

24       Q    And so if Mr. Barbee had any complaints, he

25  would have been -- it would have been appropriate for him
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   to raise them with Mr. Fowler?

2        A    Yes.

3        Q    How did you hear about the discipline of Gary

4   Roberts?

5        A    Some of the guys were talking about it.  I just

6   heard them tell me.

7        Q    And how did you become aware of the incident

8   between Gary Roberts and Mr. Barbee?

9        A    I was told what happened.

10       Q    By whom?

11       A    I'm not really sure who told me.

12       Q    So would it be correct, then, that there was a

13  lot of talk --

14       A    A lot of talk.

15       Q    -- among the employees --

16            Wait till I finish my question, please.

17       A    Okay.

18       Q    A lot of talk among the employees about Gary

19  Roberts calling Mr. Barbee "nigger," right?

20       A    Yes.

21       Q    And there was a lot of talk about the

22  discipline that Mr. Roberts got?

23       A    Yeah.

24       Q    Now, I'd like you to look at Joint Exhibit 7.

25  It's the policy, Mr. Stewart.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A     Oh, okay.

 2        Q     Do you remember giving your deposition to me on

 3   February 24, 2010?

 4        A     That's been a while.

 5        Q     Well, maybe I can refresh your memory.  You

 6   indicated that you had seen Joint Exhibit 7?

 7        A     Yes.

 8        Q     And that you had read it?

 9        A     I scanned through it.

10        Q     What is the difference --

11        A     I mean, just kind of looked over it a little

12   bit and read a little bit and sat it back down.

13        Q     Did you ever read the whole thing?

14        A     No, I didn't.

15        Q     Did you ever have -- were you ever given that

16   policy?

17        A     No.

18        Q     Where were you when you scanned it?

19        A     Well, I got one when, in the mail when I just

20   got my papers.

21        Q     Okay.  I'm sorry.  You got that policy in the

22   mail?

23        A     Well, I got a copy of this somewhere.

24        Q     Did you get it in the mail?

25        A     Yes.
```

```
 1       Q     How long ago?

 2       A     When I got subpoenaed.  Been last week or

 3  whenever.

 4       Q     All right.  Was that the first time you scanned

 5  it?

 6       A     No.  I saw the one in the, in the break room.

 7       Q     When did you scan it when you saw it -- well,

 8  let me back up.  I'm assuming something.

 9             Did you scan it when you saw it in the break

10  room?

11       A     I just kind of picked it up a little bit and

12  read a few of it and sat it back down.

13       Q     Well, I thought it was on a bulletin board?

14       A     It was on the bulletin board.  You can pick it

15  up.

16       Q     Okay.  And then you put it back on the bulletin

17  board?

18       A     Put it back.

19       Q     Okay.  When was that?

20       A     I'm not sure.

21       Q     Has it been since you gave your deposition?

22       A     It's been a while.  I can't remember.

23       Q     Do you remember my asking you this question on

24  February 24, 2010?  "Have you ever seen any written

25  policy at either Grohne or Christy-Foltz regarding
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  discrimination?"

2          And your answer:  "Unless this is a copy of the

3  contract -- I read through the contract once in a while,

4  but I don't hold no discrimination against anybody."

5          Do you remember that question and answer?

6      A    Yes.  I don't hold no discrimination against

7  anybody.

8      Q    Okay.  But when you said you -- you said it

9  was -- if it was part of the contract, you would have

10  read it.  Were you referring to the union contract?

11      A    Yeah.

12      Q    So you weren't referring to Joint Exhibit 7

13  when you were shown it in your deposition?

14      A    Well, I saw it on the bulletin board and read

15  it.

16      Q    You saw it on the bulletin before your

17  deposition, but had you even scanned it before your

18  deposition?

19      A    Yes.

20      Q    Could you tell me when?

21      A    I don't remember what day, how long it's been.

22      Q    Do you know what's in there?

23      A    No.

24      Q    No, without looking at it.  What's your memory

25  of what's contained in that Joint Exhibit 7?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A     About discrimination.

 2        Q     Anything else, than just that it's about

 3   discrimination?

 4        A     I, I can't remember.  It's been a while.

 5        Q     So I gather when you got it in the mail last

 6   week you didn't read it?

 7        A     I went through -- I looked at it.

 8        Q     Mr. Stewart, have you ever had any training on

 9   discrimination?

10        A     Yeah.  I was raised -- my folks trained me

11   right.  I, about discrimination.

12        Q     Okay.  Have you ever had any training on

13   discrimination at any work site or place you worked?

14        A     No.

15        Q     Have you ever had any training on racial

16   discrimination?

17        A     I know right from wrong.

18        Q     Mr. Stewart, that's not my question.

19        A     I know but --

20        Q     Could you answer my question, please?  Have you

21   had any training on race discrimination at the workplace?

22        A     No.

23        Q     Have you had any training on racial harassment

24   at the workplace?

25        A     No.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      Have you had any training on what would be --
2   any training on what would be the symbolism of a noose to
3   African-Americans?
4      A      No.
5      Q      Have you had any training on what symbols would
6   be intimidating to African-Americans?
7      A      No.
8      Q      I'm going to go back one more time because
9   sometimes people remember things a few minutes later.
10           Do you remember any specifics contained in
11   Joint Exhibit 7?
12      A      No.
13      Q      Mr. Stewart, when you were working for Grohne
14   before it was bought out by Christy-Foltz, did Grohne
15   conduct safety meetings?
16      A      We had a couple meetings.
17      Q      And after Christy-Foltz bought out Grohne, were
18   there any safety meetings?
19      A      I can remember they had one, but I don't
20   remember what time, what year it was.
21      Q      So there was one -- at least one meeting, and
22   that was with all the employees, the truck drivers?
23      A      The truck drivers.
24      Q      And it was to discuss safety issues, right?
25      A      Yes.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     Now, let's go to when you saw Mr. Campbell tie

2   Plaintiff's Exhibit 3; is that correct?

3      A     Yeah.

4      Q     Was anyone else present besides you and

5   Mr. Campbell?

6      A     Just me and Mr. Campbell.

7      Q     And where -- where did this take place?

8      A     In the batch plant.

9      Q     In the batch plant?

10     A     Yes.

11     Q     Not in the batch plant office?

12     A     Well, the batch plant office.  It's all the

13  same building.

14     Q     Okay.  And I gather you weren't working when

15  this happened?

16     A     We was on lunch hour.

17     Q     And you giggled when you saw Campbell tie that

18  rope, didn't you?

19     A     I giggled, didn't think nothing of it.

20     Q     I asked you:  Did you --

21     A     Yes.  I giggled.

22     Q     Did Mr. Campbell show you how to tie a rope

23  like that?

24     A     No, he didn't.

25     Q     You'll agree with me that that rope couldn't be

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   used for anything, right?
 2        A    No.
 3        Q    You don't agree with me?
 4        A    It can't be used for nothing.
 5        Q    I'm sorry.  I'm not following you.
 6             Can that rope be used for anything at the
 7   workplace?
 8        A    No.
 9        Q    What did Mr. Campbell do with the rope after he
10   tied it?
11        A    He laid it on the counter.
12        Q    What happened next with regard to the rope?
13        A    I don't know what happened to the rope then.
14        Q    So when you left -- were you working in the
15   batch plant office that day?
16        A    Yeah.
17        Q    So what happened to the rope?
18        A    It was just set off to the side.
19        Q    You just left it there?
20        A    Just left it there.
21        Q    Do you have any idea how it got hung up?
22        A    Probably one of the other drivers hung it up.
23   I don't know who done it.
24        Q    But you continued to see that rope in the batch
25   plant office?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    Yes.  It hung by a calendar.

 2        Q    It hung by a calendar?

 3        A    Yeah.

 4        Q    For how -- when was the period of time it hung

 5   by a calendar?

 6        A    About 15 years, 20.

 7        Q    And then it got moved?

 8        A    Got moved because we put a refrigerator in

 9   there.

10        Q    Okay.  Was there any reason why, when you put

11   the refrigerator in and you moved it, you didn't throw it

12   away?

13        A    No.  Didn't think --

14        Q    It had no use at the plant, right?

15        A    No.

16        Q    That's right?  It was serving no purpose at the

17   plant?

18        A    No.

19        Q    I mean, you couldn't use it to do anything at

20   work?

21        A    No.

22        Q    You testified that Ron Grigg called you into

23   the office?

24        A    Yes, I did.

25        Q    And he asked you about Plaintiff's Exhibit 3?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      A    Yes, he did.

 2      Q    Did he show you Plaintiff's Exhibit 3?

 3      A    I can't remember.

 4      Q    Going back to your deposition, --

 5           MR. POSTLEWAIT:  Page?

 6           MS. LEAHY:  22.

 7      Q    -- do you remember this question?  "Was anyone

 8  else present when he talked to you?"  Meaning Mr. Grigg.

 9      A    No.

10           MR. POSTLEWAIT:  Object, Your Honor.  This is

11  not impeaching.

12           MS. LEAHY:  Well, I'm going to --

13           THE COURT:  I don't think we've gotten very far

14  to, to allow me to rule.  So --

15  BY MS. LEAHY:

16      Q    You remember your answer:  "Not that I

17  remember"?

18      A    No.  It was nobody present when I was in the

19  office with Griggs.

20      Q    "What did he say to you, and what did you say

21  to him?

22           "Answer:  He asked me who made that, and I told

23  him."

24           Do you remember that question and answer?

25      A    That's right.  Yes.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q    And then the question:  "Did he have that in
2  his hand?"
3           And your answer:  "No."
4      A    No.
5      Q    "Question:  How did you know what he was
6  referring to when he asked -- when he said, 'Who made
7  that?'
8           "Answer:  He asked me about the rope that was
9  in the batch plant."
10          Answer -- that was your answer, right?
11     A    Yes.
12     Q    And then the question:  "Okay.  What did he say
13  about that?
14          "He just asked me who made that rope in the
15  batch plant, and I told him."
16          You remember that answer?
17     A    Yes.
18     Q    So when he asked -- when he was talking to you,
19  did he have Plaintiff's Exhibit 2 present?
20     A    No, he didn't.
21     Q    So when he interviewed you -- how did you know
22  what rope he was talking about?
23     A    I knew what he was talking about.
24     Q    How did you know?
25     A    That was the only rope that was in the batch

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   house.  I knew it was that rope there.

2       Q    So the only rope in the batch house --

3       A    Was this little piece of rope right here in

4   front of me.

5       Q    The only rope in the batch house in the fall

6   of 2007 was Plaintiff's Exhibit 3?

7       A    Yes.

8            MS. LEAHY:  Nothing further, Your Honor.

9            THE COURT:  Thank you.

10           Redirect?

11           MR. POSTLEWAIT:  Very briefly.

12           REDIRECT EXAMINATION BY MR. POSTLEWAIT:

13      Q    Mr. Stewart, would you look at Defendant's

14   Exhibit -- I'm sorry, Plaintiff's Exhibit 6.

15           Again, referring to the east wall of the, of

16   the batch plant that's shown in that photograph, --

17      A    Yes.

18      Q    -- do you know, are there any -- from time to

19   time, are there any -- is there any rope that hangs on

20   that wall?

21      A    Just that wall.

22      Q    All right.  And would it -- would there have

23   been rope on that wall back in 2007?

24      A    Yes.  It would be.

25      Q    When Mr. Grigg inquired to you, did you know

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   that he was talking about the, the rope that was in the

2   batch office?

3       A    Rope in the batch office.

4       Q    Okay.  And that's -- is that what you

5   understood to be the only rope --

6       A    Yeah.

7       Q    -- in the batch office?

8       A    Yes.

9       Q    Okay.  So if you mentioned to Plaintiff's

10  counsel here that it was the batch house, you were really

11  speaking of the batch office?

12      A    Batch office.

13      Q    All right.  Thank you.

14      A    But the office is in between the big building.

15  It's in the building, and the office is in the building.

16          MR. POSTLEWAIT:  Okay.  Thank you.

17             RECROSS-EXAMINATION BY MS. LEAHY:

18      Q    Mr. Stewart, just one question to really be

19  sure.  The only rope that was hanging in the batch plant

20  office was Plaintiff's Exhibit 3?

21      A    Yes, it was.

22          MS. LEAHY:  Okay.  That's all, Your Honor.

23          THE COURT:  Thank you.  You may step down.

24          (Witness Stewart excused 11:38 a.m.)

25             * * * * * * * * * * *

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1              (In open court; jury present.)

 2              RONALD L. GRIGG, sworn, 1:27 p.m.,

 3         DIRECT EXAMINATION BY MR. POSTLEWAIT:

 4    Q    Mr. Grigg, would -- state your name again.

 5    A    Ronald L. Grigg.

 6    Q    And are you married, Ron?

 7    A    Yes.

 8    Q    Do you have children?

 9    A    Two, yes.

10    Q    And what's the extent of your education?

11    A    I have a bachelor's of science from Eastern

12  Illinois University.

13    Q    In what year?

14    A    '72.

15    Q    After obtaining your degree -- or strike that.

16         What is your degree in?

17    A    Education.

18    Q    And after getting your degree in college, what

19  did you do?

20    A    I graduated in the middle of the year.  We was

21  on a quarter system.  I had worked for Christy-Foltz as a

22  laborer during summers and vacations while I was going to

23  college.  So at that time of the year, there's not too

24  many teaching jobs to find.  So I worked for

25  Christy-Foltz during the late winter/spring and summer
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1   of '72.
 2            After that, I worked for a landscaper up around
 3   Chicago for about a year and a half, came back to Decatur
 4   at that point in December of '73.  I worked for -- at
 5   that time I worked in a plant, BorgWarner, in Decatur on
 6   the third shift and also took a full-time teaching job.
 7   I replaced a teacher at a junior high school for the
 8   remaining part of that year.  So during that, into that
 9   school year, I was working two jobs.
10            And summer of '74, I went back laboring for
11   Christy-Foltz; and then in August of '74, I took the job
12   as plant manager for Christy.
13       Q    And the plant manager job pertained to what
14   part of their business?
15       A    My responsibilities is ready mix concrete
16   portion of the business, along with material, equipment
17   deliveries, and a number of other duties.
18       Q    And is that the same position that you hold
19   today?
20       A    Yes.
21       Q    And have you held that position continuously
22   throughout the time from 1974 through the present?
23       A    Yes.
24       Q    Have you had any military service?
25       A    I spent six years, Army Reserves.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      Were you honorably discharged?

2      A      Yes.

3      Q      Do you have any ownership interest in

4  Christy-Foltz?

5      A      No.  I do not.

6      Q      Do you have any ownership interest in Decatur

7  Construction Services, Inc., d/b/a Grohne Concrete?

8      A      No.

9      Q      Are there any -- other than Mr. Pinkston, are

10  there any other job sites that have expressed

11  dissatisfaction with Mr. Barbee as a ready mix driver?

12      A      Recently I've had a, several, but two

13  specifically.  Some of Christy-Foltz employees were doing

14  work out at Cat.  They asked that I not send him out

15  there.  Being Christy-Foltz employees, you know, they can

16  make that request; but if I get in a bind, I, I can send

17  him out there because I know I'm not gonna lose a

18  customer over it.  I've got a captive audience on that

19  one.

20           But Midwest Concrete, one day I -- they called

21  in, and Lawrence was the only one that I could get

22  available for them to pour at the time that they wanted.

23  They indicated that they didn't want him; that he was --

24  he made Bob Stewart look like an all star.  And John

25  Hayes [phonetic] was the one that told me that -- and Bob

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Stewart being, probably, the slowest driver that I have.

2         Q    Now, when was this -- who from Midwest Concrete

3    made this --

4         A    John Hayes.

5         Q    All right.  And what is his position with

6    Midwest Concrete?

7         A    He's one of their superintendents.

8         Q    And when was that made?

9         A    Within the last four to six weeks.

10        Q    What problems does that present for you, in

11   addition to Mr. Pinkston having already been a customer

12   that requested Mr. Barbee not come to his sites?

13        A    Well, it's very difficult to, to plan on him

14   being a driver for you when you can't send him out to

15   places you need to send him.  I mean, I don't have -- if

16   I'm running twelve trucks during the day, that don't mean

17   I have twelve trucks at any time to go anyplace I want

18   them to.  They -- they're out.  They come back different

19   times, and scheduling just makes it difficult to, to pick

20   and choose which driver I send where.

21        Q    You heard Mr. Pinkston testify about timeliness

22   of deliveries being important to him.  If you are

23   attempting to make deliveries to a customer and in the

24   rotation of trucks Mr. Barbee as a ready mix driver is in

25   the rotation, does that present a problem for you or

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    jeopardize the ability to make a timely delivery?

2         A    Well, it does, and the timely delivery means --

3    you know, if they have concrete ordered at 10:00, that

4    means they have a crew of people waiting for us to be

5    there.  So anytime we're late, then we're putting our

6    contractors at, at risk of paying people to wait on us.

7         Q    If you were to hire Mr. Barbee as a ready mix

8    driver, would he again be considered as a new hire?

9         A    He would.

10        Q    And would it be like he was starting all over

11   again?

12        A    Exactly.

13        Q    As a new hire, is he subject, then, to any

14   probationary period?

15        A    Every new hire is subject to a 30-day

16   probationary period.

17        Q    And is that pursuant to the collective

18   bargaining agreement?

19        A    Yes, it is.

20        Q    So --

21        A    And what that means is within the first 30

22   days, if they don't work out for any reason -- I mean, I,

23   I don't have to -- I don't have to have any specific

24   reason, but I can let them go.

25        Q    Given the experiences you've had with customers

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  or, or persons receiving deliveries at job sites

2  expressing dissatisfaction with Mr. Barbee as a ready mix

3  driver, what is the likelihood of him completing a

4  probationary period?

5       MR. QUIVEY:  I'm going to object to the form of

6  the question as to relevance.

7       THE COURT:  Sustained.

8  BY MR. POSTLEWAIT:

9    Q    If, if Mr. Barbee were a new hire under the

10  ready mix agreement, would you allow him to complete the

11  probationary period given --

12       MR. QUIVEY:  Objection, relevance.

13       THE COURT:  Let him finish the question.

14    Q    -- given the experiences you've had with

15  dissatisfaction from your customers?

16       MR. QUIVEY:  Objection is relevance, Your

17  Honor.

18       THE COURT:  Same problem.  Sustained.

19  BY MR. POSTLEWAIT:

20    Q    Given Mr. Barbee's request to become a ready

21  mix driver under the ready mix agreement and the

22  experiences that you have had, what do you think is the

23  best fit for him at Christy-Foltz, the material hauler or

24  a ready mix driver?

25       MR. QUIVEY:  Your Honor, object again, the

1    relevance.  If he's limiting it to October of 2007, fine.

2    But it has no relevance as to the way he asked the

3    question, which did not have a temporal limitation.

4              THE COURT:  Correct.  Sustained.

5              You may ask it in terms of that time frame.

6              MR. POSTLEWAIT:  Okay.

7    BY MR. POSTLEWAIT:

8        Q    If I take you back to the time period, Mr.

9    Grigg, of October 2007, if you were to rehire Mr. Barbee

10   at that time as a ready mix driver, what would you have

11   considered the likelihood of him fulfilling the

12   probationary period?

13             MR. QUIVEY:  Objection, calls for speculation.

14             THE COURT:  It does.  Sustained.

15   BY MR. POSTLEWAIT:

16       Q    Back in October of 2007, Mr. Grigg, what did

17   you consider the best fit for Mr. Barbee as a truck

18   driver at Christy-Foltz?

19       A    Well, I felt the best bet was the job that he

20   was doing as a material hauler.  He made much more money

21   than he would have if he would have been on the low end

22   of the seniority of the ready mix driver.

23             And given the probationary period of time that

24   he would have had to serve as the ready mix driver and

25   knowing Pinkston's complaints specifically at that time,

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    he would not have made it through the 30-day probationary

2    period.

3              MR. POSTLEWAIT:  Your Honor, I think I have

4    some photos that I wanted to provide to the witness, but

5    I think there's an objection pursuant to the pretrial

6    order.

7              THE COURT:  Well, let's do as we did with

8    Defendant's Number 1.  You can show them to the witness.

9    We won't publish them yet until that objection's been

10   resolved.

11             MR. POSTLEWAIT:  Approach the witness?

12             THE COURT:  Sure.

13   BY MR. POSTLEWAIT:

14        Q    Mr. Grigg, I've handed you what's been marked

15   as Defendant's Exhibit 6A, 6B, 6C, 6D, 6E, F, and 6-O.

16             We start with Exhibit 6A.  Do you recognize

17   what's shown in that photo?

18        A    Yes.  It's the east side of the old batch

19   plant.

20        Q    There's been much talk in this case about

21   Plaintiff's Exhibit 6.  Do you recall observing that

22   photograph?

23             That's the cables and stuff on the east wall;

24   is that correct?

25             Let me show it to you.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1          MR. POSTLEWAIT:  May I approach, Your Honor?

 2          THE COURT:  Yes.

 3     A    Yes.

 4     Q    You may look at Exhibit 6, Plaintiff's

 5  Exhibit 6.

 6     A    Yes.

 7     Q    All right.  Taking into consideration that

 8  location, where is Defendant's Exhibit 6A?  What does it

 9  show in relation to that Plaintiff's Exhibit 6?

10     A    Exhibit 6A shows the outside wall of, of this

11  picture.

12     Q    Would it be the outside wall of the batch

13  plant?

14     A    Yes, outside wall of the batch plant.

15     Q    Does it show the door that one would enter to

16  go into the batch plant on the east wall?

17     A    Yes, it does.

18     Q    Will you take a look at photo exhibit -- or

19  Defendant's Exhibit 6B, please.

20     A    Okay.

21     Q    Do you recognize the area shown in that photo?

22     A    Yes.  It's the west side of the old batch

23  plant, and it also shows the new batch plant on, and new

24  batch house on the, the west side of the building.

25     Q    Okay.  Is that where drivers would have backed
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    in in October or, I guess, in the latter half of 2007?

2        A    The larger booster trucks would have backed in

3    here from the west side.  The smaller seven-yard trucks

4    would have backed in from the east side.  They would have

5    been on -- they would have backed in on Exhibit 6A.

6        Q    And back when the, the old batch office was

7    still in use, is that where the trucks would have backed

8    in?

9        A    Yes.

10       Q    And from that location where they'd back in,

11   would the drivers have been able to see into the batch

12   office?

13       A    From the photo on 6A where they back in from

14   the east side, they could look over the left shoulder and

15   see into the batch office.

16            From where they back in from the west end, they

17   would not be able to.

18       Q    Could you take a look at photo Exhibit 6C?

19       A    Okay.

20       Q    What does that photo show?

21       A    It shows the west side of the batch plant with

22   a truck backing in from the west side.

23       Q    Does that give a better view of the, I guess,

24   the entirety of the batch plant as it appeared in, in

25   late 2007?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A     It does.  And, also, in this picture is the new

2  batch plant, which wasn't there in 2007.

3      Q     Please refer to Photo Exhibit 6D.  What does

4  that show?

5      A     This is on the east side of the batch plant

6  looking, looking to the west towards the batch plant; and

7  it shows the batch plant, the old batch plant building

8  with conveyors going up to it, and the sand pile that we

9  use to feed the conveyor.

10     Q     You heard Scott Spitzer talk about doing

11  maintenance at the, at the plant?

12     A     Yes.

13     Q     Do any of these photos show areas that he would

14  have been required to do maintenance where he may have

15  been hoisting things up to a higher point?

16     A     Yeah.  The, the whole batch plant facility

17  would be his area of maintaining.  So from the conveyors

18  to the batch plant building, everything inside of the

19  batch plant building, the top of the batch plant

20  building, the top of the silo -- all these areas he would

21  have performed maintenance on.

22     Q     Please refer to Photo Exhibit 6E.

23     A     These are stockpiles looking to the east of the

24  old batch plant.

25     Q     And if Mr. Barbee is a material hauler, is that

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1   where he would haul to?

2      A    Yes, it is.  And it's approximately -- the sand

3   stockpile is probably 50 yards away from the batch plant.

4   The rock stockpiles are 100 yards away from the batch

5   plant.

6      Q    Would you take a look at Photo Exhibit 6F?

7      A    This is a similar picture to Exhibit,

8   Plaintiff's Exhibit 6A, showing the inside of the east

9   wall, showing the steps going into the old batch plant,

10  along with the wall that, showing our cables and lifting

11  devices.

12     Q    Does that photo indicate or show the area one

13  would walk through to get from the east door where you

14  would enter into the batch plant and then the walkway up

15  to the, to the batch office?

16     A    Yes, it does.  It shows when you walk into the

17  batch plant building.  You would be turning away from

18  these cables to go up into the batch plant office.

19     Q    Is that -- Exhibit 6F, is that the way it would

20  have appeared, as an accurate description of the way it

21  would have appeared in late 2007, including October

22  of 2007?

23     A    Yes.

24     Q    Would you take a look at Exhibit 6-O please,

25  Defendant's Exhibit 6-O?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    It's a break room area that we have in the main

 2   part of the, of the office building where my office is.

 3   It's a room kind of behind my office; and it has a couple

 4   tables and benches, a desk.  It's not shown in the

 5   picture, but there's a refrigerator and a microwave in

 6   this room.

 7        Q    Does Photo Exhibit 6-O show a bulletin board?

 8        A    Yes, it does.

 9        Q    And is that the bulletin board that employees

10   have testified where, where notices are posted?

11        A    Yes.  Yes, it is.

12        Q    Is that bulletin board where the Joint

13   Exhibit 7, the antiharassment policy, was posted?

14        A    Yes.

15        Q    And is Photo Exhibit 6-O an accurate

16   description of the way the break room appeared in October

17   of 2007?

18        A    Yes.

19        Q    And how about August of 2007?

20        A    Yes.

21             MR. POSTLEWAIT:  Approach the witness, Your

22   Honor?

23             THE COURT:  Yes.

24   BY MR. POSTLEWAIT:

25        Q    Mr. Grigg, I've handed you what's been marked
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    as Defendant's Exhibit 19, 20, and 21.  Do you recognize

2    Exhibit 19?

3        A    Yes.

4        Q    And what is it?

5        A    It's basically a ledger that I made out when I

6    personally loaned Lawrence Barbee $500 in cash, and it's

7    giving the payment schedule where he's going to pay me

8    back, which he signed; and it gives the, gives the

9    payment amounts and the dates when he repaid the loan.

10       Q    Can you turn to Exhibit 20.  Can you identify

11   that document?

12       A    This looks like a, when Christy-Foltz loaned

13   Lawrence Barbee $700 and an employee record of when that

14   was taken out of his check, when it was repaid; and it

15   looks like it was $100 a week.

16       Q    Will you turn to Exhibit 21.  Can you identify

17   that document?

18       A    This is August 21st of '06, and it's a

19   statement that I'm sure I typed out and had Lawrence sign

20   that says, "I, Lawrence Barbee, agree to have

21   Christy-Foltz to withhold $100 per week until the amount

22   of $500 have been satisfied.

23           "In addition, I allow any other purchases I

24   make from the company to be deducted from my wages in a

25   timely manner until my account is paid in full."

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1        Q     And does that document relate to another loan

2   to Mr. Barbee?

3        A     Yes, it does.

4              MR. POSTLEWAIT:  Approach the witness, Your

5   Honor?

6              THE COURT:  Yes.

7   BY MR. POSTLEWAIT:

8        Q     I've just handed you what's been marked as

9   Defendant's Exhibit, Group Exhibit 22, Group Exhibit 23,

10  Group Exhibit 24, and Group Exhibit 25.

11             Referring to Group Exhibit 22, will you take a

12  look at that set of documents?

13       A     Okay.  It looks like it's a payroll record for

14  Lawrence Barbee.

15       Q     All right.  And does that -- the first page,

16  what dates does that cover?

17       A     3/19/04.  To be more specific, on the type of

18  report, it's a Teamster vacation time report, which I

19  think is, calculates the time that a driver would have

20  that would -- he has to have so many hours to qualify for

21  vacation pay.  So this report is probably for that.

22       Q     Okay.  And the first two pages of that pertain

23  to the, when he first worked for Christy-Foltz in 2004?

24       A     Yes.  It goes from 3/19/04 through 3/29/05.

25       Q     And then the third page references check

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  activity?

2       A    Yes.

3       Q    What does that document show?

4       A    It looks like from the time from 3/23/04

5  through 12/14/04, he made $4718.40.

6       Q    If you go, then, to page 6 where the vacation

7  time report picks up again?

8       A    Okay.  It's, starts at 10/3/05.  It looks like

9  it's going up to the present day.

10      Q    Would the last day on the document, in terms of

11 the printout, be September 30th of 2010?

12      A    Yes.

13      Q    And then there are further check activity

14 reports following that.  Do you see that?

15      A    Yes, I do.

16      Q    And if you look at the first check activity

17 report referencing the 2005 dates?

18      A    Yes, from 10 -- October of '05 to December

19 of '05, his net pay was 2934.12.

20      Q    And what was his gross pay?

21      A    3735.41.

22      Q    If you move further to the right to include any

23 overtime?

24      A    Gross pay, 4236.66.

25      Q    The next page, referencing check activity

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    during the year 2006, what does that show in terms of his

2    gross and net pay in 2006?

3         A    Gross pay was, in 2006, 20,787.09; net pay,

4    15,094.83.

5         Q    Then if you continue through the group exhibit

6    and look at the year 2007?

7         A    2007, his gross pay was 21,489.26; net pay,

8    13,948.67.  There were a lot of deductions there, though.

9         Q    What are the nature of the deductions, if you

10   know?

11        A    Part of it's union dues, taxes.

12             MR. QUIVEY:  I'm going to object to the

13   relevance of any deductions of gross pay.

14             THE COURT:  Sustained.

15   BY MR. POSTLEWAIT:

16        Q    Let's just speak in terms of the gross pay, Mr.

17   Grigg.

18             If you go to the next page of 2008?

19        A    2008 gross pay, 22,973.84.

20        Q    And then how about in 2009, if you continue

21   through the document?

22        A    2009, 18,517.35.

23        Q    And 2010?

24        A    2010, 15,731.38.

25        Q    Now, will you take a look at Group Exhibit 23?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      A    Okay.  This has Jason Cecil's name on it.

 2      Q    What period of time does it cover?

 3      A    This is 11/05/07 through 9/16/08.

 4      Q    And what is the nature of that document?

 5      A    It's a vacation time report, just, just the

 6  number of hours that he had.

 7      Q    Is that the same type of report that we just

 8  looked at with reference to Mr. Barbee?

 9      A    Yes.

10      Q    Okay.  And on the last page of that exhibit,

11  does it show the wages -- or the check activity?

12      A    Gross pay, 13,380.24.

13      Q    And for what year was that?

14      A    That was from 11/07 through 9 of '08.

15      Q    Could you take a look at Group Exhibit 24?

16      A    This is Tommy Sheets.  It goes from 6/2 of '08

17  through 11/25/09.

18      Q    In looking at the first page -- I think you may

19  have missed it -- it says "5/30/08."  Do you see that?

20  Just so we don't misstate.

21      A    Yes.  Yeah.

22      Q    All right.

23      A    It does start on 5/30/08.

24      Q    And then at the end of that exhibit, if you

25  look at the first page reflecting check activity, what
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1    does it show for gross pay?

 2         A    18,527.79.

 3         Q    And for what year?

 4         A    That's from 6 of '08 through 12 of '08.

 5         Q    And how about Mr. Sheets in 2009?

 6         A    2009, 11,657.78.

 7         Q    Would you then turn to Defendant Group

 8    Exhibit 25?

 9         A    This is Justin Beaman.

10         Q    What's the nature of that report?

11         A    It's a vacation time report.

12         Q    Same type of report that we've looked at for

13    Mr. Barbee and Mr. Sheets and --

14         A    Yes, it is.

15         Q    -- the other employee we mentioned?

16         A    Starts on 5/7 of '09 and goes through 9/30 of

17    2010.

18         Q    And at the end of that exhibit, referring to

19    the first page regarding check activity, what year does

20    that pertain to?

21         A    From 9/08 to 12/08, he made $5,353.11.

22         Q    And how about the next page involving 2009 pay

23    for Mr. Beaman?

24         A    2009, he made $1,790.53.

25         Q    And how about 2010 for Mr. Beaman?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        A    2010, he's made $14,173.20.

2        Q    Is Mr. Beaman the lowest seniority employee in

3   2010?

4        A    Yes.

5        Q    And is Mr. Sheets employed anymore?

6        A    No, he's not.

7        Q    And did he leave voluntarily?

8        A    He left voluntarily.  Yes.

9        Q    And how about Jason Cecil?  Is he still

10  employed?

11       A    He is not.

12       Q    And did he -- how did he --

13       A    He left voluntarily.

14       Q    -- separate himself?

15            I'm sorry?

16       A    He left voluntarily.

17            MR. POSTLEWAIT:  Okay.  I think that's all I

18  have.  Thank you.

19            THE COURT:  Thank you.

20              CROSS-EXAMINATION BY MR. QUIVEY:

21       Q    Sir, in regard to Mr. Barbee requesting a

22  transfer to the ready mix position, you have also thought

23  his request was a ploy related to his discrimination

24  claims, right?

25       A    That was my opinion later down the road.  Yes.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     Did either Mr. Cecil or Mr. Sheets lose their

2   CDL license?

3      A     I believe Mr. Sheets did.

4      Q     And that's why he stopped being a ready mix

5   driver, right?

6      A     That's a pretty good reason.

7      Q     So it wasn't exactly voluntarily, right?

8      A     Well, yeah.  I didn't have anything to do with

9   him losing his job.

10     Q     So, in other words, two out of the three white

11  ready mix drivers that were hired after Mr. Barbee made

12  the request no longer work there, correct?

13     A     Correct.

14     Q     And as a result of that, Mr. Beaman's hours

15  have increased, correct?

16     A     Correct.

17     Q     And as a ready mix driver's hours increase,

18  they make more money, correct?

19     A     Correct.

20     Q     That's why Scott Spitzer transferred from being

21  a hauler to a ready mix driver, right?

22     A     It was good timing.  I mean, it was all in the

23  timing; but, yes.

24     Q     Part of that timing relates to when you think

25  people higher on the list may retire, correct?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A      That would have something to do with it.

2      Q      Mr. Fowler also wanted to transfer from being a

3  hauler to a ready mix driver, right?

4      A      Yes.

5      Q      And he also would be in an exact -- the exact

6  same situation as Mr. Barbee as it relates to more hours

7  as a hauler, correct?

8      A      More hours as a hauler?

9      Q      Well, he would initially be driving more hours

10  as a hauler than he would be being junior on the

11  seniority list as the ready mix, right?

12      A      Yes.

13      Q      So there's no difference between the two as it

14  relates to that, correct?

15      A      Correct.

16      Q      Sir, in regards to loans to Mr. Barbee,

17  yesterday I showed you a document that showed a loan to

18  Mr. Roberts, correct?

19      A      That was not a loan.  That was payment of a

20  debt that he owed.  There's a difference in getting money

21  from, for a product that you've sold than handing out

22  cash to a person.

23      Q      So you think he sold that concrete and then was

24  being repaid for it?

25      A      No.  No.  I didn't say that.  I'm just saying

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    that there's a difference in collecting a debt --

2    collecting a bill and taking money out of your pocket to

3    give somebody.

4        Q    Regardless, he owed the money, and he repaid it

5    in installments, correct?

6        A    True.

7        Q    With regard to, to the pictures you were just

8    shown, a lot of those pictures showed the batch plant,

9    not as it was in 2007, but as it is after the new batch

10   plant was constructed, correct?

11       A    That's true, but it still shows the old batch

12   plant the way that it was.

13       Q    When were those pictures taken?

14       A    I believe December of '08.

15       Q    Who took them?

16       A    I did.

17       Q    So all of them were taken in December of '08?

18       A    Yes.

19       Q    If it was taken in December of '08, how do you

20   know the picture that shows the bulletin board was the

21   same as it was in August and October?

22       A    Well, I was -- I been there the whole time, and

23   it hasn't changed.

24       Q    So it's your testimony that absolutely nothing

25   changed as to the bulletin board as far as being put on

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    or taken off from August 1st of 2008 to whenever in

2    December of '08 you took those pictures?

3         A    No.  I'm not saying what's on, what's actually

4    on the bulletin board is the same.  I'm just saying

5    the -- I just took the picture to give the layout of the

6    room.

7         Q    All right.  So --

8         A    I'm not saying that what was on the bulletin

9    board when I took the picture is the same thing that was

10   on it in '07.

11        Q    Right.  Well, you said -- I said '08.  It's

12   definitely not the same as it was in '07, correct?

13        A    Correct.

14        Q    But the bulletin board was still there?

15        A    Exactly.

16        Q    Sir, all of Mr. Barbee's loans or debts,

17   whatever you want to call them, they were repaid in full,

18   correct?

19        A    They were.

20             MR. QUIVEY:  No more questions.

21             THE COURT:  Thank you.

22             Any redirect?

23             MR. POSTLEWAIT:  Nothing further, Your Honor.

24             THE COURT:  Very well.

25             Thank you, sir.  You may step down.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1              (Witness Grigg excused, 2:11 p.m.)

 2                  * * * * * * * * * * *

 3              (In open court; jury present.)

 4              THE COURT:  You may please be seated.  We are

 5    again in session.

 6              Mr. Postlewait, I understand you have

 7    additional questions for Mr. Grigg.

 8              So Mr. Grigg, if you'll return to the stand,

 9    you're still under oath.  We don't have to have you

10    resworn.

11     RONALD L. GRIGG, previously sworn and remaining under

12         oath, resumed the witness stand, 2:45 p.m.,

13             DIRECT EXAMINATION BY MR. POSTLEWAIT:

14       Q    State your name for the record.

15       A    Ronald L. Grigg.

16             MR. POSTLEWAIT:  May I approach the witness,

17    Your Honor?

18             THE COURT:  Yes.

19    BY MR. POSTLEWAIT:

20       Q    Mr. Grigg, I've handed you what's been marked

21    as Defendant's Exhibit 10.  Can you identify that

22    document?

23       A    It's a letter I received.  It was dated on --

24    it was written on August 15, 2007.  It was to myself and

25    Christy-Foltz, Incorporated, from Lawrence Barbee.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1      Q    And is that the letter that Mr. Barbee sent to
 2  you that then prompted the August 20 meeting?
 3      A    Yes, it is.
 4           MR. POSTLEWAIT:  No further questions.
 5           THE COURT:  Any further questions?
 6           MR. QUIVEY:  No, sir.
 7           THE COURT:  Thank you.
 8           Thank you.  You may step down.
 9               (Witness Grigg excused, 2:46 p.m.)
10               * * * * * * * * * * * *
11               (In open court; jury present.)
12           MICHAEL SPITZER, sworn, 2:47 p.m.,
13             DIRECT EXAMINATION BY MS. LEAHY:
14      Q    State your name, please.
15      A    Michael Spitzer.
16      Q    And your address, Mr. Spitzer?
17      A    1700 Noble Drive, Mt. Zion, Illinois.
18      Q    Mr. Spitzer, are you currently employed?
19      A    Yes.
20      Q    Where do you work?
21      A    Grohne Concrete.
22      Q    And is that owned by Christy-Foltz?
23      A    Yes, ma'am.
24      Q    When did you begin to work -- let me back up.
25           Did you work for Grohne Concrete before
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Christy-Foltz acquired it?

2        A    No.

3        Q    When did you start to work for Christy-Foltz?

4        A    I drove a sand truck for two years, and I

5    believe it was '99; and then I started in the mixer truck

6    for Grohne at, in '01.

7        Q    And how -- you began to drive the truck in

8    199--

9        A    I drove a dump truck for Christy-Foltz in --

10   two years before I started at the, Grohne, so --

11       Q    And then you went to be a ready mix truck

12   driver?

13       A    Right.

14       Q    And how did you come to be a ready mix truck

15   driver?

16       A    I asked Ron if I could go to the ready mix.

17       Q    And did you understand, then, that you would be

18   at the bottom of seniority if you went there?

19       A    Yes, ma'am.

20       Q    And did Mr. Grigg grant your request?

21       A    Yeah.

22       Q    Have you held any other positions other than --

23   and I think your first position was technically a

24   material hauler, right?

25       A    Right, yeah.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
1        Q    And then you went to be a ready mix truck

2   driver?

3        A    Uh-huh.

4        Q    Anything else?

5        A    I'm a mechanic now.

6        Q    And when did you become a mechanic?

7        A    I don't know, probably '03, somewhere around

8   there, '04.  I'm not sure.

9        Q    And what do you do as a mechanic?

10        A    Work on the trucks for Christy-Foltz and

11   Grohne.

12             MS. LEAHY:  May I approach, Your Honor?

13             THE COURT:  Yes.

14   BY MS. LEAHY:

15        Q    Mr. Spitzer, have you ever tied a rope at

16   Christy-Foltz?

17        A    Yeah.

18        Q    What was the occasion of doing that?

19        A    Scott was working up on top of the old batch

20   plant, and he'd asked me to -- he'd left a tool or

21   something; and he asked me to tie it onto the rope and,

22   so he could pull it up.

23        Q    And you're talking about Scott Spitzer?

24        A    Right.

25        Q    That's your brother, right?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A      Right, yeah.

2      Q      Okay.  Do you remember when it was that you

3  tied this rope --

4      A      Probably in '01.  It was the first year I

5  started.  I was pretty new in the mixer area.

6      Q      Mr. Spitzer, I'm showing you what was marked as

7  Plaintiff's Exhibit 4.

8      A      Uh-huh.

9      Q      Is that the rope you tied?

10     A      I believe it is.

11     Q      Mr. Spitzer, you remember my taking your

12  deposition?

13     A      Yes, I do, ma'am.

14     Q      And do you remember telling me in your

15  deposition that that wasn't the rope you tied?

16     A      Right.  I -- after I looked at the deposition,

17  I went and looked at the rope that he'd used; and it had

18  been seven or eight -- six or seven years since I tied

19  it, and I didn't recognize that as being the same rope;

20  but when I checked it, it is.

21     Q      What's the same rope?

22     A      The same rope that he uses to pull stuff up on

23  the batch plant.

24     Q      Well, now I'm confused.  You gave your

25  deposition --

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

 1          MS. LEAHY:  Your Honor, if I may address Mr.

 2   Spitzer as an adverse witness?

 3          MR. POSTLEWAIT:  No objection.

 4          THE COURT:  Very well.  You may.

 5   BY MS. LEAHY:

 6      Q    Mr. Spitzer, you gave two depositions in this

 7   matter, correct?

 8      A    Yes, ma'am.

 9      Q    And the first was on February 24, 2010, and the

10   second was on March 19, 2010?

11      A    I'll have to take your word for that.

12      Q    And during that second deposition, you were

13   shown Plaintiff's Exhibit 4, right?

14      A    Yes, I was, ma'am.

15      Q    And you were pretty adamant that that wasn't

16   the rope you tied, right?

17      A    Yes, I was.  I really didn't think it was.

18      Q    All right.  Now, you said after the deposition

19   you went and looked at a rope?

20      A    Yeah.  There's -- yeah, the one that he used,

21   that used to be on the batch plant.

22      Q    Where was this rope that you went to look at

23   after --

24      A    There's a piece of it tied on the batch, still

25   up on the railing of the plant.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     What day did you go and look at this rope?

2      A     Right after -- the next day after the

3  deposition.

4      Q     Why?

5      A     Because I was confused about why, what the, why

6  it wasn't -- you know, I didn't think that was the rope.

7  I wanted to find out for myself what, what was going on.

8      Q     Were you confused at the end of the deposition?

9      A     I -- yes, I was, because I --

10     Q     Why didn't you tell me you were confused?

11     A     I really honestly didn't think that was the

12  same type of rope that I tied.  But like I say, when I

13  went and checked, it was.  I made a mistake, and I think

14  I went and told Ron I'd made a mistake.

15     Q     Oh, you went and told Mr. Grigg you made a

16  mistake?

17     A     I told Ron; I said, "I think I made a mistake

18  because I told them that wasn't the same rope, and it

19  is."

20     Q     Did you contact me --

21     A     No.

22     Q     -- to tell me you made a mistake?

23     A     No.  He told me not to worry about it.

24     Q     Who told you not to worry about it?

25     A     Ron said, "Don't worry about it."

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q     That's Mr. Grigg?

2      A     Yes.

3      Q     I'm showing you Plaintiff's Exhibit Number 6,

4   and there's the original version and then a blown-up

5   version.

6      A     Uh-huh.

7      Q     You were shown this photograph during your

8   deposition, weren't you?

9      A     Yes, I was.

10      Q     And didn't you tell me in your deposition that

11   the rope you tied was to the left?

12      A     Yes.  This would be the rope I tied it on, and

13   I told you I don't know why this is -- this is off to the

14   right.  But, but it is the same rope.  It's the same type

15   of rope.

16      Q     Let me see if I understand this correctly.  If

17   you look at Plaintiff's Exhibit Number 6 --

18      A     This is the picture I'm holding, right?

19      Q     Yes.

20      A     Uh-huh.

21      Q     There's two hooks with things hanging on it,

22   right?

23      A     Uh-huh.

24      Q     Yes?

25      A     Yes, ma'am.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        Q    And you told me that the rope you tied to help

 2   your brother haul things up on the roof was on the left?

 3        A    Yes, ma'am.

 4        Q    And the one on the right, you had never tied

 5   that rope?

 6        A    Well, like I said, I didn't think this was the

 7   same, same rope.  This was a smaller picture at the

 8   deposition.

 9        Q    You were shown that, that rope itself at the

10   deposition, weren't you?

11        A    This here?  Yes.

12        Q    Oh, okay.  And you told me you never tied that

13   rope?

14        A    I told you that that wasn't the same type of

15   rope, and I was wrong.  Like I said, I went and checked

16   on it myself after the deposition because I was upset

17   about, you know, being misled or whatever.  I really

18   thought that was a different rope at the deposition; but

19   when I went and checked, it is the same type of rope,

20   exactly the same.

21        Q    Well, --

22        A    You got to remember:  It had been six years

23   since I done this.  I didn't remember the details, you

24   know.  It looked a whole lot different when I tied it; it

25   was a lot newer.
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      Q      Did you tell me at your deposition you were

2   familiar with that type of rope?

3             I'm now talking about --

4      A      Yeah.  The nylon, nylon rope deteriorates.

5   Yeah.

6      Q      And didn't you tell me that you'd used that

7   type of rope on your boat?

8      A      Yes, I do.

9      Q      And didn't you tell me that it deteriorated and

10  became dust-like, grain-like within a year?

11     A      Yes, it does.

12     Q      And didn't you say when you were shown and you

13  held Plaintiff's Exhibit 4, that rope itself -- didn't

14  you say that it was the fiber disintegrating and not

15  cement dust?

16     A      Yeah.  There was a lot of fiber on the table

17  from it.  Yeah.

18     Q      Now, let me see if I understand this correctly.

19  You finished your deposition?

20     A      Uh-huh.

21     Q      When you left the room, were you confused?

22     A      I was wondering why -- I thought that was a

23  different rope, you know.

24     Q      You thought what was a different rope?

25     A      This here was.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    Q    Was different from?

2    A    Right, from what I tied it on.  So I went, and

3  I checked the next day.

4    Q    Okay.  So when you --

5    A    I also, I also went and checked in my shop and

6  seen if the rope that I took off my boat was still there;

7  and it was.

8    Q    In fact, you'd worked on your boat --

9    A    Yeah.  I'd worked on my boat in there.

10    Q    -- at the Christy-Foltz premises?

11    A    Right, right.  Yeah.

12    Q    At the batch plant?

13    A    Not at the batch plant; up in the shop, yeah.

14    Q    Okay.  And when you worked on your boat

15  there, you thought you might have discarded that type of

16  rope, --

17    A    Yes.

18    Q    -- that nylon rope?

19    A    There is that -- some up there, but it was

20  still there.

21    Q    Okay.

22    A    And I did this for my own peace of mind, you

23  know; I didn't -- I didn't understand, you know, where

24  the confusion was in this, in this knot.  But like I

25  said, when I went and checked, that is the same type of

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  rope that he uses to pull stuff up on the batch plant.

2  So I'm pretty sure that's the same rope I tied when I,

3  when he had me pull it up six years before.

4       Q    Let me go back.  When you left the

5  deposition, --

6       A    Uh-huh.

7       Q    -- were you confused?

8       A    Yeah.

9       Q    Why didn't you tell me you were confused?

10      A    You didn't ask.  By then, I was ready to go.

11      Q    You sure were, weren't you?

12      A    Yes, I was.

13      Q    The next day -- it was the next day you went

14  and checked?

15      A    Uh-huh.

16      Q    What did you check?

17      A    I went in my shop to see if the rope off my

18  boat was still there, and it was; and I went and checked

19  to see if this was the same rope that he uses to pull

20  stuff up on the batch plant.

21      Q    You went to see if Exhibit Number 4 was the

22  same rope that was used to pull things up?

23      A    Right.  It's the same type of rope.  It looks

24  just the same.

25      Q    Did you see the rope you had tied to pull

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  things up to the roof of the batch plant?

2      A    There's a part of it still up on the batch,

3  still tied up on the rail of the batch plant where it had

4  been cut off or broke or whatever.  That's where it was

5  tied when I did this six years before.

6      Q    So the rope that you tied was still in the

7  batch plant?

8      A    No.  There's a piece of it up in the air tied

9  to the railing.  Evidently, when he took it down, he just

10  cut it off.  I don't know.

11      Q    When who took it down?

12      A    Whoever took it down, which Scott is the one

13  that works on it.  I would assume it would be him.

14      Q    You talked with your, Scott about your

15  deposition and what you told me during your deposition?

16      A    I had asked him, you know, why this -- I'd

17  asked him why this rope was not still -- or why this knot

18  was still not attached to that rope, why it was hanging

19  separate, because that's what confused me to begin with,

20  because it was hanging separate.  And that's really about

21  the only thing I asked him.

22      Q    So you're telling me today that you tied the

23  knot in Plaintiff's Exhibit 4?

24      A    I'm pretty sure.  Yeah.

25      Q    But you told me at your deposition you had not

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  tied the --

2      A    No.  I did not -- at the deposition, I did not

3  think that was the same type of rope that I tied it on.

4  I was wrong.  I apologize for that.

5      Q    Did you talk to Mr. -- you said you talked to

6  Mr. Grigg about it?

7      A    I told Ron there the next day or so; I said,

8  "Ron, I" -- after I'd checked it and seen that I'd made a

9  mistake, I told Ron that, "Ron, I -- I made a mistake.  I

10  told them I didn't think that was the same rope I tied it

11  on."

12          And he said, "Don't worry about it."

13      Q    Did you tell him the mistake was made during

14  your deposition?

15      A    Yeah.  Yeah.

16      Q    If you look at Plaintiff's Exhibit 6, can you,

17  can you tell me what Plaintiff's Exhibit 4 was attached

18  to?

19      A    It's the right hook, underneath the chain --

20  the cable come-alongs.  You can see it there.  It's not,

21  no longer attached to that rope.

22      Q    Did you take what was attached to the rope

23  down?

24      A    I don't understand.

25      Q    All right.  Did you -- when you talked to Mr.

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  Grigg, did you tell him --

2      A    I -- no.  That was the extent of the

3  conversation.  I told him I'd made a mistake, that it was

4  the same rope; and he said, "Don't worry about it."  And

5  I didn't worry about it after that.

6      Q    Did you tell him that Plaintiff's Exhibit 4 had

7  been attached to more rope that was still hanging there?

8      A    I, I still don't understand your question.

9  This rope is no longer there.  What's still hanging there

10 is a piece, oh, about this long that's still tied to the

11 rail up on top of the old batch plant.

12     Q    So this was attached to something else?

13     A    Yeah.  It was attached to this rope on the

14 left.

15     Q    All right.  Did you tell Mr. Grigg that what

16 Exhibit 4 was --

17     A    No.

18     Q    -- attached to --

19     A    All I told Ron, or Mr. Grigg, was I had made a

20 mistake; that I didn't think this was the same type of

21 rope that I'd tied the knot in, and it was -- but it was.

22 And he said, "Don't worry about it."  And I didn't worry

23 about it after that.

24     Q    Did you talk to Mr. Postlewait and tell him

25 you'd made a mistake?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1        A    No.

 2        Q    Did you talk to anybody else and say you'd made

 3    a mistake?

 4        A    Yeah.  I'm sure I told Scott I'd, I'd made a

 5    mistake; and, no, I don't -- I haven't discussed this

 6    with anybody else because -- save you a lot of time

 7    asking me questions.

 8        Q    So, anyway, you and your brother found out your

 9    testimony was inconsistent, right?

10        A    No.  I made a mistake about this type of rope,

11    but I checked this out myself without -- before I even

12    asked Scott about it because I wanted to find out for

13    myself what was going on.

14        Q    And when you found out what was going on, you

15    didn't get --

16        A    I told Scott I'd made a mistake.  I told him I

17    didn't think it was the same type of rope, and it was; it

18    was the same rope.

19        Q    How do you know it was the same rope?

20        A    Same type of rope.  It looks the same.  It's

21    weathered the same.  It's the same type of rope.

22        Q    And when you found out you made that mistake,

23    you didn't contact me in any way to tell me about it?

24        A    I had no reason to contact you, ma'am.

25        Q    You had no reason to contact me?
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

```
 1              You were under oath when you gave your
 2     deposition.
 3          A    And I'm sorry about that.  I made a mistake.
 4          Q    But you didn't think you had any obligation --
 5          A    I had no idea how to get ahold of you.
 6          Q    Did you ask Mr. Grigg how to get --
 7          A    It just -- I'm sorry.
 8          Q    Did you ask Mr. Grigg how to get ahold of me?
 9          A    No.  I did not.  You didn't say anything at the
10     deposition, if you remember anything to call you up, and
11     so I didn't.
12          Q    You ever had any training on discrimination?
13          A    Yeah, at my previous job.
14          Q    You did?  When?
15          A    To some extent, yeah.  I had training on
16     interviewing new employees, and that was included.
17          Q    Training on interviewing new employees.
18               Did you have any training on racial harassment?
19          A    No.
20          Q    Any training on any type of harassment?
21          A    No.
22          Q    Any training on how to do an investigation?
23          A    No.
24          Q    Why did you go to Ron Grigg when you found out
25     you'd made a mistake about the rope and that you'd
```

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  testified under oath --

2       A    He's my supervisor.

3       Q    Why did you --

4       A    And I, I wasn't lying.  I honestly did think it

5  was a different rope.

6       Q    You were pretty adamant about that, weren't

7  you?

8       A    Yes, I was.  I just did not think that was a

9  nylon rope that I'd tied that on, but the rope he used

10 and the rope that's still up there is a nylon rope, so --

11      Q    When did you tie that?

12      A    I'm real sure it's the summer of '01 because I

13 checked to make sure that was my start date, and I knew I

14 did it the first year I worked there.

15      Q    What did you check?

16      A    Huh?

17      Q    What -- you said you checked.  What did you

18 check?

19      A    I just checked, I just checked my start, the

20 year I started, to make sure I was -- because I knew it

21 would come up, what year it was; and I knew I did this

22 the first year I started.

23      Q    Did you see it continually then?

24      A    No.  No, I didn't.

25      Q    When -- did you ever see it as it is now

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    hanging in the batch plant?

2        A    As it is in this picture?

3        Q    Yes.

4        A    At the deposition.

5        Q    So the first time you saw this --

6        A    Separate like that, yeah.

7        Q    Okay.  Let me, let me phrase it.  Okay?  Wait

8    till I finish my question.

9            The first time that you saw Plaintiff's Exhibit

10   Number 4 disconnected from the rest of the rope was at

11   the deposition?

12       A    Right.

13       Q    You had never seen it before hanging in the

14   batch plant as you see it now?

15       A    Like this?  No.  I'd never noticed it.  I, I'm

16   not down there that much.

17       Q    My question was:  You'd never seen it before,

18   right?

19       A    Right.

20       Q    Separated like that.

21       A    Right, right, right.  I'd never seen it like

22   that before.

23           MS. LEAHY:  Nothing further.

24           THE COURT:  Thank you.

25           Sir, just a minute.  We'll let -- Mr.

1    Postlewait may have a question.

2            THE WITNESS:  Okay.

3             CROSS-EXAMINATION BY MR. POSTLEWAIT:

4        Q    Mr. Spitzer, how frequently would you get down

5    to the batch plant?

6        A    Well, at the old plant, in the summertime I'd

7    go down there and run the loader quite a bit.

8        Q    All right.  But your job is mechanic?

9        A    Right now, yeah.

10       Q    And you work in a different area than the batch

11   plant?

12       A    Yes.

13       Q    What -- describe how, how -- what's the

14   different area that you work at compared to where the

15   batch plant is?

16       A    It's a different building, and it's -- I don't

17   know -- half a block away or -- the batch plant runs

18   between -- well, it's probably farther than that.  It's

19   quite a ways.  It's the other end of the, other end of

20   the property.

21       Q    And with respect to Plaintiff's Exhibit 6, that

22   photograph, what are the items that are on the wall, the

23   east wall of the batch plant?

24       A    There's two cable come-alongs, and it looks

25   like a choker behind that, and the rope, and I'm not

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1  sure -- looks like a piece of hose hanging behind the

2  rope.  I can't tell for sure what that is.

3      Q    And are those tools that are used down at the

4  batch plant?

5      A    Yes.

6      Q    Those are not tools that you would use as a

7  mechanic up at the mechanic shop?

8      A    Sometimes I borrow his cable chokers.

9      Q    All right.  Does the --

10     A    A lot of times Scott gets them for me, though,

11 so --

12     Q    Does the rope shown in Plaintiff's Exhibit 6

13 appear to be consistent with the types of, of other tools

14 that are shown there on the wall?

15     A    I'm not sure I understand.  Yeah.  It's a rope

16 and the other cable come-- he uses these, the cable

17 come-alongs for when they test the scales; and the rope

18 is right there when he needs it for whatever.  He uses it

19 for several things.

20     Q    All right.  I'm talking about the, the rope

21 that's shown in the photo --

22     A    Right.

23     Q    -- that appears to be like the, the --

24     A    Right.  That's, that's the rope he used to use

25 to pull stuff up on top of the batch plant.  I think he

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1    also uses it when they, when he has to pull the pipe out

2    of the well.

3         Q    But it's consistent --

4         A    Right, right, --

5         Q    -- with the other things on the wall?

6         A    -- right, stuff you use down there.

7              MR. POSTLEWAIT:  Nothing further.  Thank you.

8              THE WITNESS:  Okay.

9              THE COURT:  Any follow-ups?

10             MS. LEAHY:  No, Your Honor.

11             THE COURT:  Thank you.  You may step down.

12                  (Witness Michael Spitzer excused, 3:09 p.m.)

13                     * * * * * * * * * * *

14                  (In open court; jury present.)

15             LAWRENCE C. BARBEE, sworn, 3:09 p.m.,

16                  DIRECT EXAMINATION BY MS. LEAHY:

17        Q    State your name, please.

18        A    My name is Lawrence C. Barbee.

19        Q    And you're the plaintiff in the case, right?

20        A    Yes, ma'am.

21        Q    And you've been present throughout the trial?

22        A    Yes, ma'am.

23        Q    Mr. Barbee, at any time, did Mr. Grigg tell you

24   that there was a ready mix customer that did not want you

25   to deliver?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1      A    No, ma'am.

2      Q    Did anyone at Christy-Foltz ever tell you that

3  there was a customer of ready mix that did not want you

4  to deliver to it?

5      A    No, ma'am.

6      Q    Did you ever have a meeting with Mr. Grigg and

7  Mr. Pinkston to talk about any problems that either one

8  of them thought you were having regarding delivery of

9  ready mix?

10     A    No, ma'am.

11     Q    Mr. Barbee, after August 9, 2010 [sic], did the

12  attitude of the workers toward you change?

13     A    Yes.

14     Q    And it was that they stopped talking to you?

15     A    Yes, ma'am.

16     Q    Did you ever call anyone "nigger"?

17     A    No, ma'am.

18     Q    Did you ever call anyone "honky"?

19     A    No, ma'am.

20     Q    Did you ever call anyone "cracker"?

21     A    No, ma'am.

22     Q    Did you ever call anyone "coon"?

23     A    No, ma'am.

24          MS. LEAHY:  I have nothing further, Your Honor.

25          THE COURT:  Cross-examination on this?

BARBEE v. CHRISTY-FOLTZ, INC., Case No. 09-2056

1          MR. POSTLEWAIT:  No questions.

2          THE COURT:  You may step down.  Thank you.

3             (Witness Barbee excused, 3:11 p.m.)

4

5                  * * * * * * * * * *

6

7                  REPORTER'S CERTIFICATE

8          I, LISA KNIGHT COSIMINI, RMR-CRR, hereby certify

9     that the foregoing is a correct transcript from the

10    record of proceedings in the above-entitled matter.

11          Dated this 9th of November, 2010.

12

13                  s/Lisa Knight Cosimini
                _____
                   Lisa Knight Cosimini, RMR-CRR
14                 Illinois License # 084-002998

15

16

17

18

19

20

21

22

23

24

25